# Exhibit 1



## PLANET DEPOS

### We make it » *happen.*

# Transcript of **RUSSELL ALAN WILLIAMS, M.D.**

### **Date:** February 28, 2014

### **Case:** CLARK v. HOWARD COUNTY GENERAL HOSPITAL, ET AL

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Court Reporting | Videography | Videoconferencing | Interpretation | Transcription

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

1 (Pages 1 to 4)

**Page 1**

1   IN THE UNITED STATES DISTRICT COURT FOR
2          THE DISTRICT OF MARYLAND
3              NORTHERN DIVISION
4
5   MARY CLARK,              )
                             )
6       Plaintiff,           )
                             )
7   vs.              ) No. 1:13-CV-00184 ELH
                             )
8   HOWARD COUNTY GENERAL    )
    HOSPITAL, et al.,        )
9                            )
        Defendants.          )
10  _____)
11
12
13
14
15   DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
16         Friday, February 28, 2014
17           Long Beach, California
18              2:10 p.m.
19
20
21
22
23   Job No.: 53457
24   Pages: 1 - 90
25   REPORTED BY: Joy E. Shure, CSR No. 3659, RPR, CRR, CLR

**Page 2**

1   Deposition of RUSSELL ALAN WILLIAMS, M.D., held at:
2
3
4
5
6
7
8       Kusar Court Reporters & Videoconferencing, Inc.
9          111 West Ocean Boulevard
10            Suite 1200
11         Long Beach, California 90802
12
13
14
15
16
17
18      Pursuant to Notice, before Joy E. Shure, CSR No.
19   3659, RPR, CRR, CLR, in and for the State of
20   California.
21
22
23
24
25

**Page 3**

1   APPEARANCES OF COUNSEL:
2
3   On Behalf of Plaintiff:
4       BERMAN SOBIN GROSS FELDMAN & DARBY, LLP
5       BY: KEVIN M. RINGEL
6          Attorney at Law
7       481 North Frederick Avenue
8       Suite 300
9       Gaithersburg, Maryland 20877
10      (301) 670-7030
11
12
13   On Behalf of Defendants COLUMBIA AESTHETIC PLASTIC
14   SURGERY, LLC, and ERIC CHANG, M.D.:
15      GLEASON FLYNN EMIG & FOGLEMAN, CHARTERED
16      BY: STEVEN A. HAMILTON
17         Attorney at Law
18      11 North Washington Street
19      Suite 400
20      Rockville, Maryland 20850
21      (301) 294-2110
22
23
24
25

**Page 4**

1                I N D E X
2
3   WITNESS          EXAMINATION        PAGE
4   Russell Alan      By Mr. Hamilton      5
5   Williams, M.D.
6
7
8        EXHIBITS FOR IDENTIFICATION
9          (Originals Retained by counsel)
10         (Copies attached to transcript)
11  Defendants' 1   A copy of a Notice of        11
12      Deposition Duces Tecum of
13      Russell A. Williams, M.D.;
14      5 pages
15  Defendants' 2   A copy of Dr. Williams's     28
16      curriculum vitae; 56 pages
17  Defendants' 3   A copy of a document entitled  88
18      "Plaintiff's Rule 26(a)(2)
19      Disclosures"; 5 pages
20  Defendants' 4   A copy of Dr. Williams's     85
21      Certificate of Qualified
22      Expert; 3 pages
23  Defendants' 5   A copy of Dr. Williams's     62
24      amended report dated 1/13/14;
25      4 pages

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

2 (Pages 5 to 8)

---

**5**

1    FRIDAY, FEBRUARY 28, 2014, LONG BEACH, CALIFORNIA
2              2:10 P.M.
3                * * *
4
5        RUSSELL ALAN WILLIAMS, M.D.,
6    the witness herein, having been first duly sworn, was
7    examined and testified as follows:
8
9              EXAMINATION+
10   BY MR. HAMILTON:
11       Q.   Good afternoon, Doctor.  I previously
12   introduced myself upon coming into the conference room,
13   but for the record, I will do so again.
14       My name is Steven Hamilton, and I'm with the
15   law firm of Gleason Flynn Emig & Fogleman, standing in
16   for Mr. McAfee who just had surgery, but doing well.
17       A.   Good afternoon, Mr. Hamilton.
18       Q.   So we're here to take your deposition today
19   because you've been named as an expert in this case, and
20   from the records I reviewed, I understand you've been
21   deposed before, so you pretty much, I assume, are
22   familiar with the ground rules.
23       I'm going to ask you questions.  You give
24   responses.  I'll do my best not to cut you off in terms
25   of your answers, and you don't cut me off.  That happens

---

**6**

1    from time to time, and we'll both do our level best not
2    to talk too fast because we don't want -- is it Joy?
3        THE REPORTER:  Yes.
4    BY MR. HAMILTON:
5        Q.   -- to get mad at us for going too fast.
6        So if there is any question you don't
7    understand, please let me know and I'll make my best
8    efforts to rephrase it.
9        For the record, sir, would you give us your
10   full name and your address?
11       A.   Russell Alan Williams.
12       Q.   And you are a physician; is that correct?
13       A.   Yes.
14       Q.   Okay.  And you have been identified as an
15   expert in this case of Mary Clark versus what was Howard
16   County General Hospital and Dr. Chang?
17       A.   Yes.
18       Q.   Have you ever reviewed any cases for counsel
19   before?
20       A.   Yes.
21       Q.   How many cases?
22       A.   One.
23       Q.   And what case was that?
24       A.   I don't remember the name of the case.  It was
25   many years ago.

---

**7**

1        Q.   And was that in Howard County?
2        A.   I actually don't know which county it was in.
3        Q.   Okay.  Do you recall the type of case?
4        A.   It was a fire in a plastic surgery case.
5            MR. HAMILTON:  A fire in a plastic surgery
6    case.  Counsel, would you care to enlighten me in terms
7    of that?
8            MR. RINGEL:  It's actually included in the
9    report for Dr. Williams.  I have the name here if you
10   need it.
11           MR. HAMILTON:  Okay.  I have the report.
12           MR. RINGEL:  It's the second paragraph.  Oh,
13   actually, but that case wasn't for us.  That was the
14   previous case in the last four years.
15       I don't have the name of the prior case that
16   he's done for my law firm, but I can supplement that.
17           MR. HAMILTON:  Okay.  If you would.
18       Q.   And was your deposition taken in that case,
19   Doctor?
20       A.   I think it was, yes.  I mean, I am guessing,
21   but I presume it was.  I don't know.  I don't remember.
22       Q.   In any event, would it be fair and accurate to
23   say you did not retain a copy?
24       A.   Yes.
25           MR. HAMILTON:  Okay.  Counsel, do you recall

---

**8**

1    who the defendant was in the case?
2            MR. RINGEL:  I do not.  It wasn't me.
3            MR. HAMILTON:  No, I know it wasn't you.
4            MR. RINGEL:  I don't have it with me, but I
5    can --
6            MR. HAMILTON:  If you have a copy of the
7    deposition, I would make a request that you produce a
8    copy of his deposition.
9            MR. RINGEL:  We can supplement that.
10           MR. HAMILTON:  Okay.  And speaking of
11   supplementation, I notice in my brief review of the file
12   and in Dr. Williams's report that he made reference to
13   the instruction manual for the lighted retractor, but
14   that was not forwarded in the -- attached to the report,
15   nor was it provided in response to production of
16   documents.
17           MR. RINGEL:  I'll get that.  I can look for
18   that, too.
19           MR. HAMILTON:  Okay.  Do you have a copy of
20   that?
21           MR. RINGEL:  I don't have that with me, no.
22           MR. HAMILTON:  Okay.  If you could e-mail that
23   to Ms. Karlin on Monday, that would be appreciated,
24   because I'd like to, when the deposition comes in, make
25   sure our experts have everything that Dr. Williams has

Case 1:13-cv-00184-JFM   Document 51-1   Filed 05/04/14   Page 5 of 42
DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

3 (Pages 9 to 12)

**9**

1  reviewed. Okay?
2      MR. RINGEL: Of course.
3  BY MR. HAMILTON:
4      Q. Okay. Tell me what you recall, Doctor, about
5  that other case that you were an expert for Mr. Berman.
6      A. It was a lady who was having something removed.
7  I think it was removed or some plastic surgery operation
8  that caught fire when they used the Bovie to cauterize
9  in the presence of oxygen.
10     Q. Was it a Bovie, uh -- that's an instrument
11 that's used for cauterization and for cutting?
12     A. It can be used for both.
13     Q. And you testified against the doctor in that
14 case?
15     A. Yes.
16     Q. What was the basis of your opinion, if you
17 recall, from which you rendered an opinion against the
18 doctor?
19     A. That oxygen shouldn't be freely flowing into
20 the operative field when you use something that produces
21 a spark.
22     Q. Okay. If you could provide a bit more detail
23 about that. Oxygen was flowing, you mean just from the
24 site being exposed to oxygen?
25     A. I believe that the patient was getting

**10**

1  supplementary oxygen.
2      Q. By mask?
3      A. Yes.
4      Q. Okay. And where was the fire?
5      A. In the field, the operative field.
6      Q. And where was the operative field?
7      A. It was in the head and neck.
8      Q. Oh, in the head and neck?
9      A. Yes.
10     Q. Okay. Do you recall whether or not you
11 testified at trial in that case?
12     A. Yes, I did.
13     Q. Okay. And again, do you remember whether or
14 not that was Howard County or Baltimore?
15     A. I don't know the difference.
16     MR. RINGEL: I don't remember.
17     MR. HAMILTON: Okay. But that's part -- you
18 will provide that information?
19     MR. RINGEL: Yeah, anything that we have in
20 that case that is discoverable, we'll produce.
21     MR. HAMILTON: Okay.
22     THE WITNESS: I have to say the details of the
23 operation I am not clear on. I can't remember.
24 BY MR. HAMILTON:
25     Q. Okay. I want to show you what's been marked

**11**

1  for identification as Deposition Exhibit 1, which is a
2  notice of the deposition, and I want to go briefly
3  through these documents that you were requested to
4  provide.
5      Counsel, I believe you already have a copy?
6      MR. RINGEL: I do.
7      (The aforementioned document was marked
8      as Defendants' Exhibit 1 for identification
9      and was retained by counsel.)
10 BY MR. HAMILTON:
11     Q. Okay. Item No. 1, all records reviewed by
12 you -- I'm paraphrasing now -- but all records reviewed
13 by you in connection with the testimony you will offer
14 at the hearing of this matter.
15     My understanding from our off-the-record
16 conversation between Mr. Berman (sic) and you and myself
17 is that you didn't produce any documents because
18 everything that was sent to you was sent to you
19 electronically?
20     A. That's true.
21     Q. Okay. In your report, you listed some
22 documents that you reviewed. Do you have that?
23     Counsel, do you have a copy of that report?
24     MR. RINGEL: His report, I do.
25     MR. HAMILTON: Okay. Can you show that to the

**12**

1  doctor?
2      (Document handed to the witness.)
3  BY MR. HAMILTON:
4      Q. Under No. 1, when you say, "The history
5  provided by the plaintiff, Mary Clark," what written
6  history was that? Whether it's a document that you
7  received electronically or via text or e-mail, what was
8  it?
9      A. I believe it was the history of the illness,
10 whatever she was being treated for. The exact format of
11 it, it was electronic.
12     Q. Okay. But was it a document or something
13 prepared by Ms. Clark or Mr. Berman or a medical record
14 or what? That's what I'm trying to determine.
15     A. I believe it was a medical record.
16     MR. HAMILTON: Okay. And again, Counsel, since
17 all this is electronically and I don't have access to
18 his documents, is that correct, that's what he's
19 referring to, or is there some separate document that
20 you prepared and gave to the doctor or Ms. Clark gave?
21     MR. RINGEL: We believe, no, it's the medical
22 history is my understanding.
23     MR. HAMILTON: But I can do a medical history.
24 I mean, I can dictate one, but I'm trying to determine
25 whether or not it's a document that was prepared by

Case 1:13-cv-00184-JFM   Document 51-1   Filed 05/04/14   Page 6 of 42
DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

4 (Pages 13 to 16)

13

1   Ms. Clark or whether or not it's the actual medical
2   record.
3        MR. RINGEL: I don't believe any document -- I
4   don't know for sure if any document has specifically
5   been prepared by Ms. Clark. I don't think so.
6   BY MR. HAMILTON:
7        Q. So, Doctor, it's my understanding you believe
8   that's the chart of the operation?
9        A. I believe it's the -- it relates to her
10  illness, yes.
11       Q. The amended complaint, photographs of
12  Ms. Clark's burns, the operation manual of the lighted
13  retractor used during Ms. Clark's procedure, which we've
14  already discussed with counsel, he's going to provide me
15  a copy, or Ms. Karlin a copy of that on Monday.
16       The discovery provided by the parties. So you
17  reviewed the answers to interrogatories?
18       A. The which?
19       Q. The interrogatory responses.
20       A. Yes.
21       Q. And request for admissions and request for
22  production of documents; correct?
23       A. Yes.
24       Q. I'm just trying to verify what you reviewed,
25  Doctor.

14

1        A. I reviewed those things, and I don't remember
2   the exact names of them, but they were provided to me.
3        Q. Okay. And when you make reference to the
4   "medical records from Dr. Chang," is that essentially
5   his office chart?
6        A. Yes. It's the medical records from the
7   hospital and Dr. Chang.
8        Q. Okay. Well, No. 7 makes reference to the
9   medical records from Howard County General Hospital, and
10  I had assumed before I started asking questions that
11  this was the chart that you were referring to, and
12  that's the source of my confusion going back to Item
13  No. 1, referring to the history provided by the
14  plaintiff.
15       A. I believe that that's the history from the
16  hospital.
17       Q. Okay. And the depositions taken. Do you
18  recall what depositions you reviewed?
19       A. The depositions of the three nursing and
20  technical assistants and Dr. Chang, yes.
21       Q. Okay. Now, in connection with your review,
22  and, obviously, you issued your report and reviewed this
23  case prior to the opinions of the experts that were
24  named on behalf of the hospital and Dr. Chang; am I
25  correct?

15

1        A. Can you say that again?
2        Q. Okay. Under No. 10, you say, "The opinions of
3   the other experts involved in this case."
4        A. Yes.
5        Q. Okay. You reviewed this case before it was
6   placed into litigation; correct?
7        A. I don't know whether it was in litigation or
8   not when I first reviewed it.
9        Q. Well, you prepared a statement of qualified
10  expert that was filed by counsel at the time this case
11  was filed in the Health Claims Arbitration, and counsel
12  is nodding yes.
13       And this is procedural, but I would just -- and
14  you had rendered your opinion that there was a deviation
15  from the standard of care by the nurses and by
16  Dr. Chang; correct?
17       A. I don't know if it was in litigation or not. I
18  thought it was at that stage, yeah.
19       Q. Okay. But in any event, in your statement, and
20  I can show you the qualified -- do you have, Counsel,
21  your copy?
22       MR. RINGEL: I have it somewhere here.
23  BY MR. HAMILTON:
24       Q. It's a Certificate of Qualified Expert that was
25  filed in the Health Claims Arbitration Office, and that

16

1   was filed either with the complaint or some time after
2   the complaint, and you signed -- I have a working copy.
3   Do you have it, Counsel?
4        MR. RINGEL: I don't know. Mine's in the
5   computer.
6        MR. HAMILTON: Okay. Could you just show it to
7   the doctor then?
8        MR. RINGEL: Yes, it will take me a second.
9   BY MR. HAMILTON:
10       Q. I can show you the signature page.
11       A. Uh-huh.
12       MR. RINGEL: I've got one that's unexecuted,
13  but I believe it to be the exact same. I printed it
14  right off of our system if you want to take a look at
15  what I've got.
16       MR. HAMILTON: I assume it's the same. I've
17  got the signature page.
18       MR. RINGEL: Yes.
19  BY MR. HAMILTON:
20       Q. All I'm trying to establish, Doctor, is that
21  sometime before you received any statement or opinions
22  by the experts named on behalf of Dr. Chang or the
23  hospital, you had already reached your opinions and
24  conclusions in this case.
25       Is that fair and accurate?

---

**17**

1    A.  The dates of when I received all of the
2  information, I don't remember.  You could tell me if you
3  wouldn't mind.
4    Q.  Well, I don't have the dates right here in
5  front of me because I didn't know that we were just
6  dealing with the electronic records.
7       I would have asked you to produce your computer
8  with all the records so I could peruse it and we would
9  have access to the dates when you received the
10 documents.
11   A.  I would bring the whole computer here?
12   Q.  Well, or print the documents out, one of the
13 two.
14   A.  Oh, okay.
15   Q.  But my point being, Doctor, that I'm trying to
16 establish that, and maybe counsel would be willing to
17 stipulate, that you'd already reached certain
18 conclusions, opinions concerning the care and treatment
19 by Dr. Chang and the nurses at the hospital before --
20      MR. RINGEL:  Well, I know what you're trying to
21 get at.  I would be willing to stipulate that he
22 produced the Certificate of Qualified Expert and he
23 produced the Report of Qualified Expert prior to
24 reviewing Dr. Siegle and Dr. Ruff's opinion.  The report
25 that you're referring to is an amended report which was

**18**

1  produced at a later date.
2       MR. HAMILTON:  Well, no, actually, I was using
3  the Report of the Qualified Expert.
4       MR. RINGEL:  Right.  Again, that's the original
5  document --
6       MR. HAMILTON:  Correct.
7       MR. RINGEL:  -- which said -- that came at a
8  later date, and, obviously, what happened was he
9  reviewed those reports following the naming of those
10 experts.
11      MR. HAMILTON:  Okay.
12      MR. RINGEL:  I don't think there's a dispute as
13 to that.
14 BY MR. HAMILTON:
15   Q.  All right.  I take it then that in your report,
16 you did not receive all these documents at once; is that
17 accurate?
18   A.  I honestly don't remember when I received them.
19   Q.  Okay.  In preparation for this deposition,
20 Doctor, did you go back and review the documents that
21 you were sent?
22   A.  I reviewed the material, yeah, and I didn't
23 look at the dates of anything.
24   Q.  Okay.  And going back to the operation manual,
25 that's what we already discussed that counsel is going

**19**

1  to produce to Ms. Karlin on Monday.
2       So these documents that are listed in 1 through
3  10 then and the photographs, do they represent the
4  universe of documents that you reviewed in connection
5  with this case?
6    A.  Yes.
7    Q.  Okay.  In connection with your review of any of
8  these documents, did you make any notes?
9    A.  No.
10   Q.  When you reviewed Dr. Chang's deposition or
11 that of the nurses, did you highlight or dog-ear any
12 pages?
13   A.  No.
14   Q.  Are you relying on any specific testimony that
15 Dr. Chang gave in his deposition?
16   A.  Am I relying on it?
17   Q.  On any specific answer by Dr. Chang?
18   A.  Am I relying on a specific answer by Dr. Chang?
19   Q.  Correct, as a part of your -- let me -- as a
20 part of the basis for any opinion you intend to render?
21   A.  I think the whole picture is synthesized
22 from reading all of the material, and his information
23 would be part of the whole picture.
24   Q.  Okay.  But is there any specific information?
25      I assume he probably gave his home address and

**20**

1  office address in his deposition, so I assume that that
2  doesn't form the basis of your -- part of the basis for
3  your opinion.
4       What I'm trying to drive at is, is there a
5  specific response that he gave in connection with a
6  question at his deposition that you have pulled out that
7  you are using that to rely on, in part, to support your
8  opinions?
9       MR. RINGEL:  Object to the form.
10      You can answer.
11      THE WITNESS:  Uhm, it would -- the whole
12 picture was put together based on reading of the
13 material that I have, and the material that Dr. Chang
14 produced is just part of the opinion that I synthesized.
15 BY MR. HAMILTON:
16   Q.  Okay.  Since you issued this report, I'll call
17 it, it's the amended report -- okay? -- have you
18 received any other documents from Mr. Berman?
19   A.  Uh, no, not that I remember.
20   Q.  Okay.  So you have not received and reviewed
21 the report by the expert engineer that the hospital
22 retained to investigate the cause of the burn?
23   A.  No.
24   Q.  Did you know that there was such an
25 investigation in this case by an engineering expert?

