# Exhibit 3

# In the Matter of:

*MARY CLARK*

*vs.*

*HOWARD COUNTY GENERAL HOSPITAL, ET AL*

---

*PAUL G. RUFF, IV, M.D.*
*March 5, 2014*

---

**M E R R I L L   L A D**
1325 G Street NW, Suite 200, Washington, DC
Phone: 800.292.4789   Fax:202.861.3425

Page 1

IN THE UNITED STATES DISTRICT COURT FOR MARYLAND

(Northern District)

------------------------------)

MARY CLARK,                        )

                    Plaintiff,  )

           v.                      )    CASE NUMBER:

HOWARD COUNTY GENERAL              )  1:13-CV-00184 ELH

HOSPITAL, et al.,                  )

                    Defendants. )

------------------------------)

DEPOSITION OF PAUL G. RUFF, IV, M.D.,

Washington, D.C.

Wednesday, March 5, 2014

2:00 p.m.

Job No.:  1-245473

Pages:  1 - 102

Reported by:  Bess A. Avery, RMR

PAUL G. RUFF, IV, M.D. - 3/5/2014

```
Page 2
 1    Deposition of PAUL G. RUFF, IV, M.D., a witness
 2   called in the above-entitled action, held in the
 3   offices of:
 4
 5       Ruff Plastic Surgery
 6       2440 M Street
 7       Suite 300
 8       Washington, D.C.  20037
 9
10
11
12
13
14
15       Pursuant to agreement before Bess A. Avery,
16   Registered Merit Reporter and Notary Public in and
17   for the District of Columbia
18
19
20
21
22
```

```
Page 4
 1   A P P E A R A N C E S   C O N T I N U E D
 2
 3   ON BEHALF OF THE DEFENDANTS
 4   COLUMBIA AESTHETIC PLASTIC
 5   SURGERY, LLC AND ERIC CHANG, M.D.:
 6       KAREN S. KARLIN, ESQUIRE
 7       Gleason, Flynn, Emig & Fogleman Chartered
 8       11 North Washington Street
 9       Suite 400
10       Rockville, Maryland  20850
11       (301) 294-2110
12
13
14
15
16
17
18
19
20
21
22
```

```
Page 3
 1       A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4       KEVIN M. RINGEL, ESQUIRE
 5       Berman, Sobin, Gross,
 6       Feldman & Darby LLP
 7       481 North Frederick Avenue
 8       Suite 300
 9       Gaithersburg, Maryland  20877
10       (301)  670-7030
11           and
12       CRAIG B. HERON, ESQUIRE
13       Berman, Sobin, Gross,
14       Feldman & Darby LLP
15       32 West Road
16       Suite 210
17       Towson, Maryland  21204
18       (410) 769-5406
19
20
21
22
```

```
Page 5
 1       C O N T E N T S
 2   EXAMINATION OF PAUL G. RUFF IV, M.D.        PAGE
 3     By Mr. Ringel. . . . . . . . . . . . 6
 4     By Ms. Karlin. . . . . . . . . . . . 94
 5
 6
 7
 8
 9
10       E X H I B I T S
11       (Exhibits attached to transcript)
12   RUFF DEPOSITION                             PAGE
13   Exhibit 1  Curriculum Vitae of Paul G. Ruff . . . .8
14       IV, M.D.
15   Exhibit 2  Notice of Deposition . . . . . . . . . 28
16   Exhibit 3  09/30/2013 bill from Dr. Ruff to . . . 34
17       Karen Karlin, Esq. of the law firm
18       Gleason, Flynn, Emig & Fogleman
19       Chartered
20   Exhibit 4  Report of Dr. Ruff from September . . 37
21       25, 2013
22   Exhibit 5  Expert Witness Disclosure . . . . . . 89
```

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 6

1        P R O C E E D I N G S
2    Thereupon,
3            PAUL G. RUFF IV, M.D.
4    called for examination by counsel for the Plaintiff,
5    being first duly sworn by the NOTARY PUBLIC,
6    testified as follows:
7            EXAMINATION
8    BY MR. RINGEL:
9        Q    Good afternoon, Dr. Ruff. I know we just
10   discussed, off the record before I introduced
11   myself, but for the record, my name is Kevin Ringel.
12   I represent Mary Clark, the plaintiff in this case.
13   I'm joined by Craig Heron, also representing Mary
14   Clark.
15        I believe you've had your deposition taken
16   before. Correct?
17       A    I have, one time before.
18       Q    Okay. And just to go over and refresh
19   just the ground rules for it, most important thing
20   is probably for our court reporter here, just make
21   sure that one person is speaking at a time. So it's
22   natural in conversation for us to anticipate the end

Page 7

1    of someone's question, start answering, but for the
2    clean record and so she can hear everything, just
3    make sure we all finish speaking before the next
4    person speaks.
5        The next thing is just use verbal
6    responses. Nods of the head, shaking of the head
7    you can't get on the transcript. And if you need a
8    break at any time, if anyone needs a break, just let
9    us know and I'm happy to take a break.
10        Sounds good?
11       A    Sounds good.
12       Q    Okay. Would you state your full name for
13   the record as well as your work address.
14       A    It's Paul Gray Ruff IV, and my work
15   address is 2440 M Street, Northwest, Suite 200,
16   Washington, D.C. 20037.
17       Q    And you are a physician. Correct?
18       A    I am.
19       Q    And you've been identified as an expert
20   witness in the case of Mary Clark versus Howard
21   County General Hospital and Dr. Eric Chang.
22        Correct?

Page 8

1        A    I have.
2        Q    Okay. I'd like to start and go through a
3    little bit of your background. I have a copy of
4    your curriculum vitae, which I'd like to mark as 1.
5            (Ruff Deposition Exhibit 1 was marked for
6            identification.)
7    BY MR. RINGEL:
8        Q    If you would just take a look at this C.V.
9    I've just handed you. Is this up to date?
10       A    If it's the one that was provided, yes, it
11   should be up to date.
12       Q    Okay. No additions, no deletions, no
13   corrections to anything on here?
14       A    No, not that I -- no.
15       Q    Are there any publications, lectures, et
16   cetera, that you've been involved with that would be
17   particularly pertinent to the issues in this case?
18       A    Not that I've been involved with that are
19   pertinent to the issues in this case.
20       Q    No presentations on operating room fires
21   or surgical burns?
22       A    No.

Page 9

1        Q    For any of these presentations you have
2    listed here do you have any accompanying PowerPoint
3    presentations or slides that go with it?
4        A    These are so old, I don't think I have any
5    of those presentations any more.
6        Q    Okay. Are you board certified, Doctor?
7        A    I am.
8        Q    In what?
9        A    General surgery and plastic surgery.
10       Q    Did you have to take an exam for each of
11   those?
12       A    I did.
13       Q    Was this an oral or written exam?
14       A    Both were oral and written.
15       Q    Did you pass on your first attempt?
16       A    I passed my general surgery on my first
17   attempt. I passed my plastic surgery writtens first
18   time, I took my orals twice.
19       Q    Okay. Orals for which one?
20       A    Plastic surgery.
21       Q    For plastic surgery.
22        And did you have to get those up to date

3  (Pages 6 to 9)

PAUL G. RUFF, IV, M.D. – 3/5/2014

Page 10

1   and renewed or recertified or anything like that?
2       A   Yes, I did.
3       Q   And when was the last time?
4       A   I recertified both within the last 18
5   months.
6       Q   Okay.  Are you current -- and it's correct
7   that you are currently licensed to practice
8   medicine?
9       A   Yes, I am.
10      Q   And where do you hold a license to
11  practice, what jurisdictions?
12      A   Maryland, D.C., and Virginia.
13      Q   Have you ever at any point in time had any
14  suspension or discipline with any of your licenses?
15      A   No.
16      Q   Do you currently have hospital privileges?
17      A   I do.
18      Q   Where are your hospital privileges?
19      A   Washington Hospital Center, Georgetown
20  University Hospital, Sibley Memorial Hospital,
21  Suburban Hospital.
22      Q   Have you ever had any hospital privileges

Page 11

1   at any point in time ever be revoked, terminated or
2   suspended?
3       A   No.
4       Q   Have you ever had an application for
5   privileges at a hospital denied?
6       A   No.
7       Q   Have you done any teaching?
8       A   I don't know how you mean that question.
9       Q   Have you taught either at any kind of
10  medical school as a resident or as a medical, a
11  professor, anything like that?
12      A   We've had residents rotate through our
13  services so if you include one-on-one and rounding
14  with them, yes.
15      Q   Anything in a hospital setting?
16      A   At the Washington Hospital Center in
17  Georgetown, yes.
18      Q   Okay.  Have you ever lectured or taught
19  any medical student or anything like that,
20  particularly any of the issues involved in the case,
21  surgical burns or operating room fires?
22      A   As far as a --

Page 12

1           MS. KARLIN:  I'm just going to object to
2   "the issue" in this case being an operating fire,
3   but you can answer the question.
4   BY MR. RINGEL:
5       Q   I think that's fair.
6           Surgical burn, I think as far as I'm
7   aware, maybe you can correct me, I think of
8   operating room fire as sort of being the umbrella
9   and the surgical burn sort of following under that.
10  Is that accurate or?
11      A   I think that's a debatable point.  There
12  is -- there is some type of source and some type of
13  reaction so, you know, I think many people would
14  agree with that and some might not.
15      Q   Have you ever taught specifically on the
16  issue of surgical burns?
17      A   Not specifically on the issue of surgical
18  burns as in a lecture or something like that, but
19  those are things we talk about during operations
20  when we are using devices that may or may not be
21  related to a surgical burn such as a laser, cautery
22  device, light source.

Page 13

1       Q   So it's sort of like a safety
2   presentation.  Would that be accurate?
3       A   Not really a safety presentation, part of
4   understanding of how an operation would proceed and
5   the things that you need to do to keep yourself and
6   the patient, more importantly, and the people in the
7   room safe.
8       Q   Okay.  What textbooks do you routinely
9   refer to in your practice?
10      A   I don't know if I've opened a textbook
11  recently, so I can't give you a specific source.
12      Q   How about any medical journals?  Do you
13  routinely review any medical journals?
14      A   Our Society journals I review.
15      Q   Which ones would those be?
16      A   Plastic and Reconstructive Surgery.
17      Q   How often do you receive them?  Is that
18  like a quarterly journal?
19      A   Monthly.
20      Q   Monthly?
21      A   Mm-hmm.
22      Q   Do you consider these texts to be

4 (Pages 10 to 13)

PAUL G. RUFF, IV, M.D. ~ 3/5/2014

Page 14

1  authoritative in the field of operating room safety,
2  surgical burns, anything like that?
3       MS. KARLIN: Objection.
4       THE WITNESS: I can tell you I don't think
5  anything is absolutely authoritative.
6  BY MR. RINGEL:
7       Q  Let me put it: Are you relying -- we'll
8  get to in a second your opinions in this case.
9       Are you relying on any literature
10 specifically in reaching your opinions for this
11 case?
12      A  No.
13      Q  No. So there's no specific piece of
14 literature you point to?
15      A  No.
16      Q  If we could talk about your general
17 practice for a second --
18      A  Yes.
19      Q  -- and try to break it down between
20 clinical, hospital, medical research, legal work,
21 what would you say the breakdown is of your
22 practice?

Page 15

1       A  Probably 90 to 95 percent clinical.
2       Q  Okay.
3       A  The rest of it is, thereabout, 1 percent.
4       Q  Between research and legal?
5       A  Yes, and hospital.
6       Q  And hospital? Okay.
7       You have done legal work in the past?
8       A  I have done some.
9       Q  Okay. And we'll get to a little more
10 specifics in a second. Of the cases you've reviewed
11 or done any legal work on what is the breakdown of
12 the times you were retained on behalf of a plaintiff
13 versus retained on behalf of the defendant?
14      A  I've been retained on behalf of the
15 plaintiff once. All other times would have been the
16 defendant.
17      Q  How many other times would you say for the
18 defense?
19      A  I think three.
20      Q  Three?
21      A  Yeah.
22      Q  So is it accurate that you think you've

Page 16

1  been retained for legal services, or legal cases for
2  medical opinions about four times?
3       A  How far back do you want me to go?
4       Q  Let's say ten years.
5       A  Ten years, yeah, about four times. Maybe
6  five. I can't remember if that falls in the
7  ten-year range.
8       Q  Do you think there's anything beyond the
9  ten-year range?
10      A  There was one, it was a plaintiff's case,
11 but that was a young woman who was hit by a truck
12 and whose leg I salvaged. So I was also a treating
13 physician and a legal expert combination in that.
14 That was a long time ago.
15      Q  Got it. Okay.
16      I've received a copy of your fee schedule
17 somewhere. I just want to make sure it's still
18 accurate. Is it accurate that you charge $1500 per
19 hour for deposition with a two-hour minimum?
20      A  Yes.
21      Q  Is it still accurate that you charge 7,500
22 for a half day for trial work?

Page 17

1       A  Yes.
2       Q  And $250 for a half hour of reviewing
3  documents, materials?
4       A  That would be accurate.
5       Q  Okay. Specifically have you reviewed any
6  cases or done any legal work in the past for the law
7  firm of Gleason, Flynn, Emig, Fogleman?
8       A  I have.
9       Q  Okay. Let's talk about that.
10      How many cases have you reviewed or worked
11 for them in the past?
12      A  It's -- I think it's just one other case.
13      Q  One other case. Do you remember the name
14 of that case?
15      A  It's Guevara versus Onyewu.
16      Q  "Onyewu"?
17      MR. RINGEL: And, Ms. Karlin, do you have
18 any information on that case if we were to --
19      MS. KARLIN: I --
20      MR. RINGEL: -- the name of the case,
21 where it was filed, things like that?
22      MS. KARLIN: I was not involved. I

5 (Pages 14 to 17)

Page 18

1 believe the physician is Dr. Onyewu.

2      MR. RINGEL: Dr. Onyewu?

3      MS. KARLIN: But that was before my time.

4      THE WITNESS: Larry was the attorney.

5 BY MR. RINGEL:

6     Q  Larry McAfee?

7     A  Yes.

8     Q  Well, you are jumping ahead of some of my

9 questions, but we'll get to that.

10     What was that case about, the one that you

11 reviewed with the Dr. Onyewu, which hopefully we'll

12 get the spelling at some point, what were the issues

13 involved in that case?

14     A  Scars on arms after an arm lift.

15     Q  An arm lift. What is an arm lift?

16     A  It's removal of extra and redundant skin

17 on the arms.

18     Q  And were you retained on behalf of the

19 defendant?

20     A  On behalf of Dr. Onyewu.

21     Q  Dr. Onyewu. Okay.

22     When, about, was this case?

Page 19

1     A  Maybe four years ago.

2     Q  Did you have to give a deposition in that

3 case?

4     A  No.

5     Q  So you also didn't testify at trial, I'm

6 assuming?

7     A  No.

8     Q  What was the opinion you came to in that

9 case?

10     A  I think, you mean, it's a bit complicated,

11 but the opinion from that case was that the scarring

12 on her arms was not a result from something that

13 Dr. Onyewu did erroneously or negligently. That was

14 the result.

15     Q  Do you know the outcome of the case?

16     A  I do not.

17     Q  As far as you understand it did not reach

18 trial?

19     A  As far as I know, no.

20     Q  Okay. I have from, I believe it's from an

21 expert witness disclosure, there were two cases.

22 There was one case that says you were retained on

Page 20

1 behalf of the plaintiff, and it was involving a

2 woman who was severely burned during a cosmetic

3 laser procedure, that settled before depositions

4 were taken. Is that what we are talking about now?

5     A  Yes, I was never deposed in that case.

6     Q  So that was the Onyewu case that you were

7 retained by Larry McAfee?

8     A  No.

9     Q  No? That was the plaintiff -- oh, I'm

10 sorry, that was the plaintiff case, right, so that

11 was the previous one.

12     The second case I have here is there was a

13 plastic surgeon was being sued for poor scars after

14 a cosmetic procedure on her arms, and it says, "No

15 deposition yet"?

16     A  Yes.

17     Q  Which one is that?

18     A  That's that one.

19     Q  That's the one for --

20     A  Yes.

21     Q  -- Larry McAfee and Dr. Onyewu?

22     A  Yes.

Page 21

1     Q  In the Expert Disclosure it said, "No

2 depositions yet." Is it your understanding that

3 case is dismissed or settled or you --

4     A  I don't know what the status of that case

5 is.

6     Q  Do you know if your deposition will be

7 scheduled to be taken at any point?

8     A  I have no idea.

9     Q  And you said this was about four years

10 ago?

11     A  Yes.

12     Q  Okay. So I think we've discussed about

13 four cases in which you've worked as an expert. Is

14 that accurate?

15     A  Approximately. I think that's accurate,

16 yes.

17     Q  Okay. What percentage of your total

18 income is from legal work as opposed to your medical

19 practice seeing patients, et cetera?

20     A  It's minimal.

21     Q  If you had to put a percentage on it?

22     A  Maybe 2 percent.

6 (Pages 18 to 21)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 22

1  Q  Okay.
2  A  Maybe 1 percent. I mean it's very small.
3  Q  Have you ever personally been a defendant
4  in a lawsuit?
5  A  Yes.
6  Q  Okay. How many times?
7  A  Twice.
8  Q  Let's start with the earliest, let's start
9  with the most recent in time --
10  A  Okay.
11  Q  -- because you'll probably remember it
12  better.
13  A  I remember them both extremely well.
14  Q  I'm sure you do.
15     When was this, the one that was most
16  recent?
17  A  It's currently ongoing.
18  Q  Okay. So, as far as you know, is it in
19  litigation? Has a complaint been filed?
20  A  Yes.
21  Q  Okay. Where is the complaint filed?
22  A  It's in Boston.

Page 23

1  Q  In Boston?
2  A  Yes.
3  Q  Okay. What are the allegations as far as
4  you're aware of in that case?
5  A  The allegations are of negligence and
6  assault and battery. The background is I was in
7  training for a number of pharmaceutical companies on
8  injectables, and I was doing a training in Boston
9  for a particular pharmaceutical.
10     The patient in question had a complication
11  about seven or nine months after my training. The
12  two doctors that I was training had done subsequent
13  injections on her after my training. The drug
14  company was involved as well as the two physicians
15  and myself.
16     The issue here, though, she's claiming
17  malpractice and assault and battery, saying that I
18  palpated her, and that was assault, during my
19  examination and during the training portion, and
20  that my training was a cause of her complications.
21     The problem here, though, is I never
22  touched her. And that is confirmed by all of the

Page 24

1  people in the room, plus the two physicians, nor did
2  I ever inject her, so I don't have a doctor-patient
3  relationship with her.
4     I can tell you Sanofi-Aventis settled.
5  They settled the case.
6  Q  That's the hospital?
7  A  No, that's the drug company.
8  Q  The drug company, okay.
9  A  For whom I was training. I'm still named
10  in it. I was supposed to be dropped when they
11  settled, but that never happened.
12  Q  What was this incident when you were with
13  this patient, do you remember? Was it a year ago,
14  two years ago?
15  A  No, this was 2009, I believe.
16  Q  Okay. Do you remember the name? I'm sure
17  you do.
18  A  Well, I remember the name of the doctor.
19  And I think it's Drizen versus Kiwue. Drizen is
20  D-R-I-Z-E-N, and Kiwue is K-I-W-U-E, I believe.
21  Yeah, it's a weird -- maybe it's K-W-I-U-E. That, I
22  don't remember.