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

6 (Pages 21 to 24)

---

**21**

1    A.  Not specifically, no.
2    Q.  Under No. 2, all records pertaining to any
3    examination of plaintiff by you.  I assume you did not
4    examine Ms. Clark?
5    A.  No.
6    Q.  Have you ever spoken with her personally?
7    A.  No.
8    Q.  Okay.  Any and all written reports setting
9    forth your opinions in this case, and I assume, and
10   correct me if I'm wrong so we can try to speed this
11   along, that would be the initial qualified expert report
12   and then the amended report?
13   A.  Yes.
14   Q.  Those are the only reports.
15       "All medical treatises, texts, articles, or
16   other scholarly works relied upon by the witness in
17   arriving at his opinion in this case."
18   A.  It's based on my practice and years of working.
19   Q.  Well, let me ask you this:  Did you do -- from
20   the time you were retained in this case up to today's
21   date, did you review any literature in connection with
22   this case?
23   A.  Not that I remember.
24   Q.  Okay.
25   A.  I'm reading stuff continually, so --

---

**22**

1    Q.  Well, I understand that.  You're still
2    practicing; am I correct?
3    A.  Right up to five minutes ago.
4    Q.  And I assume you review literature as part of
5    your continuing medical education and preparation and
6    teaching residents and things of that nature?
7    A.  Yes.
8    Q.  But my question is a little bit different.
9        From the time you were retained up until
10   today's date, did you specifically go on-line and do any
11   type of Medline search for any documents, literature,
12   anything associated with fires, burns --
13   A.  Not that I --
14   Q.  Let me --
15   A.  Okay.
16   Q.  -- use of light retractors, et cetera?
17   A.  Not that I remember.
18       MR. RINGEL:  We're just trying to make it easy
19   for the court reporter here so she can get an accurate
20   record of what's being said.  It's hard for her to do it
21   with multiple people talking at once.
22       THE WITNESS:  Forgive my excitement.
23   BY MR. HAMILTON:
24   Q.  Were you provided with any medical literature
25   by Mr. Berman or anybody else in connection with this

---

**23**

1    case?
2    A.  Not that I remember.
3    Q.  No. 7 asked you to produce all correspondence
4    between Mr. Berman and you.  Is there any
5    correspondence?
6    A.  No, I haven't written any letters.
7    Q.  Have you received any letters from him
8    providing any --
9    A.  I think there were letters accompanying --
10   well, there are letters as part of the electronic
11   portfolio.
12   Q.  Okay.  Do you have any recollection of what
13   those letters contained, what information?
14   A.  Uhm, I think they said herewith --
15       MR. HAMILTON:  Is that essentially it?
16       MR. RINGEL:  I'm sorry?
17       MR. HAMILTON:  Is that essentially it?
18       I want to speed the process up.  You know, I'm
19   entitled to any correspondence, but if your letters to
20   Dr. Williams only say --
21       MR. RINGEL:  There's nothing substantial.
22       MR. HAMILTON:  -- only say, "Please find
23   enclosed," or "Please find attached," then --
24       MR. RINGEL:  They're all "Please find
25   attached," scheduling, I mean, where we're meeting.

---

**24**

1    BY MR. HAMILTON:
2    Q.  Okay.  Prior to today's date, have you met with
3    counsel personally about this case or has all of your
4    communication been by telephone or electronic?
5    A.  "Counsel," you're counsel?
6        MR. RINGEL:  Yes, me and Mr. Berman.
7        THE WITNESS:  Yeah.
8        MR. HAMILTON:  I'm sorry.
9        MR. RINGEL:  I'm Kevin Ringel.
10       MR. HAMILTON:  My apologies.
11       MR. RINGEL:  And there's another attorney,
12   Craig Heron, who might also have been involved in the
13   case.  There's three of us.
14   BY MR. HAMILTON:
15   Q.  Okay.  Have you met with either of the three of
16   them?
17   A.  I met with Mr. Ringel yesterday.
18   Q.  Okay.
19       MR. RINGEL:  Trust me, I'd love to get confused
20   for Mr. Berman.  And you can put that in the transcript
21   because he'll love to see it.
22   BY MR. HAMILTON:
23   Q.  You were asked to produce any and all federal
24   and state income tax returns or 1099s and W-2s
25   associated with your review of cases and the amounts

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

7 (Pages 25 to 28)

25

1    that you received as income.
2        A.  In my life?
3        Q.  Let's say the last 10 years.
4        A.  It is pretty minuscule.  It is not what I do.
5    I can tell you I've done one case in the last four or
6    five years or so.
7        Q.  Okay.  And prior to that time?
8        A.  Not many more.  I'm not that popular.
9        Q.  Well, that might answer No. 10, "Any and all
10   expert witness disclosures prepared for filing in
11   Federal Court cases in the last five years."
12           There's only been that one case that was
13   identified in your amended report; correct?
14       A.  Yeah, I think it was more than five years ago.
15   I'm guessing.  I don't know.
16           MR. RINGEL:  Yeah, I think, our recollection,
17   with our research, we wouldn't figure out the date
18   either.
19   BY MR. HAMILTON:
20       Q.  But your best estimate is within the last four,
21   five, six years, there's only been this one case that
22   you've identified in the document?
23       A.  The one case, the Reynoso case is the only case
24   in the last four years.
25       Q.  Do you recall the names of the attorneys in

26

1    that case?
2        A.  No.
3        Q.  Was that case here in California?
4        A.  Yes.
5        Q.  It was?
6        A.  Yes.
7        Q.  Were you testifying on behalf of the plaintiff
8    or the healthcare provider?
9        A.  No, the doctors.
10       Q.  Okay.  I don't want you to pull a number out of
11   the air, obviously, but can you give me an idea, say, in
12   the last -- and you've been doing this -- well, strike
13   that.
14           For how many years have you been reviewing and
15   testifying in medical malpractice cases?
16       A.  Uhm, I don't know.  Probably 10, 15.
17       Q.  Okay.  Let's take the middle ground.
18           Let's say in the last 12 years, of the number
19   of cases, whether or not that's 5 or 50, can you give me
20   the percentage breakdown in terms of the percentage of
21   cases you've reviewed on behalf of the patient versus
22   the healthcare provider?
23       A.  Healthcare provider, probably 95 percent.
24       Q.  And is it fair and accurate to say that all of
25   those are essentially in the State of California?

27

1        A.  I don't know.  I seem to think there were
2    others outside, yes.
3        Q.  Okay.  Do you recall what this Reynoso case was
4    about?
5        A.  Yeah.
6        Q.  What?
7        A.  It was about an esophagus perforation.  He
8    died.
9        Q.  Gee, thanks.
10       A.  Did I make that up?
11       Q.  You didn't do that to scare me, did you,
12   Doctor?
13       A.  It was an esophagus case.  I don't know that it
14   was bad.  And I don't wish you any ill.
15       Q.  I know you don't.
16           MR. RINGEL:  Neither do I.
17           THE WITNESS:  Okay.
18   BY MR. HAMILTON:
19       Q.  And it's still accurate that in connection with
20   your review of cases, you charge $400 per hour for
21   review, $5,000 for court appearance, plus travel, I
22   assume, and $1,000 for the first hour of deposition, and
23   then $500 per hour after that; fair and accurate?
24       A.  Or a part thereof.
25       Q.  What?

28

1        A.  The hours.
2           MR. RINGEL:  I think he was just referring
3    to --
4    BY MR. HAMILTON:
5        Q.  Or a part, I'm with you.
6        A.  I'm sorry.
7        Q.  I'll have to remember not to go through a part
8    thereof.
9           Okay.  Now, I want to show you what I've marked
10   as Deposition Exhibit 2, and that is a copy of your
11   curriculum vitae that was provided to us by counsel, but
12   this says, "Updated July 26th, 2007."
13       A.  Gee, I was a lot younger then.
14           (The aforementioned document was marked
15           as Defendants' Exhibit+ 2 for identification
16           and was retained by counsel.)
17   BY MR. HAMILTON:
18       Q.  And we asked you to produce a current copy of
19   your curriculum vitae.  So I take it you didn't produce
20   that today either?
21       A.  No, I didn't see that.
22       Q.  Okay.  What's the latest version?
23       A.  It's probably within the last six months or so.
24       Q.  Okay.  I want to ask you some questions
25   about -- no, you hold on to that.  I've got a copy here.

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

29

1    Let's go through your background a little bit.
2  As I understand it, Doctor, again, your initial
3  background was in general surgery; correct?  And then
4  you started subspecializing in vascular surgery?
5    A.  Vascular surgery was part of general surgery,
6  very much so.
7    Q.  Back in the days, as they say?
8    A.  Not so long ago.
9    Q.  Okay.
10   A.  And then it became, uhm, you know, we're forced
11 into a little area now.
12   Q.  Okay.  Are you board certified in general
13 surgery?
14   A.  Yes.
15   Q.  Are you grandfathered in, or are you required
16 to recertify?
17   A.  I can tell you I recertified just a few months
18 ago.
19   Q.  Okay.  In general surgery or vascular?
20   A.  And I'm qualified to go till 2024.
21   Q.  Okay.  Let me back up, though.
22     There are boards in vascular surgery; correct?
23   A.  Yes.
24   Q.  I'm just talking about general surgery.
25   A.  Yes.

30

1    Q.  You were initially boarded in general surgery?
2    A.  Yes.
3    Q.  Okay.  And is that what you just recertified
4  for?
5    A.  Yes.
6    Q.  Okay.  Now, have you ever taken the boards in
7  vascular surgery?
8    A.  Yes.
9    Q.  Did you pass those?
10   A.  Yes.
11   Q.  First time?
12   A.  Yes.
13   Q.  Same thing with general surgery?
14   A.  Yes.
15   Q.  Okay.  Have you recertified, or are you
16 required to be recertified in vascular surgery?
17   A.  Yes, recertified.
18   Q.  When were you recertified?
19   A.  A couple of years ago.
20   Q.  Up to, let's just say, in the last 15 years,
21 what percentage of your practice is general surgery
22 versus your subspecialty or specialty area of vascular
23 surgery?
24   A.  15 years ago, most of it was general surgery.
25   Q.  Okay.  10 years ago then?

31

1    A.  Probably general surgery, yeah.
2    Q.  Okay.  Five years ago?
3    A.  Uh, general/vascular.
4    Q.  Well, can you give me a percentage over the
5  last 10 years, an average year, what percentage of your
6  practice is general surgery in nature and what
7  percentage of your practice -- versus your percentage of
8  practice in vascular surgery?
9    A.  I can't give you averaged over the 10 years.  I
10 can tell you it was more general 10 years ago than it is
11 today, yeah, and it's still general.  I do general
12 today, too.
13   Q.  Okay.  I take it, though, that's pretty much
14 all you do is general surgery and vascular surgery?
15   A.  Yes.
16   Q.  Okay.  You don't -- I thought I saw something
17 in your curriculum vitae about gastroenterology --
18   A.  Well, that's GI surgery, general surgery.
19   Q.  You've got to let me finish my question.
20   A.  But I know what it is.
21   Q.  The reason why I ask that, because in going
22 through your CV, it appears as though you were doing a
23 lot of work in general, slash, vascular surgery, and
24 then it appeared that more recently you were doing or
25 seemed to have more of an interest in surgery from a

32

1  gastroenterology standpoint.
2    A.  Well, gastro- --- GI surgery is general surgery.
3  That's what's left.
4    Q.  Okay.  You've never done a residency in plastic
5  and reconstructive surgery; correct?
6    A.  No.
7    Q.  And, obviously, since you didn't do a
8  residency, you would not have been qualified to do a
9  fellowship in plastic and reconstructive surgery;
10 correct?
11   A.  I think if you do a general surgery residency,
12 you'd be qualified to do a plastic surgery fellowship.
13   Q.  A fellowship?
14   A.  I think it's called a residency.
15   Q.  A residency?
16   A.  Yeah.
17   Q.  But under either scenario, you've never done a
18 residency or a fellowship in plastic and reconstructive
19 surgery; correct?
20   A.  No, I haven't.
21   Q.  Okay.  And you've never had privileges at any
22 hospitals, from the time you completed your medical
23 education up to today's date, any privilege, any
24 surgical privileges at any hospital in plastic and
25 reconstructive surgery; correct?

Case 1:13-cv-00184-JFM   Document 51-1   Filed 05/04/14   Page 11 of 42
DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

9 (Pages 33 to 36)

33

1      A.  No.
2      Q.  I'm correct?
3      A.  You are correct, yes.
4      Q.  Okay.  And you're not eligible to take the
5   boards in plastic and reconstructive surgery.
6        Am I correct on that?
7      A.  That's right.
8      Q.  And in going through your CV, at least through
9   2007, I did not see any articles pertaining to the
10  specialty area of plastic and reconstructive surgery
11  because there aren't any.
12       Am I correct on that?
13     A.  I wouldn't -- no, I don't think there were.  I
14  don't think I wrote in conjunction with any plastic
15  surgery.
16     Q.  And separate and apart from writing in
17  conjunction with plastic surgery, you didn't author on
18  your own any articles in the peer reviewed literature on
19  plastic and reconstructive surgery?
20     A.  Not that I remember.
21     Q.  And you don't hold yourself out to the public,
22  to hospitals, patients, or even courts to be an expert
23  in the field of plastic and reconstructive surgery, do
24  you?
25     A.  I'd be a lot richer if I did.

34

1      Q.  But the answer to my question is you do not
2   hold yourself out to be an expert; correct?
3      A.  No, I do not hold myself out to be an expert.
4      Q.  Okay.  Have you ever been sued, Doctor?
5      A.  Yes.
6      Q.  Are there any suits currently pending?
7      A.  No.
8      Q.  Okay.  How many times?
9      A.  Uhm, a couple of times.
10     Q.  Do you have any memory of what they're about,
11  what they involved?
12     A.  Uhm, the one that I remember is a graft
13  clotting.
14       THE REPORTER:  A what?
15  BY MR. HAMILTON:
16     Q.  Graft clotting; am I right?
17     A.  Yes.
18     Q.  Go ahead.
19     A.  I can't remember the others.  They're way back.
20  I've become more cautious.
21     Q.  The fees that you generate from your review in
22  testifying, in particular in this case, do they -- do
23  you retain those fees, or do they go with the people
24  that you practice with, or do they go to the hospital or
25  what?

35

1      A.  I retain them.
2      Q.  Personally, okay.
3      A.  Because they're so small, they don't reach a
4   threshold level.
5      Q.  Have you ever advertised your services to be an
6   expert in cases?
7      A.  No.
8      Q.  Have you ever been affiliated with any
9   organization that provides attorneys with the names of
10  prospective experts to review and test in cases?
11     A.  I don't believe so.
12       MR. HAMILTON:  One second.
13       (A one-minute recess was taken.)
14  BY MR. HAMILTON:
15     Q.  Okay.  Going through my notes, and so if I
16  repeat myself, I apologize, but I think I already asked
17  you whether or not you ever testified against a plastic
18  surgeon, and that's the case we were referring to --
19     A.  Yes.
20     Q.  -- on behalf of Mr. Berman and his compadres?
21       MR. RINGEL:  Yes.
22  BY MR. HAMILTON:
23     Q.  Have you ever testified in a case involving a
24  burn secondary to using a lighted retractor?
25     A.  No.

36

1      Q.  Okay.  Have you ever reviewed a case in
2   connection with a patient who sustained a burn from a
3   lighted retractor?
4      A.  No.
5      Q.  Have you discussed this case with any other
6   doctors?
7      A.  No.
8      Q.  I already asked you, you did not make any notes
9   in connection with your review of the depositions or any
10  of the medical records; correct?
11     A.  No.
12     Q.  Is there any article or book chapter in your CV
13  that you are specifically relying upon to support any
14  opinion you intend to render in this case?
15       MR. RINGEL:  Object to the form.
16       You can answer.
17       THE WITNESS:  There's several articles on
18  operating room fires that are background to my
19  knowledge.
20  BY MR. HAMILTON:
21     Q.  Okay.  Let me make this distinction, though.
22  And I saw them, and we'll discuss them in a minute.
23       I know you published a couple of articles, and
24  then it appears as though you followed up with some
25  lectures based upon those articles at a couple of

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

37

1  institutions; correct?
2      A.  This was at the request of the American College
3  of Surgeons that the lectures were done.
4      Q.  Yes, but they tracked the articles that you
5  wrote, and I believe there was even a book chapter?
6      A.  There was, yes.
7      Q.  Okay.  And I understand that, in part, forms
8  the basis, in part, for your overall education,
9  knowledge, and experience?
10     A.  Yes.
11     Q.  Okay.  And my question is a little bit
12  different.
13         What I'm trying to determine is, when you come
14  to court and testify in this case, do you intend to rely
15  upon a specific article and quote chapter and verse, so
16  to speak --
17         MR. RINGEL:  Object to the -- excuse me.
18  BY MR. HAMILTON:
19     Q.  -- that you are relying upon a specific article
20  or book chapter to use in support of your opinion?
21         MR. RINGEL:  Object to the form.
22         THE WITNESS:  No, I don't have any specific
23  article in mind.
24  BY MR. HAMILTON:
25     Q.  Okay.  And there's nothing from the articles or

38

1  the book chapter that you wrote that you specifically
2  intend to use specifically?
3      A.  No.
4         MR. RINGEL:  Same objection.
5  BY MR. HAMILTON:
6      Q.  I take it you've never performed breast
7  reconstruction surgery with tissue expanders?
8      A.  No.
9      Q.  You have not?
10     A.  That's right.
11     Q.  And likewise, you've never performed breast
12  reconstruction surgery utilizing implants.
13         Am I correct on that?
14     A.  Yes.
15     Q.  And I take it you've never performed a breast
16  capsulectomy for implant repositioning?
17     A.  No, I have not.
18     Q.  And am I also correct that you've never
19  performed a breast reconstruction with transfer of fat
20  from the abdomen to the breast?
21     A.  Right.
22     Q.  And having not done any of those, you've never
23  had occasion to use a lighted retractor, obviously, in
24  connection with any of those procedures; is that
25  accurate?

39

1      A.  Not in connection with those operations, no.
2      Q.  Have you ever used this type of lighted
3  retractor -- let me rephrase that.
4         The lighted retractor that was used in this
5  case, have you ever personally used it?
6         MR. RINGEL:  Object to the form.
7         Go ahead.
8         THE WITNESS:  Generically, I've used lighted
9  retractors, yes.
10  BY MR. HAMILTON:
11     Q.  Okay.  But you can't -- you have not
12  specifically used the lighted retractor that Dr. Chang
13  used in this case; is that correct?
14     A.  Yes.
15         MR. RINGEL:  Object to the form.
16  BY MR. HAMILTON:
17     Q.  Have you ever seen, put your hands on one of
18  these -- the lighted retractor that was used by
19  Dr. Chang in this case?
20     A.  No.
21         MR. RINGEL:  Object to the form.
22  BY MR. HAMILTON:
23     Q.  And am I also correct that you don't know how
24  Dr. Chang specifically used this lighted retractor in
25  connection with Ms. Clark's surgery; right?

40

1         MR. RINGEL:  Object to the form.
2         THE WITNESS:  No.  Yes, you are right.
3  BY MR. HAMILTON:
4      Q.  And you don't know how many times Dr. Chang was
5  required to use this retractor during the course of his
6  surgery on Ms. Clark; correct?
7         MR. RINGEL:  Object to the form.
8         THE WITNESS:  I think that's -- I mean, he uses
9  it once.  That's for the operation.
10  BY MR. HAMILTON:
11     Q.  Okay.  But you've never done the operation, so
12  do you know how many times he used it in this case?
13     A.  Oh, he switched it on and off or --
14     Q.  Well, let's start with switched it on and off.
15     A.  No, I don't.  I take the view that if you do an
16  operation, you use the retractor once in many ways.  You
17  move it around.
18     Q.  Okay.  But you don't know how he was using it;
19  correct?
20     A.  No, I don't know how many times he, I think,
21  put it in or out exactly.
22     Q.  Well, you have no information on how it was
23  used, how often it was used, the manner in which it was
24  used, how often he had it on or off; am I correct?
25         MR. RINGEL:  Object to the form.