Page 25

1  Q  Okay. So that one is still pending, it
2  has not concluded yet?
3  A  Yes, and I've had my deposition taken in
4  that case.
5  Q  Okay. Let's go to the older case now.
6  Starting, again, when approximately was it?
7  A  That one occurred -- the dates on that
8  one, I'm less -- I remember the case, I don't
9  remember the dates very well.
10     That one was probably six or seven years
11  ago. The incident occurred about a year or so
12  before that, maybe two years before that.
13  Q  So we are talking approximately 2008/2007
14  range?
15  A  Probably right around there. Maybe 2006
16  at the very farthest.
17  Q  And where was this case?
18  A  At the Washington Hospital Center.
19  Q  And, as far as you know, it was filed in
20  D.C. Court?
21  A  Yes.
22  Q  Okay. What are the allegations

7 (Pages 22 to 25)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 26

1  surrounding that case?
2      A   Misdiagnosis of osteomyelitis that
3  resulted in an amputation.
4      Q   You had your deposition taken in that one,
5  I'm sure, too.
6      A   No, I did not. That was settled before --
7  that was dropped. It was -- the orthopedic surgeon
8  and I in that case never had our depositions taken.
9  That case was dropped.
10     Q   Well, settled or dropped? I mean I know
11 that they are probably two --
12     A   It was dismissed.
13     Q   Dismissed?
14     A   Yes.
15     Q   Okay. And, again, I know I'm trying --
16 this is like legal language here versus lay
17 language. Was it dismissed after some -- I don't
18 need to know the details -- kind of a confidential
19 arrangement where there was money that exchanged
20 hands?
21     A   No, no. It was just dismissed. The
22 judge, after attempts at multiple expert witnesses

Page 27

1  who continued to fail, I guess, whatever litmus test
2  you all have, the judge, when they were unable to
3  provide any expert witnesses in defense of us, she
4  dismissed the case entirely.
5      Q   And it was probably dismissed, you say,
6  about 2008 or so?
7      A   Probably -- no, no. That may have been
8  when everything occurred. I think it was dismissed
9  in -- oh, maybe 2008/2009. Yes, that would be about
10 right. I'm thinking about when things first
11 occurred.
12     Q   And you've never been a defendant in any
13 other lawsuit other than those two we've talked
14 about?
15     A   No, that's it.
16     Q   Do you regularly use a lighted fiberoptic
17 retractor as part of your practice?
18     A   Very regularly.
19     Q   Okay. Have you ever used the exact model
20 of fiberoptic lighted retractor that Dr. Chang used
21 in this case?
22     A   I can't confirm that I have, but given the

Page 28

1  number of places that I operated on and this
2  particular manufacturer, I most likely have.
3      Q   But you don't know for sure?
4      A   I can't tell you exactly for sure.
5      Q   Okay. I've got here now --
6      A   This is a very common retractor, so it's
7  not -- it wouldn't be unusual.
8      Q   Okay. I'm going to hand you what we are
9  marking Plaintiff's Exhibit 2. This is our notice
10 of deposition for you.
11         (Ruff Deposition Exhibit 2 was marked for
12         identification.)
13         THE WITNESS: Okay.
14 BY MR. RINGEL:
15     Q   I'd like to go through this with you. It
16 says here that, if you go down to the bottom of the
17 first page, we've requested you bring your entire
18 file, original file, relative to Mary Clark.
19     A   Yes.
20     Q   Is that what you have here before you, I'm
21 assuming?
22     A   This is what I have here before me.

Page 29

1      Q   A copy of your most recent curriculum
2  vitae, which we've done as Exhibit 1. Correct?
3      A   Yes.
4      Q   A copy of any documents reviewed by you
5  relative to Mary Clark?
6      A   That's what's sitting here.
7      Q   A copy of any documents prepared by you
8  relative to Mary Clark?
9      A   I have that here.
10     Q   And prepared by you, what documents,
11 specifically -- I know there was a report you
12 produced. Correct?
13     A   Yes.
14     Q   Any other reports or documents you've
15 produced?
16     A   No.
17     Q   Just that one report?
18     A   Just that one report.
19     Q   Okay. And we'll go through that in a
20 second. It's the one that's on your letterhead?
21     A   Yes.
22     Q   I think it's dated like September 2013 or

8 (Pages 26 to 29)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 30

1    so.
2        A    Yes.
3        Q    Okay.
4        A    I am sorry --
5        Q    Do you need to take a break?
6        A    Yes.
7             (Discussion off record)
8    BY MR. RINGEL:
9        Q    Back on the record.
10            We were going through your -- the Notice
11   of the Deposition.  We also requested a copy of any
12   correspondence received by you or prepared by you
13   relative to Mary Clark.
14            I'm assuming you've corresponded with
15   defense counsel in this case.  Correct?
16       A    By e-mail a few times.
17       Q    By e-mail.  Anything more substantive
18   than, Here are some documents, or --
19       A    No, that, that encompasses that or -- that
20   encompasses every amount of communication that I've
21   ever had with --
22       Q    No discussion of the medical issues

Page 31

1    involved in this case or your opinions?
2        A    Not by e-mail, no.
3        Q    Okay.  Anything by old fashion regular
4    mail?
5        A    No.
6        Q    Okay.  I need to ask --
7        A    Good question.
8        Q    Number 6: A copy of any literature upon
9    which you rely or which you intend to reference or
10   claim is authoritative.
11            Am I correct in stating that there is no
12   literature or reference which you believe is
13   authoritative as it pertains to your opinions in
14   this case?
15       A    There's nothing specific, no.
16            MS. KARLIN: I object to the term
17   "authoritative," but go ahead.  Sorry.
18   BY MR. RINGEL:
19       Q    Number 7: All notes and reports generated
20   by you in the above-captioned matter?
21       A    Yep, everything is here.
22       Q    Okay.  And is there anything that's

Page 32

1    electronic that wouldn't be here before you?
2        A    No.
3        Q    Okay.  All textbook and/or journal
4    articles or unpublished research or any literature
5    upon which you relied in formulating or supporting
6    your opinions in this case?
7        A    Nothing else.
8        Q    Again, nothing.  Okay.
9             And a list of cases wherein deponent,
10   that'd be you, has testified during the past four
11   years either by deposition or in person?
12       A    We've already discussed those.
13       Q    Do you have a list of the cases as well
14   with the case names?
15       A    I don't have a specific list.  I can
16   provide that, though.
17       Q    Okay.  Yeah, if you could provide that,
18   maybe do it through counsel and just step that over
19   to us.
20       A    Not a problem.
21       Q    Okay.  Number 10: In addition to
22   authoritative sources listed above, copies of the

Page 33

1    following items listed on your curriculum vitae, any
2    articles, lecture notes, memorandum or other
3    document outlined in your curriculum vitae which
4    relate to the facts and circumstances of this case?
5        A    There was none.
6        Q    Okay.  So am I correct in stating that
7    there are no articles, lectures, notes, et cetera
8    that you have published or that you reference in
9    your curriculum vitae  which specifically would talk
10   about surgical burns or the issues involved in
11   Mary Clark's case?
12       A    There are not.
13       Q    Okay.  Any bills, time sheets, documents,
14   or memos regarding documents for work done and time
15   spent on this case?
16       A    There's only one that I've produced.  I
17   mean, I think that's one of the e-mails.
18       Q    Okay.  So there's a bill you've produced
19   to Gleason, Flynn -- the law firm, Gleason, Flynn?
20       A    Yes.
21       Q    Do you have that with you today?
22       A    I'm sure I can pull it out.

9  (Pages 30 to 33)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 34

1     MS. KARLIN: Well, if you don't have it, I
2   can get it to you, no problem --
3     MR. RINGEL: Yeah, we know you all have
4   it.
5     MS. KARLIN: Yeah.
6     MR. RINGEL: We can do it through counsel.
7   You can just send me that via e-mail or whatever.
8     Okay. And if you want to just go off the
9   record for just one second, if I could just look
10  through your stack of stuff here.
11    (Discussion off record)
12    (Ruff Deposition Exhibit 3 was marked for
13      identification.)
14  BY MR. RINGEL:
15    Q  Okay, Doctor, we just went off the record
16  and I was just taking a peek through your file. And
17  one thing I did pull out was a bill, it looks like,
18  dated September 30, 2013, addressed to Karen Karlin,
19  Esquire, and it says: For submission for review of
20  interrogatories, review of depositions, and
21  preparation of expert medical opinion. A total of
22  four hours at the rate of 250 per half hour for a

Page 35

1   total of $2,000.
2     And we've marked it Exhibit 3.
3     A  Yes.
4     Q  If you'd just take a look at it, is that a
5   fair and accurate copy?
6     A  Yes.
7     Q  Are you aware of any other bills you may
8   have produced since that one?
9     A  I have not produced any since that time.
10    Q  And if there are any more, I'd just ask,
11  if you find some, just shoot me an e-mail. Okay.
12    In preparation for the deposition here
13  today have you gone back and reviewed your file --
14    A  Yes.
15    Q  -- recently.
16    As you were -- you reviewed the
17  depositions involved in this case?
18    A  Selectively, yes.
19    Q  Which depositions have you reviewed?
20    A  Dr. Chang's, Ms. Goodwin's, Benedikta's,
21  Dr. Williams, and -- I can't remember the other
22  person's name.

Page 36

1     (Witness reviews document)
2     THE WITNESS: I perused Mrs. Clark's
3   deposition. I cannot remember the name of the other
4   person.
5     MS. KARLIN: Which one are you looking
6   for?
7     THE WITNESS: Not Benedikta --
8     MS. KARLIN: Ms. Hobert?
9     THE WITNESS: Yes, Ms. Hobert.
10  BY MR. RINGEL:
11    Q  I'm not sure I saw it in there. You have
12  reviewed Dr. Russell Williams, the one that was done
13  last week?
14    A  Yes. I have that on e-mail. I didn't
15  print that one out.
16    Q  That was part of your review as well?
17    A  Yes.
18    Q  Specifically with Dr. Chang, for the
19  opinions that you intend to render in this case, do
20  you rely on any specific testimony by Dr. Chang?
21    A  I can't pull out any specific statement or
22  word or line that helps me one way or another.

Page 37

1     Q  Okay. So there's nothing --
2     A  There's nothing specific.
3     Q  Okay. There's nothing, if you were to
4   testify at trial, that there's no one specific
5   statement that you feel supports, or you're basing
6   your opinion on in this case?
7     A  Not one specific statement. It has more
8   to do with how the case proceeded and his
9   recollection of the sequence of the case.
10    Q  How about any other witness or expert or
11  any doctor involved in this case, are there any
12  specific statements that you intend to rely on as
13  the basis of your opinion?
14    A  Not a specific statement, no.
15    Q  Since -- and we are going to talk about
16  this in a second. I've got your report here dated
17  September 25th, 2013, which I think will be 4,
18  Exhibit 4.
19    (Ruff Deposition Exhibit 4 was marked for
20      identification.)
21  BY MR. RINGEL:
22    Q  Since you've produced this report from

10 (Pages 34 to 37)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 38

1  September 25th, have you received any additional
2  documents from counsel?
3      A   Since I did this one, I don't remember
4  exactly the time frame, but Dr. Williams' testimony
5  --
6      Q   Right. Well, I'm not trying to trick you
7  up here.
8      A   No, no. I'm just trying to think what
9  I've seen since then. I know it's Dr. Williams'
10  testimony; the report, the engineering report. I
11  think that -- I can't remember when.
12     Q   Did you review Dr. -- Mary Clark's
13  deposition? Not "Dr.," Mary Clark's.
14     A   I did review Mary Clark's deposition.
15  That one I just perused. I didn't go through it
16  line by line. And that one I did receive subsequent
17  to that because that looks like it was December 9th.
18     Q   Okay. Any other documents that you would
19  have received subsequent to producing your report?
20     A   Just that, including Mary Clark's
21  deposition which was December 9th.
22     Q   Mary Clark's deposition, Dr. Williams'

Page 39

1  deposition transcript which you received by e-mail?
2      A   Yes.
3      Q   Have you reviewed the Amended Report for
4  Dr. Williams?
5      A   The Amended Report?
6      Q   I saw it in your stack. It was the one
7  from January.
8      A   Oh, that one, yes, and the Amended
9  Report from Dr. Williams.
10     Q   Okay. So that was part of your review
11  that you reviewed after you produced this report?
12     A   Yes.
13     Q   Any other documents that you would have
14  received besides those?
15     A   Not that I can recall.
16     Q   Okay.
17         MS. KARLIN: Just to be fair, I did e-mail
18  him copies of the photographs from Dr. Chang. He
19  had seen them by copy, which are not good pictures,
20  so I sent him a copy on the computer so that they
21  can actually be visualized. But those weren't new.
22         THE WITNESS: But those weren't new.

Page 40

1         MR. RINGEL: And I think I saw those.
2         MS. KARLIN: Those were just better
3  copies.
4         THE WITNESS: Yes.
5         MR. RINGEL: Okay.
6         MS. KARLIN: I also don't know if you
7  listed the discovery responses? I don't know if
8  that came up in the list or not.
9         MR. RINGEL: I think the discovery
10  responses, to be fair, are listed in the original
11  report.
12         THE WITNESS: Yeah.
13         MS. KARLIN: Okay. Sorry.
14  BY MR. RINGEL:
15     Q   Okay. Obviously, Ms. Karlin is here
16  today. Have you met with counsel, Ms. Karlin or
17  otherwise, prior to this deposition?
18     A   Once before, yes.
19     Q   And when was that?
20     A   In the last two weeks.
21     Q   Okay. Have you -- and, obviously, we've
22  discussed that you've had e-mail correspondence with

Page 41

1  Ms. Karlin and Mr. McAfee?
2      A   Yes.
3      Q   How were you found by counsel, if you
4  know, to offer expert testimony in this case?
5      A   Through Mr. McAfee. He had used me prior,
6  which was that other case we discussed.
7      Q   Okay. How long was the meeting that you
8  had with counsel sometime in the past two weeks?
9      A   How long was it? About an hour and a
10  half, an hour? I don't know.
11     Q   Just to the best you remember.
12     A   About an hour. I can't remember.
13     Q   And it was done in person?
14     A   Yes.
15     Q   In your office here?
16     A   Yes.
17     Q   We've already talked about your bills.
18         Do you know any of the parties in this
19  case personally?
20     A   No, I do not.
21     Q   Okay. You don't know Dr. Chang
22  personally?

11 (Pages 38 to 41)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 42

1    A   No.
2    Q   Any of the nurses or staff that were
3    involved in the procedure?
4    A   No.
5    Q   You don't know Mary Clark?
6    A   No.
7    Q   Do you know any of the expert witnesses in
8    this case?
9    A   No -- well, no, I don't know Dr. Sigal.  I
10   think he's the other expert witness.
11   Q   Right, Dr. Robert Sigal.
12   A   Yes.  I know of him, I don't know him.
13   Q   You don't know him personally?
14   A   No.
15   Q   How about Clyde Richard?
16   A   No.
17   Q   Do you know Dr. Russell Williams?
18   A   No.
19   Q   You are a general plastic surgeon?
20   A   I am a plastic surgeon.
21   Q   Okay.  Well, I -- just educate me here,
22   because I know sometimes plastic surgeons have

Page 43

1    different names.
2        Is there a particular title, or just
3    general plastic surgeon?
4    A   Plastic surgeon.
5    Q   Okay.  I'm going to go through and list
6    some procedures here and I want to ask you for each
7    of them.
8        Have you ever or do you regularly perform
9    a left breast capsulectomy for implant
10   repositioning?
11   A   Yes.
12   Q   How often would you perform this
13   procedure?
14   A   Probably a couple of dozen times a year.
15   Q   How about a left breast implant exchange?
16   A   About the same, if not more.
17   Q   Right breast implant exchange?
18   A   About the same.
19   Q   Fat transfer from abdomen to left breast?
20   A   Probably about 20 to 30 times a year.
21   Q   Fat transfer from abdomen to right breast?
22   A   About the same.

Page 44

1    Q   Meaning?
2    A   About the same as the left breast.  They
3    tend to be done --
4    Q   -- together?
5    A   -- bilaterally.
6    Q   Liposuction of bilateral axillary areas
7    for contouring of the lateral breast area?
8    A   That would probably be at least 50 to 75
9    times a year.
10   Q   I'm going to ask a general question, and
11   I'll try to be more specific.  Have you ever had any
12   complications occur during your performance of these
13   procedures?
14       MS. KARLIN:  Objection.  It's very broad.
15   BY MR. RINGEL:
16   Q   If you can answer, I'll get very specific.
17   A   Everybody has complications.
18   Q   Have you ever had a situation in any of
19   these procedures in which a patient, by any means,
20   has resulted in a surgical burn?
21   A   Not that I can recall.
22   Q   Did I -- sorry.

Page 45

1    A   Would you repeat that question.  I just
2    want to make sure --
3    Q   Yes.  I was just asking you whether any of
4    these procedures you just listed --
5    A   Yes.
6    Q   -- whether or not a patient -- there's
7    been a complication that's arisen in which a patient
8    suffered a surgical burn through any means.
9    A   Not at my hands, but I have been involved
10   in cases where I was working with another surgeon
11   where there have been cautery burns from underneath
12   through a capsule and skin flap.
13   Q   And so what would your role have been in
14   that?
15   A   To help repair.
16   Q   Okay.  But you weren't actually the one --
17   A   Oh.  I wasn't actually the one, no.
18   Q   Okay.  Forgetting the six procedures I
19   just listed, now just speaking generally as part of
20   your practice, have you ever had situations arise in
21   which a patient has suffered a surgical burn through
22   any means?

12 (Pages 42 to 45)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 46

1     A   Not by my hands.

2     Q   Again, as you were assisting or -- I mean

3  explain "Not by my hands."

4     A   Yes, I mean I've been involved in cases,

5  for example, a mastectomy and breast reconstruction,

6  where the general surgeon was assisting and went

7  right through the skin flap with a cautery and

8  created a surgical burn through the cautery.

9     Q   So you were in the operating room as --

10  what was your role?

11    A   I was an assisting surgeon doing the

12  reconstruction.

13    Q   Okay.  And when was this approximately?

14    A   Oh, God.  Ten years ago.

15    Q   Okay.  I'm going to hand you your report

16  from September 25, 2013, which we've marked as

17  Exhibit 4.

18        Okay.  Look this over.  This is your

19  report.  Correct?

20    A   That appears to be, yes.

21    Q   And on the last page, that would be your

22  signature?

Page 47

1     A   Yes, it is.

2     Q   Are you the author of this document?

3     A   I am.

4     Q   Did you consult with anyone else in

5  producing this document?

6        MS. KARLIN:  Objection.  It's privileged

7  with regard to anything prior to his final report in

8  federal court.

9  BY MR. RINGEL:

10    Q   Okay.  Well, leaving aside --

11        MR. RINGEL:  Well, the basis of privilege

12  being?

13        MS. KARLIN:  It's in the Rule, it's

14  privileged.

15        MR. RINGEL:  Are you instructing him not

16  to answer?

17        MS. KARLIN:  Yes, there's -- anything

18  prior to his prior report, if there was any

19  consultation with counsel, that's privileged.