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

11 (Pages 41 to 44)

41

1      THE WITNESS:  You're correct.
2   BY MR. HAMILTON:
3      Q.   Do you have any idea of the length of the cord
4   that goes from the handle, that connects with the handle
5   of the retractor that is plugged in?
6      A.   It's the length -- it's about the length
7   from -- a guess, six feet or so.
8      Q.   You're guessing, though?
9      A.   Yes.
10         (Interruption in the proceedings.)
11      THE WITNESS:  Can I take this?
12      MR. HAMILTON:  Sure.
13         (A three-minute recess was taken.)
14   BY MR. HAMILTON:
15      Q.   Do you have any idea, Doctor, in terms of any
16   side tables, how they can be positioned in reference to
17   the operative site where Dr. Chang was operating?
18      A.   The Mayo stands and --
19      Q.   Yes, things of that nature.
20      A.   In general, yes.
21      Q.   No, in this specific case at this institution?
22      A.   Uhm, I believe there was, positioned at the
23   head of the patient.
24      Q.   And what's the basis for that statement?
25      A.   From, I think, the nursing deposition.

42

1      Q.   Have you ever seen what is referred to as a
2   holster for this light retractor?
3      A.   Uhm, there's no specific holster for it, but
4   they make holsters out of towels.
5      Q.   Okay.  So when, I think, and we'll get to your
6   report, I believe you indicated in the report that
7   Dr. Chang was required to put it in a holster, you meant
8   putting it on a towel?
9      A.   I meant it's a loose term for storing it in a
10   pouch of some construction --
11      Q.   A towel?
12      A.   -- that's off the field.
13      Q.   But a towel can be used?
14      A.   Off the field, yes.
15      Q.   On this Mayo table?
16      A.   Yes.
17      Q.   Is that what you're referring to?
18      A.   (Nods head up and down.)
19         I take it, Doctor, you didn't conduct any type
20   of surveys -- strike that.
21         Since you didn't speak with any other doctors
22   in connection with this case, specifically plastic
23   surgeons, you don't know how plastic surgeons utilize a
24   lighted retractor in connection with undertaking these
25   types of procedures as far as why they place it on

43

1   patients wrapped under towels?
2      MR. RINGEL:  Object to the form.
3   BY MR. HAMILTON:
4      Q.   Is that correct?
5      A.   I didn't speak to any plastic surgeons.
6      Q.   So you agree with my question; correct?
7      MR. RINGEL:  Object to the form.
8      THE WITNESS:  Yes, that I didn't speak.
9   BY MR. HAMILTON:
10      Q.   Where do you understand the word "holster" came
11   from?
12      A.   I don't know.  The Wild West.
13      Q.   But --
14      A.   Butch Cassidy.  I don't know.
15      MR. RINGEL:  Object to the form.
16   BY MR. HAMILTON:
17      Q.   The type of lighted retractors you've used
18   yourself in the past, not the kind that Dr. Chang used,
19   but the type you've used, they didn't have any holsters
20   either; am I correct?
21      A.   They were not specifically made for it.  The
22   only holsters that I'm aware of are the ones for the
23   Bovie.
24      Q.   Okay.  So in connection with your use of these
25   lighted retractors, you wrapped towels or something

44

1   under it, used a towel?
2      A.   The main thing is to put it off the table --
3      Q.   Okay.  But you used towels?
4      A.   -- hang it over the edge, and there is a towel
5   underneath on the Mayo table, too.  The towel is not the
6   important part when it's off the patient.
7      Q.   Okay.  And I understand the purpose for that is
8   to avoid a patient being burned from the light which is
9   the source of the heat in the retractor; correct?
10      A.   Yes.
11      Q.   Are you aware of the fact that in this
12   particular case, it wasn't the heat generated by the
13   light from the retractor that caused the burn?
14      A.   It was the heat generated by the light which is
15   produced, and it travels through the cord, so --
16      Q.   So sitting here today, it's your understanding
17   that the burn that Ms. Clark sustained occurred as a
18   consequence of heat generated by the lighted retractor
19   which was --
20      A.   Heat generated by the light which warmed up the
21   retractor.
22      Q.   Yeah, but it's the heat from the light itself
23   being on that caused the burn.  That's your conclusion?
24      MR. RINGEL:  Object to the form.
25      THE WITNESS:  No, my conclusion is that the

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

12 (Pages 45 to 48)

---

45

1  light heated the retractor. The heat from the light was
2  transferred to the retractor.
3  BY MR. HAMILTON:
4      Q.  Okay. But the heat was generated from the
5  lighted portion of the retractor. That's where the heat
6  source came from which heated the retractor which caused
7  the burn?
8          MR. RINGEL:  Object to the form.
9          THE WITNESS:  The heat was generated from the
10  joining of the light source to the retractor.
11  BY MR. HAMILTON:
12      Q.  The what?
13      A.  The fiberoptic connection is where the heat was
14  generated.
15      Q.  Okay. It's plugged in. You've got a
16  fiberoptic connection. So the light is turned on;
17  correct?
18      A.  Yes.
19      Q.  The light generates the heat; correct?
20      A.  The light comes from the light source which is
21  the light you're talking about, and along with light,
22  you get heat which is transmitted by the cord and by the
23  fiberoptic cord, and at the junction you have heat
24  release. That heat goes into the air, and here it went
25  into the retractor and heated the retractor.

---

46

1      Q.  I'm not actually following you.
2      A.  The end of the fiberoptic cord produces heat,
3  and where it joins the retractor, it produces heat and
4  it's released there, and it dissipated into the
5  retractor and heated it because it was laying still.
6      Q.  And what's the basis for your conclusion that
7  is what caused the fire?
8      A.  I don't think there was a fire.
9      Q.  I mean, I'm sorry. My apologies. The burn.
10      A.  Because that's known that that's where the heat
11  is generated.
12      Q.  Okay. You don't know, sitting here today, how
13  plastic surgeons around the country use this specific
14  lighted retractor in connection with the type of
15  surgical procedures that Dr. Chang performed on
16  Ms. Clark; correct?
17      A.  No.
18          MR. RINGEL:  Object to the form.
19  BY MR. HAMILTON:
20      Q.  And you don't know how many of them use this
21  specific light retractor by placing it under a folded
22  towel or towels on the chest of the patient for
23  immediate use; correct?
24          MR. RINGEL:  Objection.
25          THE WITNESS:  No.

---

47

1  BY MR. HAMILTON:
2      Q.  I need to go back to my previous question.
3          Now, is it your understanding that all lighted
4  retractors, even the handles, are hot once they're
5  plugged in?
6      A.  I think that if you position them, the heat
7  will dissipate through if you leave them lay in a
8  certain way.
9      Q.  That wasn't my question, though. I mean, if
10  I -- if this was the retractor (indicating), obviously,
11  and I'm using my little umbrella here as an example, but
12  if the light is coming out this side (indicating), it's
13  plugged in, but the surgeon is holding the retractor in
14  his or her hand to do whatever they're doing with it, is
15  it your understanding that the part that the surgeon is
16  actually holding becomes hot?
17      A.  Uhm, no, it doesn't. The heat dissipates in
18  another way, straight up.
19      Q.  It dissipates through the end where the light
20  comes out?
21      A.  I think it dissipates through into the air.
22      Q.  So the surgeon wouldn't feel the heat on the
23  handle, he or she?
24      A.  Yes.
25      Q.  And you wouldn't feel the heat on the retractor

---

48

1  if you just held the retractor either; am I correct?
2      A.  That's right.
3          MR. RINGEL:  I'm going to object to this line
4  of questioning. He's not proffered as an expert in
5  engineering.
6  BY MR. HAMILTON:
7      Q.  And obviously, you don't hold yourself out as
8  an expert in engineering; correct?
9      A.  No.
10      Q.  I want to go back to your CV for a minute. And
11  if you would turn to Page 26 -- are you with me?
12      A.  Yes, uh-huh.
13      Q.  I'm looking -- I want to go through these, and
14  as a predicate of this question, I've already asked
15  you --
16      A.  Is that 26 there (indicating)?
17      Q.  I'm sorry, Page 25, and it's No. 47. Are you
18  with me?
19      A.  Uh-huh. Yes.
20      Q.  Okay. Like I said, as a predicate to my
21  question concerning what I'm going to ask you about,
22  you've already indicated to me that you're not
23  specifically relying upon any of these articles or that
24  book chapter, but I'm just curious and want to find out
25  a little bit about what these articles are about.

---

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

13 (Pages 49 to 52)

49

1      No. 47, "Hazards in the Operating Room," that
2  was back in 1997.  Do you have a recollection generally
3  about what type of hazards you're talking about here?
4      A.  I don't remember, but these were all generated
5  as a result of the American College.  So it would be
6  about fires.
7      Q.  So to be clear, I mean, they're all about fires
8  or just about not having electrical cords run across the
9  floor.  That could be a hazard too, I guess, but --
10      A.  Yeah, I don't remember.
11      Q.  You don't remember what the hazards were in
12  this article?
13      A.  I'm pretty sure that they're all related, too.
14      Q.  Okay.  And No. 50, obviously, the title in
15  itself answers the question, "Operating Room Fires"?
16      A.  Uh-huh.  Yes.
17      Q.  Now, are you talking about fires involving the
18  patient, or are you talking about just fires and things,
19  that a fire can occur in an operating room?
20      A.  No, fires involving patients.
21      Q.  Okay.  And you're primarily talking there about
22  things like using Bovie catheters, things of that
23  nature?
24      A.  Uhm, yeah, the range.
25      Q.  Okay.  And that was back in 2002.

50

1      If you turn to Page 43 -- okay? -- the fourth
2  article, or I think these are under "Lectures," American
3  College of Surgeons, "Fires in the Operating Room," that
4  kind of like coincides with the previous article that
5  you had written, and you were requested by the American
6  College to discuss and be a lecturer on that?
7      A.  That was part of my assignment.  This was the
8  big meeting, and I put on a symposium.
9      Q.  Okay.  But if you go back, we were on Page 25,
10  that article, "Hazards in the Operating Room," you
11  talked about in terms of being -- involving fires, I'm
12  just trying to -- is there a correlation between the
13  publication in No. 48 and then your giving a lecture on
14  that as a result of that publication at the American
15  College?  Would that be fair and accurate?
16      A.  I think that publication is years after this
17  lecture, isn't it?
18      Q.  No, sir; No. 47 is 1997 actually.
19      A.  Well, that was all -- I think that must have
20  been about the time that I was asked to produce a
21  symposium for the big meeting.
22      Q.  That's what I mean.  And that's the symposium
23  in 1997 on Page 43?
24      A.  Yeah.
25      Q.  Okay.  One kind of like goes with the other is

51

1  my point.
2      A.  Uh, yeah.
3      Q.  Okay.
4      A.  I think there's an article in the American
5  College bulletin that goes with it, too, isn't there?
6      Q.  Back in 1997?
7      A.  Somewhere around there.
8      Q.  And then on Page 45, the first lecture there,
9  is that a lecture, in effect, following up on the
10  previous lecture?
11      A.  It's, uhm -- yes.
12      Q.  Okay.  And I think the last one, Page 47 --
13  were we on that page? -- you did one at the Critical
14  Care Conference on January 17th of 2003, and then
15  October of 2003 in Orange, California, and surgery grand
16  rounds on February 5th, 2004.
17      Is that you're essentially giving the same
18  lecture on safety in the operating room, three different
19  lectures?
20      A.  I believe they thought I was the local expert.
21      Q.  I'm not asking what to speculate in terms of
22  what they thought.  I'm just asking you whether or not
23  these three lectures, I mean, you were invited as a
24  lecturer, you're giving essentially the same lecture, in
25  effect, to three different institutions at their

52

1  request?
2      A.  Yes.
3      Q.  Okay.  Those are all the lectures that I see in
4  the CV.  You haven't given any lectures since then on
5  safety or fires in the operating room, have you?
6      A.  Uhm, I don't know.  I don't keep this record;
7  my assistant does.  So if there's none there, odds are
8  that I haven't, but we did miss a lot of stuff in these
9  lectures.
10      Q.  And, hypothetically, if there are some lectures
11  that you gave, say, in 2005 or 2006, I'm just using that
12  as a hypothetical date, would they be essentially the
13  same lecture, but at different -- giving it to a
14  different institution?
15      A.  Yes.
16      Q.  Okay.  In connection with any of your lectures,
17  do you prepare a PowerPoint presentation?
18      A.  Yes.
19      Q.  Do you still have that PowerPoint presentation
20  that you use?
21      A.  Probably.
22      Q.  Okay.  Do you know how long it is?
23      A.  How many slides?
24      Q.  Yes.
25      A.  I don't know.  It fits an hour's talk.

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

---

53

1    Q.  I'm sorry?
2    A.  An hour's worth of talk.
3    Q.  Okay.  Can you produce a hard copy of this?
4    A.  No, not an hard copy.  I can give you an
5    electronic copy.
6    Q.  Okay.  You can just e-mail it to me?
7    A.  Well, I'll do it through --
8    Q.  No, I understand it comes from counsel, but it
9    can be e-mailed to us?
10   A.  I think so.
11   Q.  Okay.  I would appreciate you doing that, and
12   we'll make a specific request for it.
13         MR. RINGEL:  Are you talking specifically that
14   lecture only, the one that's been discussed here?
15   BY MR. HAMILTON:
16   Q.  I thought we had already established that you
17   essentially used the same PowerPoint in connection with
18   the lectures; am I correct, Doctor?
19   A.  Yes.  If the last one was in 2006, I can't
20   guarantee that I still have it.
21   Q.  Well, I was using that as a hypothetical year.
22   The last one on your CV is 2003, or 2004, I think it is.
23   A.  Well, it makes it even less likely that I can
24   get to it.
25   Q.  Okay.  Well, and if you don't have it, then

---

54

1    that's what you would have used if you had any
2    subsequent lectures -- am I correct? -- since 2004?
3    A.  Yeah.
4    Q.  Okay.  So if you don't have it now, is it fair
5    and accurate to conclude that you probably have not
6    given any further lectures since 2004?
7    A.  Not necessarily.  I can't produce lectures or
8    PowerPoints of things I've done.
9    Q.  No, no, I'm talking about the specific
10   PowerPoints in connection with fires and OR burns,
11   things of that nature, safety, that you were giving back
12   in 2003, 2004.
13   A.  I'm sorry.  I've lost the track.  You want me
14   to produce it, and I'm not sure that I can.
15   Q.  Okay.  We were going back to Page 47.  You gave
16   a presentation to the Critical Care Conference
17   January of 2003, Orange, California, the surgical grand
18   rounds on October 16th, 2003, in Orange, California, and
19   then surgery grand rounds again on February 5th, 2004.
20   A.  Uh-huh.
21   Q.  Previously I asked you whether or not you used
22   the same information, the same lecture, and you said
23   yes.
24   A.  It would be a skeleton that would be changed as
25   I felt the mood to change it.

---

55

1    Q.  Okay.  But whatever the changes are, the latest
2    one, according to this CV, would be the PowerPoint that
3    you would have used on February 5th, 2004; correct?
4    A.  Yeah.  I mean, I think so.  In truth,
5    Mr. Hamilton, I have not got an organized system for
6    keeping lectures, so I don't know where anything is or
7    what I could produce.
8    Q.  Okay.  Well, I would ask you just to take a
9    look, and if you have it and it can be reasonably
10   produced, let counsel know.  If it no longer exists,
11   then let us know.
12   A.  It's 10 years ago.
13   Q.  Well, I don't know, because I don't -- I have
14   your CV only through 2007.
15   A.  Oh, okay.
16   Q.  So I'm off by seven years here or six years and
17   some months.
18        I take it you're not aware of the fact that the
19   retractor heated in this case and caused the burn to
20   Ms. Clark because the nurses used an inappropriate
21   connecting cord?
22   A.  Uhm, I think the patient got the burn because
23   the retractor was placed on her chest.
24   Q.  Okay.  So to answer my question, though, you're
25   not aware of the fact that the actual burn, the ultimate

---

56

1    cause of the burn, that the retractor, in terms of the
2    retractor getting hot and causing a burn was a result of
3    the nurses placing an inappropriate connecting cord to
4    the retractor causing the retractor to get hot?
5         MR. RINGEL:  Object to the form.
6         THE WITNESS:  I think any retractor will get
7    hot and shouldn't be placed on the skin.
8    BY MR. HAMILTON:
9    Q.  That wasn't my question.  I need you to answer
10   my question, sir.
11        You're not aware of the fact that the
12   conclusion in this case is that the retractor became hot
13   because the nurses applied an inappropriate cord to the
14   retractor?
15        MR. RINGEL:  Object to the form.
16   BY MR. HAMILTON:
17   Q.  You're not aware of that, are you?
18   A.  I knew that they changed cords.
19   Q.  Okay.
20   A.  But still the same dictum applies that you
21   wouldn't put it on the patient's chest.
22   Q.  Okay.  But you knew they changed cords, but you
23   do not know that it was an inappropriate use -- change
24   of a cord that caused the retractor to heat up, causing
25   the burn?  You didn't know that; correct?