20        MR. RINGEL:  Okay.  So I just want to be

21  clear for the record.  My question was whether or

22  not he consulted with anyone else in regards to

Page 48

1  producing this document, and you are instructing him

2  that --

3        MS. KARLIN:  Anything other than counsel

4  he can answer, if he consulted with anyone other

5  than counsel.

6  BY MR. RINGEL:

7     Q   Okay.  Let's go with that.

8        Have you consulted with anyone other than

9  counsel in producing this report?

10    A   No.

11    Q   And my next question, which I'm guessing

12  there will be an objection, is:  Have you consulted

13  with counsel in producing this report?

14        MS. KARLIN:  Objection.  That's

15  privileged.

16        MR. RINGEL:  Okay.  And that's your

17  instruction, you're going to instruct him not to

18  answer to that?

19        MS. KARLIN:  Yeah.

20        MR. RINGEL:  Okay.

21  BY MR. RINGEL:

22    Q   Have you had any conversations with

Page 49

1  Dr. Sigal regarding this case or any of the issues

2  surrounding this case?

3     A   No.

4     Q   And Dr. Sigal being the other expert named

5  by the defendant?

6     A   Yes.

7     Q   Okay.  We went over your fee schedule on

8  here.  The fee schedule you produced here is still

9  fair and accurate.  Correct?

10    A   It is the same as the one you read

11  earlier.

12        MS. KARLIN:  It's going up as we speak,

13  right?

14  BY MR. RINGEL:

15    Q   Okay.  I want to go through the list of

16  documents that you've stated you have reviewed

17  informing the opinions in the September 25th, 2013

18  letter.  I'll be reading from the bottom of page 1.

19        "The Plaintiff's Amended Complaint;

20  medical records from Dr. Chang; medical records from

21  Scott Andochick, M.D.; medical records from

22  Frederick Memorial Hospital procedures dated

13 (Pages 46 to 49)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 50

1  4/12/06, 5/6/06, 8/2/06, 10/19/06 and EKG and
2  laboratory reports; medical records from Howard
3  County General Hospital procedures dated 5/16/07 and
4  5/24/10; medical records from Northwest Hospital;
5  medical records from the Cardiology Center;
6  photographs of plaintiff's burn injury; Answers to
7  Interrogatories from Plaintiff and the co-Defendant
8  Howard County General Hospital; and, Number 10,
9  deposition transcripts of Dr. Chang; Linda Goodwin,
10  RN; Toni Hobert; and Benedikta, Vesnovky."
11      Is that a complete list of the documents
12  that you've reviewed for this particular report?
13      A  Yes, it is.
14      Q  And, as we discussed earlier, there are
15  some documents which you have since subsequently
16  received following you producing this report?
17      A  Yes.
18      Q  Specifically the deposition transcript of
19  Mary Clark?
20      A  Yes.
21      Q  The deposition transcript of Dr. Russell
22  Williams?

Page 51

1      A  Yes.
2      Q  The Amended Report of Dr. Russell Williams
3  from January 2014?
4      A  Yes.
5      Q  You received the instruction manual for
6  the lighted retractor that was used?
7      A  I did.  That was actually part of, I
8  think, Toni Hobert's deposition.
9      Q  Okay.  So that you would have reviewed as
10  part -- as basically Number 10.  When you say you
11  reviewed the deposition transcript of Toni Hobert,
12  you also reviewed the instruction manual that was
13  included?
14      A  Yes, it was part of that.
15      Q  Okay.  If you can remember, when did you
16  first review the additional documents, Mary Clark's
17  deposition, Russell Williams', and the Amended
18  Report of Dr. Williams?
19      A  I know I reviewed Mary Clark's deposition
20  at the very end of December, December 27th, because
21  I have that written on there.
22      The Dr. Williams' Amended Report, probably

Page 52

1  middle of January.
2      Q  Did any of these additional documents
3  change the opinions you state in this report?
4      A  No.
5      Q  Okay.  Did they have any effect on the
6  opinions in your report, any impact?
7      A  No effect.
8      Q  Do you have a copy of the instruction
9  manual as a part of your file?
10      A  It is in here.
11      Q  Okay.  You can hold on to it.  Hold on to
12  it there.  And, actually, put it back.  I won't be
13  referencing it.
14      What is your understanding of how
15  Mary Clark came to be burned during the procedure in
16  question?
17      A  My understanding of the etiology of those
18  burns was an overheated retractor handle.
19      Q  And what do you base this on?
20      A  Based on the depositions of the staff in
21  the OR and Dr. Chang.
22      Q  And it's your understanding that the

Page 53

1  reactor and the handle were laid on top of
2  Mary Clark's chest during the procedure?
3      A  They were placed in the area on a towel.
4      Q  "The area" being?
5      A  The surgical site which would have been
6  her chest region.
7      Q  Oh, okay.  Do you have any understanding
8  of where the burns actually are?  Specifically if
9  you could, I guess, point --
10      A  Yes.
11      Q  -- and then also reference for the record.
12      A  The burns are upon her chest.
13      Q  Okay.  So above the breast, between her
14  neck.  Would that be accurate?
15      A  Yes.
16      Q  Do you have an opinion as to which part of
17  the retractor became hot during this procedure?
18      A  They state the handle became hot, which
19  would be very unusual.
20      Q  Why do you say that?
21      A  Well, there's no way a handle can be hot
22  and have a surgeon continue to operate effectively.

14 (Pages 50 to 53)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 54

1  That would be incompatible with the utility of the
2  device as well as the comfort of the surgeon.
3      Q    And you base --
4      A    Or -- I'm sorry.
5      Q    Please continue.
6      A    Or whoever is holding it, whether it's a
7  medical student, a resident, or an assistant.
8      Q    And what do you base this opinion on?
9      A    Having used this type of retractor, or
10  this retractor, in hundreds of cases.
11      Q    So is it -- am I correct in saying that
12  it's your understanding that the actual tip itself
13  did not become hot?
14      A    No, I said the handle.
15      Q    The handle.  So if you could describe from
16  your understanding what the handle -- the handle
17  being, there's a part that you would hold --
18      A    Yes.
19      Q    -- and then there's a lighted end, and
20  then there's another cord that goes out to whatever
21  the power source or the light source is?
22      A    There's a cord that comes from the light

Page 55

1  source, connects to a specific connector at the very
2  end of the handle.  The handle transmits a tube
3  which at the end of the blade is the illumination.
4      Q    Okay.  So the actual tip itself would not
5  have become hot as far as your understanding?
6      A    No -- well, the tip is going to be hot.
7  The tip will be hot, but the handle itself --
8      Q    Why is the tip hot?
9      A    Well, the tip is transmitting the light.
10      Q    Okay.  So the light is causing the heat?
11      A    The energy is the result -- the light is
12  the result of the energy, the light is energy coming
13  through the source, through the cord, through the
14  blade itself, or the fiber optics of the blade, and
15  that, that tip will be hot.
16      Q    And under normal circumstances it will
17  always be hot?
18      A    Yes.
19      Q    Okay.  Do you know how many times,
20  specifically with Dr. Chang's procedure, he would
21  have had to use the retractor over the course of the
22  procedure?

Page 56

1      A    He would have used it fairly continuously
2  when he was dissecting the pocket or performing the
3  capsulectomy or making any little bit of capsule
4  pocket adjustments.  So it would be, for periods of
5  the case, continuous in/out, in/out.
6      Q    So "continuous" being it's always in his
7  hand?
8      A    Either in his hand or in his hand, down,
9  back in his hand, a second later, down, depending on
10  what they were operating on.
11      Q    Okay.  So within seconds it going in and
12  out of his hand.
13      A    Yes.
14      Q    Is that correct?  I'm just trying to
15  characterize what you're saying.
16      A    Yeah, absolutely.
17      Q    But you don't know specifically how many
18  times -- I mean you couldn't put a number on it.
19  Right?
20      A    Every case is unique, it's almost
21  impossible.
22      Q    Okay.  Do you know how long the procedure

Page 57

1  was?
2      A    I think that procedure was approximately
3  three hours, maybe three-and-a-half hours.
4      Q    Would he had have been using the lighted
5  -- or is it your understanding that he used the
6  lighted retractor continuously over the entire
7  three-hour period, or were there breaks when it was
8  used?
9      A    It would have been used when he was
10  dissecting the pocket in the capsules.  That would
11  probably, for an average case, entail maybe an hour
12  to an hour and a half of the surgery.
13      Q    And when is it your understanding that
14  actually this overheating incident occurred and the
15  burns were sustained?
16      A    He notes that he, and I can't remember if
17  it was Benedikta or Toni Hobert, noticed that the
18  handle was hot during a portion of the procedure,
19  and they switched it out.  I don't believe the burns
20  were identified until the end of the procedure.
21      Q    And these opinions are based on your
22  review of the deposition transcripts?

15 (Pages 54 to 57)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 58

1      A   Yes.
2      Q   And the medical records?
3      A   Yes.
4      Q   And your opinions about your experience is
5   based on your years of experience doing this?
6      A   Yes.
7      Q   There's no -- well, strike that.
8          Okay. I'd like to specifically talk about
9   your summary of opinions. There's no page numbers
10  here, but I'm looking at the section that says:
11  "Summary of Opinions." I think it's the second to
12  the last page.
13     A   Yes.
14     Q   Following me?
15         In the first full paragraph you state:
16  "It is my opinion that it is not uncommon or
17  unreasonable to place a lighted retractor on the
18  surgical field because they typically do not get so
19  hot as to burn the skin or cause injury."
20         Did I read that correctly?
21     A   "It is my opinion --"
22         (Witness reviews document)

Page 59

1          THE WITNESS: You're in the second
2   paragraph?
3   BY MR. RINGEL:
4      Q   It's like the middle of the paragraph.
5      A   Oh. Yes.
6      Q   Okay. And do you believe this to be the
7   standard of care?
8      A   Yes.
9      Q   And you still hold this to be your
10  opinion?
11     A   Yes.
12     Q   What do you rely upon to form this
13  opinion?
14     A   My experience, my training.
15     Q   There's no documents or literature you
16  could point to that would support this?
17     A   Nothing specifically, no.
18     Q   By "surgical field" are you referring to
19  the patient's actual body in this sentence?
20     A   That's part of the surgical field.
21     Q   What else would encompass "surgical
22  field"?

Page 60

1      A   The drapes, the table, the Mayo stand, the
2   instruments table, the people in the field, the
3   surgeon, the scrub tech.
4      Q   Okay. Well, you say "instruments table."
5   That would be -- what does an instrument table mean
6   to you?
7      A   It's the back table where all the
8   instruments are laid out which the surgical tech
9   usually hands from, organizes from.
10     Q   And, in your opinion, that's part of the
11  surgical field?
12     A   Yes.
13     Q   That's how you understand it.
14         And in your statement here when you say:
15  "It is my opinion that it is not uncommon or
16  unreasonable to place a lighted retractor on the
17  surgical field," am I correct in saying that by
18  "surgical field" in this particular instance you are
19  referring to the patient's body?
20     A   Yes.
21     Q   In your experience, I know you've been
22  doing this for a long time, is it common and

Page 61

1   reasonable for a surgeon to have a side table, or --
2   side table or side tray near the surgical field or
3   within the surgical field?
4      A   It depends on the surgeon's preference,
5   their training, their experience, how they've
6   evolved in their particular procedures.
7      Q   In your procedures you stated that there's
8   usually an instrument table behind the patient or at
9   the foot of the patient?
10     A   It depends on the procedure.
11     Q   Are there procedures in which you don't
12  use a side table or side tray?
13     A   No, I think all of our procedures, we use
14  one or two Mayo stands and an instrument tray.
15     Q   For all of the procedures that you do?
16     A   That I do, yes.
17     Q   But it's your opinion that there are other
18  surgeons who would not use a surgical tray or a side
19  table?
20     A   It depends on the procedure, it depends on
21  the surgeon. There's usually a table for the
22  instruments, everything is laid out. Occasionally

16   (Pages 58 to 61)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 62

1   there's a Mayo stand as a secondary procedure -- or
2   a secondary tray.
3       Q   What I'm trying to get at here is, do you
4   have -- strike that.
5           Is it your opinion that it is reasonable
6   and common for some surgeons to not have a table or
7   a tray in the surgical field?
8           MS. KARLIN: Object to the form.
9           THE WITNESS: I guess I'm-- I'm not quite
10  sure how you mean that.
11  BY MR. RINGEL:
12      Q   I think -- let me try to rephrase, if I
13  can. Sorry.
14          Is it your opinion that the standard of
15  care would hold that it's common and reasonable for
16  surgeons, depending upon the type of surgery they
17  are doing, to not have any type of side table or
18  tray within the surgical field itself?
19          MS. KARLIN: Objection.
20          THE WITNESS: That's a really -- the
21  standard of care is -- I mean that is a very
22  difficult moniker to put on that, or label to put on

Page 63

1   that. Every procedure is different, you know,
2   whether you need a tiny little table, whether you
3   just need a tray somewhere, whether you need a tray
4   at the foot of the bed. Every surgeon's preferences
5   are different.
6           The most important thing is you have
7   sterile access to your instruments that you need
8   sterilely, you have a safe place to put them if you
9   need to put them safely so blades don't get put,
10  needles don't get punctured somewhere, the surgeon
11  and the operators don't stick themselves, and that
12  you have easy access to things so that the procedure
13  that you are performing can be done efficiently.
14  BY MR. RINGEL:
15      Q   Okay. Let's --
16      A   I mean it's a hard -- it's a very hard --
17      Q   It might be poorly worded. Let me try to
18  break it down a little bit. Something you just said
19  might be helpful here.
20          You stated that you want to make sure you
21  have a safe place to put all your instruments.
22  Correct?

Page 64

1       A   And for everybody's safety, yes.
2       Q   Okay. And you would hold that to be true
3   for any procedure, you want to make sure that your
4   instruments and your tools are always in a safe
5   place?
6       A   Yes.
7       Q   And, as you just mentioned, needles and
8   blades in particular you don't want to make sure
9   anyone gets poked or cut or things like that.
10  Right?
11      A   Yes.
12      Q   Is it a safe place to put -- strike that.
13          Would it be safe to put needles or blades
14  on a patient's body itself?
15      A   We typically try and avoid that.
16      Q   Where would you put them?
17      A   Up on the Mayo stand or on the table, or
18  on the side -- on the table next to the patient for
19  a transfer, so you put it down and the assistant
20  picks it up.
21      Q   And the purpose being for safety. You
22  don't want to harm the patient who is unconscious or

Page 65

1   anybody else working with it?
2       A   Anybody there.
3       Q   Okay. Let's shift it to a lighted
4   retractor now. Is it your opinion that a safe place
5   to put a right lighted reactor is on the patient's
6   body itself?
7       A   If a lighted retractor is padded properly
8   and the tip is not in contact with the drapes,
9   because you'd smell burn. I mean that's not subtle.
10  If it's within reach, because you are using it
11  continuously throughout a portion of the procedure,
12  that would not be an unusual place to put it.
13      Q   Meaning the body?
14      A   Yes.
15      Q   And the purpose being convenience to the
16  surgeon?
17      A   No, safety for everybody. Meaning that
18  you have easy access to it so the procedure
19  continues to move along properly. If you're in a
20  place where you're dissecting around blood vessels,
21  a bloody area that you need to be able to get at
22  quickly with the light just in case something

17 (Pages 62 to 65)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 66

1   changes fast, that is within immediate reach.
2       Q   Would a side table or tray not be within
3   immediate reach?
4       A   It depends on how your positioned, whether
5   you are left-handed or right-handed, whether it's
6   the right side or left side of the patient. It
7   really depends on a surgeon's body position and
8   where things are.
9       Q   Do you agree it's possible to have a side
10  table or tray within immediate reach?
11          MS. KARLIN: Objection, asked and
12  answered.
13          THE WITNESS: Sometimes.
14  BY MR. RINGEL:
15      Q   Okay. As a surgeon you have control over
16  the positioning of the staff and nurses within the
17  operating room as well as the layout of the tables
18  and equipment, things like that?
19      A   Not always. Certain types of procedure
20  rooms, certain setups where an anesthesia machine
21  goes, where table turns are, depending on the type
22  and amount of equipment that are required in a room

Page 67

1   versus the room size, you don't always have
2   absolutely control over that.
3       Q   Would you say the majority of the time
4   where you can walk into an operating room and say:
5   I want this table over here, I want you to stand
6   here?
7          MS. KARLIN: Objection.
8          THE WITNESS: The majority of the time you
9   can do that, yes.
10  BY MR. RINGEL:
11      Q   Okay. You stated, for the lighted
12  retractor, it's safe to put it on a patient if it's
13  padded properly. Did I get that right?
14      A   If you create a way that you are
15  protecting the patient to have immediate access to
16  that retractor, yes, it would not be unusual to put
17  a lighted retractor somewhere on the patient's body.
18      Q   Let's talk about the padded. When you say
19  "padded properly," what does that specifically
20  entail?
21      A   Usually a towel.
22      Q   Anything else?

Page 68

1       A   No, it's typically a towel.
2       Q   And how would you put the lighted
3   retractor on the towel? If you could just describe
4   how you would actually place it.
5       A   The towels usually come -- the towels are
6   usually folded so that there's a few layers, and the
7   lighted retractor is generally set so that the tip
8   is nowhere near the patient, off, and not in contact
9   with anything else.
10      Q   So the handle and tip itself would be on
11  the towel?
12      A   The blade and the tip, and the handle is
13  usually sometimes off a little bit.
14      Q   And where would that -- okay.
15      A   It depends on where it is on the patient.
16      Q   You stated that the tip should not be in
17  contact with drapes?
18      A   Yes.
19      Q   Why is that?
20      A   Because the tip tends to get hot.
21      Q   The tip tends to get hot. What about the
22  other portions of the tool?

Page 69

1       A   As long as everything is in continuity,
2   they should not be hot.
3       Q   Okay. And you stated that your goal is to
4   create a way to protect the patient. Did I get that
5   right?
6       A   Yes.
7       Q   Okay. What is your understanding of how
8   Dr. Chang, what the setup was in that procedure
9   room?
10      A   Depending on which side the patient was
11  in, standard supine position with arms out, and I
12  think the instrument table was at the feet, which it
13  would typically be in a breast case.
14          I don't remember knowing exactly -- I
15  couldn't tell where the Mayo stand was, or if there
16  was a Mayo stand, which is a smaller table which is
17  usually mobile and more accessible.
18      Q   Is this a metal tray?
19      A   Yeah, it's a metal tray.
20      Q   And the purpose of a Mayo table is you put
21  equipment and tools on it?
22      A   It's a smaller, more mobile than the

18  (Pages 66 to 69)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 70

1  bigger table where you have all of your instruments
2  out --
3      Q   And you could --
4      A   -- things you would be using on a more
5  routine basis.
6      Q   Okay.  And you would position that
7  somewhere that's easily accessible to the surgeon?
8      A   No, usually easily accessible to the tech,
9  because the tech is the one handing the surgeon
10  things.  If you are old school, and you reach for
11  one of those things on that table, you would get
12  your hand slapped.
13      Q   That's the tech's domain.
14      A   Yeah.
15      Q   Okay.  It's your understanding that
16  Dr. Chang had a Mayo table in the procedure room
17  with him?
18      A   Well, I couldn't tell if he had a Mayo
19  stand.  I knew he had an instrument table, but I
20  wasn't clear if he had a Mayo stand or not.
21      Q   If he did have a Mayo stand, that's
22  something that he could position at his orders

Page 71

1  around the patient?
2          MS. KARLIN:  Objection.
3          THE WITNESS:  He could help identify
4  optimal placement of it for ease of access by the
5  personnel.
6  BY MR. RINGEL:
7      Q   I want to go to a second statement in that
8  same paragraph.  It's the last sentence.  It says:
9  "Based upon my training and experience, a retractor
10  should not and does not typically overheat when used
11  under the circumstances presented."
12          Did I read that right?
13      A   You did.
14      Q   Okay.  Is this still your opinion?
15      A   Yes.
16      Q   And what is the basis of the opinion?
17      A   Hundreds and hundreds of cases utilizing
18  retractors in this way.
19      Q   Okay.  What do you define as "overheat"?
20      A   Overheat is something that becomes either
21  uncomfortable to the surgeon or staff utilizing it,
22  or to the point where it can create an injury.