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

15 (Pages 57 to 60)

57

1   MR. RINGEL: Object to the form.
2       THE WITNESS: I think that's what people claim,
3   but I think the same precautions should be taken.
4   BY MR. HAMILTON:
5       Q. I'm going to ask it again, Doctor. I just need
6   it very direct.
7       You do not know, sitting here today, that the
8   investigation by an expert engineer concluded that the
9   cord, that an inappropriate cord was placed by the
10  nurses, and that inappropriate cord caused the retractor
11  to heat, and that's what caused the burn? You did not
12  know that, did you?
13      MR. RINGEL: Objection; asked and answered.
14      THE WITNESS: I know that the retractor heated
15  and was placed at the time on the patient's chest.
16  BY MR. HAMILTON:
17      Q. But you did not know that the reason as to why
18  the retractor heated was because the nurses applied or
19  utilized an inappropriate size cord and attached it to
20  the retractor; correct?
21      A. But I'm still saying that the retractor --
22      Q. I understand. You can give all the caveats --
23  I understand that, but I deserve an answer to my
24  question.
25      A. There were two cords. One was swapped for the

58

1   other, and the retractor heated with the first cord, and
2   because it was on the chest, the patient got burned.
3       Q. But you did not know that an inappropriate cord
4   was placed or attached to the retractor and that's what
5   caused the retractor to heat? You did not know that,
6   did you?
7       MR. RINGEL: Objection; asked and answered.
8       THE WITNESS: I have not seen the expert's
9   report on that.
10  BY MR. HAMILTON:
11      Q. Okay. So the answer to my question is just a
12  simple no, you didn't know that; correct?
13      A. I didn't know that the cord was the -- I mean,
14  the retractor heated. I know that. And it was on the
15  patient.
16      Q. I understand you want to keep going with that,
17  Doctor, but to answer my question and we can move on,
18  you did not know that the cause of this fire was the
19  inappropriate use of connecting the cord by the nurses
20  in which they attached it to the retractor that caused
21  the retractor to heat which caused the burn; correct?
22      MR. RINGEL: Well, hold on a second.
23      Objection; because you're asking him first
24  what's the cause of the burn. He answered what he
25  thought the cause of the burn was according to his

59

1   opinion. Now you're asking him about what caused the
2   retractor. He said he didn't review the engineering
3   report.
4       MR. HAMILTON: So then he doesn't know, and
5   that's all I'm asking. If he says, well, I don't know,
6   then I'll move on.
7       MR. RINGEL: So I'm not sure what you're
8   looking for, but you can answer the question.
9       THE WITNESS: I didn't see the engineering
10  report.
11  BY MR. HAMILTON:
12      Q. So you don't know that the engineer concluded
13  that it was the inappropriate use of an inappropriate
14  connecting cord to the retractor connected to the
15  retractor which caused the retractor to heat, which led
16  to the burn? You did not know that; am I correct?
17      A. Lots of "inappropriates." One was that the
18  retractor was placed on the tissue.
19      Q. I'm going to keep asking the question.
20      MR. RINGEL: Same objection.
21  BY MR. HAMILTON:
22      Q. I'm entitled to -- I don't think there's any
23  dispute, Doctor, that the retractor -- and we can argue
24  about standard -- we're going to talk about standard of
25  care in a minute in terms of whether or not it can or

60

1   should or should not be placed on the patient.
2       I'm talking about the cause of the retractor
3   heating which resulted in the burn.
4       A. I haven't read the report of the engineers.
5       Q. So you did not know that the engineer's
6   conclusion was that it was the inappropriate attachment
7   of an inappropriate cord to the retractor that caused
8   the retractor to heat which brought about the burn? You
9   did not know that?
10      A. No, because I have not read the report.
11      MR. RINGEL: Same objection.
12  BY MR. HAMILTON:
13      Q. Do you know how many times this specific
14  lighted retractor has been used nationwide by plastic
15  surgeons in the manner in which it was used by Dr. Chang
16  where there was a fire?
17      MR. RINGEL: Objection.
18  BY MR. HAMILTON:
19      Q. I mean not a fire, a burn.
20      A. No.
21      MR. RINGEL: You mean the same model or --
22      MR. HAMILTON: Same retractor, same positioning
23  used by Dr. Chang.
24      Q. Your answer is still no?
25      A. No, I don't know. It's not the sort of thing

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

16 (Pages 61 to 64)

---

61

1  that's collected.
2      Q.  Okay.  Do you know where -- do you know whether
3  or not utilizing this lighted retractor in a manner in
4  which it was placed by Dr. Chang on Ms. Clark's body has
5  ever caused any burn to any patient?
6      A.  No, I don't know.
7          MR. HAMILTON:  You let us know when you need to
8  take a break.
9          THE REPORTER:  I'm fine.  Thanks.
10 BY MR. HAMILTON:
11     Q.  The light on the retractor generates heat -- am
12 I correct? -- the presence of the light?
13     A.  The light cord junction generates heat, yes.
14     Q.  The light cord junction?
15     A.  With the retractor and the light.
16     Q.  But the light in and of itself -- I mean, I'm
17 not trying to say that there's some other thing that
18 does not cause or causes it.  I'm just concentrating on
19 the light itself.
20         The light causes heat just like the lights in
21 this room can cause heat?
22     A.  Well, the heat is transmitted from the unit
23 that produces the light along the fiberoptics.
24     Q.  Okay.  I want to show you what's been marked
25 as -- I'm missing something, and I apologize.  I need an

---

62

1  extra copy of his amended report.
2          Could you make a copy real quick for me?
3          THE REPORTER:  Yes.
4          MR. HAMILTON:  Or did I give it to him?
5          MR. RINGEL:  I think I gave him my copy, but
6  let's see.  You're talking about this (indicating);
7  right?
8          MR. HAMILTON:  Yes.  Can we get a copy of this?
9          THE REPORTER:  Sure.
10         (A three-minute recess was taken.)
11 BY MR. HAMILTON:
12     Q.  Okay.  I want to show you what's been marked --
13 and we're skipping -- Exhibit No. 5, which is a copy of
14 your amended report.
15         (The aforementioned document was marked
16         as Defendants' Exhibit+ 5 for identification
17         and was retained by counsel.)
18 BY MR. HAMILTON:
19     Q.  The bottom of Page 2, you say, "It would appear
20 that at some point during the procedure, Dr. Chang had
21 placed the lighted retractor on the drape, which was
22 directly on top of and covering Ms. Clark's chest."
23         That's not accurate, is it, Doctor, based upon
24 your review of the records and Dr. Chang's deposition?
25     A.  I believe there was some question about a towel

---

63

1  being there, too.
2      Q.  Yes.  Were you aware that Dr. Chang had folded
3  a towel that sat under the -- then he put the retractor
4  on top of the towel, the towel separated the retractor
5  from the drape which also separated that from the
6  patient?
7      A.  Yes.
8      Q.  Okay.  So your report talking about he placed
9  it on the drape is not accurate, is it?
10         MR. RINGEL:  Object to the form.
11         THE WITNESS:  Uh, well, yeah, it's on drape,
12 not a towel.
13 BY MR. HAMILTON:
14     Q.  I'm sorry?
15     A.  There was a towel involved.
16     Q.  But briefly, the answer to my question that
17 your statement here is inaccurate, is not accurate;
18 correct?
19         MR. RINGEL:  Object to the form.
20         THE WITNESS:  Uhm, that's what I recall, but
21 I --
22 BY MR. HAMILTON:
23     Q.  When you say that's what you recall, you mean
24 that it was just placed on a drape and he did not have a
25 folded towel up under it?

---

64

1      A.  I think there was a towel involved, but, uhm, I
2  don't remember.
3      Q.  Okay.  If there was a towel involved, then your
4  report where it just talks about placing the lighted
5  retractor on the drape would not be accurate; is that
6  correct?
7      A.  That's right.  Yes.
8      Q.  And then if you turn to the next page, you
9  say -- the very next paragraph, "The above," referencing
10 the paragraph before it which we just talked about, "was
11 confirmed after reviewing the depositions of Dr. Chang,
12 Ms. Godwin, Ms. Herbert, and Ms. Vesnovky,"
13 V-e-s-n-o-v-k-y; correct?
14     A.  Yes, I say that.
15     Q.  Now, in connection with your opinions in this
16 case, you believe that the nurses deviated from the
17 standard of care; correct?
18     A.  Uhm, I don't think they're in charge of the
19 operation.
20     Q.  That wasn't my question.
21     A.  No.
22     Q.  Didn't you render opinions in this statement
23 that you believe the hospital, through its nurses,
24 deviated from the standard of care?  You make reference
25 to the, quote, "defendants."

---

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

17 (Pages 65 to 68)

---

**65**

1    MR. RINGEL: Object to the form.
2    THE WITNESS: Uhm --
3    BY MR. HAMILTON:
4    Q. Why don't you take a moment to review your
5    document, Doctor, because I think you talk in the plural
6    and you talk about the nurses' conduct as well.
7    A. (Peruses document.)
8    Uhm, the leader of the team, the captain of the
9    ship was Dr. Chang, the defendant.
10    Q. Doctor, and let me interrupt you. I just want
11    to let you know that in Maryland, we don't refer to it
12    as the captain of the ship in terms of the surgeon being
13    responsible of everybody.
14    In this report you make reference to the
15    defendants?
16    A. Yes.
17    Q. You talk about them plural?
18    A. Yes.
19    Q. Each of them, being whoever they are, being
20    below the standard of care; correct?
21    A. Yes.
22    Q. Okay. Nurses have certain responsibilities,
23    doctors have certain responsibilities; true?
24    A. Yes. Uh-huh.
25    Q. Okay. All I'm asking, in this case, when you

---

**66**

1    reviewed it, you reached the conclusion that the nurses
2    deviated from the standard of care, did you not?
3    A. Yes.
4    Q. And in what respect did you believe that they
5    deviated from the standard of care?
6    A. Uh, they -- uh, someone should have decided or
7    told the -- uh, the retractor shouldn't have been placed
8    on the patient. You can say that's the surgeon's
9    responsibility or the collective responsibility of the
10    team. So I'm saying it's a collective responsibility.
11    Q. Okay. Is your opinion in this case actually a
12    single opinion; namely, that the retractor should not be
13    left on the patient, and Dr. Chang and the nurses should
14    have made sure that it wasn't?
15    A. The essence of it is that the retractor
16    shouldn't have been left on the patient.
17    Q. Okay. Would you agree with me that the
18    standard of care in connection with a case like this
19    would be for the surgeon to take reasonable steps to
20    preclude the patient from being burned?
21    A. And I think the reasonable --
22    Q. Wait a minute. Do you agree with that?
23    A. Yes.
24    Q. Okay. Now, I understand from your conclusion
25    that you believe the reasonable approach is to not leave

---

**67**

1    the retractor on?
2    A. On the patient.
3    Q. Okay. Would you agree with me that there are
4    other surgeons who may take issue with that conclusion
5    and take the position that the standard of care allows a
6    surgeon to utilize other techniques to protect a
7    patient, such as placing something under -- between the
8    retractor and the patient to minimize and to eliminate a
9    burn?
10    MR. RINGEL: Object to the form.
11    THE WITNESS: I'm sure there are people, and
12    you have them as your experts, that say this.
13    BY MR. HAMILTON:
14    Q. Okay. And you can't -- you don't take issue
15    with the sincerity or the reasonableness of their
16    opinions, do you?
17    A. No, I don't.
18    Q. I'm sorry?
19    A. Their sincerity, the reasonableness of it, I do
20    take exception.
21    Q. Well, the reasonableness becomes a matter of
22    your opinion versus their opinion; correct?
23    A. Yes.
24    MR. RINGEL: Object to the form.
25    ///

---

**68**

1    BY MR. HAMILTON:
2    Q. But would you agree with me that there's no
3    specific document in terms of establishing a national
4    standard of care of specifically what must or what must
5    not be done in connection with steps, reasonable steps,
6    to be taken in an attempt to avoid a burn to a patient?
7    A. Uhm, there's a standard of care that is out
8    there, yeah.
9    Q. Okay. Can you quote me --
10    A. JCH sent out a document after all of these
11    fires saying what there were.
12    Q. Okay. These are fires. I'm talking about a
13    burn from a lighted retractor in terms of a national
14    standard of care document. You can't provide -- you
15    don't know of any specific document that addresses that,
16    do you?
17    MR. RINGEL: Object to the form.
18    THE WITNESS: Other than the manufacturer
19    saying don't put this in contact with the patient.
20    BY MR. HAMILTON:
21    Q. That's the only document you're aware of?
22    A. That's the only document I've seen.
23    Q. And are you aware that the manufacturer's
24    document is premised upon the concern that it is the
25    heat from the light that can cause a burn?

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

18 (Pages 69 to 72)

69

1    A.  Uhm, the light heats up the instrument.  That
2  is what causes the burn.
3    Q.  At the time of the burn in this case, though,
4  the light wasn't on, was it?  It wasn't being used, was
5  it?
6    A.  The retractor wasn't being used, but it was
7  laying there.
8    Q.  Okay.  But then the light wasn't heating the
9  retractor, was it?
10    A.  I believe it was on.
11    Q.  Can you show me in any document you reviewed
12  where it's stated that the light was actually on?
13    A.  Uhm, somewhere -- no, I can't produce the
14  document now.
15    Q.  And the summary of your opinions in your
16  report, is this essentially your opinion, looking under
17  "Summary of Opinions," the second paragraph, "The
18  defendants breached the applicable standards of medical
19  care as to Ms. Clark when they created a favorable
20  environment for a surgical burn and," quote, "and in not
21  taking steps to lessen the chances of such of an event
22  from occurring."
23        Is that what you believe the standard of care
24  is?
25    A.  Yes.

70

1    Q.  Okay.  Now, you are aware, though, and you can
2  see that Dr. Chang did take steps to minimize the
3  potential for a burn by placing the retractor on towels;
4  correct?
5    A.  Uhm, that's what he said, yes.
6    Q.  In the next paragraph you make reference to
7  that "The defendants collectively lacked personal
8  training on operating room fire and/or burns, used
9  improper surgical techniques, and failed to have proper
10  communication between all the operating room staff doing
11  the procedure."
12        Do you intend to render that opinion or --
13    A.  They, uhm, started -- became fire aware after
14  this and started to have, I think, be instructed on it.
15    Q.  What is your basis for your opinion, and let's
16  talk specifically about Dr. Chang, that he lacked
17  personal training on operating room fire -- well, let's
18  leave out the room "fire," because there was no fire;
19  correct?
20    A.  Huh-uh.
21    Q.  That's fair?
22    A.  There was no fire, yes.
23    Q.  Okay.  So let's paraphrase that sentence just a
24  little bit and say that Dr. Chang lacked personal
25  training on operating room burns.

71

1        What's the basis for your opinion that he
2  lacked personal training?
3    A.  I believe in his, uhm, deposition he says that
4  he was never trained to do this.
5    Q.  Trained to do -- I'm sorry, to do what?
6    A.  To -- there's a sentence, that he says during
7  his training, he was never instructed on burns or on
8  fires, some statement like that.
9    Q.  And is that the entire basis for your opinion
10  that Dr. Chang did not have -- lacked personal training?
11        MR. RINGEL:  Object to the form.
12        THE WITNESS:  Well, that's what he said.
13  BY MR. HAMILTON:
14    Q.  Okay.  Are you quoting him?
15    A.  I believe it is, yes.
16    Q.  And what do you believe that training -- what
17  training was required -- strike that.
18        What is the training that you believe Dr. Chang
19  was required to have in terms of doing this type of an
20  operation using a lighted retractor?
21    A.  I think with any other fiberoptic device, the
22  risk of burns is something that you need to be aware of
23  and take -- perform the procedure in a way to prevent
24  them happening.
25    Q.  But to go back to your report, you talk about

72

1  the standard of care required healthcare providers to
2  take steps to lessen the chances; am I correct?  That's
3  your definition; correct?
4    A.  Yes.
5    Q.  Okay.  Now, Dr. Chang did take steps to lessen
6  chances of a burn; correct?
7    A.  Uh, that's what he said, yes.
8    Q.  Okay.  You can see that he did; correct?
9    A.  Yes.
10    Q.  Okay.  On the last page of your report -- well,
11  strike that.  I'm trying to, as they say, cut to the
12  chase.
13        Under "Summary of Opinions," and putting aside
14  the issue, the lack of personal training which we
15  discussed, in these other paragraphs, even though there
16  are four paragraphs, notwithstanding the number of words
17  and sentences, does this essentially come down to
18  essentially one opinion, other than the issue of lack of
19  personal training, that he, Dr. Chang, should not have
20  placed a -- let the retractor to remain on the patient's
21  chest?
22        MR. RINGEL:  Object to the form.
23        THE WITNESS:  If he hadn't done that.
24  BY MR. HAMILTON:
25    Q.  No, no.  Is that your opinion?

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

19 (Pages 73 to 76)

73

1    A.  If he hadn't put it on the patient's chest, she
2    wouldn't have got burned.
3    Q.  That's a different question.
4    A.  Oh, I see.
5    Q.  I'm saying, as far as your opinion on the
6    standard of care, not the result -- are you with me?
7    A.  Yes.
8    Q.  Can we boil these four paragraphs down to
9    essentially the one -- essentially one opinion, other
10   than the opinion concerning lack of personal training
11   now, that the standard of care required that Dr. Chang
12   not leave the retractor on the patient?
13   A.  If he had just not left it on the patient, she
14   wouldn't have been burned.
15   Q.  But that's not answering my question, Doctor.
16   A.  That's the essence of it.
17   Q.  That may be the result of it, but we're talking
18   about the standard of care.
19       MR. RINGEL:  Objection.  He just said that was
20   the essence.  Your question was can we boil this down to
21   the essence, and he told you what he thought the essence
22   of it was.
23       THE WITNESS:  Don't leave something that can
24   cause a burn on a patient.  Don't even risk it.
25   ///

74

1    BY MR. HAMILTON:
2    Q.  My point, but you have to state an opinion
3    within -- as far as the standard of care is concerned.
4        So your opinion in this case is that the
5    standard of care dictated that Dr. --
6    A.  Chang.
7    Q.  Thank you -- that Dr. Chang deviated from the
8    standard of care because he left the retractor on the
9    patient?  That's your opinion?  And then the result of
10   that is that she got a burn?
11   A.  If Dr. Chang -- if I can word it in my way --
12   Q.  No, Doctor, I need it actually in my way.  I'm
13   entitled to an answer to my question, which is --
14   A.  And I'm entitled to say what I think.
15   Q.  Yes, I don't mind you explaining your answer.
16   You're entitled to do that, sir.
17   A.  Yes.
18   Q.  But I'm entitled to ask the question.  Okay?
19   And I need to a direct response.  And I'm talking
20   now about the standard of care.  Okay?
21       In your summary of opinions, the second
22   paragraph, we already talked about the defendants,
23   Dr. Chang, not taking steps to lessen the chances of
24   such an event occurring.  Then the next paragraph was
25   lack of personal training, which we discussed.

75

1        The next paragraph, you said the standard of
2    medical care ensured that the surgical field was free
3    from all surgical fire and burn hazards.  Dr. Chang
4    should have been aware of the burn hazards that a
5    lighted retractor presented during the surgical
6    procedure, and you say, go on and essentially say, that
7    the standard of care required in this case is that he
8    not leave the retractor on the patient.
9    A.  The fiberoptic retractor shouldn't be left
10   laying on the patient.
11   Q.  And then finally, go to the next page.
12   A.  I'm on it.
13   Q.  I'm sorry?
14   A.  I'm there.
15   Q.  The paragraph says, "It was also a further
16   deviation from the standard of care to ensure that the
17   settings on the lighted retractor were proper, given the
18   nature of the surgery that was to be performed."
19       Does this particular lighted retractor have
20   settings?
21   A.  I think the light source has settings.  Well,
22   the light source has settings.
23   Q.  Okay.
24   A.  And when it's not in use, they should be turned
25   down.

76

1    Q.  Do you know what the settings were being used
2    by Dr. Chang?
3    A.  Uhm, not specifically, but in a typical case,
4    they would have had them on.
5    Q.  I'm not talking about a typical case.  I'm
6    talking about this specific case.  You do not know what
7    settings Dr. Chang used in this case; am I correct?
8        MR. RINGEL:  Objection; asked and answered.
9        THE WITNESS:  No.
10   BY MR. HAMILTON:.
11   Q.  You don't know whether or not he turned them up
12   or turned them down; correct?
13       MR. RINGEL:  Objection; asked and answered.
14       THE WITNESS:  No.
15   BY MR. HAMILTON:
16   Q.  You do not know what the settings were, if
17   there were any settings on at all, at the time that the
18   burn occurred; am I correct?
19   A.  Uhm, no.
20   Q.  So is it that you're still going to render that
21   opinion at trial, or is that an opinion that you're now
22   withdrawing?
23       MR. RINGEL:  Object to the form.
24       THE WITNESS:  Well, it was a heated retractor,
25   and the heat came from the light source, and it burned

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

20  (Pages  77 to 80)

---

77

1  the patient, and if it hadn't been laying on the
2  patient, she would not have suffered these burns, and it
3  could easily have been placed directly off the patient
4  which would be the standard.
5  BY MR. HAMILTON:
6  Q.  Well, in your conclusions, you say, "regardless
7  of whether or not the lighted retractor was
8  malfunctioning, the standard of care requires that the
9  lighted retractor be stored in a proper holster or on a
10  metal table"; am I correct?
11  A.  Uh-huh.
12  MR. RINGEL:  Yes or no?
13  THE WITNESS:  Yes.
14  BY MR. HAMILTON:
15  Q.  So the surgeon has that option; am I correct?
16  A.  And the option is off the patient.
17  Q.  The option is to store it in a proper holster
18  or on a metal table.  I'm quoting you.  That's your
19  opinion?
20  A.  Yes.
21  Q.  Okay.  And we already established there is no,
22  like you said before, there's no, like, holster as such
23  like a gun holster.  You're talking about using some
24  type of material to wrap or have the retractor under;
25  correct?