Page 72

1      Q   An injury to anyone?
2      A   Anyone in the room.
3      Q   Okay.  And "uncomfortable" meaning that
4  it's too hot to hold while you are actually doing
5  the procedure?
6      A   Yeah.  Have you ever picked up a pan that
7  you shouldn't have picked up on the stove?
8      Q   Unfortunately, yes.
9      A   Okay.  Same thing.
10      Q   Okay.  You agree, then, that the retractor
11  in this case actually did overheat according to your
12  definition of the term.  Correct?
13      A   Yes.
14      Q   You're not an expert in engineering, just
15  to make that clear?
16      A   I am not.
17      Q   Okay.  And, just so we get it clear, you
18  don't plan on offering any opinions as to the
19  engineering of the retractor or how it should be
20  assembled?
21      A   No.
22      Q   You will not be offering that?

Page 73

1      A   I will not be offering those opinions.
2      Q   Okay.  Have you ever had a retractor
3  overheat?
4      A   No, I have not.
5      Q   If a retractor is overheating what do you
6  believe is the standard of care that a surgeon
7  should do at that point?
8      A   Change it out.  There's obviously
9  something not right with the system.
10      Q   "Change it out" meaning replacing it with
11  a different unit, or what do you mean?
12      A   Replacing the entire surgical instrument.
13      Q   Okay.  And that should be done
14  immediately?
15      A   As soon as it's identified that there was
16  a problem, yes.
17      Q   So as soon as he feels it potentially
18  overheating or uncomfortable or, as you stated, it
19  can create an injury, you believe the standard of
20  care is that it should be immediately replaced with
21  a functioning unit?
22      A   In order to keep everyone safe in the

19 (Pages 70 to 73)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 74

1   room, as soon as it was identified that it was
2   overheating to a point where it was uncomfortable, I
3   believe it should have been changed.
4      Q   And you wouldn't put an overheating
5   instrument on the patient itself. Correct?
6      A   No, and I don't think Dr. Chang did
7   either.
8      Q   And you believe the standard of care would
9   be that, if there's an overheating instrument, you
10  would not put it on the patient itself. Correct?
11     A   I believe that a malfunctioning instrument
12  should definitely be changed at that point.
13     Q   Including -- and just answer the question.
14  It should not be placed on the patient
15  itself. Correct?
16     MS. KARLIN: When are you talking about?
17     MR. RINGEL: Just talking about during the
18  procedure as to his opinions as to, when an
19  instrument is overheating, you believe the standard
20  of care is that it should not be placed on the
21  patient and it should immediately be replaced.
22     MS. KARLIN: After he's aware that it's

Page 75

1   overheating?
2      MR. RINGEL: Right, when he's aware that
3   it's overheating.
4      THE WITNESS: Yes.
5   BY MR. RINGEL:
6      Q   The answer is yes. All right.
7      I want to go to another statement you
8   make. I think you make it twice. I'm looking at
9   the bottom of the same page.
10     A   Mm-hmm.
11     Q   And I think also in your conclusions
12  section you say the same thing. Let's go to the
13  conclusion section, I think you state it more
14  clearly there. The last sentence of your conclusion
15  section above your signature page, you state: "I
16  further conclude that any liability for the
17  malfunctioning instrument utilized by Dr. Chang
18  during the surgery at issue due to the retractor
19  being paired with an inappropriate cord does not
20  rest with Dr. Chang as he had no involvement in
21  obtaining and/or reviewing the supply/instruments
22  for surgery."

Page 76

1      Correct?
2      A   Yes.
3      Q   Is this still your opinion?
4      A   It is.
5      Q   Okay. I think you also state it in
6   similar wording in the page before. What do you
7   rely upon to form this opinion?
8      A   Thousands of surgical procedures and the
9   reliance on the staff and the staff of the
10  facilities where I operate to ensure that all of the
11  instrumentation is correct for the procedures that
12  we are planning.
13     Q   Okay. And there's no specific statements
14  that you're relying on to form this opinion?
15     A   No, there aren't.
16     Q   There's no specific documents or
17  literature, publications that you're referring to to
18  support this opinion?
19     A   No, there is not.
20     Q   I want to break this down a little bit
21  here.
22     A   Okay.

Page 77

1      Q   Let's try to make it a little more
2   specific. You state here that "Dr. Chang had no
3   involvement in obtaining any of his supplies and/or
4   instruments." Correct?
5      A   That's my understanding.
6      Q   So does that mean that Dr. Chang is
7   walking into the operating room or the procedure
8   room and all the instruments are already there?
9      A   That's typically what happens. Once the
10  case is posted, a case posting then goes to the
11  charge nurse or one of the nurses that's in charge
12  of that, and each surgeon will have what's called a
13  "preference card." And on a preference card is a
14  list of either instruments sets or types of
15  instruments that they would typically use in that
16  procedure.
17     The OR staff then pulls that out and a
18  cart is sent up to the OR with all of that on it.
19  So if you are asking me whether he should have
20  pulled different instruments, no. But if he,
21  through creation of a preference card, would have
22  asked for particular types of instruments, yes.

20  (Pages 74 to 77)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 78

1   Q   Just so I'm understanding, he's basically
2   creating a toolbox for himself that he basically
3   says, Hey, when I'm in this room I need this type of
4   tool, this type of tool, this type of retractor,
5   this is what I'm going to need for my procedure.
6       Right?
7   A   Yes.
8   Q   And then when he's going in there they
9   already know what his toolbox, so to speak, entails,
10  and he's going to have that readily available?
11  A   Yes.
12  Q   And is it your understanding that he would
13  include all the tools in it that he would need for
14  the surgery at the time so that he wouldn't have to
15  request a new tool or anything like that at any
16  point?
17  A   Most surgeons, if they, when they have a
18  procedure will request what they typically use. If
19  there is something unusual or different, that may
20  have a separate, different request.
21      But, when I walk into an OR, I like to
22  know that everything I think I may need is

Page 79

1   immediately available, whether it's all open or not
2   is a whole different scenario, but immediately
3   available so that there's no waste of time.
4   Q   How specific -- I'll ask a general
5   question and try to make it clear for you.
6       How specific do you get in this preference
7   cart, meaning can you say, "I want a 3-inch scalpel
8   -- I'm making these up because I am totally a
9   layperson here -- a 3-inch scalpel versus a 4-inch
10  scalpel or something like that?
11  A   You don't watch very much Grey's Anatomy.
12  Q   No, I don't. I watch sports and stupid TV
13  shows.
14  A   You can get very specific. Sometimes you
15  ask for the lighted reactor set -- I'm just looking
16  at that because we are looking at lighted
17  reactors -- and that may have, that particular
18  hospital, six lighted refractors in it. It really
19  varies, but you can be extremely specific if that's
20  what the hospital is set up to do. It may be
21  somewhat generic given that there may be a variety
22  of instruments, one of which you would use, but it

Page 80

1   comes in a big pack.
2   Q   So you can say: I want the brand X model,
3   not the brand Y model?
4   A   Sometimes that -- you can say that.
5   Whether it's always available, is another whole
6   story.
7   Q   Understood. Let's say the hospital has
8   four or five of the same instrument. Is it your
9   understanding that it is common practice for the
10  doctor to say, I want this particular one, like this
11  serial number?
12  A   No.
13  Q   They just want this particular
14  specification, this model?
15  A   Yes.
16  Q   Okay. Your understanding is that
17  Dr. Chang had no involvement in choosing the lighted
18  retractor?
19  A   That's my understanding.
20  Q   Isn't Dr. Chang responsible for inspecting
21  the equipment as it arrives and make sure everything
22  is functioning properly?

Page 81

1   A   No, he is not.
2   Q   And what's the basis for that?
3   A   There is no way for a surgeon to look in
4   and inspect every single piece of equipment. He
5   relies upon the hospital, the facility, the staff to
6   go through all of that while he's preparing the
7   patient, preparing something. I mean there's no way
8   possible for a surgeon to look at every piece of
9   equipment as it is either unwrapped or -- but it is
10  appropriate for them to rely on the staff in the OR
11  or whatever facility they are in to make sure that
12  everything that comes up is in good condition, is
13  functioning properly, and, if it's not, to make an
14  appropriate change, or alert him.
15  Q   Alert who?
16  A   Alert the surgeon, in this case,
17  Dr. Chang.
18  Q   Okay. Just so I want to make sure I'm
19  characterizing correctly, your opinion is that the
20  standard of care does not require Dr. Chang to
21  inspect the equipment to make sure it's functioning
22  properly and safely?

21 (Pages 78 to 81)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 82

1    A   It is not Dr. Chang's responsibility to
2  test and evaluate every piece of equipment prior to
3  starting that procedure.
4    Q   Are there some pieces of equipment you
5  would expect him to test and evaluate?
6    A   No.
7    Q   So the standard of care doesn't require
8  him to inspect any of the equipment that he's using
9  when he walks into that operating room?
10   A   He's not required to inspect the equipment
11 when he's walking into the operating room.
12   Q   Okay.  You also state in the same
13 sentence, the second part:  "He has no involvement
14 at all in reviewing the supplies or instruments for
15 surgery."
16      Do you agree with that?
17   A   I do agree with that.
18   Q   Okay.  Meaning -- well, what does that
19 mean to you?
20   A   When he walks into the room he relies on
21 the scrub tech and the nurse to have pulled
22 everything that is appropriate within the procedure

Page 83

1  plan as well as what he has on his preference card,
2  and he has every right to rely upon them to have
3  done that accurately and ensure that everything is
4  in proper order.
5    Q   Am I correct in saying that your
6  characterization of standard of care is that
7  Dr. Chang does not have a responsibility to review
8  the equipment that's in the operating room at the
9  time he enters or begins the procedure?
10      MS. KARLIN:  Objection, asked and
11 answered.
12      THE WITNESS:  That is correct.
13 BY MR. RINGEL:
14   Q   Meaning that he has no responsibility to
15 say, Hey, this piece is missing or I need this tool
16 or this equipment, I need this for the surgery;
17 that's not his responsibility?
18   A   No, and I can tell you when I -- I have my
19 own OR here.  We have a fully accredited facility
20 here on site.  And I have my same staff and my same
21 team.  And I'm doing a breast procedure, which I did
22 today, I ask for the breast set.

Page 84

1      I rely on my team to have that breast set
2  pulled and make sure everything is properly done.
3  They inspect everything that they know is there,
4  they know what's on my preference card is what
5  matches up to what's sitting there, and that they've
6  tested the things that need to be tested so that we
7  can move forward with the surgery.
8    Q   Let's go with a little bit of
9  hypothetical.  I understand what you are saying.
10      It's important to have all the proper
11 tools at there ready because in surgery you don't
12 know what's going to happen and you want to make
13 sure, as you said, that everything is ready and
14 available and at your disposal.  Correct?
15   A   Correct.
16   Q   Meaning that if there's some emergency
17 that arises, you have the tools and equipment to
18 properly handle whatever crisis or emergency, God
19 forbid, should occur?
20   A   Yes.
21   Q   It's not the surgeon's responsibility,
22 then, to ensure that all those tools are there in

Page 85

1  case this emergency arises, but, rather, in your
2  opinion it's someone else's responsibility?
3    A   It is the staff's responsibility to ensure
4  what has been requested is all available and
5  present.
6      (Voices heard from outside the room)
7      THE WITNESS:  Sorry about that.
8  BY MR. RINGEL:
9    Q   I've sort of highlighted three opinions
10 here that I've pulled out.  Are there any new
11 opinions that you might render at trial that I might
12 have missed?
13   A   No.
14   Q   Okay.  And just I want to summarize just
15 to make sure I'm not missing anything.  But your
16 opinions you plan on providing at trial is that it's
17 not uncommon or unreasonable -- let's say, number
18 one, it is not uncommon or unreasonable to place a
19 lighted retractor on the surgical field because they
20 typically do not get so hot as to burn the skin or
21 cause injury?
22   A   Yes.

22 (Pages 82 to 85)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 86

1    Q   Number two, based upon your training and
2    experience, a retractor should not and does not
3    typically overheat when used under the circumstances
4    presented?
5    A   Specifically related to the light handle,
6    yeah.
7    Q   And Number three, "I conclude that any
8    liability for the malfunctioning instrument utilized
9    by Dr. Chang during the surgery at issue due to the
10   retractor being paired with an inappropriate cord
11   does not rest with Dr. Chang as he had no
12   involvement in obtaining and/or reviewing the
13   supplies/instruments for surgery"?
14   A   Yeah, I can tell you if the light handle
15   and retractor tend to match because the two points
16   --
17   Q   Well, just, is that --
18   A   Yes, that's true.
19   Q   Right, I know we've been over it.  So
20   those are the three opinions that you plan on
21   rendering and no other opinions you plan on
22   rendering at this time?

Page 87

1    A   No.
2        MS. KARLIN:  Well, I'm just going to add
3    he will refute the opinions of Dr. Williams to the
4    extent that they are not included in what you've
5    just stated.
6        MR. RINGEL:  Fair enough.
7    BY MR. RINGEL:
8    Q   In your own practice, as you've stated,
9    you performed many, many surgeries, and you use a
10   lighted reactor.  Correct?
11   A   Very regularly.
12   Q   For what types of procedures?
13   A   Breast augmentations, breast lifts, breast
14   reductions, exchange of implants, pocket revisions,
15   face lifts, sometimes abdominalplasties.
16   Q   Anything where you need a light?
17   A   Pretty much, yes.
18   Q   And in a hard to reach place?
19   A   Yes.
20   Q   In your practice where do you normally
21   place the lighted retractor during the actual
22   procedure itself?

Page 88

1    A   It really depends.  If I'm performing a
2    face lift, it's usually I'm working here, it goes
3    right here on the chest.
4    Q   Meaning, you are referring to, basically,
5    if it was a woman, above the chest but below the
6    neck?
7    A   Yes, exactly.
8    Q   Okay.
9    A   If I'm doing a -- say I'm doing a breast
10   lift or an augmentation, I'm looking from
11   underneath.  We usually have things so I can put it
12   right here on the abdomen, so I'm looking down,
13   looking down.  Those are the typical places where we
14   would put it.
15   Q   You don't normally put them on a Mayo
16   stand or a side table?
17   A   Not when I'm actively using it, no.
18   Q   When you are not actively using it, you
19   would place it off to the side?
20   A   If we got to a portion of the procedure
21   that did not require the lighted retractor, say,
22   we're sewing, yes, it goes off to the side.

Page 89

1    Q   Okay.  I want to show you -- I think we
2    are up to 5 now -- it's the Expert Witness
3    Disclosure Pursuant to Rule 26(a)(2) for the record.
4        (Ruff Deposition Exhibit 5 was marked for
5         identification.)
6        MR. RINGEL:  Here, I'm handing you
7    Number 5.
8    BY MR. RINGEL:
9    Q   Okay.  I've just handed you a -- "Expert
10   Witness Disclosure Pursuant to Rule 26(a)(2)" is the
11   title of the document.  Were you involved at all in
12   preparing this document?
13   A   No, I was not.
14   Q   And in it, you would agree with me,
15   starting on page 3, it summarizes your expected
16   opinions and testimony?
17   A   Yes.
18   Q   Okay.  You agree that Dr. Chang noticed
19   burns on Ms. Clark following the surgery.  Correct?
20   A   Yes.
21   Q   And you agree that he took some measures
22   to try to treat the burn at or near the time of the

23  (Pages 86 to 89)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 90

1  procedure?
2      A  It was, as far as I understand, shortly
3  after they removed the drapes at the conclusion of
4  the procedure it was noted, and he treated at that
5  time.
6      Q  And your understanding is that the actual
7  burn occurred through the drapes.  Right?
8      A  I actually don't know how the -- I can't
9  tell you exactly how the burns occurred.  If they
10  had occurred through the drapes, you would have burn
11  marks on the drapes.  And according -- and you would
12  have smelled it.  I don't know if you've ever
13  smelled burning drapes, but they smell horrible,
14  it's not a subtle smell.
15          So I can't -- I would not believe that
16  they would have occurred through the drape because
17  you would -- somebody in the OR would have noticed
18  that smell, the anesthesia tech, nurse, surgeon --
19      Q  So the only other way for the burns to
20  occur would have been through direct contact with
21  the skin.  Correct?
22      A  That would probably have been the only

Page 91

1  other way.
2      Q  From the disclosure it states: "Upon
3  recognition of the burn injury, Dr. Chang excised
4  the burned tissue until healthy bleeding tissue was
5  seen and the wounds were closed and dressed."
6          Do you agree with that?
7      A  Yes.
8      Q  You don't dispute that the overheated
9  lighted retractor cord that was placed on Ms. Clark
10  caused the burning as noted in the report?
11      A  That appears to be the consensus of
12  everybody there that -- not the cord, they were
13  talking about the handle.
14      Q  The handle?
15      A  Yes, where the cord comes in and links
16  into the retractor itself so...
17      Q  You don't dispute that the handle of the
18  lighted retractor is what caused the burns?
19      A  That appears to be -- I don't dispute
20  that, no, that appears to be correct.
21      Q  And you don't plan on offering any opinion
22  at trial that would dispute that?

Page 92

1      A  No.
2      Q  You also don't dispute that the surgical
3  burns that occurred during the surgery with
4  Dr. Chang caused the resulting disfigurement on her
5  body?
6          MS. KARLIN:  Object to the form.
7          THE WITNESS:  The burns led to the scars
8  that she has.
9  BY MR. RINGEL:
10      Q  Okay.  Are you currently aware of the
11  present nature and extent of the disfigurement
12  Ms. Clark has today from the burns?
13      A  I'm not quite sure when the last set of
14  pictures are dated, but she has pretty significant
15  burns on her chest.
16      Q  Okay.  So you have received some pictures
17  within the past six months.  Is it fair to say?
18          MS. KARLIN:  Objection.  I don't know the
19  dates on the photos.  I've given him photos from
20  Dr. Chang.  They are not recent photos.  That's what
21  he has.
22          THE WITNESS:  I don't know how recent the

Page 93

1  photos are.
2  BY MR. RINGEL:
3      Q  Okay.  So you've received photos, but we
4  don't know what the date of those photos taken were?
5      A  Correct.
6      Q  And you haven't independently actually met
7  Ms. Clark in person?
8      A  No, I have not.
9      Q  So you haven't seen the scars in person?
10      A  No.
11      Q  And I take it you don't plan on offering
12  any opinion at trial that would speak to the nature
13  and extent of her disfigurement at present.  Is that
14  correct?
15      A  No, I don't.
16      Q  And you also wouldn't plan on offering any
17  opinions at trial that would refute that the
18  surgical burns were caused by the lighted reactor?
19      A  I'm not planning --
20          MS. KARLIN:  Objection.  I think you've
21  covered that.  He's told you.
22  BY MR. RINGEL:

24 (Pages 90 to 93)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 94

1     Q   Okay. So your answer is no?
2     A   My answer is: I don't plan on that at
3   this time, right.
4     Q   Okay.
5         MR. RINGEL: I think we are wrapping up.
6   Let me just check some things. We can go off the
7   record.
8         (Discussion off record)
9         MR. RINGEL: I don't have any additional
10  questions.
11        MS. KARLIN: I just have a couple.
12        (Discussion off record)
13             EXAMINATION
14  BY MS. KARLIN:
15    Q   Doctor, you testified in response to
16  counsel's question that your opinion that the burn
17  at issue occurred due to an overheated retractor
18  handle is based on the depositions of individuals
19  who were present in the operating room. You also
20  were provided with a copy of a report from Johns
21  Hopkins Hospital Clinical Engineering Services.
22        Is that correct?