---

78

1  A.  Uh, no, I'm not talking about that.  I'm
2  talking about a holster off the patient.
3  Q.  Well, that's not the wording in your report, is
4  it, Doctor?
5  A.  That's the sense of it, though.
6  Q.  Oh, that's the sense, okay.
7  A.  Yes.
8  Q.  Have we now gone through all the opinions you
9  intend to render, if you're called to testify at trial,
10  where you believe there was a deviation from the
11  standard of care?
12  A.  Uhm, yes.
13  Q.  Okay.  If I understand it, and I want you to
14  correct me if I'm wrong, there are essentially three
15  opinions.
16  Dr. Chang should not have kept -- that the
17  standard of care required that a retractor not be kept
18  on the patient, and that he violated that standard by
19  leaving it on the patient.  That's one?
20  A.  Yes.
21  Q.  That he did not ensure that the proper settings
22  were being used on the lighted retractor?
23  A.  The team, yes.
24  Q.  Okay.  The nurses.  That first opinion applies
25  to the nurses and the doctor --

---

79

1  A.  Uh-huh.
2  Q.  You have to say "yes."
3  A.  Yes.
4  Q.  -- in terms of not staying on the patient.
5  And then the second opinion, in terms of
6  standard of care, requiring the doctor and the nurses to
7  know or ensure that the settings on the retractor were
8  proper?
9  A.  Yes.
10  Q.  Okay.  And then the third opinion is that the
11  nurses and Dr. Chang lacked somehow personal training on
12  operating room -- uh, essentially avoiding burns?
13  A.  Yes.
14  Q.  Okay.  Do you intend to stick by all three of
15  those, or are there any of those that you want to
16  withdraw here today?
17  MR. RINGEL:  Object to the form.
18  THE WITNESS:  No, I'll stick with them.
19  BY MR. HAMILTON:
20  Q.  Okay.  Just for clarification, if you go back
21  to Page 2 of your report, in the paragraph we were
22  discussing earlier, you say the defendants lacked
23  personal training.
24  In the second -- well, let me just state it,
25  the entire sentence.  Quote, "The defendants

---

80

1  collectively lacked personal training on operating room
2  fire and/or burns, used improper surgical techniques,
3  and failed to have proper communication between all the
4  operating room staff during the surgical procedure."
5  Your use of the term "improper surgical
6  technique," as I understand it, you're not saying his
7  actual surgical technique was below the standard of
8  care?
9  A.  No, it's the conduct of the operation.
10  Q.  Okay.  That's what I wanted to clarify.
11  A.  Yes.
12  Q.  Because that's a whole different animal as far
13  as surgical technique; true?
14  A.  No.
15  Q.  No?
16  A.  No.  I think the whole conduct of the operation
17  is the technique.
18  Q.  Okay.
19  A.  You can have a messy surgeon.
20  Q.  I'm talking --
21  A.  Yeah.
22  Q.  Are you finished?  I'm watching her
23  peripherally.
24  A.  Yes, I have.
25  Q.  Okay.

Case 1:13-cv-00184-JFM   Document 51-1   Filed 05/04/14   Page 23 of 42
DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

21 (Pages 81 to 84)

**81**

1    MR. RINGEL: You're allowed to finish your
2  answer.
3  BY MR. HAMILTON:
4    Q. Yes.
5    A. Oh, I don't know whether I finished or not,
6  because I cut it off and switched the thought.
7    Q. Your mind was overheating. Don't burn it.
8    A. You're right.
9    Q. But when you use -- just so I'm clear, when you
10 use the term "improper surgical techniques," you're not
11 talking about the actual --
12   A. Cut and tie.
13   Q. Yes, cut, manipulate, retract, expand,
14 whatever?
15   A. No, I'm sure that was perfect.
16   Q. Let me have that document back.
17     Let's go off the record for a second.
18     (Discussion held off the record.)
19 BY MR. HAMILTON:
20   Q. Doctor, let me ask you this: You've never
21 spoken with Ms. Clark; am I correct?
22   A. That's right.
23   Q. Did you read her deposition?
24   A. Uhm, I don't think I've seen it.
25   Q. Okay. Has counsel, either of the Three

**82**

1  Musketeers, and I say that with kindness and a smile on
2  my face; okay? That's not meant to be derogatory.
3     MR. RINGEL: We don't take it as such, let the
4  record reflect. I'll take it as a badge of honor.
5     MR. HAMILTON: There you go.
6     THE WITNESS: You people fight with each other
7  over the table, and then you're as sweet as pie about a
8  minute later.
9     MR. RINGEL: We do our job.
10    MR. HAMILTON: Well, this is not fighting.
11 Believe me, she will tell you this is not fighting.
12 This is collegial.
13    (Discussion held off the record.)
14    MR. HAMILTON: I'll withdraw all of that.
15   Q. Have you spoken with any of the attorneys
16 representing Ms. Clark about Ms. Clark's feelings, what
17 she's been going through since the time of the burns?
18   A. I spoke with counsel, yes.
19   Q. Okay. But you've never spoken with her?
20   A. Not with her, no.
21   Q. Have you ever seen any records, other than
22 Dr. Chang's records, of Ms. Clark's condition after
23 sustaining the burns and being treated?
24   A. Uhm, no.
25   Q. Okay. Have you ever been asked to render an

**83**

1  opinion about any mental anguish she suffered?
2    A. No.
3    Q. Have you ever been asked to render any opinions
4  about any -- the degree of any permanent impairment or
5  disfigurement?
6    A. No.
7    Q. Okay. And you don't have any such opinions in
8  those regards, do you?
9    A. Oh, I do. I mean, she wouldn't sue if she
10 wasn't in a high state of anguish.
11   Q. How do you know she wouldn't sue?
12   A. Because I know people, I work with them all the
13 time.
14   Q. I see. That's the basis for that opinion?
15   A. That's 40 years of working with patients, yes.
16   Q. Okay.
17   A. Happy and unhappy.
18   Q. Do you know what, if any, steps, have been
19 taken by her since the burn to -- strike that.
20     Do you know the extent to which the burns
21 healed?
22   A. I never saw any post-treatment picture of them.
23 I know that she -- I've been told that she's frightened
24 to have any further anesthetics because she doesn't know
25 what's going to happen.

**84**

1    The last one she had, she woke up with these
2  burns, and that she won't go out unless she's got a set
3  of clothes that cover up to here (indicating).
4    Q. Okay. But you know that from counsel. That's
5  your only source of information; correct?
6    A. I think he's very reliable.
7    Q. That wasn't my question. You only know that
8  from counsel; correct?
9    A. Yes.
10   Q. You don't know the extent of any disfigurement
11 at this point in time or discoloration or whether or not
12 any -- she has any keloiding or anything along those
13 lines, do you?
14   A. That picture --
15   Q. No. Do you?
16   A. Mr. Hamilton --
17   Q. Yes, but I need you to answer my question,
18 Doctor.
19     MR. RINGEL: I think he's trying to.
20     THE WITNESS: I am trying to, believe me.
21     Those pictures were taken when there was some
22 degree of healing. They looked like keloid to me.
23 BY MR. HAMILTON:
24   Q. And that's my point, Doctor, since those -- you
25 already told me, since those pictures, you have no idea

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

22 (Pages 85 to 88)

85

1    since those pictures were taken how these wounds
2    ultimately healed, the extent, if any, of any
3    disfigurement or scarring; isn't that true?
4       A.  That's true.
5       Q.  You have no specific experience in Dr. Chang's
6    specialty; correct?
7       A.  That's correct.
8       Q.  And you've never practiced clinically at all
9    surgically in connection with plastic and reconstructive
10   surgery?
11      A.  No.
12      Q.  And I want to show you what's been marked as
13   Deposition Exhibit 4, and this is the Report of the
14   Qualified Expert that you signed when this case was
15   filed, or shortly thereafter.
16          (The aforementioned document was marked
17          as Defendants' Exhibit+ 4 for identification
18          and was retained by counsel.)
19   BY MR. HAMILTON:
20      Q.  I'll ask you to read that to yourself and see
21   whether or not that report is still representative of
22   your opinions in this case and is accurate as far as
23   your statement of the standard of care.
24      A.  (Peruses document.)
25          The experience is --

86

1       Q.  Do me a favor now --
2       A.  Oh, "2," this experience as a defendant --
3       Q.  Wait, wait. Bear with me.
4       MR. RINGEL: He's referring to the Certificate
5    of Qualified Expert, Paragraph 2, where it talks about
6    his clinical experience.
7    BY MR. HAMILTON:
8       Q.  Right. Okay. Go ahead.
9       A.  And the defendant's, the healthcare provider's
10   specialty, relates to plastic surgery that we general
11   surgeons do, so if you're -- oh, you cleared the air
12   about capsulotomies and all that stuff. It's highly
13   specialized stuff.
14      Q.  What plastic surgery do general surgeons do?
15      A.  Oh, the stuff that plastic surgeons can't be
16   bothered doing, skin grafts to patients that can't pay.
17      Q.  But otherwise, this statement --
18      A.  Yes, yes.
19      Q.  The Certificate of Qualified Expert is complete
20   and accurate?
21      A.  Yes.
22      Q.  Okay. And just for the record, I want to
23   identify what we have already discussed, in part, is the
24   of Plaintiff's Rule 26(a)(2) Disclosure, which is
25   Exhibit 3, which we talked about.

87

1       MR. RINGEL: Exhibit 3?
2       MR. HAMILTON: Yes.
3       MR. RINGEL: Well, the confusion is because
4    there's a couple. There's the 26(a)(2) disclosure, this
5    one that was filed in August 2013. Then there's an
6    amended one. There was a whole discovery squabble. And
7    then there's the amended one which satisfied the
8    26(a)(2) which is Exhibit 3, the amended report.
9       MR. HAMILTON: That's the amended report.
10      MR. RINGEL: So there's two documents which
11   could refer to the same thing. So if you could just be
12   specific.
13      MR. HAMILTON: Well, no, what I did is I
14   referred to Exhibit 3 is what was the Plaintiff's Rule
15   26(a)(2) Disclosure. That's the caption of this
16   document.
17      MR. RINGEL: Okay.
18      MR. HAMILTON: And the caption of the other
19   document that you're referring to, which is Exhibit 5,
20   is his amended report.
21      MR. RINGEL: So "5" is the amended report, and
22   "3" is the August 2013 disclosure?
23      MR. HAMILTON: Yes.
24      MR. RINGEL: Okay. I just wanted to make sure
25   I'm clear.

88

1          (The aforementioned document was marked
2          as Defendants' Exhibit+ 3 for identification
3          and was retained by counsel.)
4       MR. HAMILTON: And you and I discussed about
5    Dr. Williams' proffer or non-proffer on issues related
6    to mental anguish, things of that nature?
7       MR. HAMILTON: Right.
8       MR. HAMILTON: Okay. Let me take five minutes.
9    I think I'm done.
10         (A three-minute recess was taken.)
11   BY MR. HAMILTON:
12      Q.  I'm done. Doctor, thank you so much. You're
13   going to at least look for that PowerPoint and let
14   counsel know whether you have it available?
15      A.  When I get the check, I'll go home and look
16   for it immediately if I get the check.
17      Q.  You will get the check, that I can guarantee
18   you.
19      MR. RINGEL: I don't have any questions. I
20   think we're okay waiving your reading of the transcript
21   and we can sign it.
22      THE REPORTER: So waive signature?
23      MR. HAMILTON: So you're going to waive
24   signature?
25      MR. RINGEL: Yes, we're going to waive

89

1    signature.
2         MR. HAMILTON:  Okay.
3         MR. RINGEL:  And you said you're requesting an
4    expedite from the reporter?
5         MR. HAMILTON:  Yes, Monday.
6         MR. RINGEL:  I would need one also.
7         MR. HAMILTON:  All I want is an electronic
8    copy, in any event, a four-per-page mini script with the
9    attachments.
10        THE REPORTER:  A regular and a condensed?
11        MR. HAMILTON:  No, just the condensed.
12        MR. RINGEL:  I'll take both.
13        (Signature having been waived, the deposition
14   of RUSSELL ALAN WILLIAMS, M.D. concluded at 4:11 p.m.)
15        * * *
16
17
18
19
20
21
22
23
24
25

90

1              REPORTER'S CERTIFICATE
2         I, Joy E. Shure, RPR, CRR, CLR, a Certified
3    Shorthand Reporter, holding a valid and current license
4    issued by the State of California, CSR No. 3659, do
5    hereby certify:
6
7         That said proceedings were taken down by me in
8    shorthand at the time and place therein set forth and
9    thereafter transcribed into typewriting under my direction
10   and supervision.
11
12        I further certify that I am neither counsel for
13   nor related to any party to said action nor in anywise
14   interested in the outcome thereof.
15
16        The dismantling, unsealing, or unbinding of the
17   original transcript will render the Reporter's certificate
18   null and void.
19
20        IN WITNESS WHEREOF, I have hereunto subscribed my
21   name on this 3rd day of March, 2014.
22
23
24   _____
25        Certified Shorthand Reporter

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

91

**A**

abdomen
38:20
access
12:17 17:9
accompanying
23:9
accurate
7:22 16:25 18:17
22:19 26:24
27:19,23 38:25
50:15 54:5
62:23 63:9,17
64:5 85:22
86:20
action
90:13
actual
13:1 55:25 80:7
81:11
address
6:10 19:25 20:1
addresses
68:15
admissions
13:21
advertised
35:5
AESTHETIC
3:13
affiliated
35:8
aforementioned
11:7 28:14 62:15
85:16 88:1
afternoon
5:11,17
ago
6:25 22:3 25:14
29:8,18 30:19
30:24,25 31:2
31:10 55:12
agree
43:6 66:17,22
67:3 68:2
ahead
34:18 39:7 86:8

air
26:11 45:24
47:21 86:11
al
1:8
Alan
1:15 2:1 4:4 5:5
6:11 89:14
allowed
81:1
allows
67:5
amended
4:24 13:11 17:25
20:17 21:12
25:13 62:1,14
87:6,7,8,9,20,21
American
37:2 49:5 50:2,5
50:14 51:4
amounts
24:25
and/or
70:8
anesthetics
83:24
anguish
83:1,10 88:6
animal
80:12
answer
19:17,18 20:10
25:9 34:1 36:16
55:24 56:9
57:23 58:11,17
59:8 60:24
63:16 74:13,15
81:2 84:17
answered
57:13 58:7,24
76:8,13
answering
73:15
answers
5:25 13:17 49:15
anybody
22:25

anywise
90:13
apart
33:16
apologies
24:10 46:9
apologize
35:16 61:25
appear
62:19
appearance
27:21
APPEARANCES
3:1
appeared
31:24
appears
31:22 36:24
applicable
69:18
applied
56:13 57:18
applies
56:20 78:24
appreciate
53:11
appreciated
8:23
approach
66:25
Arbitration
15:11,25
area
29:11 30:22
33:10
argue
59:23
arriving
21:17
article
36:12 37:15,19,23
49:12 50:2,4,10
51:4
articles
21:15 33:9,18
36:17,23,25
37:4,25 48:23

48:25
aside
72:13
asked
17:7 23:3 24:23
28:18 35:16
36:8 48:14
50:20 54:21
57:13 58:7 76:8
76:13 82:25
83:3
asking
14:10 51:21,22
58:23 59:1,5,19
65:25
assignment
50:7
assistant
52:7
assistants
14:20
associated
22:12 24:25
assume
5:21 16:16 19:25
20:1 21:3,9 22:4
27:22
assumed
14:10
attached
4:10 8:14 23:23
23:25 57:19
58:4,20
attachment
60:6
attachments
89:9
attempt
68:6
attorney
3:6,17 24:11
attorneys
25:25 35:9 82:15
August
87:5,22
author
33:17

available
88:14
Avenue
3:7
average
31:5
averaged
31:9
avoid
44:8 68:6
avoiding
79:12
aware
43:22 44:11
55:18,25 56:11
56:17 63:2
68:21,23 70:1
70:13 71:22
75:4

**B**

back
14:12 18:20,24
29:7,21 34:19
47:2 48:10 49:2
49:25 50:9 51:6
54:11,15 71:25
79:20 81:16
background
29:1,3 36:18
bad
27:14
badge
82:4
Baltimore
10:14
based
20:12 21:18
36:25 62:23
basis
9:16 19:20 20:2,2
37:8 41:24 46:6
70:15 71:1,9
83:14
Beach
1:17 2:11 5:1
Bear
86:3

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

92

| | | | | |
|---|---|---|---|---|
| **behalf** | 2:9 | 43:14 | 55:19 56:12 | **certify** |
| 3:3,13 14:24 | **Bovie** | ———— **C** ———— | 64:16 65:25 | 90:5,12 |
| 16:22 26:7,21 | 9:8,10 43:23 | **California** | 66:11,18 69:3 | **cetera** |
| 35:20 | 49:22 | 1:17 2:11,20 5:1 | 74:4 75:7 76:3,5 | 22:16 |
| **believe** | **breached** | 26:3,25 51:15 | 76:6,7 85:14,22 | **chances** |
| 9:25 11:5 12:9,15 | 69:18 | 54:17,18 90:4 | **cases** | 69:21 72:2,6 |
| 12:21 13:3,7,9 | **break** | **call** | 6:18,21 24:25 | 74:23 |
| 14:15 16:13 | 61:8 | 20:16 | 25:11 26:15,19 | **Chang** |
| 35:11 37:5 | **breakdown** | **called** | 26:21 27:20 | 3:14 6:16 14:4,7 |
| 41:22 42:6 | 26:20 | 32:14 78:9 | 35:6,10 | 14:20,24 15:16 |
| 51:20 62:25 | **breast** | **capsulectomy** | **Cassidy** | 16:22 17:19 |
| 64:16,23 66:4 | 38:6,11,15,19,20 | 38:16 | 43:14 | 19:15,17,18 |
| 66:25 69:10,23 | **brief** | **capsulotomies** | **catheters** | 20:13 39:12,19 |
| 71:3,15,16,18 | 8:11 | 86:12 | 49:22 | 39:24 40:4 |
| 78:10 82:11 | **briefly** | **captain** | **caught** | 41:17 42:7 |
| 84:20 | 11:2 63:16 | 65:8,12 | 9:8 | 43:18 46:15 |
| **Berman** | **bring** | **caption** | **cause** | 60:15,23 61:4 |
| 3:4 9:5 11:16 | 17:11 | 87:15,18 | 20:22 56:1 58:18 | 62:20 63:2 |
| 12:13 20:18 | **brought** | **care** | 58:24,25 60:2 | 64:11 65:9 |
| 22:25 23:4 24:6 | 60:8 | 7:6 15:15 17:18 | 61:18,21 68:25 | 66:13 70:2,16 |
| 24:20 35:20 | **bulletin** | 51:14 54:16 | 73:24 | 70:24 71:10,18 |
| **best** | 51:5 | 59:25 64:17,24 | **caused** | 72:5,19 73:11 |
| 5:24 6:1,7 25:20 | **burn** | 65:20 66:2,5,18 | 44:13,23 45:6 | 74:6,7,11,23 |
| **big** | 20:22 35:24 36:2 | 67:5 68:4,7,14 | 46:7 55:19 | 75:3 76:2,7 |
| 50:8,21 | 44:13,17,23 | 69:19,23 72:1 | 56:24 57:10,11 | 78:16 79:11 |
| **bit** | 45:7 46:9 55:19 | 73:6,11,18 74:3 | 58:5,20,21 59:1 | **change** |
| 9:22 22:8 29:1 | 55:22,25 56:1,2 | 74:5,8,20 75:2,7 | 59:15 60:7 61:5 | 54:25 56:23 |
| 37:11 48:25 | 56:25 57:11 | 75:16 77:8 | **causes** | **changed** |
| 70:24 | 58:21,24,25 | 78:11,17 79:6 | 61:18,20 69:2 | 54:24 56:18,22 |
| **board** | 59:16 60:3,8,19 | 80:8 85:23 | **causing** | **changes** |
| 29:12 | 61:5 67:9 68:6 | **case** | 56:2,4,24 | 55:1 |
| **boarded** | 68:13,25 69:2,3 | 5:19 6:15,23,24 | **cauterization** | **Chang's** |
| 30:1 | 69:20 70:3 72:6 | 7:3,4,6,13,14,15 | 9:11 | 19:10 62:24 |
| **boards** | 73:24 74:10 | 7:18 8:1 9:5,14 | **cauterize** | 82:22 85:5 |
| 29:22 30:6 33:5 | 75:3,4 76:18 | 10:11,20 14:23 | 9:8 | **chapter** |
| **body** | 81:7 83:19 | 15:3,5,10 16:24 | **cautious** | 36:12 37:5,15,20 |
| 61:4 | **burned** | 19:5 20:25 21:9 | 34:20 | 38:1 48:24 |
| **boil** | 44:8 58:2 66:20 | 21:17,20,22 | **caveats** | **charge** |
| 73:8,20 | 73:2,14 76:25 | 23:1 24:3,13 | 57:22 | 27:20 64:18 |
| **book** | **burns** | 25:5,12,21,23 | **certain** | **chart** |
| 36:12 37:5,20 | 13:12 22:12 | 25:23,23 26:1,3 | 17:17 47:8 65:22 | 13:8 14:5,11 |
| 38:1 48:24 | 54:10 70:8,25 | 27:3,13 34:22 | 65:23 | **CHARTERED** |
| **bothered** | 71:7,22 77:2 | 35:18,23 36:1,5 | **certificate** | 3:15 |
| 86:16 | 79:12 80:2 | 36:14 37:14 | 4:21 15:24 17:22 | **chase** |
| **bottom** | 82:17,23 83:20 | 39:5,13,19 | 86:4,19 90:1,17 | 72:12 |
| 62:19 | 84:2 | 40:12 41:21 | **certified** | **check** |
| **Boulevard** | **Butch** | 42:22 44:12 | 29:12 90:2,25 | 88:15,16,17 |

chest
46:22 55:23
56:21 57:15
58:2 62:22
72:21 73:1
claim
57:2
Claims
15:11,25
clarification
79:20
clarify
80:10
Clark
1:5 6:15 12:5,13
12:20 13:1,5
21:4 40:6 44:17
46:16 55:20
69:19 81:21
82:16
Clark's
13:12,13 39:25
61:4 62:22
82:16,22
clear
10:23 49:7 81:9
87:25
cleared
86:11
clinical
86:6
clinically
85:8
clothes
84:3
clotting
34:13,16
CLR
1:25 2:19 90:2
coincides
50:4
collected
61:1
collective
66:9,10
collectively
70:7 80:1