Page 95

1     A   That is correct.
2     Q   Do the conclusions of that report also
3   support your opinion?
4     A   The report noted that with the mispairing
5   of a light handle and a cord that there is always
6   the potential of excessive overheating right there
7   in that handle portion. So, yes, the report
8   reflects the observations of the staff in the OR at
9   the time.
10    Q   And can you tell me specifically in this
11  case what the evaluation was by the engineer who did
12  the testing?
13        (Document tendered to the witness)
14        MR. RINGEL: And you've just handed him
15  the report that we are talking about?
16        MS. KARLIN: Yeah, the report. And there
17  was an evaluation section at the bottom.
18        THE WITNESS: It reads: "The direct
19  causes of the incident were that the handpiece
20  overheated due to the use of an improper fiberoptic
21  cable and that the handpiece was laid on the
22  patient's chest."

Page 96

1   BY MS. KARLIN:
2     Q   And that portion of the handpiece
3   overheating due to the use of an improper cable is
4   consistent with what we discussed during your
5   deposition. Correct?
6     A   Yes, it is.
7     Q   And that is consistent with what the
8   nurses testified?
9         MR. RINGEL: Object to the form.
10        THE WITNESS: Yes, it is.
11  BY MS. KARLIN:
12    Q   And when you testified earlier toward the
13  beginning of your deposition you indicated that you
14  would be relying upon Dr. Chang's deposition
15  testimony as to his recollection of how the case
16  proceeded in the case. And there is also deposition
17  testimony under oath by the individuals who were
18  present in the operating room as to the cord being
19  mispaired with the retractor.
20        Is that correct?
21        MR. RINGEL: Object to the form.
22        THE WITNESS: Yeah, that is correct.

Page 97

1   BY MS. KARLIN:
2     Q   Okay. Will you be relying upon that
3   testimony as well?
4     A   Yes, I will.
5     Q   And although you were asked earlier if
6   you're offering engineering opinions in this case,
7   you indicated no. Correct?
8     A   Correct.
9     Q   But you do have an engineering report that
10  clearly tested the retractor and has indicated
11  conclusions based upon the testing, and that is
12  authored by an engineer. Correct?
13        MR. RINGEL: Object to the form.
14        THE WITNESS: It's my understanding that
15  the Johns Hopkins Engineering Department evaluated
16  that and came to those conclusions.
17  BY MS. KARLIN:
18    Q   And you are going to rely on those
19  conclusions in your opinions?
20    A   Yes.
21    Q   All right.
22        MS. KARLIN: That's all I have. Thank

25 (Pages 94 to 97)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 98

1    you.

2         MR. RINGEL:  Nothing further for me.

3    Thank you, Doctor.

4         MS. KARLIN:  We would like to read and

5    sign.

6         THE COURT REPORTER:  Okay.  Would you like

7    to order the transcript?

8         MS. KARLIN:  Yes, we would like an

9    expedited transcript. Can we do a -- what's today,

10   Wednesday.  Can we do like a three-day turnaround?

11   Would that be okay?

12        THE COURT REPORTER:  Mm-hmm, sure.

13        And you are ordering the original,

14   correct?

15        MR. RINGEL:  Yeah, I think we have already

16   ordered.  We already set it with you guys.

17        (Whereupon, signature having not been

18   waived, the deposition of PAUL G. RUFF IV, M.D. was

19   concluded at 3:33 p.m.)

20

21

22

Page 99

1         ACKNOWLEDGMENT OF DEPONENT

2         I, PAUL G. RUFF IV, M.D., do hereby

3    acknowledge that I have read and examined the

4    foregoing testimony, and the same is a true, correct

5    and complete transcription of the testimony given by

6    me and any corrections appear on the attached Errata

7    sheet signed by me.

8

9    _____

10   (DATE)          (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

Page 100

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2         I, Bess A. Avery, Registered Merit

3    Reporter, the officer before whom the foregoing

4    deposition was taken, do hereby certify that the

5    foregoing transcript is a true and correct record of

6    the testimony given; that said testimony was taken

7    by me stenographically and thereafter reduced to

8    typewriting under my supervision; and that I am

9    neither counsel for, related to, nor employed by any

10   of the parties to this case and have no interest,

11   financial or otherwise, in its outcome.

12        IN WITNESS WHEREOF, I have hereunto set my

13   hand and affixed my notarial seal this 10th day of

14   March 2014.

15

16   My commission expires:

17   September 30, 2018

18

19   _____

20   BESS A. AVERY, RMR

21   NOTARY PUBLIC IN AND FOR THE

22   DISTRICT OF COLUMBIA

Page 101

1         E R R A T A  S H E E T

2    IN RE: CLARK V. HOWARD COUNTY GENERAL HOSPITAL, ET

3    AL.

4    RETURN BY: _____

5    PAGE   LINE      CORRECTION AND REASON

6    ___ ___ _____

7    ___ ___ _____

8    ___ ___ _____

9    ___ ___ _____

10   ___ ___ _____

11   ___ ___ _____

12   ___ ___ _____

13   ___ ___ _____

14   ___ ___ _____

15   ___ ___ _____

16   ___ ___ _____

17   ___ ___ _____

18   ___ ___ _____

19   ___ ___ _____

20   ___ ___ _____

21   (DATE)        (SIGNATURE)

22

26 (Pages 98 to 101)

PAUL G. RUFF, IV, M.D. – 3/5/2014

Page 102

1    ERRATA SHEET CONTINUED

2    IN RE: CLARK V. HOWARD COUNTY GENERAL HOSPITAL, ET

3    AL.

4    RETURN BY: _____

5    PAGE   LINE        CORRECTION AND REASON

6    ____   ____   _____

7    ____   ____   _____

8    ____   ____   _____

9    ____   ____   _____

10   ____   ____   _____

11   ____   ____   _____

12   ____   ____   _____

13   ____   ____   _____

14   ____   ____   _____

15   ____   ____   _____

16   ____   ____   _____

17   ____   ____   _____

18   ____   ____   _____

19   ____   ____   _____

20   ____   ____   _____

21   _____

22   (DATE)         (SIGNATURE)

27 (Page 102)

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 1

| A | | | |
|---|---|---|---|
| **abdomen** | **7:13,15** | **answered** | **assault** |
| 43:19,21 88:12 | **addressed** | 66:12 83:11 | 23:6,17,18 |
| **abdominalplasties** | 34:18 | **answering** | **assembled** |
| 87:15 | **adjustments** | 7:1 | 72:20 |
| **able** | 56:4 | **Answers** | **assistant** |
| 65:21 | **AESTHETIC** | 50:6 | 54:7 64:19 |
| **above-captioned** | 4:4 | **anticipate** | **assisting** |
| 31:20 | **affixed** | 6:22 | 46:2,6,11 |
| **above-entitled** | 100:13 | **anybody** | **assuming** |
| 2:2 | **afternoon** | 65:1,2 | 19:6 28:21 30:14 |
| **absolutely** | 6:9 | **appear** | **attached** |
| 14:5 56:16 67:2 | **ago** | 99:6 | 5:11 99:6 |
| **access** | 16:14 19:1 21:10 | **appears** | **attempt** |
| 63:7,12 65:18 67:15 | 24:13,14 25:11 | 46:20 91:11,19,20 | 9:15,17 |
| 71:4 | 46:14 | **application** | **attempts** |
| **accessible** | **agree** | 11:4 | 26:22 |
| 69:17 70:7,8 | 12:14 66:9 72:10 | **appropriate** | **attorney** |
| **accompanying** | 82:16,17 89:14,18 | 81:10,14 82:22 | 18:4 |
| 9:2 | 89:21 91:6 | **approximately** | **augmentation** |
| **accredited** | **agreement** | 21:15 25:6,13 46:13 | 88:10 |
| 83:19 | 2:15 | 57:2 | **augmentations** |
| **accurate** | **ahead** | **area** | 87:13 |
| 12:10 13:2 15:22 | 18:8 31:17 | 44:7 53:3,4 65:21 | **author** |
| 16:18,18,21 17:4 | **al** | **areas** | 47:2 |
| 21:14,15 35:5 49:9 | 1:8 101:3 102:3 | 44:6 | **authored** |
| 53:14 | **alert** | **aren't** | 97:12 |
| **accurately** | 81:14,15,16 | 76:15 | **authoritative** |
| 83:3 | **allegations** | **arisen** | 14:1,5 31:10,13,17 |
| **acknowledge** | 23:3,5 25:22 | 45:7 | 32:22 |
| 99:3 | **Amended** | **arises** | **available** |
| **ACKNOWLEDG...** | 39:3,5,8 49:19 51:2 | 84:17 85:1 | 78:10 79:1,3 80:5 |
| 99:1 | 51:17,22 | **arm** | 84:14 85:4 |
| **action** | **amount** | 18:14,15,15 | **Avenue** |
| 2:2 | 30:20 66:22 | **arms** | 3:7 |
| **actively** | **amputation** | 18:14,17 19:12 20:14 | **average** |
| 88:17,18 | 26:3 | 69:11 | 57:11 |
| **actual** | **Anatomy** | **arrangement** | **Avery** |
| 54:12 55:4 59:19 | 79:11 | 26:19 | 1:22 2:15 100:2,20 |
| 87:21 90:6 | **Andochick** | **arrives** | **avoid** |
| **add** | 49:21 | 80:21 | 64:15 |
| 87:2 | **and/or** | **articles** | **aware** |
| **addition** | 32:3 75:21 77:3 | 32:4 33:2,7 | 12:7 23:4 35:7 74:22 |
| 32:21 | 86:12 | **aside** | 75:2 92:10 |
| **additional** | **anesthesia** | 47:10 | **axillary** |
| 38:1 51:16 52:2 94:9 | 66:20 90:18 | **asked** | 44:6 |
| **additions** | **answer** | 66:11 77:22 83:10 | |
| 8:12 | 12:3 44:16 47:16 | 97:5 | B |
| **address** | 48:4,18 74:13 75:6 | **asking** | **B** |
| | 94:1,2 | 45:3 77:19 | 3:12 5:10 |

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 2

**back**
16:3 30:9 35:13
52:12 56:9 60:7
**background**
8:3 23:6
**base**
52:19 54:3,8
**based**
52:20 57:21 58:5
71:9 86:1 94:18
97:11
**basically**
51:10 78:1,2 88:4
**basing**
37:5
**basis**
37:13 47:11 70:5
71:16 81:2
**battery**
23:6,17
**bed**
63:4
**beginning**
96:13
**begins**
83:9
**behalf**
3:3 4:3 15:12,13,14
18:18,20 20:1
**believe**
6:15 18:1 19:20
24:15,20 31:12
57:19 59:6 73:6,19
74:3,8,11,19 90:15
**Benedikta**
36:7 50:10 57:17
**Benedikta's**
35:20
**Berman**
3:5,13
**Bess**
1:22 2:15 100:2,20
**best**
41:11
**better**
22:12 40:2
**beyond**
16:8
**big**

80:1
**bigger**
70:1
**bilateral**
44:6
**bilaterally**
44:5
**bill**
5:16 33:18 34:17
**bills**
33:13 35:7 41:17
**bit**
8:3 19:10 56:3 63:18
68:13 76:20 84:8
**blade**
55:3,14,14 68:12
**blades**
63:9 64:8,13
**bleeding**
91:4
**blood**
65:20
**bloody**
65:21
**board**
9:6
**body**
59:19 60:19 64:14
65:6,13 66:7 67:17
92:5
**Boston**
22:22 23:1,8
**bottom**
28:16 49:18 75:9
95:17
**brand**
80:2,3
**break**
7:8,8,9 14:19 30:5
63:18 76:20
**breakdown**
14:21 15:11
**breaks**
57:7
**breast**
43:9,15,17,19,21 44:2
44:7 46:5 53:13
69:13 83:21,22 84:1
87:13,13,13 88:9

**bring**
28:17
**broad**
44:14
**burn**
12:6,9,21 44:20 45:8
45:21 46:8 50:6
58:19 65:9 85:20
89:22 90:7,10 91:3
94:16
**burned**
20:2 52:15 91:4
**burning**
90:13 91:10
**burns**
8:21 11:21 12:16,18
14:2 33:10 45:11
52:18 53:8,12 57:15
57:19 89:19 90:9,19
91:18 92:3,7,12,15
93:18

---
**C**

**C**
3:1 4:1,1 5:1 6:1
102:1
**cable**
95:21 96:3
**called**
2:2 6:4 77:12
**can't**
7:7 13:11 16:6 27:22
28:4 35:21 36:21
38:11 41:12 57:16
90:8,15
**capsule**
45:12 56:3
**capsulectomy**
43:9 56:3
**capsules**
57:10
**card**
77:13,13,21 83:1
84:4
**Cardiology**
50:5
**care**
59:7 62:15,21 73:6
73:20 74:8,20 81:20

82:7 83:6
**cart**
77:18 79:7
**case**
1:6 6:12 7:20 8:17,19
11:20 12:2 14:8,11
16:10 17:12,13,14
17:18,20 18:10,13
18:22 19:3,9,11,15
19:22 20:5,6,10,12
21:3,4 23:4 24:5
25:4,5,8,17 26:1,8,9
27:4,21 30:15 31:1
31:14 32:6,14 33:4
33:11,15 35:17
36:19 37:6,8,9,11
41:4,6,19 42:8 49:1
49:2 56:5,20 57:11
65:22 69:13 72:11
77:10,10 81:16 85:1
95:11 96:15,16 97:6
100:10
**cases**
15:10 16:1 17:6,10
19:21 21:13 32:9,13
45:10 46:4 54:10
71:17
**cause**
23:20 58:19 85:21
**caused**
91:10,18 92:4 93:18
**causes**
95:19
**causing**
55:10
**cautery**
12:21 45:11 46:7,8
**Center**
10:19 11:16 25:18
50:5
**certain**
66:19,20
**CERTIFICATE**
100:1
**certified**
9:6
**certify**
100:4
**cetera**

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 3

8:16 21:19 33:7
**Chang**
4:5 7:21 27:20 36:18
36:20 39:18 41:21
49:20 50:9 52:21
69:8 70:16 74:6
75:17,20 77:2,6
80:17,20 81:17,20
83:7 86:9,11 89:18
91:3 92:4,20
**change**
52:3 73:8,10 81:14
**changed**
74:3,12
**changes**
66:1
**Chang's**
35:20 55:20 82:1
96:14
**characterization**
83:6
**characterize**
56:15
**characterizing**
81:19
**charge**
16:18,21 77:11,11
**Chartered**
4:7 5:19
**check**
94:6
**chest**
53:2,6,12 88:3,5
92:15 95:22
**choosing**
80:17
**circumstances**
33:4 55:16 71:11
86:3
**claim**
31:10
**claiming**
23:16
**Clark**
1:4 6:12,14 7:20
28:18 29:5,8 30:13
42:5 50:19 52:15
89:19 91:9 92:12
93:7 101:2 102:2

**Clark's**
33:11 36:2 38:12,13
38:14,20,22 51:16
51:19 53:2
**clean**
7:2
**clear**
47:21 70:20 72:15,17
79:5
**clearly**
75:14 97:10
**clinical**
14:20 15:1 94:21
**closed**
91:5
**Clyde**
42:15
**Columbia**
2:17 4:4 100:22
**combination**
16:13
**come**
68:5
**comes**
54:22 80:1 81:12
91:15
**comfort**
54:2
**coming**
55:12
**commission**
100:16
**common**
28:6 60:22 62:6,15
80:9
**communication**
30:20
**companies**
23:7
**company**
23:14 24:7,8
**complaint**
22:19,21 49:19
**complete**
50:11 99:5
**complicated**
19:10
**complication**
23:10 45:7

**complications**
23:20 44:12,17
**computer**
39:20
**conclude**
75:16 86:7
**concluded**
25:2 98:19
**conclusion**
75:13,14 90:3
**conclusions**
75:11 95:2 97:11,16
97:19
**condition**
81:12
**confidential**
26:18
**confirm**
27:22
**confirmed**
23:22
**connector**
55:1
**connects**
55:1
**consensus**
91:11
**consider**
13:22
**consistent**
96:4,7
**consult**
47:4
**consultation**
47:19
**consulted**
47:22 48:4,8,12
**contact**
65:8 68:8,17 90:20
**continue**
53:22 54:5
**continued**
27:1
**continues**
65:19
**continuity**
69:1
**continuous**
56:5,6

**continuously**
56:1 57:6 65:11
**contouring**
44:7
**control**
66:15 67:2
**convenience**
65:15
**conversation**
6:22
**conversations**
48:22
**copies**
32:22 39:18 40:3
**copy**
8:3 16:16 29:1,4,7
30:11 31:8 35:5
39:19,20 52:8 94:20
**cord**
54:20,22 55:13 75:19
86:10 91:9,12,15
95:5 96:18
**correct**
6:16 7:17,22 10:6
12:7 29:2,12 30:15
31:11 33:6 46:19
49:9 54:11 56:14
60:17 63:22 72:12
74:5,10,15 76:1,11
77:4 83:5,12 84:14
84:15 87:10 89:19
90:21 91:20 93:5,14
94:22 95:1 96:5,20
96:22 97:7,8,12
98:14 99:4 100:5
**CORRECTION**
101:5 102:5
**corrections**
8:13 99:6
**correctly**
58:20 81:19
**corresponded**
30:14
**correspondence**
30:12 40:22
**cosmetic**
20:2,14
**couldn't**
56:18 69:15 70:18

PAUL G. RUFF, IV, M.D. - 3/5/2014

counsel
6:4 30:15 32:18 34:6
38:2 40:16 41:3,8
47:19 48:3,5,9,13
100:9
counsel's
94:16
County
1:7 7:21 50:3,8 101:2
102:2
couple
43:14 94:11
course
55:21
court
1:1 6:20 25:20 47:8
98:6,12
covered
93:21
co-Defendant
50:7
Craig
3:12 6:13
create
67:14 69:4 71:22
73:19
created
46:8
creating
78:2
creation
77:21
crisis
84:18
current
10:6
currently
10:7,16 22:17 92:10
curriculum
5:13 8:4 29:1 33:1,3
33:9
cut
64:9
C.V
8:8