College
37:2 49:5 50:3,6
50:15 51:5
collegial
82:12
COLUMBIA
3:13
come
37:13 72:17
comes
8:24 45:20 47:20
53:8
coming
5:12 47:12
communication
24:4 70:10 80:3
compadres
35:20
complaint
13:11 16:1,2
complete
86:19
completed
32:22
computer
16:5 17:7,11
concentrating
61:18
concern
68:24
concerned
74:3
concerning
17:18 48:21
73:10
conclude
54:5
concluded
57:8 59:12 89:14
conclusion
44:23,25 46:6
56:12 60:6 66:1
66:24 67:4
conclusions
16:24 17:18 77:6
condensed
89:10,11

condition
82:22
conduct
42:19 65:6 80:9
80:16
conference
5:12 51:14 54:16
confirmed
64:11
confused
24:19
confusion
14:12 87:3
conjunction
33:14,17
connected
59:14
connecting
55:21 56:3 58:19
59:14
connection
11:13 14:21 19:4
19:7 20:5 21:21
22:25 27:19
36:2,9 38:24
39:1,25 42:22
42:24 43:24
45:13,16 46:14
52:16 53:17
54:10 64:15
66:18 68:5 85:9
connects
41:4
consequence
44:18
construction
42:10
contact
68:19
contained
23:13
continually
21:25
continuing
22:5
conversation
11:16

Copies
4:10
copy
4:11,15,17,20,23
7:23 8:6,8,19
11:5,23 13:15
13:15 15:21
16:2 28:10,18
28:25 53:3,4,5
62:1,2,5,8,13
89:8
cord
41:3 44:15 45:22
45:23 46:2
55:21 56:3,13
56:24 57:9,9,10
57:19 58:1,3,13
58:19 59:14
60:7 61:13,14
cords
49:8 56:18,22
57:25
correct
6:12 12:18 13:22
14:25 15:6,16
18:6 19:19
21:10 22:2
25:13 29:3,22
32:5,10,19,25
33:2,3,6,12 34:2
36:10 37:1
38:13,18 39:13
39:23 40:6,19
40:24 41:1 43:4
43:6,20 44:9
45:17,19 46:16
46:23 48:1,8
53:18 54:2 55:3
56:25 57:20
58:12,21 59:16
61:12 63:18
64:6,13,17
65:20 67:22
70:4,19 72:2,3,6
72:8 76:7,12,18
77:10,15,25
78:14 81:21

84:5,8 85:6,7
correlation
50:12
correspondence
23:3,5,19
counsel
3:1 4:9 6:18 7:6
7:25 11:5,9,23
12:16 13:14
15:10,11,20
16:3 17:16
18:25 24:3,5,5
28:11,16 53:8
55:10 62:17
81:25 82:18
84:4,8 85:18
88:3,14 90:12
country
46:13
county
1:8 6:16 7:1,2
10:14 14:9
couple
30:19 34:9 36:23
36:25 87:4
course
9:2 40:5
court
1:1 2:8 22:19
25:11 27:21
37:14
courts
33:22
cover
84:3
covering
62:22
Craig
24:12
created
69:19
Critical
51:13 54:16
CRR
1:25 2:19 90:2
CSR
1:25 2:18 90:4

Case 1:13-cv-00184-JFM   Document 51-1   Filed 05/04/14   Page 29 of 42
DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

94

**curious**
48:24
**current**
28:18 90:3
**currently**
34:6
**curriculum**
4:16 28:11,19
  31:17
**cut**
5:24,25 72:11
  81:6,12,13
**cutting**
9:11
**CV**
31:22 33:8 36:12
  48:10 52:4
  53:22 55:2,14

───────
**D**

**D**
4:1
**DARBY**
3:4
**date**
18:1,8 21:21
  22:10 24:2
  25:17 32:23
  52:12
**dated**
4:24
**dates**
17:1,4,9 18:23
**day**
90:21
**days**
29:7
**dealing**
17:6
**decided**
66:6
**defendant**
8:1 65:9 86:2
**defendants**
1:9 3:13 4:11,15
  4:17,20,23 11:8
  28:15 62:16
  64:25 65:15

69:18 70:7
74:22 79:22,25
85:17 88:2
**defendant's**
86:9
**definition**
72:3
**degree**
83:4 84:22
**deposed**
5:21
**deposition**
1:15 2:1 4:12
  5:18 7:18 8:7,8
  8:24 11:1,2
  18:19 19:10,15
  20:1,6 27:22
  28:10 41:25
  62:24 71:3
  81:23 85:13
  89:13
**depositions**
14:17,18,19 36:9
  64:11
**derogatory**
82:2
**deserve**
57:23
**detail**
9:22
**details**
10:22
**determine**
12:14,24 37:13
**deviated**
64:16,24 66:2,5
  74:7
**deviation**
15:14 75:16
  78:10
**device**
71:21
**dictate**
12:24
**dictated**
74:5
**dictum**

56:20
**died**
27:8
**difference**
10:15
**different**
22:8 37:12 51:18
  51:25 52:13,14
  73:3 80:12
**direct**
57:6 74:19
**direction**
90:9
**directly**
62:22 77:3
**disclosure**
86:24 87:4,15,22
**disclosures**
4:19 25:10
**discoloration**
84:11
**discoverable**
10:20
**discovery**
13:16 87:6
**discuss**
36:22 50:6
**discussed**
13:14 18:25 36:5
  53:14 72:15
  74:25 86:23
  88:4
**discussing**
79:22
**Discussion**
81:18 82:13
**disfigurement**
83:5 84:10 85:3
**dismantling**
90:16
**dispute**
18:12 59:23
**dissipate**
47:7
**dissipated**
46:4
**dissipates**

47:17,19,21
**distinction**
36:21
**DISTRICT**
1:1,2
**DIVISION**
1:3
**doctor**
5:11 7:19 9:4,13
  9:18 12:1,20
  13:7,25 16:7,20
  17:15 18:20
  27:12 29:2 34:4
  41:15 42:19
  53:18 57:5
  58:17 59:23
  62:23 65:5,10
  73:15 74:12
  78:4,25 79:6
  81:20 84:18,24
  88:12
**doctors**
26:9 36:6 42:21
  65:23
**document**
4:17 11:7 12:2,6
  12:12,19,25
  13:3,4 18:5
  25:22 28:14
  62:15 65:5,7
  68:3,10,14,15
  68:21,22,24
  69:11,14 81:16
  85:16,24 87:16
  87:19 88:1
**documents**
8:16 11:3,17,22
  12:18 13:22
  17:10,12 18:16
  18:20 19:2,4,8
  20:18 22:11
  87:10
**dog-ear**
19:11
**doing**
5:16 26:12 31:22
  31:24 47:14

53:11 70:10
71:19 86:16
**Dr**
4:15,20,23 6:16
  7:9 8:12,25 14:4
  14:7,20,24
  15:16 16:22
  17:19,24,24
  19:10,15,17,18
  20:13 23:20
  39:12,19,24
  40:4 41:17 42:7
  43:18 46:15
  60:15,23 61:4
  62:20,24 63:2
  64:11 65:9
  66:13 70:2,16
  70:24 71:10,18
  72:5,19 73:11
  74:5,7,11,23
  75:3 76:2,7
  78:16 79:11
  82:22 85:5 88:5
**drape**
62:21 63:5,9,11
  63:24 64:5
**drive**
20:4
**Duces**
4:12
**duly**
5:6

───────
**E**

**E**
1:25 2:18 4:1
  90:2
**earlier**
79:22
**easily**
77:3
**easy**
22:18
**edge**
44:4
**education**
22:5 32:23 37:8
**effect**

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

95

51:9,25
**efforts**
6:8
**either**
16:1 24:15 25:18
28:20 32:17
43:20 48:1
81:25
**electrical**
49:8
**electronic**
12:11 17:6 23:10
24:4 53:5 89:7
**electronically**
11:19 12:7,17
**ELH**
1:7
**eligible**
33:4
**eliminate**
67:8
**Emig**
3:15 5:15
**enclosed**
23:23
**engineer**
20:21 57:8 59:12
**engineering**
20:25 48:5,8 59:2
59:9
**engineers**
60:4
**engineer's**
60:5
**enlighten**
7:6
**ensure**
75:16 78:21 79:7
**ensured**
75:2
**entire**
71:9 79:25
**entitled**
4:17 23:19 59:22
74:13,14,16,18
74:19
**environment**

69:20
**ERIC**
3:14
**esophagus**
27:7,13
**essence**
66:15 73:16,20,21
73:21
**essentially**
14:4 23:15,17
26:25 51:17,24
52:12 53:17
69:16 72:17,18
73:9,9 75:6
78:14 79:12
**establish**
16:20 17:16
**established**
53:16 77:21
**establishing**
68:3
**estimate**
25:20
**et**
1:8 22:16
**event**
7:22 15:19 69:21
74:24 89:8
**everybody**
65:13
**exact**
12:10 14:2 16:13
**exactly**
40:21
**examination**
4:3 5:9 21:3
**examine**
21:4
**examined**
5:7
**example**
47:11
**exception**
67:20
**excitement**
22:22
**excuse**

37:17
**Exhibit**
11:1,8 28:10,15
62:13,16 85:13
85:17 86:25
87:1,8,14,19
88:2
**EXHIBITS**
4:8
**exists**
55:10
**expand**
81:13
**expanders**
38:7
**expedite**
89:4
**experience**
37:9 85:5,25 86:2
86:6
**expert**
4:22 5:19 6:15
9:5 15:10,24
17:22,23 18:3
20:21,25 21:11
25:10 33:22
34:2,3 35:6 48:4
48:8 51:20 57:8
85:14 86:5,19
**experts**
8:25 14:23 15:3
16:22 18:10
35:10 67:12
**expert's**
58:8
**explaining**
74:15
**exposed**
9:24
**extent**
83:20 84:10 85:2
**extra**
62:1
**e-mail**
8:22 12:7 53:6
**e-mailed**
53:9

| **F** |
| --- |

**face**
82:2
**fact**
44:11 55:18,25
56:11
**failed**
70:9 80:3
**fair**
7:22 16:25 26:24
27:23 50:15
54:4 70:21
**familiar**
5:22
**far**
42:25 73:5 74:3
80:12 85:22
**fast**
6:2,5
**fat**
38:19
**favor**
86:1
**favorable**
69:19
**February**
1:16 5:1 51:16
54:19 55:3
**federal**
24:23 25:11
**feel**
47:22,25
**feelings**
82:16
**fees**
34:21,23
**feet**
41:7
**FELDMAN**
3:4
**fellowship**
32:9,12,13,18
**felt**
54:25
**fiberoptic**
45:13,16,23 46:2
71:21 75:9

**fiberoptics**
61:23
**field**
9:20 10:5,5,6
33:23 42:12,14
75:2
**fight**
82:6
**fighting**
82:10,11
**figure**
25:17
**file**
8:11
**filed**
15:10,11,25 16:1
85:15 87:5
**filing**
25:10
**finally**
75:11
**find**
23:22,23,24 48:24
**fine**
61:9
**finish**
31:19 81:1
**finished**
80:22 81:5
**fire**
7:4,5 9:8 10:4
46:7,8 49:19
58:18 60:16,19
70:8,13,17,18
70:18,22 75:3
80:2
**fires**
22:12 36:18 49:6
49:7,15,17,18
49:20 50:3,11
52:5 54:10
68:11,12 71:8
**firm**
5:15 7:16
**first**
5:6 15:8 27:22
30:11 51:8 58:1

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

58:23 78:24
**fits**
52:25
**five**
22:3 25:6,11,14
25:21 31:2 88:8
**floor**
49:9
**flowing**
9:19,23
**Flynn**
3:15 5:15
**Fogleman**
3:15 5:15
**folded**
46:21 63:2,25
**followed**
36:24
**following**
18:9 46:1 51:9
**follows**
5:7
**forced**
29:10
**Forgive**
22:22
**form**
20:2,9 36:15
37:21 39:6,15
39:21 40:1,7,25
43:2,7,15 44:24
45:8 46:18 56:5
56:15 57:1
63:10,19 65:1
67:10,24 68:17
71:11 72:22
76:23 79:17
**format**
12:10
**forms**
37:7
**forth**
21:9 90:8
**forwarded**
8:14
**four**
7:14 25:5,20,24

72:16 73:8
**fourth**
50:1
**four-per-page**
89:8
**Frederick**
3:7
**free**
75:2
**freely**
9:19
**Friday**
1:16 5:1
**frightened**
83:23
**front**
17:5
**full**
6:10
**further**
54:6 75:15 83:24
90:12

—————————
**G**
**Gaithersburg**
3:9
**gastro**
32:2
**gastroenterology**
31:17 32:1
**Gee**
27:9 28:13
**general**
1:8 6:16 14:9
29:3,5,12,19,24
30:1,13,21,24
31:1,6,10,11,11
31:14,18,23
32:2,11 41:20
86:10,14
**generally**
49:2
**general/vascular**
31:3
**generate**
34:21
**generated**
44:12,14,18,20

45:4,9,14 46:11
49:4
**generates**
45:19 61:11,13
**Generically**
39:8
**getting**
9:25 56:2
**GI**
31:18 32:2
**give**
5:23 6:9 26:11,19
31:4,9 53:4
57:22 62:4
**given**
52:4 54:6 75:17
**giving**
50:13 51:17,24
52:13 54:11
**Gleason**
3:15 5:15
**go**
11:2 18:20 22:10
28:7 29:1,20
34:18,23,24
39:7 47:2 48:10
48:13 50:9
71:25 75:6,11
79:20 81:17
82:5 84:2 86:8
88:15
**Godwin**
64:12
**goes**
41:4 45:24 50:25
51:5
**going**
5:23 6:5 13:14
14:12 18:24,25
31:21 33:8
35:15 48:3,21
54:15 57:5
58:16 59:19,24
76:20 82:17
83:25 88:13,23
88:25
**Good**

5:11,17
**graft**
34:12,16
**grafts**
86:16
**grand**
51:15 54:17,19
**grandfathered**
29:15
**GROSS**
3:4
**ground**
5:22 26:17
**guarantee**
53:20 88:17
**guess**
41:7 49:9
**guessing**
7:20 25:15 41:8
**gun**
77:23

—————————
**H**
**Hamilton**
3:16 4:4 5:10,14
5:17 6:4 7:5,11
7:17,25 8:3,6,10
8:19,22 9:3
10:17,21,24
11:10,25 12:3
12:16,23 13:6
15:23 16:6,9,16
16:19 18:2,6,11
18:14 20:15
22:23 23:15,17
23:22 24:1,8,10
24:14,22 25:19
27:18 28:4,17
34:15 35:12,14
35:22 36:20
37:18,24 38:5
39:10,16,22
40:3,10 41:2,12
41:14 43:3,9,16
45:3,11 46:19
47:1 48:6 53:15
55:5 56:8,16
57:4,16 58:10

59:4,11,21
60:12,18,22
61:7,10 62:4,8
62:11,18 63:13
63:22 65:3
67:13 68:1,20
71:13 72:24
74:1 76:10,15
77:5,14 79:19
81:3,19 82:5,10
82:14 84:16,23
85:19 86:7 87:2
87:9,13,18,23
88:4,8,11,23
89:2,5,7,11
**hand**
47:14
**handed**
12:2
**handle**
41:4,4 47:23
**handles**
47:4
**hands**
39:17
**hang**
44:4
**happen**
83:25
**happened**
18:8
**happening**
71:24
**happens**
5:25
**Happy**
83:17
**hard**
22:20 53:3,4
**hazard**
49:9
**hazards**
49:1,3,11 50:10
75:3,4
**head**
10:7,8 41:23
42:18

healed
83:21 85:2
healing
84:22
Health
15:11,25
healthcare
26:8,22,23 72:1
86:9
hearing
11:14
heat
44:9,12,14,18,20
44:22 45:1,4,5,9
45:13,19,22,23
45:24 46:2,3,10
47:6,17,22,25
56:24 57:11
58:5,21 59:15
60:8 61:11,13
61:20,21,22
68:25 76:25
heated
45:1,6,25 46:5
55:19 57:14,18
58:1,14 76:24
heating
60:3 69:8
heats
69:1
held
2:1 48:1 81:18
82:13
Herbert
64:12
hereunto
90:20
herewith
23:14
Heron
24:12
he'll
24:21
high
83:10
highlight
19:11

highly
86:12
history
12:4,6,9,22,23
14:13,15
hold
28:25 33:21 34:2
34:3 48:7 58:22
holding
47:13,16 90:3
holster
42:2,3,7 43:10
77:9,17,22,23
78:2
holsters
42:4 43:19,22
home
19:25 88:15
honestly
18:18
honor
82:4
hospital
1:8 6:16 14:7,9
14:16,24 16:23
17:19 20:21
32:24 34:24
64:23
hospitals
32:22 33:22
hot
47:4,16 56:2,4,7
56:12
hour
27:20,22,23
hours
28:1
hour's
52:25 53:2
Howard
1:8 6:15 7:1
10:14 14:9
Huh-uh
70:20
hypothetical
52:12 53:21
hypothetically

52:10

_____ I _____
idea
26:11 41:3,15
84:25
identification
4:8 11:1,8 28:15
62:16 85:17
88:2
identified
6:14 25:13,22
identify
86:23
ill
27:14
illness
12:9 13:10
immediate
46:23
immediately
88:16
impairment
83:4
implant
38:16
implants
38:12
important
44:6
improper
70:9 80:2,5 81:10
inaccurate
63:17
inappropriate
55:20 56:3,13,23
57:9,10,19 58:3
58:19 59:13,13
60:6,7
inappropriates
59:17
included
7:8
income
24:24 25:1
indicated
42:6 48:22
indicating

47:10,12 48:16
62:6 84:3
information
10:18 17:2 19:22
19:24 23:13
40:22 54:22
84:5
initial
21:11 29:2
initially
30:1
institution
41:21 52:14
institutions
37:1 51:25
instructed
70:14 71:7
instruction
8:13
instrument
9:10 69:1
intend
19:20 36:14
37:14 38:2
70:12 78:9
79:14
interest
31:25
interested
90:14
interrogatories
13:17
interrogatory
13:19
interrupt
65:10
Interruption
41:10
introduced
5:12
investigate
20:22
investigation
20:25 57:8
invited
51:23
involved