___ D ___
D
4:1 6:1 102:1

Darby
3:6,14
date
8:9,11 9:22 93:4
99:10 101:21
102:22
dated
29:22 34:18 37:16
49:22 50:3 92:14
dates
25:7,9 92:19
day
16:22 100:13
debatable
12:11
December
38:17,21 51:20,20
defendant
15:13,16 18:19 22:3
27:12 49:5
Defendants
1:9 4:3
defense
15:18 27:3 30:15
define
71:19
definitely
74:12
definition
72:12
deletions
8:12
denied
11:5
Department
97:15
depending
56:9 62:16 66:21
69:10
depends
61:4,10,20,20 66:4,7
68:15 88:1
deponent
32:9 99:1
deposed
20:5
deposition
1:14 2:1 5:12,15 6:15
8:5 16:19 19:2

20:15 21:6 25:3
26:4 28:10,11 30:11
32:11 34:12 35:12
36:3 37:19 38:13,14
38:21,22 39:1 40:17
50:9,18,21 51:8,11
51:17,19 57:22 89:4
96:5,13,14,16 98:18
100:4
depositions
20:3 21:2 26:8 34:20
35:17,19 52:20
94:18
describe
54:15 68:3
details
26:18
device
12:22 54:2
devices
12:20
didn't
19:5 36:14 38:15
different
43:1 63:1,5 73:11
77:20 78:19,20 79:2
difficult
62:22
direct
90:20 95:18
discipline
10:14
disclosure
5:22 19:21 21:1 89:3
89:10 91:2
discovery
40:7,9
discussed
6:10 21:12 32:12
40:22 41:6 50:14
96:4
discussion
30:7,22 34:11 94:8
94:12
disfigurement
92:4,11 93:13
dismissed
21:3 26:12,13,17,21
27:4,5,8

disposal
84:14
dispute
91:8,17,19,22 92:2
dissecting
56:2 57:10 65:20
District
1:1,2 2:17 100:22
doctor
9:6 24:18 34:15
37:11 80:10 94:15
98:3
doctors
23:12
doctor-patient
24:2
document
33:3 36:1 47:2,5 48:1
58:22 89:11,12
95:13
documents
17:3 29:4,7,10,14
30:18 33:13,14 38:2
38:18 39:13 49:16
50:11,15 51:16 52:2
59:15 76:16
doesn't
82:7
doing
23:8 46:11 58:5
60:22 62:17 72:4
83:21 88:9,9
domain
70:13
don't
9:4 11:8 13:10 14:4
21:4 24:2,22 25:8
26:17 28:3 32:15
34:1 38:3 40:6,7
41:10,21 42:5,9,12
42:13 56:17 57:19
61:11 63:9,10,11
64:8,22 67:1 69:14
72:18 74:6 79:11,12
84:11 88:15 90:8,12
91:8,17,19,21 92:2
92:18,22 93:4,11,15
94:2,9
dozen

PAUL G. RUFF, IV, M.D. – 3/5/2014

Page 5

**43:14**
**Dr**
5:16,20 6:9 7:21 18:1
  18:2,11,20,21 19:13
  20:21 27:20 35:20
  35:21 36:12,18,20
  38:4,9,12,13,22
  39:4,9,18 41:21
  42:9,11,17 49:1,4
  49:20 50:9,21 51:2
  51:18,22 52:21
  55:20 69:8 70:16
  74:6 75:17,20 77:2
  77:6 80:17,20 81:17
  81:20 82:1 83:7
  86:9,11 87:3 89:18
  91:3 92:4,20 96:14
**drape**
90:16
**drapes**
60:1 65:8 68:17 90:3
  90:7,10,11,13
**dressed**
91:5
**Drizen**
24:19,19
**dropped**
24:10 26:7,9,10
**drug**
23:13 24:7,8
**due**
75:18 86:9 94:17
  95:20 96:3
**duly**
6:5
**D-R-I-Z-E-N**
24:20
**D.C**
1:15 2:8 7:16 10:12
  25:20

**E**
**E**
3:1,1 4:1,1,1 5:1,10
  6:1,1 101:1,1,1
  102:1,1,1,1
**earlier**
49:11 50:14 96:12
  97:5

**earliest**
22:8
**ease**
71:4
**easily**
70:7,8
**easy**
63:12 65:18
**educate**
42:21
**effect**
52:5,7
**effectively**
53:22
**efficiently**
63:13
**either**
11:9 32:11 56:8
  71:20 74:7 77:14
  81:9
**EKG**
50:1
**electronic**
32:1
**ELH**
1:7
**else's**
85:2
**emergency**
84:16,18 85:1
**Emig**
4:7 5:18 17:7
**employed**
100:9
**encompass**
59:21
**encompasses**
30:19,20
**energy**
55:11,12,12
**engineer**
95:11 97:12
**engineering**
38:10 72:14,19 94:21
  97:6,9,15
**ensure**
76:10 83:3 84:22
  85:3
**entail**

**earliest**
57:11 67:20
**entails**
78:9
**enters**
83:9
**entire**
28:17 57:6 73:12
**entirely**
27:4
**equipment**
66:18,22 69:21 80:21
  81:4,9,21 82:2,4,8
  82:10 83:8,16 84:17
**Eric**
4:5 7:21
**Errata**
99:6
**erroneously**
19:13
**Esq**
5:17
**Esquire**
3:4,12 4:6 34:19
**et**
1:8 8:15 21:19 33:7
  101:2 102:2
**etiology**
52:17
**evaluate**
82:2,5
**evaluated**
97:15
**evaluation**
95:11,17
**everybody**
44:17 65:17 91:12
**everybody's**
64:1
**evolved**
61:6
**exact**
27:19
**exactly**
28:4 38:4 69:14 88:7
  90:9
**exam**
9:10,13
**examination**
5:2 6:4,7 23:19 94:13

**examined**
99:3
**example**
46:5
**excessive**
95:6
**exchange**
43:15,17 87:14
**exchanged**
26:19
**excised**
91:3
**Exhibit**
5:13,15,16,20,22 8:5
  28:9,11 29:2 34:12
  35:2 37:18,19 46:17
  89:4
**Exhibits**
5:11
**expect**
82:5
**expected**
89:15
**expedited**
98:9
**experience**
58:4,5 59:14 60:21
  61:5 71:9 86:2
**expert**
5:22 7:19 16:13
  19:21 21:1,13 26:22
  27:3 34:21 37:10
  41:4 42:7,10 49:4
  72:14 89:2,9
**expires**
100:16
**explain**
46:3
**extent**
87:4 92:11 93:13
**extra**
18:16
**extremely**
22:13 79:19
**e-mail**
30:16,17 31:2 34:7
  35:11 36:14 39:1,17
  40:22
**e-mails**

PAUL G. RUFF, IV, M.D. – 3/5/2014

33:17

**F**

**face**
87:15 88:2
**facilities**
76:10
**facility**
81:5,11 83:19
**facts**
33:4
**fail**
27:1
**fair**
12:5 35:5 39:17
40:10 49:9 87:6
92:17
**fairly**
56:1
**falls**
16:6
**far**
11:22 12:6 16:3
19:17,19 22:18 23:3
25:19 55:5 90:2
**farthest**
25:16
**fashion**
31:3
**fast**
66:1
**Fat**
43:19,21
**federal**
47:8
**fee**
16:16 49:7,8
**feel**
37:5
**feels**
73:17
**feet**
69:12
**Feldman**
3:6,14
**fiber**
55:14
**fiberoptic**
27:16,20 95:20

**field**
14:1 58:18 59:18,20
59:22 60:2,11,17,18
61:2,3 62:7,18
85:19
**file**
28:18,18 34:16 35:13
52:9
**filed**
17:21 22:19,21 25:19
**final**
47:7
**financial**
100:11
**find**
35:11
**finish**
7:3
**fire**
12:2,8
**fires**
8:20 11:21
**firm**
5:17 17:7 33:19
**first**
6:5 9:15,16,17 27:10
28:17 51:16 58:15
**five**
16:6 80:8
**flap**
45:12 46:7
**Flynn**
4:7 5:18 17:7 33:19
33:19
**Fogleman**
4:7 5:18 17:7
**folded**
68:6
**following**
12:9 33:1 50:16
58:14 89:19
**follows**
6:6
**foot**
61:9 63:4
**forbid**
84:19
**foregoing**
99:4 100:3,5

**Forgetting**
45:18
**form**
59:12 62:8 76:7,14
92:6 96:9,21 97:13
**formulating**
32:5
**forward**
84:7
**found**
41:3
**four**
16:2,5 19:1 21:9,13
32:10 34:22 80:8
**frame**
38:4
**Frederick**
3:7 49:22
**full**
7:12 58:15
**fully**
83:19
**functioning**
73:21 80:22 81:13,21
**further**
75:16 98:2

**G**

**G**
1:14 2:1 5:2,13 6:1,3
98:18 99:2
**Gaithersburg**
3:9
**general**
1:7 7:21 9:9,16 14:16
42:19 43:3 44:10
46:6 50:3,8 79:4
101:2 102:2
**generally**
45:19 68:7
**generated**
31:19
**generic**
79:21
**Georgetown**
10:19 11:17
**give**
13:11 19:2
**given**

27:22 79:21 92:19
99:5 100:6
**Gleason**
4:7 5:18 17:7 33:19
33:19
**go**
6:18 8:2 9:3 16:3
25:5 28:15,16 29:19
31:17 34:8 38:15
43:5 48:7 49:15
71:7 75:7,12 81:6
84:8 94:6
**goal**
69:3
**God**
46:14 84:18
**goes**
54:20 66:21 77:10
88:2,22
**going**
12:1 28:8 30:10
37:15 43:5 44:10
46:15 48:17 49:12
55:6 56:11 78:5,8
78:10 84:12 87:2
97:18
**good**
6:9 7:10,11 31:7
39:19 81:12
**Goodwin**
50:9
**Goodwin's**
35:20
**Gray**
7:14
**Grey's**
79:11
**Gross**
3:5,13
**ground**
6:19
**guess**
27:1 53:9 62:9
**guessing**
48:11
**Guevara**
17:15
**guys**
98:16

PAUL G. RUFF, IV, M.D. – 3/5/2014

Page 7

| **H** | | | |
|---|---|---|---|
| **H** | **held** | 55:5,6,7,8,15,17 | **inappropriate** |
| 5:10 101:1 102:1 | 2:2 | 57:18 58:19 68:20 | 75:19 86:10 |
| **half** | **help** | 68:21 69:2 72:4 | **incident** |
| 16:22 17:2 34:22 | 45:15 71:3 | 85:20 | 24:12 25:11 57:14 |
| 41:10 57:12 | **helpful** | **hour** | 95:19 |
| **hand** | 63:19 | 16:19 17:2 34:22 | **include** |
| 28:8 46:15 56:7,8,8,9 | **helps** | 41:9,10,12 57:11,12 | 11:13 78:13 |
| 56:12 70:12 100:13 | 36:22 | **hours** | **included** |
| **handed** | **hereunto** | 34:22 57:3,3 | 51:13 87:4 |
| 8:9 89:9 95:14 | 100:12 | **Howard** | **including** |
| **handing** | **Heron** | 1:7 7:20 50:2,8 101:2 | 38:20 74:13 |
| 70:9 89:6 | 3:12 6:13 | 102:2 | **income** |
| **handle** | **Hey** | **hundreds** | 21:18 |
| 52:18 53:1,18,21 | 78:3 83:15 | 54:10 71:17,17 | **incompatible** |
| 54:14,15,16,16 55:2 | **he's** | **hypothetical** | 54:1 |
| 55:2,7 57:18 68:10 | 42:10 74:22 75:2 | 84:9 | **independently** |
| 68:12 84:18 86:5,14 | 78:1,8,10 81:6 82:8 | | 93:6 |
| 91:13,14,17 94:18 | 82:10,11 93:21 | **I** | **indicated** |
| 95:5,7 | **highlighted** | **idea** | 96:13 97:7,10 |
| **handpiece** | 85:9 | 21:8 | **individuals** |
| 95:19,21 96:2 | **hit** | **identification** | 94:18 96:17 |
| **hands** | 16:11 | 8:6 28:12 34:13 | **information** |
| 26:20 45:9 46:1,3 | **Hobert** | 37:20 89:5 | 17:18 |
| 60:9 | 36:8,9 50:10 51:11 | **identified** | **informing** |
| **happen** | 57:17 | 7:19 57:20 73:15 | 49:17 |
| 84:12 | **Hobert's** | 74:1 | **inject** |
| **happened** | 51:8 | **identify** | 24:2 |
| 24:11 | **hold** | 71:3 | **injectables** |
| **happens** | 10:10 52:11,11 54:17 | **illumination** | 23:8 |
| 77:9 | 59:9 62:15 64:2 | 55:3 | **injections** |
| **happy** | 72:4 | **immediate** | 23:13 |
| 7:9 | **holding** | 66:1,3,10 67:15 | **injury** |
| **hard** | 54:6 | **immediately** | 50:6 58:19 71:22 |
| 63:16,16 87:18 | **hopefully** | 73:14,20 74:21 79:1 | 72:1 73:19 85:21 |
| **harm** | 18:11 | 79:2 | 91:3 |
| 64:22 | **Hopkins** | **impact** | **inspect** |
| **haven't** | 94:21 97:15 | 52:6 | 81:4,21 82:8,10 84:3 |
| 93:6,9 | **horrible** | **implant** | **inspecting** |
| **head** | 90:13 | 43:9,15,17 | 80:20 |
| 7:6,6 | **hospital** | **implants** | **instance** |
| **healthy** | 1:8 7:21 10:16,18,19 | 87:14 | 60:18 |
| 91:4 | 10:20,21,22 11:5 | **important** | **instruct** |
| **hear** | 11:15,16 14:20 15:5 | 6:19 63:6 84:10 | 48:17 |
| 7:2 | 15:6 24:6 25:18 | **importantly** | **instructing** |
| **heard** | 49:22 50:3,4,8 | 13:6 | 47:15 48:1 |
| 85:6 | 79:18,20 80:7 81:5 | **impossible** | **instruction** |
| **heat** | 94:21 101:2 102:2 | 56:21 | 48:17 51:5,12 52:8 |
| 55:10 | **hot** | **improper** | **instrument** |
| | 53:17,18,21 54:13 | 95:20 96:3 | 60:5 61:8,14 69:12 |

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 8

70:19 73:12 74:5,9
74:11,19 75:17 80:8
86:8
**instrumentation**
76:11
**instruments**
60:2,4,8 61:22 63:7
63:21 64:4 70:1
77:4,8,14,15,20,22
79:22 82:14
**intend**
31:9 36:19 37:12
**interest**
100:10
**interrogatories**
34:20 50:7
**introduced**
6:10
**involved**
8:16,18 11:20 17:22
18:13 23:14 31:1
33:10 35:17 37:11
42:3 45:9 46:4
89:11
**involvement**
75:20 77:3 80:17
82:13 86:12
**involving**
20:1
**in/out**
56:5,5
**Isn't**
80:20
**issue**
12:2,16,17 23:16
75:18 86:9 94:17
**issues**
8:17,19 11:20 18:12
30:22 33:10 49:1
**items**
33:1
**it's**
6:21 7:14 8:10 10:6
13:1 16:17 17:12,12
17:15 18:16 19:10
19:20 21:20 22:2,17
22:22 24:19,21,21
28:6 29:20,22 38:9
44:14 47:6,13,13

49:12 52:22 54:6,12
56:6,20 58:11 59:4
60:7 61:17 62:15
63:16,16 65:10 66:5
66:9 67:12,12 68:1
69:19,22 70:15 71:8
72:4 73:15 74:22
75:3 79:1 80:5
81:13,21 84:10,21
85:2,16 88:2 89:2
90:14 97:14
**IV**
1:14 2:1 5:2,14 6:3
7:14 98:18 99:2
**I'd**
8:2,4 28:15 35:10
58:8
**I'll**
44:11,16 49:18 79:4
**I'm**
6:13 7:9 12:1,6 19:5
20:9 22:14 24:9,16
25:8 26:5,15 27:10
28:8,20 30:14 33:22
36:11 38:6,8 43:5
44:10 46:15 48:11
54:4 56:14 58:10
62:3,9,9 75:8 78:1,3
78:5 79:8,15 81:18
83:21 85:15 87:2
88:1,2,9,9,10,12,17
89:6 92:13 93:19
**I've**
8:9,18 13:10 15:14
16:16 25:3 28:5
30:20 33:16 37:16
38:9 46:4 85:9,10
89:9 92:19

___ **J** ___

**January**
39:7 51:3 52:1
**Job**
1:20
**Johns**
94:20 97:15
**joined**
6:13
**journal**

13:18 32:3
**journals**
13:12,13,14
**judge**
26:22 27:2
**jumping**
18:8
**jurisdictions**
10:11

___ **K** ___

**Karen**
4:6 5:17 34:18
**Karlin**
4:6 5:4,17 12:1 14:3
17:17,19,22 18:3
31:16 34:1,5,18
36:5,8 39:17 40:2,6
40:13,15,16 41:1
44:14 47:6,13,17
48:3,14,19 49:12
62:8,19 66:11 67:7
71:2 74:16,22 83:10
87:2 92:6,18 93:20
94:11,14 95:16 96:1
96:11 97:1,17,22
98:4,8
**keep**
13:5 73:22
**Kevin**
3:4 6:11
**kind**
11:9 26:18
**Kiwue**
24:19,20
**knew**
70:19
**know**
6:9 7:9 11:8 12:13
13:10 19:15,19 21:4
21:6 22:18 25:19
26:10,15,18 28:3
29:11 34:3 38:9
40:6,7 41:4,10,18
41:21 42:5,7,9,12
42:12,13,17,22
51:19 55:19 56:17
56:22 60:21 63:1
78:9,22 84:3,4,12

86:19 90:8,12 92:18
92:22 93:4
**knowing**
69:14
**K-I-W-U-E**
24:20
**K-W-I-U-E**
24:21

___ **L** ___

**label**
62:22
**laboratory**
50:2
**laid**
53:1 60:8 61:22
95:21
**language**
26:16,17
**Larry**
18:4,6 20:7,21
**laser**
12:21 20:3
**lateral**
44:7
**law**
5:17 17:6 33:19
**lawsuit**
22:4 27:13
**lay**
26:16
**layers**
68:6
**layout**
66:17
**layperson**
79:9
**leaving**
47:10
**lecture**
12:18 33:2
**lectured**
11:18
**lectures**
8:15 33:7
**led**
92:7
**left**
43:9,15,19 44:2 66:6

PAUL G. RUFF, IV, M.D. - 3/5/2014

left-handed
66:5
leg
16:12
legal
14:20 15:4,7,11 16:1
16:1,13 17:6 21:18
26:16
letter
49:18
letterhead
29:20
let's
16:4 17:9 22:8,8 25:5
48:7 63:15 65:3
67:18 75:12 77:1
80:7 84:8 85:17
liability
75:16 86:8
license
10:10
licensed
10:7
licenses
10:14
lift
18:14,15,15 88:2,10
lifts
87:13,15
light
12:22 54:21,22 55:9
55:10,11,12 65:22
86:5,14 87:16 95:5
lighted
27:16,20 51:6 54:19
57:4,6 58:17 60:16
65:3,5,7 67:11,17
68:2,7 79:15,16,18
80:17 85:19 87:10
87:21 88:21 91:9,18
93:18
Linda
50:9
line
36:22 38:16,16 101:5
102:5
links
91:15
Liposuction