15:3 24:12 34:11
63:15 64:1,3
involving
35:23 49:17,20
50:11
issue
67:4,14 72:14,18
issued
14:22 20:16 90:4
issues
88:5
Item
11:11 14:12

_____ J _____
January
51:14 54:17
JCH
68:10
job
1:23 82:9
joining
45:10
joins
46:3
Joy
1:25 2:18 6:2
90:2
July
28:12
junction
45:23 61:13,14

_____ K _____
Karlin
8:23 13:15 19:1
keep
52:6 58:16 59:19
keeping
55:6
keloid
84:22
keloiding
84:12
kept
78:16,17
Kevin
3:5 24:9

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

98

**kind**
43:18 50:4,25
**kindness**
82:1
**knew**
56:18,22
**know**
6:7 7:2,21 8:3
   10:15 13:4 15:7
   15:17 16:4 17:5
   17:20 20:24
   23:18 25:15
   26:16 27:1,13
   27:15 29:10
   31:20 36:23
   39:23 40:4,12
   40:18,20 42:23
   43:12,14 46:12
   46:20 52:6,22
   52:25 55:6,10
   55:11,13 56:23
   56:25 57:7,12
   57:14,17 58:3,5
   58:12,13,14,18
   59:4,5,12,16
   60:5,9,13,25
   61:2,2,6,7 65:11
   68:15 76:1,6,11
   76:16 79:7 81:5
   83:11,12,18,20
   83:23,24 84:4,7
   84:10 88:14
**knowledge**
36:19 37:9
**known**
46:10
**Kusar**
2:8

———— **L** ————

**lack**
72:14,18 73:10
   74:25
**lacked**
70:7,16,24 71:2
   71:10 79:11,22
   80:1
**lady**

**9:6**
**latest**
28:22 55:1
**law**
3:6,17 5:15 7:16
**lay**
47:7
**laying**
46:5 69:7 75:10
   77:1
**leader**
65:8
**leave**
47:7 66:25 70:18
   73:12,23 75:8
**leaving**
78:19
**lecture**
50:13,17 51:8,9
   51:10,18,24
   52:13 53:14
   54:22
**lecturer**
50:6 51:24
**lectures**
36:25 37:3 50:2
   51:19,23 52:3,4
   52:9,10,16
   53:18 54:2,6,7
   55:6
**led**
59:15
**left**
32:3 66:13,16
   73:13 74:8 75:9
**length**
41:3,6,6
**lessen**
69:21 72:2,5
   74:23
**letters**
23:6,7,9,10,13,19
**let's**
25:3 26:17,18
   29:1 30:20
   40:14 62:6
   70:15,17,23

**81:17**
**level**
6:1 35:4
**license**
90:3
**life**
25:2
**light**
22:16 42:2 44:8
   44:13,14,20,22
   45:1,1,10,16,19
   45:20,20,21,21
   46:21 47:12,19
   61:11,12,13,14
   61:15,16,19,20
   61:23 68:25
   69:1,4,8,12
   75:21,22 76:25
**lighted**
8:13 13:12 35:24
   36:3 38:23 39:2
   39:4,8,12,18,24
   42:24 43:17,25
   44:18 45:5
   46:14 47:3
   60:14 61:3
   62:21 64:4
   68:13 71:20
   75:5,17,19 77:7
   77:9 78:22
**lights**
61:20
**likewise**
38:11
**line**
48:3
**lines**
84:13
**listed**
11:21 19:2
**literature**
21:21 22:4,11,24
   33:18
**litigation**
15:6,7,17
**little**
22:8 29:1,11

**37:11 47:11**
48:25 70:24
**LLC**
3:14
**LLP**
3:4
**local**
51:20
**long**
1:17 2:11 5:1
   29:8 52:22
**longer**
55:10
**look**
8:17 16:14 18:23
   55:9 88:13,15
**looked**
84:22
**looking**
48:13 59:8 69:16
**loose**
42:9
**lost**
54:13
**lot**
28:13 31:23
   33:25 52:8
**Lots**
59:17
**love**
24:19,21

———— **M** ————

**M**
3:5
**mad**
6:5
**main**
44:2
**malfunctioning**
77:8
**malpractice**
26:15
**manipulate**
81:13
**manner**
40:23 60:15 61:3
**manual**

**8:13 13:12 18:24**
**manufacturer**
68:18
**manufacturer's**
68:23
**March**
90:21
**marked**
10:25 11:7 28:9
   28:14 61:24
   62:12,15 85:12
   85:16 88:1
**Mary**
1:5 6:15 12:5
**Maryland**
1:2 3:9,20 65:11
**mask**
10:2
**material**
18:22 19:22
   20:13,13 77:24
**matter**
11:14 67:21
**Mayo**
41:18 42:15 44:5
**McAfee**
5:16
**mean**
7:20 9:23 12:24
   23:25 40:8 46:9
   47:9 49:7 50:22
   51:23 55:4
   58:13 60:19,21
   61:16 63:23
   83:9
**meant**
42:7,9 82:2
**medical**
12:13,15,21,23
   13:1 14:4,6,9
   21:15 22:5,24
   26:15 32:22
   36:10 69:18
   75:2
**Medline**
22:11
**meeting**

23:25 50:8,21
memory
34:10
mental
83:1 88:6
messy
80:19
met
24:2,15,17
metal
77:10,18
middle
26:17
mind
17:3 37:23 74:15
81:7
Mine's
16:4
mini
89:8
minimize
67:8 70:2
minuscule
25:4
minute
36:22 48:10
59:25 66:22
82:8
minutes
22:3 88:8
missing
61:25
model
60:21
moment
65:4
Monday
8:23 13:15 19:1
89:5
months
28:23 29:17
55:17
mood
54:25
move
40:17 58:17 59:6
multiple

22:21
Musketeers
82:1
M.D
1:15 2:1 3:14 4:5
4:13 5:5 89:14

N

N
4:1
name
5:14 6:10,24 7:9
7:15 90:21
named
5:19 14:24 16:22
names
14:2 25:25 35:9
naming
18:9
national
68:3,13
nationwide
60:14
nature
22:6 31:6 41:19
49:23 54:11
75:18 88:6
necessarily
54:7
neck
10:7,8
need
7:10 47:2 56:9
57:5 61:7,25
71:22 74:12
84:17 89:6
neither
27:16 90:12
never
32:4,17,21 38:6
38:11,15,18,22
40:11 71:4,7
81:20 82:19
83:22 85:8
nodding
15:12
Nods
42:18

non-proffer
88:5
North
3:7,18
NORTHERN
1:3
notes
19:8 35:15 36:8
notice
2:18 4:11 8:11
11:2
notwithstanding
72:16
null
90:18
number
26:10,18 72:16
nurses
15:15 17:19
19:11 55:20
56:3,13 57:10
57:18 58:19
64:16,23 65:6
65:22 66:1,13
78:24,25 79:6
79:11
nursing
14:19 41:25

O

object
20:9 36:15 37:17
37:21 39:6,15
39:21 40:1,7,25
43:2,7,15 44:24
45:8 46:18 48:3
56:5,15 57:1
63:10,19 65:1
67:10,24 68:17
71:11 72:22
76:23 79:17
objection
38:4 46:24 57:13
58:7,23 59:20
60:11,17 73:19
76:8,13
obviously
14:22 18:8 26:11

32:7 38:23
47:10 48:7
49:14
occasion
38:23
occur
49:19
occurred
44:17 76:18
occurring
69:22 74:24
Ocean
2:9
October
51:15 54:18
odds
52:7
offer
11:13
office
14:5 15:25 20:1
off-the-record
11:15
oh
7:12 10:8 17:14
40:13 55:15
73:4 78:6 81:5
83:9 86:2,11,15
okay
6:14 7:3,11,17,25
8:10,19,22 9:1,4
9:22 10:4,10,13
10:17,21,25
11:11,21,25
12:12,16 14:3,8
14:17,21 15:2,5
15:19 16:6
17:14 18:11,19
18:24 19:7,24
20:16,17,20
21:8,24 22:15
23:12 24:2,15
24:18 25:7
26:10,17 27:3
27:17 28:9,22
28:24 29:9,12
29:19,21 30:3,6

30:15,25 31:2
31:13,16 32:4
32:21 33:4 34:4
34:8 35:2,15
36:1,21 37:7,11
37:25 39:11
40:11,18 42:5
43:24 44:3,7
45:4,15 46:12
48:20 49:14,21
49:25 50:1,9,25
51:3,12 52:3,16
52:22 53:3,6,11
53:25 54:4,15
55:1,8,15,24
56:19,22 58:11
61:2,24 62:12
63:8 64:3 65:22
65:25 66:11,17
66:24 67:3,14
68:9,12 69:8
70:1,23 71:14
72:5,8,10 74:18
74:20 75:23
77:21 78:6,13
78:24 79:10,14
79:20 80:10,18
80:25 81:25
82:2,19,25 83:7
83:16 84:4 86:8
86:22 87:17,24
88:8,20 89:2
once
18:16 22:21 40:9
40:16 47:4
ones
43:22
one-minute
35:13
on-line
22:10
operating
36:18 41:17 49:1
49:15,19 50:3
50:10 51:18
52:5 70:8,10,17
70:25 79:12

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

100

80:1,4
**operation**
9:7 10:23 13:8,12
18:24 40:9,11
40:16 64:19
71:20 80:9,16
**operations**
39:1
**operative**
9:20 10:5,6 41:17
**opinion**
9:16,17 15:14
17:24 19:20
20:3,14 21:17
36:14 37:20
59:1 66:11,12
67:22,22 69:16
70:12,15 71:1,9
72:18,25 73:5,9
73:10 74:2,4,9
76:21,21 77:19
78:24 79:5,10
83:1,14
**opinions**
14:23 15:2 16:21
16:23 17:18
20:8 21:9 64:15
64:22 67:16
69:15,17 72:13
74:21 78:8,15
83:3,7 85:22
**option**
77:15,16,17
**Orange**
51:15 54:17,18
**organization**
35:9
**organized**
55:5
**original**
18:4 90:17
**Originals**
4:9
**outcome**
90:14
**outside**
27:2

**overall**
37:8
**overheating**
81:7
**oxygen**
9:9,19,23,24 10:1

**P**

**page**
4:3 16:10,17
48:11,17 50:1,9
50:23 51:8,12
51:13 54:15
62:19 64:8
72:10 75:11
79:21
**pages**
1:24 4:14,16,19
4:22,25 19:12
**paragraph**
7:12 64:9,10
69:17 70:6
74:22,24 75:1
75:15 79:21
86:5
**paragraphs**
72:15,16 73:8
**paraphrase**
70:23
**paraphrasing**
11:12
**part**
10:17 19:19,20,23
20:2,7,14 22:4
23:10 27:24
28:5,7 29:5 37:7
37:8 44:6 47:15
50:7 86:23
**particular**
34:22 44:12
75:19
**parties**
13:16
**party**
90:13
**pass**
30:9
**patient**

9:25 26:21 36:2
41:23 44:6,8
46:22 49:18
55:22 58:2,15
60:1 61:5 63:6
66:8,13,16,20
67:2,7,8 68:6,19
73:12,13,24
74:9 75:8,10
77:1,2,3,16 78:2
78:18,19 79:4
**patients**
33:22 43:1 49:20
83:15 86:16
**patient's**
56:21 57:15
72:20 73:1
**pay**
86:16
**peer**
33:18
**pending**
34:6
**people**
22:21 34:23 57:2
67:11 82:6
83:12
**percent**
26:23
**percentage**
26:20,20 30:21
31:4,5,7,7
**perfect**
81:15
**perforation**
27:7
**perform**
71:23
**performed**
38:6,11,15,19
46:15 75:18
**peripherally**
80:23
**permanent**
83:4
**personal**
70:7,17,24 71:2

71:10 72:14,19
73:10 74:25
79:11,23 80:1
**personally**
21:6 24:3 35:2
39:5
**pertaining**
21:2 33:9
**peruse**
17:8
**Peruses**
65:7 85:24
**photographs**
13:11 19:3
**physician**
6:12
**picture**
19:21,23 20:12
83:22 84:14
**pictures**
84:21,25 85:1
**pie**
82:7
**place**
42:25 90:8
**placed**
15:6 55:23 56:7
57:9,15 58:4
59:18 60:1 61:4
62:21 63:8,24
66:7 72:20 77:3
**placing**
46:21 56:3 64:4
67:7 70:3
**plaintiff**
1:6 3:3 12:5
14:14 21:3 26:7
**Plaintiff's**
4:18 86:24 87:14
**plastic**
3:13 7:4,5 9:7
32:4,9,12,18,24
33:5,10,14,17
33:19,23 35:17
42:22,23 43:5
46:13 60:14
85:9 86:10,14

86:15
**please**
6:7 23:22,23,24
**plugged**
41:5 45:15 47:5
47:13
**plural**
65:5,17
**plus**
27:21
**point**
17:15 51:1 62:20
74:2 84:11,24
**popular**
25:8
**portfolio**
23:11
**portion**
45:5
**position**
47:6 67:5
**positioned**
41:16,22
**positioning**
60:22
**post-treatment**
83:22
**potential**
70:3
**pouch**
42:10
**PowerPoint**
52:17,19 53:17
55:2 88:13
**PowerPoints**
54:8,10
**practice**
21:18 30:21 31:6
31:7,8 34:24
**practiced**
85:8
**practicing**
22:2
**precautions**
57:3
**preclude**
66:20

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

101

predicate
48:14,20
premised
68:24
preparation
18:19 22:5
prepare
52:17
prepared
12:13,20,25 13:5
15:9 25:10
presence
9:9 61:12
presentation
52:17,19 54:16
presented
75:5
presume
7:21
pretty
5:21 25:4 31:13
49:13
prevent
71:23
previous
7:14 47:2 50:4
51:10
previously
5:11 54:21
primarily
49:21
print
17:12
printed
16:13
prior
7:15 14:23 17:23
24:2 25:7
privilege
32:23
privileges
32:21,24
probably
19:25 26:16,23
28:23 31:1
52:21 54:5
procedural

15:13
procedure
13:13 62:20
70:11 71:23
75:6 80:4
procedures
38:24 42:25
46:15
proceedings
41:10 90:7
process
23:18
produce
8:7 10:20 11:17
17:7 19:1 23:3
24:23 28:18,19
50:20 53:3 54:7
54:14 55:7
69:13
produced
17:22,23 18:1
20:14 44:15
55:10
produces
9:20 46:2,3 61:23
production
8:15 13:22
proffer
88:5
proffered
48:4
proper
70:9 75:17 77:9
77:17 78:21
79:8 80:3
prospective
35:10
protect
67:6
provide
9:22 10:18 11:4
13:14 68:14
provided
8:15 12:5 13:16
14:2,13 22:24
28:11
provider

26:8,22,23
providers
72:1
provider's
86:9
provides
35:9
providing
23:8
public
33:21
publication
50:13,14,16
published
36:23
pull
26:10
pulled
20:6
purpose
44:7
Pursuant
2:18
put
20:12 24:20
39:17 40:21
42:7 44:2 50:8
56:21 63:3
68:19 73:1
putting
42:8 72:13
p.m
1:18 5:2 89:14

**Q**

qualified
4:21 15:9,20,24
17:22,23 18:3
21:11 29:20
32:8,12 85:14
86:5,19
question
6:6 20:6 22:8
31:19 34:1
37:11 43:6 47:2
47:9 48:14,21
49:15 55:24
56:9,10 57:24

58:11,17 59:8
59:19 62:25
63:16 64:20
73:3,15,20
74:13,18 84:7
84:17
questioning
48:4
questions
5:23 14:10 28:24
88:19
quick
62:2
quote
37:15 64:25 68:9
69:20 79:25
quoting
71:14 77:18

**R**

range
49:24
reach
35:3
reached
16:23 17:17 66:1
read
60:4,10 81:23
85:20
reading
19:22 20:12
21:25 88:20
real
62:2
reason
31:21 57:17
reasonable
66:19,21,25 68:5
reasonableness
67:15,19,21
reasonably
55:9
recall
7:3,25 9:4,17
10:10 14:18
25:25 27:3
63:20,23
receive

18:16
received
12:7 16:21 17:1,9
18:18 20:18,20
23:7 25:1
recertified
29:17 30:3,15,16
30:17,18
recertify
29:16
recess
35:13 41:13
62:10 88:10
recollection
23:12 25:16 49:2
reconstruction
38:7,12,19
reconstructive
32:5,9,18,25 33:5
33:10,19,23
85:9
record
5:13 6:9 12:13,15
13:2 22:20 52:6
81:17,18 82:4
82:13 86:22
records
5:20 11:11,12
14:4,6,9 17:6,8
21:2 36:10
62:24 82:21,22
refer
65:11 87:11
reference
8:12 14:3,8 41:16
64:24 65:14
70:6
referencing
64:9
referred
42:1 87:14
referring
12:19 14:11,13
17:25 28:2
35:18 42:17
86:4 87:19
reflect

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

| | | | | |
|---|---|---|---|---|
| 82:4 | 6:8 39:3 | 42:7 71:17,19 | 45:5,6,10,25,25 | **richer** |
| **regardless** | **report** | 72:1 73:11 75:7 | 46:3,5,14,21 | 33:25 |
| 77:6 | 4:24 7:9,11 8:12 | 78:17 | 47:10,13,25 | **right** |
| **regards** | 8:14 11:21,23 | **requires** | 48:1 55:19,23 | 16:14 17:4 18:4 |
| 83:8 | 11:24 14:22 | 77:8 | 56:1,2,4,4,6,12 | 18:15 22:3 33:7 |
| **regular** | 17:23,24,25 | **requiring** | 56:14,24 57:10 | 34:16 38:10,21 |
| 89:10 | 18:3,15 20:16 | 79:6 | 57:14,18,20,21 | 39:25 40:2 48:2 |
| **related** | 20:17,21 21:11 | **research** | 58:1,4,5,14,20 | 62:7 64:7 81:8 |
| 49:13 88:5 90:13 | 21:12 25:13 | 25:17 | 58:21 59:2,14 | 81:22 86:8 88:7 |
| **relates** | 42:6,6 58:9 59:3 | **residency** | 59:15,15,18,23 | **Ringel** |
| 13:9 86:10 | 59:10 60:4,10 | 32:4,8,11,14,15 | 60:2,7,8,14,22 | 3:5 7:8,12 8:2,4,9 |
| **release** | 62:1,14 63:8 | 32:18 | 61:3,11,15 | 8:17,21 9:2 |
| 45:24 | 64:4 65:14 | **residents** | 62:21 63:3,4 | 10:16,19 11:6 |
| **released** | 69:16 71:25 | 22:6 | 64:5 66:7,12,15 | 11:24 12:21 |
| 46:4 | 72:10 78:3 | **respect** | 67:1,8 68:13 | 13:3 15:22 16:4 |
| **reliable** | 79:21 85:13,21 | 66:4 | 69:6,9 70:3 | 16:8,12,18 |
| 84:6 | 87:8,9,20,21 | **response** | 71:20 72:20 | 17:20 18:4,7,12 |
| **relied** | **REPORTED** | 8:15 20:5 74:19 | 73:12 74:8 75:5 | 20:9 22:18 |
| 21:16 | 1:25 | **responses** | 75:8,9,17,19 | 23:16,21,24 |
| **rely** | **reporter** | 5:24 13:19 | 76:24 77:7,9,24 | 24:6,9,9,11,17 |
| 20:7 37:14 | 6:3 22:19 34:14 | **responsibilities** | 78:17,22 79:7 | 24:19 25:16 |
| **relying** | 61:9 62:3,9 | 65:22,23 | **retractors** | 27:16 28:2 |
| 19:14,16,18 36:13 | 88:22 89:4,10 | **responsibility** | 22:16 39:9 43:17 | 35:21 36:15 |
| 37:19 48:23 | 90:3,25 | 66:9,9,10 | 43:25 47:4 | 37:17,21 38:4 |
| **remain** | **Reporters** | **responsible** | **returns** | 39:6,15,21 40:1 |
| 72:20 | 2:8 | 65:13 | 24:24 | 40:7,25 43:2,7 |
| **remember** | **Reporter's** | **result** | **review** | 43:15 44:24 |
| 6:24 7:21 10:13 | 90:1,17 | 49:5 50:14 56:2 | 8:11 14:21 18:20 | 45:8 46:18,24 |
| 10:16,23 14:1 | **reports** | 73:6,17 74:9 | 19:7 21:21 22:4 | 48:3 53:13 56:5 |
| 17:2 18:18 | 18:9 21:8,14 | **resulted** | 24:25 27:20,21 | 56:15 57:1,13 |
| 20:19 21:23 | **repositioning** | 60:3 | 34:21 35:10 | 58:7,22 59:7,20 |
| 22:17 23:2 28:7 | 38:16 | **retain** | 36:9 59:2 62:24 | 60:11,17,21 |
| 33:20 34:12,19 | **represent** | 7:23 34:23 35:1 | 65:4 | 62:5 63:10,19 |
| 49:4,10,11 64:2 | 19:3 | **retained** | **reviewed** | 65:1 67:10,24 |
| **removed** | **representative** | 4:9 11:9 20:22 | 5:20 6:18 9:1 | 68:17 71:11 |
| 9:6,7 | 85:21 | 21:20 22:9 | 11:11,12,22 | 72:22 73:19 |
| **render** | **representing** | 28:16 62:17 | 13:17,24 14:1 | 76:8,13,23 |
| 19:20 36:14 | 82:16 | 85:18 88:3 | 14:18,22 15:5,8 | 77:12 79:17 |
| 64:22 70:12 | **request** | **retract** | 18:9,22 19:4,10 | 81:1 82:3,9 |
| 76:20 78:9 | 8:7 13:21,21 37:2 | 81:13 | 20:20 26:21 | 84:19 86:4 87:1 |
| 82:25 83:3 | 52:1 53:12 | **retractor** | 33:18 36:1 66:1 | 87:3,10,17,21 |
| 90:17 | **requested** | 8:13 13:13 35:24 | 69:11 | 87:24 88:7,19 |
| **rendered** | 11:3 50:5 | 36:3 38:23 39:3 | **reviewing** | 88:25 89:3,6,12 |
| 9:17 15:14 | **requesting** | 39:4,12,18,24 | 17:24 26:14 | **risk** |
| **repeat** | 89:3 | 40:5,16 41:5 | 64:11 | 71:22 73:24 |
| 35:16 | **required** | 42:2,24 44:9,13 | **Reynoso** | **Rockville** |
| **rephrase** | 29:15 30:16 40:5 | 44:18,21 45:1,2 | 25:23 27:3 | 3:20 |