44:6
list
32:9,13,15 40:8 43:5
49:15 50:11 77:14
listed
9:2 32:22 33:1 40:7
40:10 45:4,19
literature
14:9,14 31:8,12 32:4
59:15 76:17
litigation
22:19
litmus
27:1
little
8:3 15:9 56:3 63:2,18
68:13 76:20 77:1
84:8
LLC
4:5
LLP
3:6,14
long
16:14 41:7,9 56:22
60:22 69:1
look
8:8 34:9 35:4 46:18
81:3,8
looking
36:5 58:10 75:8
79:15,16 88:10,12
88:13
looks
34:17 38:17

_____ M _____

M
2:6 3:4 7:15
machine
66:20
mail
31:4
majority
67:3,8
making
56:3 79:8
malfunctioning
74:11 75:17 86:8
malpractice

23:17
manual
51:5,12 52:9
manufacturer
28:2
March
1:16 100:14
mark
8:4
marked
8:5 28:11 34:12 35:2
37:19 46:16 89:4
marking
28:9
marks
90:11
Mary
1:4 6:12,13 7:20
28:18 29:5,8 30:13
33:11 38:12,13,14
38:20,22 42:5 50:19
51:16,19 52:15 53:2
Maryland
1:1 3:9,17 4:10 10:12
mastectomy
46:5
match
86:15
matches
84:5
materials
17:3
matter
31:20
may
12:20,20 27:7 35:7
78:19,22 79:17,20
79:21
Mayo
60:1 61:14 62:1
64:17 69:15,16,20
70:16,18,20,21
88:15
McAfee
18:6 20:7,21 41:1,5
mean
11:8 19:10 22:2
26:10 33:17 46:2,4
56:18 60:5 62:10,21

63:16 65:9 73:11
77:6 81:7 82:19
meaning
44:1 65:13,17 72:3
73:10 79:7 82:18
83:14 84:16 88:4
means
44:19 45:8,22
measures
89:21
medical
11:10,10,19 13:12,13
14:20 16:2 21:18
30:22 34:21 49:20
49:20,21 50:2,4,5
54:7 58:2
medicine
10:8
meeting
41:7
memorandum
33:2
Memorial
10:20 49:22
memos
33:14
mentioned
64:7
Merit
2:16 100:2
met
40:16 93:6
metal
69:18,19
middle
52:1 59:4
minimal
21:20
minimum
16:19
Misdiagnosis
26:2
mispaired
96:19
mispairing
95:4
missed
85:12
missing

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 10

```
    83:15 85:15              63:10 64:7,13         nurses                 17:5,9 18:21 19:20
Mm-hmm                   needs                 42:2 66:16 77:11       21:12,17 22:1,6,10
13:21 75:10 98:12        7:8                   96:8                   22:18,21 23:3 24:8
mobile                   negligence            ─────────────────     24:16 25:1,5,22
69:17,22                 23:5                       O                 26:15 27:19 28:5,8
model                    negligently          O                      28:13 29:19 30:3
27:19 80:2,3,14          19:13                 4:1 5:1 6:1 102:1      31:3,6,22 32:3,8,17
money                    neither               oath                   32:21 33:6,13,18
26:19                    100:9                 96:17                  34:8,15 35:11 37:1
moniker                  never                 object                 37:3 38:18 39:10,16
62:22                    20:5 23:21 24:11      12:1 31:16 62:8 92:6   40:5,13,15,21 41:7
Monthly                      26:8 27:12            96:9,21 97:13       41:21 42:21 43:5
13:19,20                 new                   objection              45:16,18 46:13,15
months                   39:22 78:15 85:10     14:3 44:14 47:6        46:18 47:10,20 48:7
10:5 23:11 92:17         nine                      48:12,14 62:19     48:16,20 49:7,15
move                     23:11                     66:11 67:7 71:2    51:9,15 52:5,11
65:19 84:7               Nods                      83:10 92:18 93:20  53:7,13 55:4,10,19
multiple                 7:6                   observations           56:11,22 58:8 59:6
26:22                    normal                95:8                   60:4 63:15 64:2
M.D                      55:16                 obtaining              65:3 66:15 67:11
1:14 2:1 4:5 5:2,14      normally              75:21 77:3 86:12       68:14 69:3,7 70:6
    6:3 49:21 98:18      87:20 88:15           obviously              70:15 71:14,19 72:3
    99:2                 North                 40:15,21 73:8          72:9,10,17 73:2,13
─────────────────       3:7 4:8               Occasionally           76:5,13,22 80:16
       N                 Northern              61:22                  81:18 82:12,18
N                        1:2                   occur                  85:14 88:8 89:1,9
3:1 4:1,1,1 5:1,1 6:1    Northwest             44:12 84:19 90:20      89:18 92:10,16 93:3
    102:1,1              7:15 50:4             occurred               94:1,4 97:2 98:6,11
name                     notarial              25:7,11 27:8,11        old
6:11 7:12 17:13,20       100:13                    57:14 90:7,9,10,16 9:4 31:3 70:10
    24:16,18 35:22 36:3  Notary                    92:3 94:17         older
named                    2:16 6:5 100:1,21     offer                  25:5
24:9 49:4                noted                 41:4                   once
names                    90:4 91:10 95:4       offering               15:15 40:18 77:9
32:14 43:1               notes                 72:18,22 73:1 91:21    ones
natural                  31:19 33:2,7 57:16        93:11,16 97:6      13:15
6:22                     notice                office                 one-on-one
nature                   5:15 28:9 30:10       41:15                  11:13
92:11 93:12              noticed               officer                ongoing
near                     57:17 89:18 90:17     100:3                  22:17
61:2 68:8 89:22          number                offices                Onyewu
neck                     1:6 23:7 28:1 31:8,19 2:3                     17:15,16 18:1,2,11,20
53:14 88:6                   32:21 50:8 51:10  oh                          18:21 19:13 20:6,21
need                         56:18 80:11 85:17 20:9 27:9 39:8 45:17   open
7:7 13:5 26:18 30:5          86:1,7 89:7           46:14 53:7 59:5    79:1
    31:6 63:2,3,3,7,9    numbers               okay                   opened
    65:21 78:3,5,13,22   58:9                  6:18 7:12 8:2,12 9:6   13:10
    83:15,16 84:6 87:16  nurse                     9:19 10:6 11:18    operate
needles                  77:11 82:21 90:18         13:8 15:2,6,9 16:15 53:22 76:10
```

PAUL G. RUFF, IV, M.D. - 3/5/2014

operated
28:1
operating
8:20 11:21 12:2,8
    14:1 46:9 56:10
    66:17 67:4 77:7
    82:9,11 83:8 94:19
    96:18
operation
13:4
operations
12:19
operators
63:11
opinion
19:8,11 34:21 37:6
    37:13 53:16 54:8
    58:16,21 59:10,13
    60:10,15 61:17 62:5
    62:14 65:4 71:14,16
    76:3,7,14,18 81:19
    85:2 91:21 93:12
    94:16 95:3
opinions
14:8,10 16:2 31:1,13
    32:6 36:19 49:17
    52:3,6 57:21 58:4,9
    58:11 72:18 73:1
    74:18 85:9,11,16
    86:20,21 87:3 89:16
    93:17 97:6,19
opposed
21:18
optics
55:14
optimal
71:4
oral
9:13,14
orals
9:18,19
order
73:22 83:4 98:7
ordered
98:16
ordering
98:13
orders
70:22

organizes
60:9
original
28:18 40:10 98:13
orthopedic
26:7
osteomyelitis
26:2
outcome
19:15 100:11
outlined
33:3
outside
85:6
overheat
71:10,19,20 72:11
    73:3 86:3
overheated
52:18 91:8 94:17
    95:20
overheating
57:14 73:5,18 74:2,4
    74:9,19 75:1,3 95:6
    96:3

---

**P**

P
3:1,1 4:1,1 6:1
pack
80:1
padded
65:7 67:13,18,19
page
5:2,12 28:17 46:21
    49:18 58:9,12 75:9
    75:15 76:6 89:15
    101:5 102:5
Pages
1:21
paired
75:19 86:10
palpated
23:18
pan
72:6
paragraph
58:15 59:2,4 71:8
part
13:3 27:17 36:16

39:10 45:19 51:7,10
    51:14 52:9 53:16
    54:17 59:20 60:10
    82:13
particular
23:9 28:2 43:2 50:12
    60:18 61:6 64:8
    77:22 79:17 80:10
    80:13
particularly
8:17 11:20
parties
41:18 100:10
pass
9:15
passed
9:16,17
patient
13:6 23:10 24:13
    44:19 45:6,7,21
    61:8,9 64:18,22
    66:6 67:12,15 68:8
    68:15 69:4,10 71:1
    74:5,10,14,21 81:7
patients
21:19
patient's
59:19 60:19 64:14
    65:5 67:17 95:22
Paul
1:14 2:1 5:2,13 6:3
    7:14 98:18 99:2
peek
34:16
pending
25:1
people
12:13 13:6 24:1 60:2
percent
15:1,3 21:22 22:2
percentage
21:17,21
perform
43:8,12
performance
44:12
performed
87:9
performing

56:2 63:13 88:1
period
57:7
periods
56:4
person
6:21 7:4 32:11 36:4
    41:13 93:7,9
personally
22:3 41:19,22 42:13
personnel
71:5
person's
35:22
pertains
31:13
pertinent
8:17,19
perused
36:2 38:15
pharmaceutical
23:7,9
photographs
39:18 50:6
photos
92:19,19,20 93:1,3,4
physician
7:17 16:13 18:1
physicians
23:14 24:1
picked
72:6,7
picks
64:20
pictures
39:19 92:14,16
piece
14:13 81:4,8 82:2
    83:15
pieces
82:4
place
58:17 60:16 63:8,21
    64:5,12 65:4,12,20
    68:4 85:18 87:18,21
    88:19
placed
53:3 74:14,20 91:9
placement

PAUL G. RUFF, IV, M.D. - 3/5/2014

71:4
**places**
28:1 88:13
**plaintiff**
1:5 3:3 6:4,12 15:12
15:15 20:1,9,10
50:7
**plaintiff's**
16:10 28:9 49:19
50:6
**plan**
72:18 83:1 85:16
86:20,21 91:21
93:11,16 94:2
**planning**
76:12 93:19
**plastic**
2:5 4:4 9:9,17,20,21
13:16 20:13 42:19
42:20,22 43:3,4
**Please**
54:5
**plus**
24:1
**pocket**
56:2,4 57:10 87:14
**point**
10:13 11:1 12:11
14:14 18:12 21:7
53:9 59:16 71:22
73:7 74:2,12 78:16
**points**
86:15
**poked**
64:9
**poor**
20:13
**poorly**
63:17
**portion**
23:19 57:18 65:11
88:20 95:7 96:2
**portions**
68:22
**position**
66:7 69:11 70:6,22
**positioned**
66:4
**positioning**

66:16
**possible**
66:9 81:8
**posted**
77:10
**posting**
77:10
**potential**
95:6
**potentially**
73:17
**power**
54:21
**PowerPoint**
9:2
**practice**
10:7,11 13:9 14:17
14:22 21:19 27:17
45:20 80:9 87:8,20
**preference**
61:4 77:13,13,21
79:6 83:1 84:4
**preferences**
63:4
**preparation**
34:21 35:12
**prepared**
29:7,10 30:12
**preparing**
81:6,7 89:12
**present**
85:5 92:11 93:13
94:19 96:18
**presentation**
13:2,3
**presentations**
8:20 9:1,3,5
**presented**
71:11 86:4
**pretty**
87:17 92:14
**previous**
20:11
**print**
36:15
**prior**
40:17 41:5 47:7,18
47:18 82:2
**privilege**

47:11
**privileged**
47:6,14,19 48:15
**privileges**
10:16,18,22 11:5
**probably**
6:20 15:1 22:11
25:10,15 26:11 27:5
27:7 43:14,20 44:8
51:22 57:11 90:22
**problem**
23:21 32:20 34:2
73:16
**procedure**
20:3,14 42:3 43:13
52:15 53:2,17 55:20
55:22 56:22 57:2,18
57:20 61:10,20 62:1
63:1,12 64:3 65:11
65:18 66:19 69:8
70:16 72:5 74:18
77:7,16 78:5,18
82:3,22 83:9,21
87:22 88:20 90:1,4
**procedures**
43:6 44:13,19 45:4
45:18 49:22 50:3
61:6,7,11,13,15
76:8,11 87:12
**proceed**
13:4
**proceeded**
37:8 96:16
**produced**
29:12,15 33:16,18
35:8,9 37:22 39:11
49:8
**producing**
38:19 47:5 48:1,9,13
50:16
**professor**
11:11
**proper**
83:4 84:10
**properly**
65:7,19 67:13,19
80:22 81:13,22 84:2
84:18
**protect**

69:4
**protecting**
67:15
**provide**
27:3 32:16,17
**provided**
8:10 94:20
**providing**
85:16
**Public**
2:16 6:5 100:1,21
**publications**
8:15 76:17
**published**
33:8
**pull**
33:22 34:17 36:21
**pulled**
77:20 82:21 84:2
85:10
**pulls**
77:17
**punctured**
63:10
**purpose**
64:21 65:15 69:20
**Pursuant**
2:15 89:3,10
**put**
14:7 21:21 52:12
56:18 62:22,22 63:8
63:9,9,21 64:12,13
64:16,19 65:5,12
67:12,16 68:2 69:20
74:4,10 88:11,14,15
**p.m**
1:17 98:19

_____
**Q**
_____

**quarterly**
13:18
**question**
7:1 11:8 12:3 23:10
31:7 44:10 45:1
47:21 48:11 52:16
74:13 79:5 94:16
**questions**
18:9 94:10
**quickly**

PAUL G. RUFF, IV, M.D. – 3/5/2014

65:22
quite
62:9 92:13

**R**

**R**
3:1 4:1 6:1 101:1,1
  102:1,1
range
16:7,9 25:14
rate
34:22
reach
19:17 65:10 66:1,3
  66:10 70:10 87:18
reaching
14:10
reaction
12:13
reactor
53:1 65:5 79:15
  87:10 93:18
reactors
79:17
read
49:10 58:20 71:12
  98:4 99:3
readily
78:10
reading
49:18
reads
95:18
ready
84:11,13
really
13:3 62:20 66:7
  79:18 88:1
**REASON**
101:5 102:5
reasonable
61:1 62:5,15
recall
39:15 44:21
receive
13:17 38:16
received
16:16 30:12 38:1,19
  39:1,14 50:16 51:5

92:16 93:3
recertified
10:1,4
recognition
91:3
recollection
37:9 96:15
reconstruction
46:5,12
**Reconstructive**
13:16
record
6:10,11 7:2,13 30:7,9
  34:9,11,15 47:21
  53:11 89:3 94:7,8
  94:12 100:5
records
49:20,20,21 50:2,4,5
  58:2
reduced
100:7
reductions
87:14
redundant
18:16
refer
13:9
reference
31:9,12 33:8 53:11
referencing
52:13
referring
59:11 60:19 76:17
  88:4
reflects
95:8
refractors
79:18
refresh
6:18
refute
87:3 93:17
regard
47:7
regarding
33:14 49:1
regards
47:22
region

53:6
**Registered**
2:16 100:2
regular
31:3
regularly
27:16,18 43:8 87:11
relate
33:4
related
12:21 86:5 100:9
relationship
24:3
relative
28:18 29:5,8 30:13
reliance
76:9
relied
32:5
relies
81:5 82:20
rely
31:9 36:20 37:12
  59:12 76:7 81:10
  83:2 84:1 97:18
relying
14:7,9 76:14 96:14
  97:2
remember
16:6 17:13 22:11,13
  24:13,16,18,22 25:8
  25:9 35:21 36:3
  38:3,11 41:11,12
  51:15 57:16 69:14
removal
18:16
removed
90:3
render
36:19 85:11
rendering
86:21,22
renewed
10:1
repair
45:15
repeat
45:1
rephrase

62:12
replaced
73:20 74:21
replacing
73:10,12
report
5:20 29:11,17,18
  37:16,22 38:10,10
  38:19 39:3,5,9,11
  40:11 46:15,19 47:7
  47:18 48:9,13 50:12
  50:16 51:2,18,22
  52:3,6 91:10 94:20
  95:2,4,7,15,16 97:9
**Reported**
1:22
reporter
2:16 6:20 98:6,12
  100:1,3
reports
29:14 31:19 50:2
repositioning
43:10
represent
6:12
representing
6:13
request
78:15,18,20
requested
28:17 30:11 85:4
require
81:20 82:7 88:21
required
66:22 82:10
research
14:20 15:4 32:4
resident
11:10 54:7
residents
11:12
response
94:15
responses
7:6 40:7,10
responsibility
82:1 83:7,14,17
  84:21 85:2,3
responsible

PAUL G. RUFF, IV, M.D. – 3/5/2014

80:20
**rest**
15:3 75:20 86;11
**result**
19:12,14 55:11,12
**resulted**
26:3 44:20
**resulting**
92:4
**retained**
15:12,13,14 16:1
   18:18 19:22 20:7
**retractor**
27:17,20 28:6 51:6
   52:18 53:17 54:9,10
   55:21 57:6 58:17
   60:16 65:4,7 67:12
   67:16,17 68:3,7
   71:9 72:10,19 73:2
   73:5 75:18 78:4
   80:18 85:19 86:2,10
   86:15 87:21 88:21
   91:9,16,18 94:17
   96:19 97:10
**retractors**
71:18
**RETURN**
101:4 102:4
**review**
13:13,14 34:19,20
   36:16 38:12,14
   39:10 51:16 57:22
   83:7
**reviewed**
15:10 17:5,10 18:11
   29:4 35:13,16,19
   36:12 39:3,11 49:16
   50:12 51:9,11,12,19
**reviewing**
17:2 75:21 82:14
   86:12
**reviews**
36:1 58:22
**revisions**
87:14
**revoked**
11:1
**Richard**
42:15

**right**
20:10 25:15 27:10
   38:6 42:11 43:17,21
   46:7 49:13 56:19
   64:10 65:5 66:6
   67:13 69:5 71:12
   73:9 75:2,6 78:6
   83:2 86:19 88:3,12
   90:7 94:3 95:6
   97:21
**right-handed**
66:5
**Ringel**
3:4 5:3 6:8,11 8:7
   12:4 14:6 17:17,20
   18:2,5 28:14 30:8
   31:18 34:3,6,14
   36:10 37:21 40:1,5
   40:9,14 44:15 47:9
   47:11,15,20 48:6,16
   48:20,21 49:14 59:3
   62:11 63:14 66:14
   67:10 71:6 74:17
   75:2,5 83:13 85:8
   87:6,7 89:6,8 92:9
   93:2,22 94:5,9
   95:14 96:9,21 97:13
   98:2,15
**RMR**
1:22 100:20
**RN**
50:10
**Road**
3:15
**Robert**
42:11
**Rockville**
4:10
**role**
45:13 46:10
**room**
8:20 11:21 12:8 13:7
   14:1 24:1 46:9
   66:17,22 67:1,4
   69:9 70:16 72:2
   74:1 77:7,8 78:3
   82:9,11,20 83:8
   85:6 94:19 96:18
**rooms**

66:20
**rotate**
11:12
**rounding**
11:13
**routine**
70:5
**routinely**
13:8,13
**Ruff**
1:14 2:1,5 5:2,12,13
   5:16,20 6:3,9 7:14
   8:5 28:11 34:12
   37:19 89:4 98:18
   99:2
**Rule**
47:13 89:3,10
**rules**
6:19
**Russell**
36:12 42:17 50:21
   51:2,17