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

103

**room**
5:12 36:18 49:1
49:15,19 50:3
50:10 51:18
52:5 61:21 70:8
70:10,17,18,25
79:12 80:1,4
**rounds**
51:16 54:18,19
**RPR**
1:25 2:19 90:2
**Ruff's**
17:24
**Rule**
4:18 86:24 87:14
**rules**
5:22
**run**
49:8
**Russell**
1:15 2:1 4:4,13
5:5 6:11 89:14

**S**

**safety**
51:18 52:5 54:11
**sat**
63:3
**satisfied**
87:7
**saw**
31:16 36:22
83:22
**saying**
57:21 66:10
68:11,19 73:5
80:6
**says**
28:12 59:5 71:3,6
75:15
**scare**
27:11
**scarring**
85:3
**scenario**
32:17
**scheduling**
23:25

**scholarly**
21:16
**script**
89:8
**search**
22:11
**second**
7:12 16:8 35:12
58:22 69:17
74:21 79:5,24
81:17
**secondary**
35:24
**see**
24:21 28:21 33:9
52:3 59:9 62:6
70:2 72:8 73:4
83:14 85:20
**seen**
39:17 42:1 58:8
68:22 81:24
82:21
**sense**
78:5,6
**sent**
11:18,18 18:21
68:10
**sentence**
70:23 71:6 79:25
**sentences**
72:17
**separate**
12:19 33:16
**separated**
63:4,5
**services**
35:5
**set**
84:2 90:8
**setting**
21:8
**settings**
75:17,20,21,22
76:1,7,16,17
78:21 79:7
**seven**
55:16

**ship**
65:9,12
**shorthand**
90:3,8,25
**shortly**
85:15
**show**
10:25 11:25
15:20 16:6,10
28:9 61:24
62:12 69:11
85:12
**Shure**
1:25 2:18 90:2
**sic**
11:16
**side**
41:16 47:12
**Siegle**
17:24
**sign**
88:21
**signature**
16:10,17 88:22,24
89:1,13
**signed**
16:2 85:14
**simple**
58:12
**sincerity**
67:15,19
**single**
66:12
**sir**
6:9 50:18 56:10
74:16
**site**
9:24 41:17
**sitting**
44:16 46:12 57:7
**six**
25:21 28:23 41:7
55:16
**size**
57:19
**skeleton**
54:24

**skin**
56:7 86:16
**skipping**
62:13
**slash**
31:23
**slides**
52:23
**small**
35:3
**smile**
82:1
**SOBIN**
3:4
**sorry**
23:16 24:8 28:6
46:9 48:17 53:1
54:13 63:14
67:18 71:5
75:13
**sort**
60:25
**source**
14:12 44:9 45:6
45:10,20 75:21
75:22 76:25
84:5
**spark**
9:21
**speak**
37:16 42:21 43:5
43:8
**speaking**
8:10
**specialized**
86:13
**specialty**
30:22 33:10 85:6
86:10
**specific**
19:14,17,18,24
20:5 37:15,19
37:22 41:21
42:3 46:13,21
53:12 54:9
60:13 68:3,15
76:6 85:5 87:12

**specifically**
13:4 21:1 22:10
36:13 38:1,2
39:12,24 42:22
43:21 48:23
53:13 68:4
70:16 76:3
**speculate**
51:21
**speed**
21:10 23:18
**spoke**
82:18
**spoken**
21:6 81:21 82:15
82:19
**squabble**
87:6
**staff**
70:10 80:4
**stage**
15:18
**standard**
15:15 59:24,24
64:17,24 65:20
66:2,5,18 67:5
68:4,7,14 69:23
72:1 73:6,11,18
74:3,5,8,20 75:1
75:7,16 77:4,8
78:11,17,18
79:6 80:7 85:23
**standards**
69:18
**standing**
5:15
**standpoint**
32:1
**stands**
41:18
**start**
40:14
**started**
14:10 29:4 70:13
70:14
**state**
2:19 24:24 26:25

74:2 79:24
83:10 90:4
stated
69:12
statement
15:9,19 16:21
41:24 63:17
64:22 71:8
85:23 86:17
STATES
1:1
staying
79:4
steps
66:19 68:5,5
69:21 70:2 72:2
72:5 74:23
83:18
Steven
3:16 5:14
stick
79:14,18
stipulate
17:17,21
store
77:17
stored
77:9
storing
42:9
straight
47:18
Street
3:18
strike
26:12 42:20
71:17 72:11
83:19
stuff
21:25 52:8 86:12
86:13,15
subscribed
90:20
subsequent
54:2
subspecializing
29:4

subspecialty
30:22
substantial
23:21
sue
83:9,11
sued
34:4
suffered
77:2 83:1
Suite
2:10 3:8,19
suits
34:6
summary
69:15,17 72:13
74:21
supervision
90:10
supplement
7:16 8:9
supplementary
10:1
supplementation
8:11
support
20:7 36:13 37:20
sure
8:25 13:4 41:12
49:13 54:14
59:7 62:9 66:14
67:11 81:15
87:24
surgeon
35:18 47:13,15,22
65:12 66:19
67:6 77:15
80:19
surgeons
37:3 42:23,23
43:5 46:13 50:3
60:15 67:4
86:11,14,15
surgeon's
66:8
surgery
3:14 5:16 7:4,5

9:7 29:3,4,5,5
29:13,19,22,24
30:1,7,13,16,21
30:23,24 31:1,6
31:8,14,14,18
31:18,23,25
32:2,2,5,9,11,12
32:19,25 33:5
33:10,15,17,19
33:23 38:7,12
39:25 40:6
51:15 54:19
75:18 85:10
86:10,14
surgical
32:24 46:15
54:17 69:20
70:9 75:2,3,5
80:2,4,5,7,13
81:10
surgically
85:9
surveys
42:20
sustained
36:2 44:17
sustaining
82:23
swapped
57:25
sweet
82:7
switched
40:13,14 81:6
sworn
5:6
symposium
50:8,21,22
synthesized
19:21 20:14
system
16:14 55:5

———— T ————
table
42:15 44:2,5
77:10,18 82:7
tables

41:16
take
5:18 16:8,14
18:15 26:17
28:19 31:13
33:4 38:6,15
40:15 41:11
42:19 55:8,18
61:8 65:4 66:19
67:4,5,14,20
70:2 71:23 72:2
72:5 82:3,4 88:8
89:12
taken
7:18 14:17 30:6
35:13 41:13
57:3 62:10 68:6
83:19 84:21
85:1 88:10 90:7
talk
6:2 52:25 53:2
59:24 65:5,6,17
70:16 71:25
talked
50:11 64:10
74:22 86:25
talking
22:21 29:24
45:21 49:3,17
49:18,21 53:13
54:9 60:2 62:6
63:8 68:12
73:17 74:19
76:5,6 77:23
78:1,2 80:20
81:11
talks
64:4 86:5
tax
24:24
teaching
22:6
team
65:8 66:10 78:23
technical
14:20
technique

80:6,7,13,17
techniques
67:6 70:9 80:2
81:10
Tecum
4:12
telephone
24:4
tell
9:4 17:2 25:5
29:17 31:10
82:11
term
42:9 80:5 81:10
terms
5:24 7:6 26:20
41:15 50:11
51:21 56:1
59:25 65:12
68:3,13 71:19
79:4,5
test
35:10
testified
5:7 9:13 10:11
35:17,23
testify
37:14 78:9
testifying
26:7,15 34:22
testimony
11:13 19:14
text
12:7
texts
21:15
thank
74:7 88:12
thanks
27:9 61:9
thereof
27:24 28:8 90:14
thing
30:13 44:2 60:25
61:17 87:11
things
14:1 22:6 41:19

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

105

49:18,22,22
54:8,11 88:6
**think**
7:20 9:7 13:5
18:12 19:21
23:9,14 25:14
25:16 27:1 28:2
32:11,14 33:13
33:14 35:16
40:8,20 41:25
42:5 46:8 47:6
47:21 50:2,16
50:19 51:4,12
53:10,22 55:4
55:22 56:6 57:2
57:3 59:22 62:5
64:1,18 65:5
66:21 70:14
71:21 74:14
75:21 80:16
81:24 84:6,19
88:9,20
**third**
79:10
**thought**
15:18 31:16
51:20,22 53:16
58:25 73:21
81:6
**three**
14:19 24:13,15
51:18,23,25
78:14 79:14
81:25
**three-minute**
41:13 62:10
88:10
**threshold**
35:4
**tie**
81:12
**till**
29:20
**time**
6:1,1 15:10 16:1
21:20 22:9 25:7
30:11 32:22

50:20 57:15
69:3 76:17
82:17 83:13
84:11 90:8
**times**
34:8,9 40:4,12,20
60:13
**tissue**
38:7 59:18
**title**
49:14
**today**
5:18 28:20 31:11
31:12 44:16
46:12 57:7
79:16
**today's**
21:20 22:10 24:2
32:23
**told**
66:7 73:21 83:23
84:25
**top**
62:22 63:4
**towel**
42:8,11,13 44:1,4
44:5 46:22
62:25 63:3,4,4
63:12,15,25
64:1,3
**towels**
42:4 43:1,25 44:3
46:22 70:3
**track**
54:13
**tracked**
37:4
**trained**
71:4,5
**training**
70:8,17,25 71:2,7
71:10,16,17,18
72:14,19 73:10
74:25 79:11,23
80:1
**transcribed**
90:9

transcript
4:10 24:20 88:20
90:17
**transfer**
38:19
**transferred**
45:2
**transmitted**
45:22 61:22
**travel**
27:21
**travels**
44:15
**treated**
12:10 82:23
**treatises**
21:15
**treatment**
17:18
**trial**
10:11 76:21 78:9
**true**
11:20 65:23
80:13 85:3,4
**Trust**
24:19
**truth**
55:4
**try**
21:10
**trying**
12:14,24 13:24
16:20 17:15,20
20:4 22:18
37:13 50:12
61:17 72:11
84:19,20
**turn**
48:11 50:1 64:8
**turned**
45:16 75:24
76:11,12
**two**
17:13 57:25
87:10
**type**
7:3 22:11 39:2

42:19 43:17,19
46:14 49:3
71:19 77:24
**types**
42:25
**typewriting**
90:9
**typical**
76:3,5

---
**U**
**uh**
9:10 20:19 31:3
51:2 63:11 66:6
66:6,7 72:7 78:1
79:12
**uhm**
20:11 23:14
26:16 29:10
34:9,12 41:22
42:3 47:17
49:24 51:11
52:6 55:22
63:20 64:1,18
65:2,8 68:7 69:1
69:13 70:5,13
71:3 76:3,19
78:12 81:24
82:24
**uh-huh**
16:11 48:12,19
49:16 54:20
65:24 77:11
79:1
**ultimate**
55:25
**ultimately**
85:2
**umbrella**
47:11
**unbinding**
90:16
**underneath**
44:5
**understand**
5:20 6:7 22:1
29:2 37:7 43:10
44:7 53:8 57:22

57:23 58:16
66:24 78:13
80:6
**understanding**
11:15 12:22 13:7
44:16 47:3,15
**undertaking**
42:24
**unexecuted**
16:12
**unhappy**
83:17
**unit**
61:22
**UNITED**
1:1
**universe**
19:4
**unsealing**
90:16
**Updated**
28:12
**use**
9:20 22:16 37:20
38:2,23 40:5,16
43:24 46:13,20
46:23 52:20
56:23 58:19
59:13 75:24
80:5 81:9,10
**uses**
40:8
**utilize**
42:23 67:6
**utilized**
57:19
**utilizing**
38:12 61:3

---
**V**
**valid**
90:3
**vascular**
29:4,5,19,22 30:7
30:16,22 31:8
31:14,23
**verify**
13:24

DEPOSITION OF RUSSELL ALAN WILLIAMS, M.D.
CONDUCTED ON FRIDAY, FEBRUARY 28, 2014

**verse**
37:15
**version**
28:22
**versus**
6:15 26:21 30:22
  31:7 67:22
**Vesnovky**
64:12
**Videoconferenc...**
2:8
**view**
40:15
**violated**
78:18
**vitae**
4:16 28:11,19
  31:17
**void**
90:18
**vs**
1:7
**V-e-s-n-o-v-k-y**
64:13

**W**

**wait**
66:22 86:3,3
**waive**
88:22,23,25
**waived**
89:13
**waiving**
88:20
**want**
6:2 10:25 11:2
  16:14 23:18
  26:10 28:9,24
  48:10,13,24
  54:13 58:16
  61:24 62:12
  65:10 78:13
  79:15 85:12
  86:22 89:7
**wanted**
80:10 87:24
**warmed**
44:20

**Washington**
3:18
**wasn't**
7:13 8:2,3 44:12
  47:9 56:9 64:20
  66:14 69:4,4,6,8
  83:10 84:7
**watching**
80:22
**way**
34:19 47:8,18
  71:23 74:11,12
**ways**
40:16
**went**
45:24
**West**
2:9 43:12
**we'll**
6:1 10:20 36:22
  42:5 53:12
**we're**
5:18 22:18 23:25
  29:10 59:24
  62:13 73:17
  88:20,25
**we've**
13:13
**WHEREOF**
90:20
**Wild**
43:12
**Williams**
1:15 2:1 4:5,13
  5:5 6:11 7:9
  8:25 23:20 88:5
  89:14
**Williams's**
4:15,20,23 8:12
**willing**
17:16,21
**wish**
27:14
**withdraw**
79:16 82:14
**withdrawing**
76:22

**witness**
4:3 5:6 10:22
  12:2 20:11
  21:16 22:22
  24:7 25:10
  27:17 36:17
  37:22 39:8 40:2
  40:8 41:1,11
  43:8 44:25 45:9
  46:25 56:6 57:2
  57:14 58:8 59:9
  63:11,20 65:2
  67:11 68:18
  71:12 72:23
  73:23 76:9,14
  76:24 77:13
  79:18 82:6
  84:20 90:20
**woke**
84:1
**word**
43:10 74:11
**wording**
78:3
**words**
72:16
**work**
31:23 83:12
**working**
16:2 21:18 83:15
**works**
21:16
**worth**
53:2
**wouldn't**
17:3 25:17 33:13
  47:22,25 56:21
  73:2,14 83:9,11
**wounds**
85:1
**wrap**
77:24
**wrapped**
43:1,25
**writing**
33:16
**written**

12:5 21:8 23:6
  50:5
**wrong**
21:10 78:14
**wrote**
33:14 37:5 38:1
**W-2s**
24:24

**X**

**X**
4:1

**Y**

**yeah**
10:19 15:18
  18:22 24:7
  25:14,16 27:5
  31:1,11 32:16
  44:22 49:10,24
  50:24 51:2 54:3
  55:4 63:11 68:8
  80:21
**year**
31:5 53:21
**years**
6:25 7:14 21:18
  25:3,6,11,14,21
  25:24 26:14,18
  30:19,20,24,25
  31:2,5,9,10
  50:16 55:12,16
  55:16 83:15
**yesterday**
24:17
**younger**
28:13

**$**

**$1,000**
27:22
**$400**
27:20
**$5,000**
27:21
**$500**
27:23

**1**

**1**
1:24 4:11 11:1,8
  11:11 12:4
  14:13 19:2
**1/13/14**
4:24
**1:13-CV-00184**
1:7
**10**
15:2 19:3 25:3,9
  26:16 30:25
  31:5,9,10 55:12
**1099s**
24:24
**11**
3:18 4:11
**111**
2:9
**12**
26:18
**1200**
2:10
**15**
26:16 30:20,24
**16th**
54:18
**17th**
51:14
**1997**
49:2 50:18,23
  51:6

**2**

**2**
4:15 21:2 28:10
  28:15 62:19
  79:21 86:2,5
**2:10**
1:18 5:2
**2002**
49:25
**2003**
51:14,15 53:22
  54:12,17,18
**2004**
51:16 53:22 54:2

54:6,12,19 55:3
**2005**
52:11
**2006**
52:11 53:19
**2007**
28:12 33:9 55:14
**2013**
87:5,22
**2014**
1:16 5:1 90:21
**2024**
29:20
**20850**
3:20
**20877**
3:9
**25**
48:17 50:9
**26**
48:11,16
**26th**
28:12
**26(a)(2)**
4:18 86:24 87:4,8
  87:15
**28**
1:16 4:15 5:1
**294-2110**
3:21

_____
**3**
4:17,22 86:25
  87:1,8,14,22
  88:2
**3rd**
90:21
**300**
3:8
**301**
3:10,21
**3659**
1:25 2:19 90:4

_____
**4**
4:20,25 85:13,17

**4:11**
89:14
**40**
83:15
**400**
3:19
**43**
50:1,23
**45**
51:8
**47**
48:17 49:1 50:18
  51:12 54:15
**48**
50:13
**481**
3:7

_____ **5** _____
**5**
4:4,14,19,23
  26:19 62:13,16
  87:19,21
**5th**
51:16 54:19 55:3
**50**
26:19 49:14
**53457**
1:23
**56**
4:16

_____ **6** _____
**62**
4:23
**670-7030**
3:10

_____ **7** _____
**7**
14:8 23:3

_____ **8** _____
**85**
4:20
**88**
4:17

_____ **9** _____
**90**
1:24
**90802**
2:11
**95**
26:23