---
**S**

**S**
3:1 4:1,6 5:1,10 6:1
   101:1 102:1
**safe**
13:7 63:8,21 64:4,12
   64:13 65:4 67:12
   73:22
**safely**
63:9 81:22
**safety**
13:1,3 14:1 64:1,21
   65:17
**salvaged**
16:12
**Sanofi-Aventiss**
24:4
**saw**
36:11 39:6 40:1
**saying**
23:17 54:11 56:15
   60:17 83:5 84:9
**says**
19:22 20:14 28:16
   34:19 58:10 71:8
   78:3

**scalpel**
79:7,9,10
**scarring**
19:11
**scars**
18:14 20:13 92:7
   93:9
**scenario**
79:2
**schedule**
16:16 49:7,8
**scheduled**
21:7
**school**
11:10 70:10
**Scott**
49:21
**scrub**
60:3 82:21
**seal**
100:13
**second**
14:8,17 15:10 20:12
   29:20 34:9 37:16
   56:9 58:11 59:1
   71:7 82:13
**secondary**
62:1,2
**seconds**
56:11
**section**
58:10 75:12,13,15
   95:17
**seeing**
21:19
**seen**
38:9 39:19 91:5 93:9
**Selectively**
35:18
**send**
34:7
**sent**
39:20 77:18
**sentence**
59:19 71:8 75:14
   82:13
**separate**
78:20
**September**

PAUL G. RUFF, IV, M.D. - 3/5/2014

5:20 29:22 34:18
37:17 38:1 46:16
49:17 100:17
**sequence**
37:9
**serial**
80:11
**services**
11:13 16:1 94:21
**set**
68:7 79:15,20 83:22
84:1 92:13 98:16
100:12
**sets**
77:14
**setting**
11:15
**settled**
20:3 21:3 24:4,5,11
26:6,10
**setup**
69:8
**setups**
66:20
**seven**
23:11 25:10
**severely**
20:2
**sewing**
88:22
**shaking**
7:6
**sheet**
99:7
**sheets**
33:13
**she's**
23:16
**shift**
65:3
**shoot**
35:11
**SHORTHAND**
100:1
**shortly**
90:2
**shouldn't**
72:7
**show**

89:1
**shows**
79:13
**Sibley**
10:20
**side**
61:1,2,2,12,12,18
62:17 64:18 66:2,6
66:6,9 69:10 88:16
88:19,22
**Sigal**
42:9,11 49:1,4
**sign**
98:5
**signature**
46:22 75:15 98:17
99:10 101:21
102:22
**signed**
99:7
**significant**
92:14
**similar**
76:6
**single**
81:4
**site**
53:5 83:20
**sitting**
29:6 84:5
**situation**
44:18
**situations**
45:20
**six**
25:10 45:18 79:18
92:17
**size**
67:1
**skin**
18:16 45:12 46:7
58:19 85:20 90:21
**slapped**
70:12
**slides**
9:3
**small**
22:2
**smaller**

69:16,22
**smell**
65:9 90:13,14,18
**smelled**
90:12,13
**Sobin**
3:5,13
**Society**
13:14
**somebody**
90:17
**someone's**
7:1
**somewhat**
79:21
**soon**
73:15,17 74:1
**sorry**
20:10 30:4 31:17
40:13 44:22 54:4
62:13 85:7
**sort**
12:8,9 13:1 85:9
**Sounds**
7:10,11
**source**
12:12,22 13:11 54:21
54:21 55:1,13
**sources**
32:22
**speak**
49:12 78:9 93:12
**speaking**
6:21 7:3 45:19
**speaks**
7:4
**specific**
13:11 14:13 31:15
32:15 36:20,21 37:2
37:4,7,12,14 44:11
44:16 55:1 76:13,16
77:2 79:4,6,14,19
**specifically**
12:15,17 14:10 17:5
29:11 33:9 36:18
50:18 53:8 55:20
56:17 58:8 59:17
67:19 86:5 95:10
**specification**

80:14
**specifics**
15:10
**spelling**
18:12
**spent**
33:15
**sports**
79:12
**stack**
34:10 39:6
**staff**
42:2 52:20 66:16
71:21 76:9,9 77:17
81:5,10 83:20 95:8
**staff's**
85:3
**stand**
60:1 62:1 64:17 67:5
69:15,16 70:19,20
70:21 88:16
**standard**
59:7 62:14,21 69:11
73:6,19 74:8,19
81:20 82:7 83:6
**stands**
61:14
**start**
7:1 8:2 22:8,8
**starting**
25:6 82:3 89:15
**state**
7:12 52:3 53:18
58:15 75:13,15 76:5
77:2 82:12
**stated**
49:16 61:7 63:20
67:11 68:16 69:3
73:18 87:5,8
**statement**
36:21 37:5,7,14
60:14 71:7 75:7
**statements**
37:12 76:13
**states**
1:1 91:2
**stating**
31:11 33:6
**status**

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 16

21:4
**stenographically**
100:7
**step**
32:18
**sterile**
63:7
**sterilely**
63:8
**stick**
63:11
**story**
80:6
**stove**
72:7
**Street**
2:6 4:8 7:15
**strike**
58:7 62:4 64:12
**student**
11:19 54:7
**stuff**
34:10
**stupid**
79:12
**submission**
34:19
**subsequent**
23:12 38:16,19
**subsequently**
50:15
**substantive**
30:17
**subtle**
65:9 90:14
**Suburban**
10:21
**sued**
20:13
**suffered**
45:8,21
**Suite**
2:7 3:8,16 4:9 7:15
**summarize**
85:14
**summarizes**
89:15
**summary**
58:9,11

**supervision**
100:8
**supine**
69:11
**supplies**
77:3 82:14
**supplies/instruments**
86:13
**supply/instruments**
75:21
**support**
59:16 76:18 95:3
**supporting**
32:5
**supports**
37:5
**supposed**
24:10
**sure**
6:21 7:3 16:17 22:14
24:16 26:5 28:3,4
33:22 36:11 45:2
62:10 63:20 64:3,8
80:21 81:11,18,21
84:2,13 85:15 92:13
98:12
**surgeon**
20:13 26:7 42:19,20
43:3,4 45:10 46:6
46:11 53:22 54:2
60:3 61:1,21 63:10
65:16 66:15 70:7,9
71:21 73:6 77:12
81:3,8,16 90:18
**surgeons**
42:22 61:18 62:6,16
78:17
**surgeon's**
61:4 63:4 66:7 84:21
**surgeries**
87:9
**surgery**
2:5 4:5 9:9,9,16,17
9:20,21 13:16 57:12
62:16 75:18,22
78:14 82:15 83:16
84:7,11 86:9,13
89:19 92:3
**surgical**

8:21 11:21 12:6,9,16
12:17,21 14:2 33:10
44:20 45:8,21 46:8
53:5 58:18 59:18,20
59:21 60:8,11,17,18
61:2,3,18 62:7,18
73:12 76:8 85:19
92:2 93:18
**surrounding**
26:1 49:2
**suspended**
11:2
**suspension**
10:14
**sustained**
57:15
**switched**
57:19
**sworn**
6:5
**system**
73:9

--- **T** ---

**T**
4:1 5:1,1,10 101:1,1
102:1,1,1
**table**
60:1,2,4,5,7 61:1,2,8
61:12,19,21 62:6,17
63:2 64:17,18 66:2
66:10,21 67:5 69:12
69:16,20 70:1,11,16
70:19 88:16
**tables**
66:17
**take**
7:9 8:8 9:10 30:5
35:4 93:11
**taken**
6:15 20:4 21:7 25:3
26:4,8 93:4 100:4,6
**talk**
12:19 14:16 17:9
33:9 37:15 58:8
67:18
**talked**
27:13 41:17
**talking**

20:4 25:13 74:16,17
91:13 95:15
**taught**
11:9,18 12:15
**teaching**
11:7
**team**
83:21 84:1
**tech**
60:3,8 70:8,9 82:21
90:18
**tech's**
70:13
**tell**
14:4 24:4 28:4 69:15
70:18 83:18 86:14
90:9 95:10
**ten**
16:4,5 46:14
**tend**
44:3 86:15
**tendered**
95:13
**tends**
68:20,21
**ten-year**
16:7,9
**term**
31:16 72:12
**terminated**
11:1
**test**
27:1 82:2,5
**tested**
84:6,6 97:10
**testified**
6:6 32:10 94:15 96:8
96:12
**testify**
19:5 37:4
**testimony**
36:20 38:4,10 41:4
89:16 96:15,17 97:3
99:4,5 100:6,6
**testing**
95:12 97:11
**textbook**
13:10 32:3
**textbooks**

PAUL G. RUFF, IV, M.D. - 3/5/2014

Page 17

13:8
texts
13:22
**Thank**
97:22 98:3
**that'd**
32:10
**that's**
12:5,11 20:18,19
21:15 24:6,7 27:15
29:6,20 31:22 33:17
45:7 47:19 48:14,16
59:20 60:10,13
62:20 65:9 70:7,13
70:21 77:5,9,11
79:19 80:19 83:8,17
86:18 92:20 97:22
**thereabout**
15:3
**there's**
14:13 16:8 31:15
33:16,18 37:1,2,3,4
45:6 47:17 53:21
54:17,19,20,22 58:7
58:9 59:15 61:7,21
62:1 68:6 73:8 74:9
76:13,16 79:3 81:7
84:16
**they've**
61:5 84:5
**thing**
6:19 7:5 34:17 63:6
72:9 75:12
**things**
12:19 13:5 17:21
27:10 63:12 64:9
66:8,18 70:4,10,11
84:6 88:11 94:6
**think**
9:4 12:5,6,7,11,13
14:4 15:19,22 16:8
17:12 19:10 21:12
21:15 24:19 27:8
29:22 33:17 37:17
38:8,11 40:1,9
42:10 51:8 57:2
58:11 61:13 62:12
69:12 74:6 75:8,11
75:13 76:5 78:22

89:1 93:20 94:5
98:15
**thinking**
27:10
**Thousands**
76:8
**three**
15:19,20 57:3 85:9
86:7,20
**three-and-a-half**
57:3
**three-day**
98:10
**three-hour**
57:7
**time**
6:17,21 7:8 9:18 10:3
10:13 11:1 16:14
18:3 22:9 33:13,14
35:9 38:4 60:22
67:3,8 78:14 79:3
83:9 86:22 89:22
90:5 94:3 95:9
**times**
15:12,15,17 16:2,5
22:6 30:16 43:14,20
44:9 55:19 56:18
**tiny**
63:2
**tip**
54:12 55:4,6,7,8,9,15
65:8 68:7,10,12,16
68:20,21
**tissue**
91:4,4
**title**
43:2 89:11
**today**
33:21 35:13 40:16
83:22 92:12 98:9
**told**
93:21
**Toni**
50:10 51:8,11 57:17
**tool**
68:22 78:4,4,15
83:15
**toolbox**
78:2,9

**tools**
64:4 69:21 78:13
84:11,17,22
**top**
53:1
**total**
21:17 34:21 35:1
**totally**
79:8
**touched**
23:22
**towel**
53:3 67:21 68:1,3,11
**towels**
68:5,5
**Towson**
3:17
**training**
23:7,8,11,12,13,19,20
24:9 59:14 61:5
71:9 86:1
**transcript**
5:11 7:7 39:1 50:18
50:21 51:11 98:7,9
100:5
**transcription**
99:5
**transcripts**
50:9 57:22
**transfer**
43:19,21 64:19
**transmits**
55:2
**transmitting**
55:9
**tray**
61:2,12,14,18 62:2,7
62:18 63:3,3 66:2
66:10 69:18,19
**treat**
89:22
**treated**
90:4
**treating**
16:12
**trial**
16:22 19:5,18 37:4
85:11,16 91:22
93:12,17

**trick**
38:6
**truck**
16:11
**true**
64:2 86:18 99:4
100:5
**try**
14:19 44:11 62:12
63:17 64:15 77:1
79:5 89:22
**trying**
26:15 38:6,8 56:14
62:3
**tube**
55:2
**turnaround**
98:10
**turns**
66:21
**TV**
79:12
**twice**
9:18 22:7 75:8
**two**
19:21 23:12,14 24:1
24:14 25:12 26:11
27:13 40:20 41:8
61:14 86:1,15
**two-hour**
16:19
**type**
12:12,12 54:9 62:16
62:17 66:21 78:3,4
78:4
**types**
66:19 77:14,22 87:12
**typewriting**
100:8
**typical**
88:13
**typically**
58:18 64:15 68:1
69:13 71:10 77:9,15
78:18 85:20 86:3

---
**U**

**U**
4:1 102:1

PAUL G. RUFF, IV, M.D. — 3/5/2014

**umbrella**
12:8
**unable**
27:2
**uncomfortable**
71:21 72:3 73:18
    74:2
**uncommon**
58:16 60:15 85:17,18
**unconscious**
64:22
**underneath**
45:11 88:11
**understand**
19:17 60:13 84:9
    90:2
**understanding**
13:4 21:2 52:14,17
    52:22 53:7 54:12,16
    55:5 57:5,13 69:7
    70:15 77:5 78:1,12
    80:9,16,19 90:6
    97:14
**Understood**
80:7
**Unfortunately**
72:8
**unique**
56:20
**unit**
73:11,21
**UNITED**
1:1
**University**
10:20
**unpublished**
32:4
**unreasonable**
58:17 60:16 85:17,18
**unusual**
28:7 53:19 65:12
    67:16 78:19
**unwrapped**
81:9
**use**
7:5 27:16 55:21
    61:12,13,18 77:15
    78:18 79:22 87:9
    95:20 96:3

**usually**
60:9 61:8,21 67:21
    68:5,6,13 69:17
    70:8 88:2,11
**utility**
54:1
**utilized**
75:17 86:8
**utilizing**
71:17,21

─────────────
**V**

**v**
1:6 101:2 102:2
**varies**
79:19
**variety**
79:21
**verbal**
7:5
**versus**
7:20 15:13 17:15
    24:19 26:16 67:1
    79:9
**Vesnovky**
50:10
**vessels**
65:20
**Virginia**
10:12
**visualized**
39:21
**vitae**
5:13 8:4 29:2 33:1,3
    33:9
**Voices**
85:6

─────────────
**W**

**waived**
98:18
**walk**
67:4 78:21
**walking**
77:7 82:11
**walks**
82:9,20
**want**
16:3,17 34:8 43:6

45:2 47:20 49:15
    63:20 64:3,8,22
    67:5,5 71:7 75:7
    76:20 79:7 80:2,10
    80:13 81:18 84:12
    85:14 89:1
**Washington**
1:15 2:8 4:8 7:16
    10:19 11:16 25:18
**wasn't**
45:17 70:20
**waste**
79:3
**watch**
79:11,12
**way**
36:22 53:21 67:14
    69:4 71:18 81:3,7
    90:19 91:1
**Wednesday**
1:16 98:10
**week**
36:13
**weeks**
40:20 41:8
**weird**
24:21
**went**
34:14 46:6 49:7
**weren't**
39:22 45:16
**West**
3:15
**we'll**
14:7 15:9 18:9,11
    29:19
**we're**
88:22
**we've**
11:12 21:12 27:13
    28:17 29:2 32:12
    35:2 40:21 41:17
    46:16 86:19
**what's**
29:6 77:12 81:2 84:4
    84:5,12 98:9
**WHEREOF**
100:12
**Williams**

35:21 36:12 38:4,9
    38:22 39:4,9 42:17
    50:22 51:2,17,18,22
    87:3
**witness**
2:1 5:22 7:20 14:4
    18:4 19:21 28:13
    36:1,2,7,9 37:10
    39:22 40:4,12 42:10
    58:22 59:1 62:9,20
    66:13 67:8 71:3
    75:4 83:12 85:7
    89:2,10 92:7,22
    95:13,18 96:10,22
    97:14 100:12
**witnesses**
26:22 27:3 42:7
**woman**
16:11 20:2 88:5
**won't**
52:12
**word**
36:22
**worded**
63:17
**wording**
76:6
**work**
7:13,14 14:20 15:7
    15:11 16:22 17:6
    21:18 33:14
**worked**
17:10 21:13
**working**
45:10 65:1 88:2
**wouldn't**
28:7 32:1 74:4 78:14
    93:16
**wounds**
91:5
**wrapping**
94:5
**written**
9:13,14 51:21
**writtens**
9:17

─────────────
**X**

**X**

5:10 80:2

**Y**

**Y**
80:3
**yeah**
15:21 16:5 24:21
  32:17 34:3,5 40:12
  48:19 56:16 69:19
  70:14 72:6 86:6,14
  95:16 96:22 98:15
**year**
24:13 25:11 43:14,20
  44:9
**years**
16:4,5 19:1 21:9
  24:14 25:10,12
  32:11 46:14 58:5
**Yep**
31:21
**young**
16:11
**you'd**
35:4 65:9
**you'll**
22:11
**you're**
23:4 37:5 48:17
  56:15 59:1 65:19,20
  72:14 76:14,17 97:6
**you've**
6:15 7:19 8:16 15:10
  15:22 21:13 27:12
  29:14 30:14 33:18
  37:22 40:22 49:16
  50:12 60:21 87:4,8
  90:12 93:3,20 95:14

**$**

**$1500**
16:18
**$2,000**
35:1
**$250**
17:2

**0**

**09/30/2013**
5:16

**1**

**1**
1:21 5:13 8:4,5 15:3
  22:2 29:2 49:18
**1-245473**
1:20
**1:13-CV-00184**
1:7
**10**
32:21 50:8 51:10
**10th**
100:13
**10/19/06**
50:1
**102**
1:21
**11**
4:8
**18**
10:4

**2**

**2**
5:15 21:22 28:9,11
**2:00**
1:17
**20**
43:20
**200**
7:15
**20037**
2:8 7:16
**2006**
25:15
**2008**
27:6
**2008/2007**
25:13
**2008/2009**
27:9
**2009**
24:15
**2013**
5:21 29:22 34:18
  37:17 46:16 49:17
**2014**
1:16 51:3 100:14
**2018**
100:17

**20850**
4:10
**20877**
3:9
**210**
3:16
**21204**
3:17
**2440**
2:6 7:15
**25**
5:21 46:16
**25th**
37:17 38:1 49:17
**250**
34:22
**26(a)(2)**
89:3,10
**27th**
51:20
**28**
5:15
**294-2110**
4:11

**3**

**3**
5:16 34:12 35:2
  89:15
**3-inch**
79:7,9
**3:33**
98:19
**30**
34:18 43:20 100:17
**300**
2:7 3:8
**301**
3:10 4:11
**32**
3:15
**34**
5:16
**37**
5:20

**4**

**4**
5:20 37:17,18,19

46:17
**4-inch**
79:9
**4/12/06**
50:1
**400**
4:9
**410**
3:18
**481**
3:7

**5**

**5**
1:16 5:22 89:2,4,7
**5/16/07**
50:3
**5/24/10**
50:4
**5/6/06**
50:1
**50**
44:8

**6**

**6**
5:3 31:8
**670-7030**
3:10

**7**

**7**
31:19
**7,500**
16:21
**75**
44:8
**769-5406**
3:18

**8**

**8**
5:13
**8/2/06**
50:1
**89**
5:22

**9**

**9th**

PAUL G. RUFF, IV, M.D. — 3/5/2014

38:17,21
**90**
15:1
**94**
5:4
**95**
15:1