# Exhibit 4

# In the Matter of:

## *MARY CLARK*
### *vs.*
## *HOWARD COUNTY GENERAL HOSPITAL, ET AL.*

---

## *CLYDE C. RICHARD, PH.D., P.E.*
### *April 9, 2014*

---

**MERRILL LAD**

1325 G Street NW, Suite 200, Washington, DC
Phone: 800.292.4789   Fax:202.861.3425

IN THE UNITED STATES DISTRICT COURT FOR

MARYLAND

(Northern Division)

- - - - - - - - - - - - X

MARY CLARK,                    :

        Plaintiff,  :

vs.                           : Case No. 1:13 CV 00184 ELH

HOWARD COUNTY GENERAL         :

HOSPITAL, et al.,             :

        Defendants. :

- - - - - - - - - - - - X


Deposition of CLYDE C. RICHARD, Ph.D., P.E.

Annapolis, Maryland

Wednesday, April 9, 2014

11:20 a.m.


Job No.: 1-246811

Pages 1 - 70

Reported by: MaryJo Legg, RMR

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

## Page 2

1    Deposition of CLYDE C. RICHARD, Ph.D., P.E.,
2  held at the offices of:
3
4    CED TECHNOLOGIES, INC.
5    2444 Holly Avenue
6    Annapolis, Maryland 21401
7    (410) 224-4235
8
9       Pursuant to notice, before MaryJo Legg,
10  Registered Merit Reporter and Notary Public of the
11  State of Maryland.
12
13
14
15
16
17
18
19
20
21
22

## Page 4

1          C O N T E N T S
2  EXAMINATION OF CLYDE C. RICHARD, Ph.D., P.E.   PAGE
3  By Mr. Ringel                5
4
5
6          E X H I B I T S
7       (Attached to the Transcript)
8  RICHARD DEPOSITION:              PAGE
9  Exhibit 1  Curriculum Vitae            7
10  Exhibit 2  Trials and Depositions
11     2009 - Present              23
12  Exhibit 3  Notice of Deposition Duces Tecum   27
13  Exhibit 4  Report dated 9/24/13         32
14  Exhibit 5  Photographs             43
15  Exhibit 6  Instruction Manual         60
16  Exhibit 7  Expert Witness Disclosure      66
17
18
19
20
21
22

## Page 3

1       A P P E A R A N C E S
2  ON BEHALF OF PLAINTIFF:
3    KEVIN M. RINGEL, ESQUIRE
4    BERMAN, SOBIN, GROSS, FELDMAN & DARBY, LLP
5    481 North Frederick Avenue
6    Suite 300
7    Gaithersburg, Maryland 20877
8    (301) 670-7030
9
10  ON BEHALF OF DEFENDANTS COLUMBIA AESTHETIC PLASTIC
11  SURGERY, LLC AND ERIC CHANG, M.D.:
12    KAREN S. KARLIN, ESQUIRE
13    GLEASON, FLYNN, EMIG & FOGLEMAN, CHARTERED
14    11 North Washington Street
15    Suite 400
16    Rockville, Maryland 20850
17    (301) 294-2110
18
19
20
21
22

## Page 5

1          P R O C E E D I N G S
2       CLYDE C. RICHARD, Ph.D., P.E.
3  having been duly sworn, testified as follows:
4       EXAMINATION BY COUNSEL FOR PLAINTIFF
5  BY MR. RINGEL:
6    Q   Good morning, Dr. Richard.
7       My name is Kevin Ringel.  I know we just
8  very briefly met before we started today, but I'll
9  introduce myself.  I'm from the law firm of Berman,
10  Sobin, Gross, Feldman & Darby, and we're representing
11  Mary Clark in today's case.
12       Have you ever had your deposition taken
13  before?
14    A   Yes.
15    Q   Okay.  So I know that you know sort of the
16  ground rules, but if I could just quickly review just
17  to refresh.
18       I would just ask that we make sure we have
19  one person speaking at a time, at all times, for the
20  benefit of the court reporter so she can get a clean
21  record.  So I'll do my best to make sure you finish
22  your answer before I speak, and I'd ask the same in

2 (Pages 2 to 5)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 6

1   return.
2        Also, make sure that all your responses are
3   verbal. Any nods of the head or shakes or, you know,
4   gestures can't be picked up in the record. So make
5   sure all your answers are verbal.
6        And lastly, if you require a break at any
7   time for any purpose, not a problem, just let me know.
8        Sound good?
9   A   Good.
10  Q   Okay. If you would please state your full
11  name and business address for the record.
12  A   Clyde C. Richard. CED Technologies, 2444
13  Holly Avenue, Annapolis, Maryland 21401.
14  Q   Dr. Richard, you are not a physician,
15  correct?
16  A   No.
17  Q   What is your Ph.D. in?
18  A   Mechanical engineering.
19  Q   And what is your professional title?
20  A   Senior mechanical engineer, CEO of CED
21  Technologies.
22  Q   Okay. And it's true that you have been

Page 7

1   identified as an expert in the case of Mary Clark
2   versus Howard County General Hospital and Dr. Eric
3   Chang?
4   A   Yes.
5   Q   I'd like to show you a copy of your CV that
6   I have.
7        (Richard Deposition Exhibit 1 was marked for
8   identification and attached to transcript.)
9   BY MR. RINGEL:
10  Q   Dr. Richard, do you recognize this as your
11  CV?
12  A   Yes.
13  Q   And is this up-to-date?
14  A   I think I dropped one license, one P.E.
15  license.
16  Q   Which one would that be?
17  A   No. This is up-to-date. I did renew New
18  Jersey.
19  Q   Okay.
20  A   So this is up-to-date.
21  Q   Okay. I'm looking here and I see
22  publications and presentations.

Page 8

1        Are there any -- are there any publications,
2   lectures, or presentations you've given that are
3   pertinent to the issues involved in this case?
4   A   In a general sense, yes. I give several
5   lectures a year on human factors.
6   Q   Could you describe what that is.
7   A   Human factors is how a human being interacts
8   with a design, how a person perceives a certain
9   product, how he uses a certain product, how he handles
10  a certain product.
11  Q   So this would be in a more general fashion,
12  any product or piece of equipment; is that correct?
13  A   Yes.
14  Q   Nothing specific to medical equipment?
15  A   No.
16  Q   And I guess even to just be more specific, a
17  fiberoptic lighted retractor?
18  A   That is true.
19  Q   Okay. For any of these presentations on
20  human factors, do you have an accompanying PowerPoint
21  presentation or slides that you produce?
22  A   I have in the past, I probably could find

Page 9

1   something. More recently I'm not using PowerPoints.
2   I find nobody listens to me when I use PowerPoints.
3   Q   You have some sort of written materials,
4   though, that would go along with some of these?
5   A   I might be able to find something, yes.
6   Q   Okay. And I guess I'll follow up with a
7   letter to you maybe if anything else comes up. I
8   would ask if we could get a hold of that, I'd like
9   that.
10       Have you done any research specifically
11  related to operating room safety or operating room
12  fires and burns?
13  A   No.
14       MS. KARLIN: Objection with regard to fires.
15  BY MR. RINGEL:
16  Q   I see you're a member of several
17  professional societies.
18       Are any of these societies focused on
19  operating room safety?
20  A   No.
21  Q   Okay. I see you also list areas of
22  expertise at the bottom.

3 (Pages 6 to 9)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 10

1      Are any of these areas of expertise
2  operating room safety?
3      A  No.
4      Q  How about medical safety in general?
5      A  No.  These are equipment related.
6      Q  Okay.  So it's fair to say that most of your
7  background is equipment and how human beings handle
8  pieces of equipment, correct?
9      A  That is true.
10     Q  Okay.  I see you are a registered
11  professional engineer in several jurisdictions.  And
12  you mentioned before that all of these are current and
13  up-to-date?
14     A  Yes.
15     Q  What is required to be a registered
16  professional engineer in each of these jurisdictions?
17     A  Graduating, first, from an engineering
18  school that has an ABET accredited program, that's
19  A-B-E-T.  Taking then an exam at that point, which is
20  called engineer in training exam, that's eight hours.
21  After five years of work, you can take the second
22  test, which is the professional engineering test.

Page 11

1      If you pass both tests and have five years,
2  then you can become a registered professional
3  engineer.
4      Q  Is there any exam involved?
5      A  Yes.  Both for the EIT and the P.E., they're
6  all day eight-hour exams, four hours in the morning,
7  four hours in the afternoon.
8      Q  And is this -- is this a test you have to
9  take for each jurisdiction or is this one covers all?
10     A  One covers all.  Once you get -- I'm
11  registered first in Maryland, that's the oldest one I
12  have.  Once you're registered in the state, you can
13  pass it on to other states.
14     Q  Okay.  You said E -- EIT?
15     A  Right.  Engineer in training is the first
16  exam.
17     Q  Did you pass this test on your first
18  attempt?
19     A  I didn't take the EIT.  I waived the EIT
20  because I was a college professor at the time.  I took
21  the P.E. test, I think in '82, I passed it the first
22  time with a score higher than 90.

Page 12

1      Q  And, Dr. Richard, you are not currently
2  licensed to practice medicine anywhere, correct?
3      A  True.
4      Q  Have you ever had any sort of suspension or
5  discipline taken against you on any of these licenses?
6      A  No.
7      Q  Or in any professional capacity whatsoever?
8      A  No.
9      Q  Doctor, have you ever been in an operating
10  room?
11     A  Yes.
12     Q  Well, I should be more specific.
13      Have you ever been -- not as a patient, I
14  should say.  Have you ever been in an operating room
15  in a professional capacity to evaluate equipment,
16  stuff like that?
17     A  Yes.
18     Q  How many times would you say you've had to
19  do this?
20     A  Two or three.
21     Q  And what -- if you could describe the
22  circumstances.

Page 13

1      A  One was a slip case on a floor, the other
2  case I recall was a -- essentially, a machine that
3  held cameras used during angioplasts, I guess, fell
4  off the track.  It was a case -- my client was G.E.
5  It fell from the ceiling and landed on the patient,
6  the camera.
7      Q  How long ago would this have been?
8      A  Ten years ago.
9      Q  For each?
10     A  Yeah.  I haven't done anything recently in
11  an operating room.
12     Q  Okay.  And, again, nothing specific to a
13  fiberoptic lighted retractor?
14     A  No.
15     Q  What was your opinion that you gave in those
16  cases?
17      Let's start with the one where there was a
18  slip on the floor.
19     A  The floor was not generally slippery, it was
20  fluid or something had collected on the floor, which
21  made the floor slippery; but the floor itself was a
22  proper floor.

4  (Pages 10 to 13)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 14

1    **Q   So it's fair to say you gave an opinion on**
2    **behalf of the hospital?**
3       A   I believe so, yeah. Or the person that
4    actually built the hospital, the floor contractor.
5       **Q   Construction company.**
6          **In the second case, the one where you said**
7    **there was a machine that held cameras, the client was**
8    **G.E., it fell off.**
9          **What was the basis of your opinion in that**
10   **case?**
11      A   That G.E. had a big problem. That their
12   design was sort of substandard and the way that they
13   attached the camera to the track was not a
14   particularly good design.
15      **Q   Were you giving an opinion on behalf of a**
16   **plaintiff in that case?**
17      A   No. G.E.
18      **Q   G.E.**
19         **What was the purpose of their retaining you?**
20      A   To figure out what happened. To figure out
21   why the camera came loose from the track.
22      **Q   So sort of like an internal investigation,**

Page 15

1    would that be accurate?
2       A   No. I was going to be their expert; but
3    once I found something they didn't like, I probably --
4    I think I disappeared from the case. They told me not
5    to write a report and to go no further with the case.
6       **Q   Okay. So you were just sort of a**
7    **consultation originally, you were not asked to testify**
8    **or anything like that?**
9       A   Not after that opinion, no.
10      **Q   Okay. You mentioned you've had your**
11   **deposition taken before.**
12         **How many times would you say you've had your**
13   **deposition taken before?**
14      A   Probably more than 200.
15      **Q   How -- and let's get a sense of the past few**
16   **years.**
17         **What is a typical year for the past two or**
18   **three years?**
19      A   Five, six times a year.
20      **Q   How many of these -- what is the breakdown**
21   **of -- well, let me get to that in a second, actually.**
22         **I know you said before you did some**

Page 16

1    teaching. You were a college professor?
2       A   Yes.
3       **Q   What were you teaching?**
4       A   Mechanical engineering, first at the
5    University of Connecticut, which won the basketball
6    game the last two nights.
7       **Q   You must be pretty happy about that.**
8       A   Four years. And then I was a professor at
9    the Naval Academy for 15 years.
10      **Q   All mechanical engineering?**
11      A   Yes.
12      **Q   Have you ever taught to any of -- taught**
13   **about any of the issues specifically pertinent to this**
14   **case?**
15      A   In -- yes. A little bit.
16         Heating has been part of my teaching,
17   mechanical engineering. My Ph.D. is in heat transfer,
18   and this is a wire that got hot. So I guess
19   indirectly I have taught in that area.
20      **Q   Okay. Have you ever taught about operating**
21   **room safety?**
22      A   No.

Page 17

1       **Q   Surgical burns?**
2       A   No.
3       **Q   Any specific heat transfer as it relates to**
4    **medical equipment?**
5       A   No.
6       **Q   Doctor, will you be giving an opinion as to**
7    **the standard of care that was appropriate in this**
8    **case?**
9       A   Not in a medical sense, no.
10      **Q   In any other sense?**
11      A   I do have an opinion that Dr. Chang, once he
12   realized he had a problem with the retractor
13   overheating, he did the right thing, he stopped and
14   switched out the cord.
15      **Q   But you don't feel that opinion is a medical**
16   **standard of care opinion, correct?**
17      A   No. It would be better to come from a
18   medical doctor. I mean, mine is a general opinion
19   that he acted responsibly when he no longer used the
20   retractor with the overheating cord and replaced the
21   cord with a proper cord after he determined it was
22   overheating.

5 (Pages 14 to 17)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 18

1    Q   And this is strictly from an engineering
2  standpoint?
3    A   I would say so, yes.
4    Q   Are there any texts -- textbooks that you
5  refer to regularly as part of your practice?
6    A   Yes. I don't know if I have them in here or
7  not. It's a list of human factors books that I
8  typically use.
9        No. I don't have them in this book, but I
10  do have a list of human factors books that I typically
11  use in cases. I can give you that list, if you want.
12    Q   I would like that, yes. So I'll add that to
13  my list.
14        And do you consider these textbooks to be
15  authoritative?
16        MS. KARLIN: Objection to the term
17  "authoritative."
18    A   In a general sense. I mean, I haven't
19  researched everything in there, but they're good
20  books. I've used them for years in my teaching and
21  I've used them for years in my work.
22  BY MR. RINGEL:

Page 19

1    Q   Do you subscribe or review to any
2  professional journals?
3    A   Yes. I get the journal from the Human
4  Factors Society, I think it's monthly; I get the
5  Society -- American Society of Mechanical Engineering,
6  I get their magazine monthly; I get the Safety Society
7  magazine and review that monthly; and the Society of
8  Automotive Engineers, SAE, I get their literature and
9  review that, too.
10    Q   Do you consider these journals to be
11  authoritative in the field?
12    A   Yes, I would say so.
13        MS. KARLIN: Objection to the term
14  "authoritative."
15    A   Yeah. They're well recognized as -- the
16  articles are good.
17  BY MR. RINGEL:
18    Q   Are you relying on any specific literature
19  to come to your opinion or conclusions in this case?
20    A   No.
21    Q   So there's no specific piece of one of those
22  textbooks or any sort of professional journals we've

Page 20

1  discussed that you can point to that would say, this
2  supports the opinions I came to in this case, correct?
3    A   That is true.
4    Q   Okay. What is the breakdown of times you
5  are retained on behalf of a plaintiff versus times you
6  are retained on behalf of a defendant?
7    A   15 percent plaintiff, 85 percent defendant,
8  in a general sense, over the years.
9    Q   When's the last time you were retained by a
10  plaintiff?
11    A   Retention is hard for me to get a handle on
12  unless I went and looked at my current caseload. The
13  last deposition I gave for a plaintiff was 6/18/12.
14    Q   Do you have reason to believe you were
15  retained by a plaintiff since that time?
16    A   Oh, yes.
17        MR. RINGEL: Okay. Off the record.
18        (Discussion held off the record.)
19  BY MR. RINGEL:
20    Q   I'd like to go over your fee schedule.
21        What do you currently charge for review of
22  cases?

Page 21

1    A   Current -- currently, the company charges
2  $365 an hour for all the work I do.
3    Q   And you say company. That would apply to
4  you as well?
5    A   Yeah. I mean, CED charges that much for me.
6  They don't pay me that much, but they charge that
7  much.
8    Q   And you're the CEO of CED, right?
9    A   Yes.
10    Q   Okay. $360 per hour, does that include
11  review of records as well as deposition testimony?
12    A   Everything, yes.
13    Q   What about trial testimony?
14    A   The same price.
15    Q   Same price.
16    A   Everything.
17    Q   Do you charge -- is it portal to portal
18  charging for your -- if you were to testify at trial
19  in terms of you charge for your travel time?
20    A   Travel time I charge, too, at that rate,
21  although I do oftentimes cut the hours back if I'm
22  sitting in an airport reading books or something.

6 (Pages 18 to 21)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 22

1    Q   Okay.  How many times have you testified at
2   trial in the past five years?
3    A   Over 100.
4    Q   Over 100.
5        How about in the past year, what's a typical
6   year like?
7    A   It's getting very small, but I did testify
8   two weeks ago in a case; but I used to do about 12
9   trials a year back 25 years ago, now I'm doing maybe
10  one or two a year.  Everything seems to settle.
11   Q   Okay.  But in the past five years, you said
12  over 100 times?
13   A   No.  I've been doing this work for 30 years.
14   Q   Okay.  How about in the past five years, how
15  many trials have you actually testified in?
16   A   About five -- four or five.
17   Q   Were these on behalf of a defendant or a
18  plaintiff?
19   A   One is defendant in 7/2010, plaintiff in
20  11/2010, defendant 6/29/2012, defendant again
21  3/28/2014.
22   Q   So these are mostly on behalf of defendant?

Page 23

1    A   Yes.
2    Q   I think I'm going to enter this -- I think
3   this is what we're looking at here.  This is trials
4   and depositions for Clyde Richard.
5        MR. RINGEL:  If we would mark this as
6   Exhibit 2.
7        (Richard Deposition Exhibit 2 was marked for
8   identification and attached to transcript.)
9   BY MR. RINGEL:
10   Q   Doctor, I noticed you referring to in front
11  of you a chart for trials and deposition from 2009 to
12  present.  I've just marked it as Exhibit 2.
13       Is that an up-to-date fair and accurate
14  copy?  Is there any changes?
15   A   Yes.  There's three items after the end of
16  yours.  You end on 8/16/13, there's three items after
17  that.
18   Q   And what are those three items after that?
19   A   One is a deposition in the Ryan Beer case,
20  one is a deposition in the Estate of Lozano,
21  L-O-Z-A-N-O, versus Ram Peat, and one is a trial in
22  Colon versus L.A. Fitness.

Page 24

1    Q   So those are two depositions and one trial?
2    A   Yes.
3    Q   What was the breakdown of plaintiff versus
4   defense?
5    A   Those three are all defense.
6    Q   Okay.  If I could add that to my list, also,
7   I'll just get an up-to-date copy of your current
8   deposition trial list.
9        Dr. Richard, have you reviewed any cases in
10  the past for the law firm of Gleason, Flynn, Emig,
11  Fogleman before?
12   A   I might have.  I know the name of the firm,
13  but I can't say specifically I have.  I know CED
14  probably has as a company.
15   Q   You're aware that they're the firm that is
16  defending Dr. Chang in this case?
17   A   Yes.
18   Q   But you couldn't specifically say how many
19  times CED Technologies has reviewed a case for the
20  firm?
21   A   No, not without some research.
22   Q   Okay.  Is that something you do have ready

Page 25

1   access to, though?
2    A   I suppose our case manager could do some
3   sort of computer scan of our database.  I don't know
4   how far back it goes, but they could come up with
5   something.
6    Q   Okay.  I'm going to add that to my list as
7   well.  If possible, if you could just sort of figure
8   out how many case you've reviewed for Gleason Flynn.
9        And if possible, when you're doing it, any
10  sort of details about name of the case and when it
11  was.
12       Dr. Richard, have you ever been named
13  personally a defendant in a lawsuit?
14   A   No.
15   Q   Dr. Richard, you do not regularly use a
16  lighted retractor in your practice, correct?
17   A   True.
18   Q   As part of your review of this case, did you
19  examine the exact model of the fiberoptic lighted
20  retractor that Dr. Chang used?
21   A   No.
22   Q   Are you aware of the exact model of

7 (Pages 22 to 25)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 26

1  fiberoptic lighted retractor that Dr. Chang used?
2      A   I have some data on -- I have some data on
3  it. I believe I have an owner's manual, but I can't
4  say for certainty I have the right owner's manual.  I
5  never did see the equipment involved.
6      Q   So you're basing your opinion based on the
7  materials you have in front of you, which we'll talk
8  about in a second, but no actual examination of the
9  equipment?
10      MS. KARLIN:  I'm just going to make a
11  statement for the record because I think you're aware
12  of the fact that we requested the equipment from the
13  hospital, and we were advised by the hospital that
14  they could not at this point in time provide us with
15  that equipment because it was not available to them,
16  they could not identify the equipment, and they could
17  not provide it to us.
18      So we had requested the equipment to give it
19  to Dr. Richard and his associate, and we were denied
20  that request by the hospital.
21  BY MR. RINGEL:
22      Q   Okay.  Just to answer the question, though,

Page 27

1  you didn't actually review or examine or evaluate any
2  of the actual equipment, correct?
3      A   That is true.
4      Q   Okay.  Okay.  I'd like to show you your --
5  the notice of deposition that we provided in this
6  case.
7      (Richard Deposition Exhibit 3 was marked for
8  identification and attached to transcript.)
9  BY MR. RINGEL:
10      Q   Dr. Richard, what materials did you review
11  in connection with this case?
12      A   I reviewed the depositions of Hobert, Chang,
13  Vesnovsky, Godwin, and they're in this notebook. And
14  I see Ruff, too, R-U-F-F, Paul Ruff, M.D.
15      I reviewed the instruction manual for a
16  retractor, which I assumed was the retractor involved,
17  or something similar. I reviewed some literature,
18  which were exhibits probably on somebody else's
19  deposition, about surgical fires. I reviewed some of
20  the discovery materials, interrogatories, et cetera,
21  and I did review some texts on heating, wire size,
22  current Joule heating, things of this sort.

Page 28

1      Q   I'm sorry, a text?
2      A   Textbooks, yes.
3      Q   Textbooks, okay.
4          Anything else?
5      A   No.
6      Q   Did you review the deposition transcript of
7  Dr. Robert Sigal?
8      A   No.
9      Q   How about Dr. Russell Williams?
10      A   No.
11      Q   How about the plaintiff Mary Clark?
12      A   No.
13      Q   The documents that you did just mention, in
14  preparation for this deposition, did you go back and
15  re-review these documents before today?
16      A   No.
17      Q   When was -- when would you have last
18  reviewed these documents?
19      A   More than a month ago.
20      Q   And what spurred the review more than a
21  month ago?
22      A   I skimmed through them. I tend to highlight

Page 29

1  when I review depositions. I do one of two things, I
2  either outline them myself by hand or I highlight
3  them.
4      If I highlight them, sometimes I write on
5  the front page of the deposition important things with
6  stars referencing certain pages. I didn't do that in
7  this case.
8      I did some highlighting, and I probably --
9  what I did a month ago was skim back through to see
10  what I had highlighted, if there was anything
11  important in what I had highlighted.
12      Q   What sort of things are you looking to
13  highlight?
14      A   Technical things. I'm not looking for
15  medical things in this case, I'm not looking for
16  recovery procedures or physical therapy or any of that
17  stuff. I'm looking for technical things. That's what
18  I'm doing in this case. I'm the technical guy.
19      So I would be looking to see if there's
20  anything in these depositions in regard to the
21  technical aspects of the retractor.
22      Q   For the opinions that you intend to render

8  (Pages 26 to 29)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 30

1  in this case, are you relying on any specific
2  testimony by Dr. Chang?
3    A  Yes, actually.
4    Q  And please elaborate on which testimony that
5  is.
6    A  Well, that he used a retractor on hundreds
7  of occasions without ever experiencing an overheating
8  problem with the instrument.  That comes out of his
9  deposition.
10     He acted responsibly, that when he found out
11  it was overheating, he replaced the cord with a proper
12  cord to eliminate the overheating.
13    Q  Any other testimony?
14    A  No.  I think those -- well, another thing
15  that comes out of his deposition is that he didn't put
16  the system together, he didn't pair the incorrect cord
17  with the lighted retractor.  He wasn't involved in
18  that.  He simply went into an operating room and it
19  was ready to be used and he used it.
20    Q  How about from any other witnesses?
21    A  No, not really.  I know other doctors have
22  testified as to a procedure, what they would do.

Page 31

1  Again, I'm not involved in that aspect of the case.
2    Q  Okay.  So by other doctors and what they
3  would do, what do you mean by that?
4    A  I think other doctors -- I reviewed a
5  deposition supporting Dr. Chang, they say the same
6  procedure he uses they would use, that they would not
7  pair the equipment together in the operating room, it
8  would be there available for them.
9     They wouldn't go in and test all the
10  equipment prior to performing surgery.  For instance,
11  they're not going to test to see if the scalpels are
12  sharp and all of that stuff, that's an assumption that
13  everything is properly done.  And that they would, in
14  fact, handle the lighted retractor in the same manner
15  he handled the lighted retractor.
16    Q  And that's not an area which you intend to
17  give an opinion in this case, correct?
18    A  No.  I think other people will do that.  The
19  doctors themselves will do that.  They have the
20  surgery practice, I don't.
21    Q  Okay.  We're going to get to your report in
22  a bit, but since you produced this written report,

Page 32

1  have you reviewed any additional documents from
2  counsel?
3     You know what, actually, we can hold off
4  until we get to the report.  That might be -- let's
5  enter it now, actually.  Be easier.
6     (Richard Deposition Exhibit 4 was marked for
7  identification and attached to transcript.)
8  BY MR. RINGEL:
9    Q  Dr. Richard, I just handed you what I
10  believe is your report from September 24th, 2013.
11    Is this a fair and accurate copy?
12    A  Yes.
13    Q  And is that your signature on the last page?
14    A  Yes.
15    Q  Okay.  Since you produced this report, have
16  you reviewed any additional records that you did not
17  have at the time this report was completed?
18    A  I would say yes, because I'm reading in the
19  report, we had at the time we wrote the report, Jesse
20  and I, we had four depositions that are listed as one,
21  two, three, and four; and I think I told you today --
22    Q  Would that have been Dr. Sigal?  Dr. Ruff, I

Page 33

1  mean, that was added?
2    A  Yes, that was added.  So apparently we
3  didn't have that at the time the report was written.
4    Q  Okay.  And you also just mentioned Jesse.
5  That's Jesse Atwood, correct?
6    A  Yes.
7    Q  And that's his signature on the last page
8  you recognize?
9    A  Yes.
10    Q  What is Mr. Atwood's position or role?
11    A  That's actually not his signature because I
12  see somebody else has signed it for him.
13    He is an electrical engineer, he's a --
14    Q  Let me stop you.
15    Who would have signed it for him, if you
16  know?
17    A  Ms. Moore, who is one of our case managers.
18    Q  Okay.  Continue as to what Mr. Atwood's role
19  was.
20    A  Jesse is in the Navy, he's an electrical
21  engineer with a P.E., he teaches at the Naval Academy.
22    Q  And what was his role in producing this

9 (Pages 30 to 33)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 34

1  report?
2      A    We thought we were going to be able to get
3  the equipment and test it electrically, that's why an
4  electrical engineer was involved.  We never did get
5  the equipment to test electrically, but initially we
6  thought that's what we were going to do to determine
7  exactly the level of heating, the time of the heating,
8  the reason for the overheat of the cord.  None of
9  which we were able to do because we never got the
10  cord, we never got the equipment.
11      Q    So is it fair to say he did not have any
12  role in producing this report?
13      A    He helped write the report.  He and I wrote
14  the report together.  So he did review these
15  depositions and he and I wrote the report together,
16  although the report is obviously very general in
17  nature.
18      MS. KARLIN:  I should add, I know that he
19  did not have the Johns Hopkins report at the time that
20  he wrote the September 24th, 2013 report, because we
21  did not provide that to him until after the hospital
22  was dismissed from the case.

Page 35

1      A    Okay.  I see that.
2  BY MR. RINGEL:
3      Q    Is there a way to parse out in here which
4  opinions are yours and which opinions are
5  Mr. Atwood's?
6      A    No.
7      Q    So this is together the two of you, both
8  your opinions?
9      A    Yes.
10      Q    Okay.  Prior to today's meeting, have you
11  met with counsel for Dr. Chang?
12      A    Yes.
13      Q    How many times have you met with counsel?
14      A    Once.
15      Q    And when was that?
16      A    About a month ago.
17      Q    And was that Ms. Karlin, who's with us
18  today?
19      A    Yes.
20      Q    How long was that meeting, approximately?
21      A    An hour.
22      Q    Have you produced any E-mail correspondence

Page 36

1  with counsel?
2      A    I don't believe so.
3      Q    How about regular mail?
4      A    No.  Again, I don't believe so.
5      Q    Do you know how you were found by counsel to
6  offer expert testimony in this case?
7      A    No.  I can tell you a call did come in to
8  our case manager, who filled out a new case assignment
9  sheet on August 22nd of 2013.
10      Q    Who was that case manager, if you know?
11      A    It's either Linda Hall or Joan Moore.
12      Q    But you don't know how the law firm of
13  Gleason Flynn obtained the name of CED Technologies?
14      A    No, I don't.
15      Q    Other than that they may have used your
16  business in the past?
17      A    That could be a way they would know us, yes.
18      Q    Okay.  I guess we'll figure that out once we
19  do a little quick search of your system maybe later.
20      Have you produced any bills for your review
21  in this case?
22      A    Yes.  I would hope so.

Page 37

1      Q    What is the current total, if you know?
2      A    I don't have it in this book.  I would have
3  to go back through the accounting department.
4      Q    Okay.  I would just add that to my list of
5  things that maybe you can help me out with later.  I
6  will send an E-mail to counsel, if you can provide
7  that to her.
8      Dr. Richard, do you know any of the parties
9  in this case?
10      A    No.
11      Q    You don't know Mary Clark, correct?
12      A    No.
13      Q    And you don't know Dr. Eric Chang?
14      A    No.
15      Q    How about any of the other expert witnesses
16  in this case?  And I'll list them as Dr. Robert Sigal,
17  Dr. Paul Ruff, and Dr. Russell Williams?
18      A    No.  I don't know any of them.
19      Q    Okay.  I think I know the answer to this,
20  but I'm going to ask it.
21      Have you ever or do you regularly perform a
22  left breast capsulectomy for implant repositioning?

10  (Pages 34 to 37)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 38

1    A   No.
2    Q   How about a left breast implant exchange?
3    A   No.
4    Q   A right breast implant exchange?
5    A   No.
6    Q   Fat transfer from abdomen to left breast?
7    A   No.
8    Q   Fat transfer from abdomen to right breast?
9    A   No.
10   Q   And liposuction of bilateral axillary areas
11   for contouring of the lateral breast area?
12   A   No.
13   Q   Have you had any -- in producing this
14   report, have you had any conversations with Dr. Sigal
15   or Dr. Ruff?
16   A   No.
17   Q   Have you ever had any conversations with
18   Dr. Sigal or Dr. Ruff?
19   A   No.
20   Q   Dr. Richard, what is your understanding of
21   how Mary Clark came to be burned during this
22   procedure?

Page 39

1    A   The cord of the retractor overheated.
2    Q   Okay.  And if you can be more specific,
3    because I know that the cord is -- is made up of
4    several components.
5        Which component overheated, as far as your
6    understanding?
7    A   I can't be more specific than just the cord.
8    I don't -- I never did get the equipment.
9    Q   Do you have any understanding of what the
10   cord actually is made of in terms of component parts?
11   A   No.  I do have diameters in the Hopkins
12   report of certain cords that they tested or replaced
13   or whatever.  So they only reference the cords as so
14   many millimeters, 4 millimeters, 2-1/2 millimeters.
15   Q   So you won't be offering any testimony in
16   this case as to which specific part of the cord was
17   overheating, correct?
18   A   That is true.
19   Q   So if there was, just hypothetically, three
20   components to this part and only one component was
21   overheating, you are not going to be able to offer any
22   testimony as to which of those parts was hot on the

Page 40

1    day of the surgery, correct?
2    A   That is true.
3    Q   Do you have any understanding of whether --
4    you say the cord.  There's a cord and then also a
5    lighted portion to the retractor.
6        Do you know which portion would have
7    overheated from those parts of it?
8    A   I believe --
9        MS. KARLIN:  Objection.
10   A   I believe it was the cord, it wasn't the
11   retractor itself.  The doctor did not notice that the
12   retractor itself was getting hot.  It was the cord to
13   the retractor that overheated and was replaced during
14   the surgery.
15   BY MR. RINGEL:
16   Q   So it will be your testimony at trial that
17   it was the cord and not the actual lighted portion
18   that was overheating?
19   A   Yes.  I believe so.
20   Q   Okay.  Do you have any idea of the length of
21   the cord that was overheating?
22   A   No.  I don't.

Page 41

1    Q   How about which portion of the cord would
2    have been hot in terms of like three inches of the
3    cord would have been hot or two inches?  Just any
4    sense of that?
5    A   No.
6    Q   Is it your opinion that the entire cord was
7    hot?
8        MS. KARLIN:  Objection.  Asked and answered.
9    A   I don't know.
10   BY MR. RINGEL:
11   Q   So you don't have an opinion one way or the
12   other?
13   A   True.
14   Q   Okay.  So when I asked you what your
15   understanding of how she came to be burned, you said
16   that the cord overheated.
17       If you could be a little more specific to
18   what your understanding is of how the overheated cord
19   came to cause the burns on Ms. Mary Clark.
20   A   I believe it got above 150 degrees.
21   Q   Were there any -- is it your understanding
22   that there were any safety precautions in place that

11  (Pages 38 to 41)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 42

1  would have prevented an overheated retractor from
2  burning --
3       MS. KARLIN: Objection.
4  BY MR. RINGEL:
5     Q   -- the skin?
6     A   I have no knowledge of that.
7     Q   You have no knowledge – do you have any
8  knowledge of where the cord actually was that caused
9  the burns?
10    A   In a general sense, I suppose by looking at
11 photographs of the burns, I could tell you that the
12 cord had to be in certain areas; but specifically, no.
13    Q   Have you looked at photographs?
14    A   I've seen photographs of her, yes.
15    Q   What is your understanding where the burns
16 are?
17    A   I believe she got burned on her breasts.
18    Q   Okay.  Do you know how many burns she has?
19    A   No, I don't.  I haven't really focused on
20 that, quite frankly.
21    Q   Okay.  Is it your understanding that the
22 lighted retractor caused the burns through direct skin

Page 43

1  contact?
2     A   The cord, yes.
3     Q   The cord.
4        So there was direct contact between the cord
5  and the skin?
6     A   There would have to be, yes.
7        MR. RINGEL: Okay.  If I could mark this
8  collectively as Exhibit 5.
9        (Richard Deposition Exhibit 5 was marked for
10 identification and attached to transcript.)
11 BY MR. RINGEL:
12    Q   Doctor, I just handed you photographs of the
13 burns in question from Mary Clark.
14       Have you reviewed these photographs prior to
15 today?
16    A   I've seen them, I haven't focused on them.
17    Q   Okay.  So they were part of the record you
18 received, correct?
19    A   I believe so, yes.
20    Q   Okay.  Looking at the first page, you would
21 agree that there at least three separate burns?
22       MS. KARLIN: Objection.  This is not his

Page 44

1  area of expertise, he's not a physician, he's not here
2  to evaluate the burns.
3        So I'm going to object to the extent that
4  it's outside of his expertise.
5        You can answer, if you can.
6     A   I can see three markings, yes, across her
7  upper chest.
8  BY MR. RINGEL:
9     Q   And there's one on the right that looks like
10 it actually might be maybe a little bit more than a --
11 it looks like a few of them grouped together.  Would
12 you agree with that?
13       MS. KARLIN: Objection.
14    A   Could be grouped together or it could be
15 longer, but it's certainly a longer dimension.
16 BY MR. RINGEL:
17    Q   Doctor, do you know how many times exactly
18 Dr. Chang would have used the retractor over the
19 course of the procedure?
20    A   No.
21       MS. KARLIN: Objection.  Again, this is all
22 outside his expertise.  And I think he's told you

Page 45

1  that.
2        MR. RINGEL: Well, he's providing an opinion
3  as to the cause, so I think this is fair game for
4  questioning.
5        MS. KARLIN: It's not fair game.  That has
6  specifically to do with how the procedure is
7  performed.  He's not a medical doctor, he's told you
8  he's not giving you medical opinions.
9        MR. RINGEL: Okay.
10       MS. KARLIN: And I don't think that has
11 anything to do with the cord.
12       MR. RINGEL: Well, I would disagree.  I'll
13 ask him the questions; and if you need to file a
14 motion, you can.
15 BY MR. RINGEL:
16    Q   If you look at, Dr. Richard, on the fourth
17 and fifth page, you'd agree those are burns that look
18 like they are separate areas?
19       MS. KARLIN: Objection.
20    A   They're in separate areas.  I can't actually
21 tell you whether they're even burns or not.
22 BY MR. RINGEL:

12 (Pages 42 to 45)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 46

1    Q   Okay.  Is it your understanding, Doctor,
2  then, that the cord was causing this burn?
3    A   Yes.
4    Q   Okay.  In looking at this, you would agree
5  that it would have had to have occurred over multiple
6  occasions where Dr. Chang was picking up and putting
7  down the cord?
8       MS. KARLIN:  Objection.
9    A   I can't tell from looking at the photos if
10 that's true or not.
11 BY MR. RINGEL:
12   Q   Your understanding of the cord is that there
13 is a cord and a retractor -- and a lighted portion,
14 correct?
15   A   True.
16   Q   And that there was a connection that was
17 made that caused the overheating?  It was an improper
18 connection, correct?
19   A   Yes.
20   Q   Okay.  And as you stated in your report, you
21 believe this connection was improperly connected by
22 the hospital, correct?

Page 47

1    A   I don't know whether it's a connection or
2  the fact the cord had broken fibers in it.  Somewhere
3  in the Hopkins report they talk about 30 percent of
4  the fibers being broken.
5    Q   Okay.  So if the portion that is overheated,
6  you don't have any opinion as to whether it's the
7  entire length that would have caused this in one burn
8  or in multiple times where he's picking up and putting
9  down the actual heated portion?
10      MS. KARLIN:  Objection.
11   A   That is true.
12 BY MR. RINGEL:
13   Q   Are you aware of any towels or drapes that
14 were used during the procedure?
15   A   Again, I wasn't in the operating room, I'm
16 not a doctor.  Only what I've read in depositions.
17   Q   Okay.  You testified earlier that the --
18 actually, strike that.
19      If we could go to your report again, which I
20 think was Exhibit 4.
21      I want to go through the opinions that you
22 have here -- and, actually, your conclusions I think

Page 48

1  would be a better summarize, on the last page.
2       There's five conclusions you plan on
3  offering in this case, correct?
4       MS. KARLIN:  Again, I'm just going to, for
5  the record, state this is before he saw the other
6  report.
7       So with that caveat, you can go ahead.
8    A   Actually, I have nine opinions now in my
9  book under Tab A, but five are in the report.
10 BY MR. RINGEL:
11   Q   Okay.  Well, are the five that are in your
12 report five of the nine that are in your Tab A?
13   A   Probably the same essence.  They may have
14 different wording, but certainly no change of thought.
15   Q   Okay.  So here's what I want to do:
16      I'm going to go through each of these
17 opinions and ask you about them; but if there's
18 additional opinions that you have there, I guess we'll
19 do that afterwards, or you can tell me if there's an
20 opinion as part of these nine that you think is said
21 in the same phrasing as this, just so we're not
22 repeating ourselves here.  I just want to ask you

Page 49

1  about all of your opinions.
2       Does that seem fair?
3    A   That's fair.
4    Q   Okay.  So just starting with number 1, you
5  said that "Ms. Mary Clark was reportedly burned during
6  her surgery from an overheated lighted retractor used
7  during the surgery."
8       Is this still your opinion?
9    A   Sure.
10   Q   And what did you rely upon to form this
11 opinion?
12   A   Discovery material, depositions.
13   Q   Okay.  Is this one of the nine in there --
14 actually, is there a way I can take a look at this
15 real quick?  I'll give it right back to you.
16      MR. RINGEL:  We can go off the record.
17      (Pause.)
18 BY MR. RINGEL:
19   Q   Doctor, while we were off the record, I was
20 just reviewing from your notebook, it was a -- looks
21 like a list of opinions that you additionally had.
22      Number 1, it says, was "The pairing of the

13  (Pages 46 to 49)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 50

1  incorrect cord would not be open and obvious."
2     A   Right.
3     Q   What is the basis of that opinion?
4     A   Just looking at the hardware, you
5  wouldn't -- you wouldn't know that something had been
6  put together incorrectly.
7     Q   So you wouldn't -- just visually speaking,
8  you wouldn't be able to tell that it was hot?
9     A   True. Or that it was incorrect or that it
10  was going to get hot.
11     When you looked at it lying there prior to
12  surgery, you wouldn't be able to look at it and say
13  somehow this instrument's got a problem with it.
14     Q   Okay. And that's also pretty much the same
15  as your number 4 here, which is, "One cannot look at
16  the lighted retractor's cord and know that the cord is
17  becoming hot."
18     That's essentially what we just said in
19  different words, correct?
20     A   That's true. If I have an extension cord in
21  this room that's getting hot, I wouldn't know it by
22  just looking at the extension cord.

Page 51

1     Q   It's not becoming red hot then?
2     A   True.
3     Q   Okay. In your report then, it says here --
4  and I know this is also on your tab -- Dr. "Eric Chang
5  was the surgeon who was performing the surgery and had
6  used a lighted retractor on hundreds of occasions
7  without ever experiencing an overheating problem with
8  this instrument."
9     Is this still your opinion?
10     A   Yes.
11     Q   And what do you rely upon to form this
12  opinion?
13     A   His deposition.
14     Q   Specifically, any specific testimony that he
15  used it hundreds of occasions, correct?
16     A   I believe he said that in his deposition,
17  yes.
18     Q   If you're providing an opinion on a piece of
19  equipment and it was working for 100 times and the
20  101st time it wasn't working properly, how is that
21  relevant to your review?
22     MS. KARLIN: Objection. I don't know what

Page 52

1  that means.
2     A   If I had the equipment, I could tell you why
3  it didn't work on the 101st time. I could actually
4  analyze that in my laboratory, which is what we hoped
5  to do in this case.
6  BY MR. RINGEL:
7     Q   And isn't it the doctor's responsibility to
8  make sure that all equipment is properly working each
9  and every time?
10     MS. KARLIN: Objection. That is outside of
11  his expertise. He is not giving medical opinion.
12     A   Yeah. Again, I believe that's a medical
13  thing that the surgeons will talk about, whether or
14  not they pretest equipment before using equipment in
15  surgery.
16  BY MR. RINGEL:
17     Q   How about -- you are an expert in human
18  factors, correct?
19     A   Yes.
20     Q   And this is, generally speaking, how
21  individuals use pieces of equipment in every day life
22  and work?

Page 53

1     A   Not in this regard, no.
2     Q   So it wouldn't be correct to say that it's
3  the responsibility here for -- to inspect all
4  equipment each and every time you use it?
5     MS. KARLIN: Objection. I just made that
6  objection. He just answered the same question. That
7  is a medical opinion in this case. Asked and
8  answered.
9  BY MR. RINGEL:
10     Q   You can answer.
11     A   Yeah. I can't evaluate that procedure in
12  terms of what doctors do and don't do in a surgery
13  situation.
14     Q   How about in another context. You stated
15  before that you did a review of a slip on a floor.
16  Let's take a hypothetical here.
17     That if the floor safety was perfect for 100
18  days, on the 101st day all of a sudden there's a
19  dangerous condition, are you saying it's not the
20  individual's responsibility to inspect each and every
21  day to make sure that it's safe?
22     MS. KARLIN: Objection. Relevance.

14 (Pages 50 to 53)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 54

1    A   I wouldn't be involved in rendering that
2  type of opinion.  I would be involved in testing the
3  floor to determine why it was slippery and how
4  slippery it was, what was the coefficient of friction.
5  BY MR. RINGEL:
6    Q   So you can't offer any opinion in either
7  that hypothetical case or in this case as to what an
8  individual's responsibility is to check the safety of
9  equipment -- piece of equipment?
10      MS. KARLIN: Objection.  Asked and answered
11  twice.
12      MR. RINGEL: It's a different question.
13      MS. KARLIN: You can answer it a third time.
14      I don't think so.
15    A   That is -- that is true.
16  BY MR. RINGEL:
17    Q   Okay.  If you go to your next opinion in
18  your report, it says, "Once Dr. Chang realized that
19  the lighted retractor had malfunctioned and was
20  overheating during the surgery, he immediately
21  replaced the retractor with a retractor that operated
22  properly."

Page 55

1      Is this still your opinion?
2    A   Yes.
3    Q   And what do you rely upon to form this
4  opinion?
5    A   His deposition.
6    Q   Which specific statements, if you can point
7  to any?
8    A   I can't.  I'd have to go back and reread his
9  deposition.
10    Q   Generally speaking, is there a statement
11  that he made that would support this?  Just generally.
12  I'm not asking to quiz your memory here.
13    A   I believe it's in his deposition that once
14  they realized in the operating room the lighted
15  retractor had a problem, they replaced it with a
16  properly operating piece of equipment.
17    Q   Next opinion, number 4 on your list here,
18  "There is no way that Dr. Chang made the lighted
19  retractor malfunction."
20      Is this still your opinion?
21    A   Yes.
22    Q   And what do you rely upon to form this

Page 56

1  opinion?
2    A   That comes from his deposition, too.  That
3  there was nothing he did in handling -- that I can
4  see, in handling the lighted retractor that made it
5  overheat.
6    Q   Meaning that he didn't like press a button
7  improperly that all of a sudden caused it to get too
8  hot?
9    A   That's true.
10    Q   He was not responsible for the assembly of
11  the piece of equipment, correct?
12    A   That's true.
13    Q   Okay.  The next opinion is, "There's no
14  way" -- this is number 5 -- actually, hold on.  Let me
15  see -- can I see this list real quick.
16      On your stated opinion here, it says,
17  "Dr. Chang had no way to know in advance that the
18  lighted retractor's cord would overheat during his
19  surgery of Ms. Clark."
20      Is that still your opinion?
21    A   Yes.
22    Q   And what do you rely upon to form that

Page 57

1  opinion?
2    A   Again, his deposition.  There's no way in
3  walking into the operating room and looking at the
4  lighted retractor that he could predict it was going
5  to overheat.
6    Q   Okay.  Is this the type of piece of
7  equipment -- well, obviously, it is possible to
8  overheat, as it did in this case.
9      Have you reviewed other types of piece of
10  equipment like this before?  Specifically -- I'll be
11  specific, as to a lighted retractor?
12    A   No.
13    Q   Or a piece of lighting equipment?
14    A   We have done lighting equipment, we probably
15  have done lighting equipment that has overheated, that
16  has caused fires; but that wouldn't be very close to
17  this piece of equipment.
18    Q   You would agree with me that light itself
19  produces heat?
20    A   Yes.
21    Q   And to produce the light, there's electrical
22  components that go into producing the light?

15  (Pages 54 to 57)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 58

1    A  Yes.  It's the electrical components in this
2  case, I believe, that caused it to overheat, not the
3  light itself.
4    Q  Okay.  So you won't be testifying that the
5  light -- the lighted tip itself was the source of the
6  overheating?
7    A  It doesn't appear to be the case, from what
8  I've reviewed in this case.
9    Q  So your opinion will be that it's the
10  electrical components that produced the light is what
11  was overheating, correct?
12    A  Yes.
13    Q  Okay.  And if I can just grab this one more
14  time.
15      Okay.  And then I think the last opinion
16  here is stated -- as number 5, this is more complete
17  it looks like.
18      "There's no way that Dr. Chang can be made
19  responsible for the burns suffered by Ms. Clark during
20  her surgery based on the conclusions in the John
21  Hopkins Hospital report that the direct cause of the
22  incident was the overheating of the lighted retractor

Page 59

1  due to 30 percent broken fibers in the 4.8-millimeter
2  cord," correct?
3    A  Right.  It's the same as I have in my report
4  but a little more complete, because I reviewed more
5  information since we wrote the report.
6    Q  And that's why I've chosen to go with this
7  one.  It looks like it's more explanatory than the one
8  that's in your report, which just says, "There's no
9  way that Dr. Chang can be made responsible for the
10  burns suffered by Ms. Clark during her surgery,"
11  correct?
12    A  Right.
13    Q  And what is the basis for this opinion?
14      Well, first, do you still hold this opinion?
15    A  Yes.  I do.
16    Q  And what do you use to rely upon -- what do
17  you rely upon to form this opinion?
18    A  Relying on the Hopkins study, who actually
19  had the equipment and did draw a conclusion of why the
20  overheating occurred, 30 percent broken fibers in the
21  4.8-millimeter cord was responsible for this.  And,
22  again, Dr. Chang's deposition.

Page 60

1      MR. RINGEL:  I'd like to mark another
2  exhibit, instruction manual.
3      (Richard Deposition Exhibit 6 was marked for
4  identification and attached to transcript.)
5  BY MR. RINGEL:
6    Q  Doctor, I just handed you an instruction
7  manual for a piece of Storz, S-T-O-R-Z, Cold Light
8  Fountain XENON 300, Model 20133120 equipment.
9      This is the same instruction manual that you
10  have reviewed as part of your review in this case,
11  correct?
12    A  I believe so, yes.
13    Q  And this is for the lighted retractor that
14  was used in this case?
15    A  As far as I know.
16    Q  Okay.  If you would look to page 2 of this
17  instruction manual -- it's actually the first page
18  after the cover.  And I'm looking at the second
19  column, it's actually the one in English, and "Note"
20  on the bottom.
21      Could you read what it says there.
22    A  "Always adjust the light source to the

Page 61

1  minimum illumination intensity necessary to achieve
2  optimum illumination of the endoscopic scene, whereby
3  direct vision or when coupled to a video camera."
4    Q  And then the next two sentences.
5    A  "Please be aware of the heat generated at
6  the distal tip of the endoscope.  The higher the
7  intensity setting of the light source, the more heat
8  will be generated at the endoscopic tip.  Never leave
9  an illuminated light cable with or without an
10  endoscope connected on or near a patient or surgical
11  drape.  The risk of patient burns and igniting" --
12    Q  I think it's flammable.
13    A  -- "flammable material can result."
14    Q  And, Doctor, you reviewed this as part of
15  your opinion?
16    A  I looked at it briefly, yes.
17    Q  And you would agree that this is intended by
18  the manufacturer to be reviewed by the end users of
19  the pieces of equipment?
20      MS. KARLIN:  Objection to the extent that
21  he's speculating as to what the manufacturer -- who
22  the manufacturer intended to read this.

16  (Pages 58 to 61)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 62

1    A   Yeah. I can't say for sure. It's classic
2  of an instruction manual typically would be read by
3  somebody -- more likely read by somebody who doesn't
4  know how to use the equipment and wants to learn how
5  to use the equipment.
6  BY MR. RINGEL:
7    Q   And, Doctor, your opinion is that
8  Dr. Chang -- in no way can Dr. Chang be made
9  responsible for the burns suffered by Ms. Clark during
10  her surgery, correct?
11    A   True.
12    Q   And if you don't use a piece of equipment as
13  it's designed, isn't he responsible --
14    MS. KARLIN: Objection.
15  BY MR. RINGEL:
16    Q   -- for any malfunctions or complications
17  that could occur?
18    MS. KARLIN: Objection. Form and
19  foundation.
20    A   Again, I would say no. And he's used this
21  piece of equipment literally hundreds and hundreds of
22  times without ever having a malfunction that he would

Page 63

1  expect a malfunction on this day.
2  BY MR. RINGEL:
3    Q   And you would agree that there are clear
4  explicit orders against actually putting the lighted
5  retractor on the patient or drapes itself?
6    MS. KARLIN: Objection to the use of the
7  word "order" and, also, to the extent that you're
8  asking him now for a medical standard of care opinion.
9    MR. RINGEL: I'm just asking what's in here.
10    MS. KARLIN: No, not necessarily, to the
11  extent that you're asking for a medical standard of
12  care opinion as to what physicians do.
13    You can answer, if you can, Doctor.
14    A   Yes. Only what it says here. It's a
15  warning or an instruction to not leave the cable with
16  or without the endoscope near a patient or a surgical
17  drape. Risk of burns, I guess, is then discussed.
18  BY MR. RINGEL:
19    Q   Is it your opinion that Dr. Chang did not
20  have responsibility to review this instruction manual
21  before using the equipment?
22    A   I don't think he would if he's used this

Page 64

1  hundreds and hundreds of times and he would be
2  up-to-date on this particular manual. I don't think
3  he would review this because he knows how to use this
4  equipment. He's used this equipment many times.
5    Q   So he would know how to use it and wouldn't
6  need the instruction manual at all?
7    A   That's typically the case, yes. If you're
8  very familiar with something, you tend not to read
9  instruction manuals.
10    Q   If you would follow me to one, two, three --
11  page 4.
12    MS. KARLIN: Just hold it up.
13  BY MR. RINGEL:
14    Q   Well, it's the -- it doesn't have a number
15  on it. I guess it's the page where on top it says,
16  symbols used.
17    A   Yes, I have it.
18    Q   And at the bottom it says, "Danger" and
19  "Caution," and then it says, "Keep out of reach of
20  patients. Do not store liquids on or above the unit,"
21  correct?
22    A   True.

Page 65

1    Q   And is your understanding that the purpose
2  of this instruction is for safety?
3    MS. KARLIN: Objection.
4    A   It has a safety symbol, yes. It's a caution
5  label, yes.
6  BY MR. RINGEL:
7    Q   Okay. And, again, this is not something you
8  would expect Dr. Chang to rely upon --
9    MS. KARLIN: Objection.
10  BY MR. RINGEL:
11    Q   -- when he's using the piece of equipment?
12    A   No, I wouldn't. Again, because he's
13  familiar with the equipment. And I really don't know
14  what it means when it says, "Keep out of reach of
15  patients." You might well be worried about the
16  patient himself grabbing hold of this thing.
17    Q   Are there any other opinions other than
18  those we have discussed that you plan on offering at
19  trial?
20    A   No.
21    Q   I noted briefly here, number 7 and 8 on your
22  packet deal with the availability of the equipment.

17 (Pages 62 to 65)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 66

1    **Could you summarize what that is.**
2    A   Yeah.  We never got the equipment.  Because
3    the lighted retractor and the improper cord were not
4    available, CED was not able to determine the exact
5    level of heating and/or the transient time involved in
6    the heating.
7    By transient time, how long it takes to get
8    to various temperatures.
9    And number 8 says, had it been available, we
10   would have been able to determine the temperature and
11   the transient time, which is what we hoped to do
12   actually, but we never did get the equipment.
13   MR. RINGEL:  Okay.  I'm going to -- one more
14   thing to mark.
15   (Richard Deposition Exhibit 7 was marked for
16   identification and attached to transcript.)
17   BY MR. RINGEL:
18   **Q   Dr. Richard, I just handed you expert**
19   **witness disclosure for this case.**
20   **Were you involved at all in preparing this**
21   **document?**
22   A   I think with three -- with opinion three,

Page 67

1    which is where Jesse and I are mentioned, yes, we
2    would have been involved in discussing this with the
3    attorney and him.
4    **Q   Did you actually write this portion?**
5    A   I don't recall myself writing this portion.
6    Maybe Jesse did.
7    **Q   Okay.**
8    MS. KARLIN:  I can answer.  They didn't.
9    MR. RINGEL:  Right.
10   BY MR. RINGEL:
11   **Q   Your role in this was just consultation as**
12   **to what your opinions would be; is that correct?**
13   A   At this point in time, yes.
14   **Q   Okay.  You agree that Dr. Chang noticed**
15   **burns on Ms. Clark following the surgery, correct?**
16   A   I believe so, yes.
17   **Q   And you agree that he took some measures to**
18   **try and treat the burn at or near the time of the**
19   **procedure?**
20   A   I believe I read that in his deposition,
21   yes.
22   **Q   You don't dispute the fact that it was the**

Page 68

1    **overheated lighted retractor cord that was placed on**
2    **Ms. Clark that actually caused the burning as noted in**
3    **his report?**
4    A   No, I don't dispute that.
5    **Q   And you don't dispute that the surgical**
6    **burns that occurred during the surgery with Dr. Chang**
7    **caused the disfigurement she has today?**
8    MS. KARLIN:  Objection.
9    A   Again, the only information I have is what I
10   read in Dr. Chang's deposition.
11   BY MR. RINGEL:
12   **Q   Fair enough.**
13   **Are you aware of the nature and extent of**
14   **the disfigurement that Ms. Clark has today from the**
15   **burns?**
16   MS. KARLIN:  Objection.  Outside his
17   expertise.
18   A   No, I'm not.
19   MR. RINGEL:  Let me go back and see if I
20   have anything else.
21   That's all I have.  Thank you, Doctor.
22   MS. KARLIN:  I have no questions.

Page 69

1    MR. RINGEL:  If we could get all those to
2    the court reporter, so she can retain them.  I see
3    you've already done a good job of keeping that
4    together.
5    And I guess we just need an etran and a
6    mini.  Certainly no rush, the trial is not until
7    February.
8    THE REPORTER:  Ms. Karlin, you will want a
9    copy?
10   MS. KARLIN:  Yes.
11   (Thereupon, with the consent of the witness,
12   reading and signature waived.)
13   (Whereupon, at 12:31 p.m., the deposition
14   was concluded.)
15
16
17
18
19
20
21
22

18  (Pages 66 to 69)

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 70

1         CERTIFICATE OF NOTARY PUBLIC
2         I, MaryJo Legg, the officer before whom the
3    foregoing deposition was taken, do hereby certify that
4    the witness, whose testimony appears in the foregoing
5    deposition, was duly sworn by me; that the testimony
6    of said witness was taken by me in stenotypy and
7    thereafter reduced to typewriting under my direction;
8    that said deposition is a true record of the testimony
9    given by said witness; that I am neither counsel for,
10   related to, nor employed by any of the parties to the
11   action in which this deposition was taken; and
12   further, that I am not a relative or employee of any
13   attorney or counsel employed by the parties hereto,
14   nor financially or otherwise interested in the outcome
15   of this action.
16
17
18            Notary Public in and for
             the State of Maryland
19
     My Commission expires:
20   September 30, 2017
21
22

MERRILL DEPOSITION SERVICES
800-292-4789                    www.deposition.com/washington-dc.htm

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 1

## A

**abdomen**
38:6,8
**ABET**
10:18
**able**
9:5 34:2,9 39:21 50:8
50:12 66:4,10
**Academy**
16:9 33:21
**access**
25:1
**accompanying**
8:20
**accounting**
37:3
**accredited**
10:18
**accurate**
15:1 23:13 32:11
**achieve**
61:1
**acted**
17:19 30:10
**action**
70:11,15
**actual**
26:8 27:2 40:17 47:9
**add**
18:12 24:6 25:6 34:18
37:4
**added**
33:1,2
**additional**
32:1,16 48:18
**additionally**
49:21
**address**
6:11
**adjust**
60:22
**advance**
56:17
**advised**
26:13
**AESTHETIC**

3:10
**afternoon**
11:7
**ago**
13:7,8 22:8,9 28:19,21
29:9 35:16
**agree**
43:21 44:12 45:17
46:4 57:18 61:17
63:3 67:14,17
**ahead**
48:7
**airport**
21:22
**al**
1:9
**American**
19:5
**analyze**
52:4
**and/or**
66:5
**angioplasts**
13:3
**Annapolis**
1:14 2:6 6:13
**answer**
5:22 26:22 37:19 44:5
53:10 54:13 63:13
67:8
**answered**
41:8 53:6,8 54:10
**answers**
6:5
**apparently**
33:2
**appear**
58:7
**appears**
70:4
**apply**
21:3
**appropriate**
17:7
**approximately**
35:20

**April**
1:15
**area**
16:19 31:16 38:11
44:1
**areas**
9:21 10:1 38:10 42:12
45:18,20
**articles**
19:16
**asked**
15:7 41:8,14 53:7
54:10
**asking**
55:12 63:8,9,11
**aspect**
31:1
**aspects**
29:21
**assembly**
56:10
**assignment**
36:8
**associate**
26:19
**assumed**
27:16
**assumption**
31:12
**attached**
4:7 7:8 14:13 23:8
27:8 32:7 43:10 60:4
66:16
**attempt**
11:18
**attorney**
67:3 70:13
**Atwood**
33:5
**Atwood's**
33:10,18 35:5
**August**
36:9
**authoritative**
18:15,17 19:11,14
**Automotive**

19:8
**availability**
65:22
**available**
26:15 31:8 66:4,9
**Avenue**
2:5 3:5 6:13
**aware**
24:15 25:22 26:11
47:13 61:5 68:13
**axillary**
38:10
**A-B-E-T**
10:19
**a.m**
1:16

## B

**B**
4:6
**back**
21:21 22:9 25:4 28:14
29:9 37:3 49:15 55:8
68:19
**background**
10:7
**based**
26:6 58:20
**basing**
26:6
**basis**
14:9 50:3 59:13
**basketball**
16:5
**becoming**
50:17 51:1
**Beer**
23:19
**behalf**
3:2,10 14:2,15 20:5,6
22:17,22
**beings**
10:7
**believe**
14:3 20:14 26:3 32:10
36:2,4 40:8,10,19

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

41:20 42:17 43:19
46:21 51:16 52:12
55:13 58:2 60:12
67:16,20
**benefit**
5:20
**Berman**
3:4 5:9
**best**
5:21
**better**
17:17 48:1
**big**
14:11
**bilateral**
38:10
**bills**
36:20
**bit**
16:15 31:22 44:10
**book**
18:9 37:2 48:9
**books**
18:7,10,20 21:22
**bottom**
9:22 60:20 64:18
**break**
6:6
**breakdown**
15:20 20:4 24:3
**breast**
37:22 38:2,4,6,8,11
**breasts**
42:17
**briefly**
5:8 61:16 65:21
**broken**
47:2,4 59:1,20
**built**
14:4
**burn**
46:2 47:7 67:18
**burned**
38:21 41:15 42:17
49:5
**burning**

42:2 68:2
**burns**
9:12 17:1 41:19 42:9
42:11,15,18,22 43:13
43:21 44:2 45:17,21
58:19 59:10 61:11
62:9 63:17 67:15
68:6,15
**business**
6:11 36:16
**button**
56:6

---

**C**

**C**
1:13 2:1 3:1 4:1,2 5:1
5:2 6:12
**cable**
61:9 63:15
**call**
36:7
**called**
10:20
**camera**
13:6 14:13,21 61:3
**cameras**
13:3 14:7
**can't**
6:4 24:13 26:3 39:7
45:20 46:9 53:11
54:6 55:8 62:1
**capacity**
12:7,15
**capsulectomy**
37:22
**care**
17:7,16 63:8,12
**case**
1:7 5:11 7:1 8:3 13:1,2
13:4 14:6,10,16 15:4
15:5 16:14 17:8
19:19 20:2 22:8
23:19 24:16,19 25:2
25:8,10,18 27:6,11
29:7,15,18 30:1 31:1
31:17 33:17 34:22

36:6,8,8,10,21 37:9
37:16 39:16 48:3
52:5 53:7 54:7,7
57:8 58:2,7,8 60:10
60:14 64:7 66:19
**caseload**
20:12
**cases**
13:16 18:11 20:22
24:9
**cause**
41:19 45:3 58:21
**caused**
42:8,22 46:17 47:7
56:7 57:16 58:2 68:2
68:7
**causing**
46:2
**caution**
64:19 65:4
**caveat**
48:7
**CED**
2:4 6:12,20 21:5,8
24:13,19 36:13 66:4
**ceiling**
13:5
**CEO**
6:20 21:8
**certain**
8:8,9,10 29:6 39:12
42:12
**certainly**
44:15 48:14 69:6
**certainty**
26:4
**CERTIFICATE**
70:1
**certify**
70:3
**cetera**
27:20
**Chang**
3:11 7:3 17:11 24:16
25:20 26:1 27:12
30:2 31:5 35:11

37:13 44:18 46:6
51:4 54:18 55:18
56:17 58:18 59:9
62:8,8 63:19 65:8
67:14 68:6
**change**
48:14
**changes**
23:14
**Chang's**
59:22 68:10
**charge**
20:21 21:6,17,19,20
**charges**
21:1,5
**charging**
21:18
**chart**
23:11
**CHARTERED**
3:13
**check**
54:8
**chest**
44:7
**chosen**
59:6
**circumstances**
12:22
**Clark**
1:5 5:11 7:1 28:11
37:11 38:21 41:19
43:13 49:5 56:19
58:19 59:10 62:9
67:15 68:2,14
**classic**
62:1
**clean**
5:20
**clear**
63:3
**client**
13:4 14:7
**close**
57:16
**Clyde**

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 3

1:13 2:1 4:2 5:2 6:12
23:4
**coefficient**
54:4
**Cold**
60:7
**collected**
13:20
**collectively**
43:8
**college**
11:20 16:1
**Colon**
23:22
**COLUMBIA**
3:10
**column**
60:19
**come**
17:17 19:19 25:4 36:7
**comes**
9:7 30:8,15 56:2
**Commission**
70:19
**company**
14:5 21:1,3 24:14
**complete**
58:16 59:4
**completed**
32:17
**complications**
62:16
**component**
39:5,10,20
**components**
39:4,20 57:22 58:1,10
**computer**
25:3
**concluded**
69:14
**conclusion**
59:19
**conclusions**
19:19 47:22 48:2
58:20
**condition**

53:19
**connected**
46:21 61:10
**Connecticut**
16:5
**connection**
27:11 46:16,18,21
47:1
**consent**
69:11
**consider**
18:14 19:10
**Construction**
14:5
**consultation**
15:7 67:11
**contact**
43:1,4
**context**
53:14
**Continue**
33:18
**contouring**
38:11
**contractor**
14:4
**conversations**
38:14,17
**copy**
7:5 23:14 24:7 32:11
69:9
**cord**
17:14,20,21,21 30:11
30:12,16 34:8,10
39:1,3,7,10,16 40:4,4
40:10,12,17,21 41:1
41:3,6,16,18 42:8,12
43:2,3,4 45:11 46:2,7
46:12,13 47:2 50:1
50:16,16,20,22 56:18
59:2,21 66:3 68:1
**cords**
39:12,13
**correct**
6:15 8:12 10:8 12:2
17:16 20:2 25:16

27:2 31:17 33:5
37:11 39:17 40:1
43:18 46:14,18,22
48:3 50:19 51:15
52:18 53:2 56:11
58:11 59:2,11 60:11
62:10 64:21 67:12,15
**correspondence**
35:22
**couldn't**
24:18
**counsel**
5:4 32:2 35:11,13 36:1
36:5 37:6 70:9,13
**County**
1:8 7:2
**coupled**
61:3
**course**
44:19
**court**
1:1 5:20 69:2
**cover**
60:18
**covers**
11:9,10
**current**
10:12 20:12 21:1 24:7
27:22 37:1
**currently**
12:1 20:21 21:1
**Curriculum**
4:9
**cut**
21:21
**CV**
1:7 7:5,11

--- D ---

**D**
5:1
**Danger**
64:18
**dangerous**
53:19
**Darby**

3:4 5:10
**data**
26:2,2
**database**
25:3
**dated**
4:13
**day**
11:6 40:1 52:21 53:18
53:21 63:1
**days**
53:18
**deal**
65:22
**defendant**
20:6,7 22:17,19,20,20
22:22 25:13
**Defendants**
1:10 3:10
**defending**
24:16
**defense**
24:4,5
**degrees**
41:20
**denied**
26:19
**department**
37:3
**deposition**
1:13 2:1 4:8,12 5:12
7:7 15:11,13 20:13
21:11 23:7,11,19,20
24:8 27:5,7,19 28:6
28:14 29:5 30:9,15
31:5 32:6 43:9 51:13
51:16 55:5,9,13 56:2
57:2 59:22 60:3
66:15 67:20 68:10
69:13 70:3,5,8,11
**depositions**
4:10 23:4 24:1 27:12
29:1,20 32:20 34:15
47:16 49:12
**describe**
8:6 12:21

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

design
8:8 14:12,14
designed
62:13
details
25:10
determine
34:6 54:3 66:4,10
determined
17:21
diameters
39:11
didn't
11:19 15:3 27:1 29:6
30:15,16 33:3 52:3
56:6 67:8
different
48:14 50:19 54:12
dimension
44:15
direct
42:22 43:4 58:21 61:3
direction
70:7
disagree
45:12
disappeared
15:4
discipline
12:5
disclosure
4:16 66:19
discovery
27:20 49:12
discussed
20:1 63:17 65:18
discussing
67:2
Discussion
20:18
disfigurement
68:7,14
dismissed
34:22
dispute
67:22 68:4,5

distal
61:6
DISTRICT
1:1
Division
1:3
doctor
12:9 17:6,18 23:10
40:11 43:12 44:17
45:7 46:1 47:16
49:19 60:6 61:14
62:7 63:13 68:21
doctors
30:21 31:2,4,19 53:12
doctor's
52:7
document
66:21
documents
28:13,15,18 32:1
doesn't
58:7 62:3 64:14
doing
22:9,13 25:9 29:18
don't
17:15 18:6,9 21:6 25:3
31:20 36:2,4,12,14
37:2,11,13,18 39:8
40:22 41:9,11 42:19
45:10 47:1,6 51:22
53:12 54:14 62:12
63:22 64:2 65:13
67:5,22 68:4,5
Dr
5:6 6:14 7:2,10 12:1
17:11 24:9,16 25:12
25:15,20 26:1,19
27:10 28:7,9 30:2
31:5 32:9,22,22
35:11 37:8,13,16,17
37:17 38:14,15,18,18
38:20 44:18 45:16
46:6 51:4 54:18
55:18 56:17 58:18
59:9,22 62:8,8 63:19
65:8 66:18 67:14

68:6,10
drape
61:11 63:17
drapes
47:13 63:5
draw
59:19
dropped
7:14
Duces
4:12
due
59:1
duly
5:3 70:5

_____ E _____

E
3:1,1 4:1,6 5:1,1 11:14
earlier
47:17
easier
32:5
eight
10:20
eight-hour
11:6
EIT
11:5,14,19,19
either
29:2 36:11 54:6
elaborate
30:4
electrical
33:13,20 34:4 57:21
58:1,10
electrically
34:3,5
ELH
1:7
eliminate
30:12
else's
27:18
Emig
3:13 24:10

employed
70:10,13
employee
70:12
endoscope
61:6,10 63:16
endoscopic
61:2,8
engineer
6:20 10:11,16,20 11:3
11:15 33:13,21 34:4
engineering
6:18 10:17,22 16:4,10
16:17 18:1 19:5
Engineers
19:8
English
60:19
enter
23:2 32:5
entire
41:6 47:7
equipment
8:12,14 10:5,7,8 12:15
17:4 26:5,9,12,15,16
26:18 27:2 31:7,10
34:3,5,10 39:8 51:19
52:2,8,14,14,21 53:4
54:9,9 55:16 56:11
57:7,10,13,14,15,17
59:19 60:8 61:19
62:4,5,12,21 63:21
64:4,4 65:11,13,22
66:2,12
Eric
3:11 7:2 37:13 51:4
ESQUIRE
3:3,12
essence
48:13
essentially
13:2 50:18
Estate
23:20
et
1:9 27:20

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

etran
69:5
evaluate
12:15 27:1 44:2 53:11
exact
25:19,22 66:4
exactly
34:7 44:17
exam
10:19,20 11:4,16
examination
4:2 5:4 26:8
examine
25:19 27:1
exams
11:6
exchange
38:2,4
exhibit
4:9,10,12,13,14,15,16
7:7 23:6,7,12 27:7
32:6 43:8,9 47:20
60:2,3 66:15
exhibits
27:18
expect
63:1 65:8
experiencing
30:7 51:7
expert
4:16 7:1 15:2 36:6
37:15 52:17 66:18
expertise
9:22 10:1 44:1,4,22
52:11 68:17
expires
70:19
explanatory
59:7
explicit
63:4
extension
50:20,22
extent
44:3 61:20 63:7,11
68:13

E-mail
35:22 37:6

F

fact
26:12 31:14 47:2
67:22
factors
8:5,7,20 18:7,10 19:4
52:18
fair
10:6 14:1 23:13 32:11
34:11 45:3,5 49:2,3
68:12
familiar
64:8 65:13
far
25:4 39:5 60:15
fashion
8:11
Fat
38:6,8
February
69:7
fee
20:20
feel
17:15
Feldman
3:4 5:10
fell
13:3,5 14:8
fiberoptic
8:17 13:13 25:19 26:1
fibers
47:2,4 59:1,20
field
19:11
fifth
45:17
figure
14:20,20 25:7 36:18
file
45:13
filled
36:8

financially
70:14
find
8:22 9:2,5
finish
5:21
fires
9:12,14 27:19 57:16
firm
5:9 24:10,12,15,20
36:12
first
10:17 11:11,15,17,21
16:4 43:20 59:14
60:17
Fitness
23:22
five
10:21 11:1 15:19 22:2
22:11,14,16,16 48:2
48:9,11,12
flammable
61:12,13
floor
13:1,18,19,20,21,21
13:22 14:4 53:15,17
54:3
fluid
13:20
Flynn
3:13 24:10 25:8 36:13
focused
9:18 42:19 43:16
Fogleman
3:13 24:11
follow
9:6 64:10
following
67:15
follows
5:3
foregoing
70:3,4
form
49:10 51:11 55:3,22
56:22 59:17 62:18

found
15:3 30:10 36:5
foundation
62:19
Fountain
60:8
four
11:6,7 16:8 22:16
32:20,21
fourth
45:16
frankly
42:20
Frederick
3:5
friction
54:4
front
23:10 26:7 29:5
full
6:10
further
15:5 70:12

G

G
5:1
Gaithersburg
3:7
game
16:6 45:3,5
general
1:8 7:2 8:4,11 10:4
17:18 18:18 20:8
34:16 42:10
generally
13:19 52:20 55:10,11
generated
61:5,8
gestures
6:4
getting
22:7 40:12 50:21
give
8:4 18:11 26:18 31:17
49:15

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 6

given
8:2 70:9
giving
14:15 17:6 45:8 52:11
Gleason
3:13 24:10 25:8 36:13
go
9:4 15:5 20:20 28:14
31:9 37:3 47:19,21
48:7,16 49:16 54:17
55:8 57:22 59:6
68:19
Godwin
27:13
goes
25:4
going
15:2 23:2 25:6 26:10
31:11,21 34:2,6
37:20 39:21 44:3
48:4,16 50:10 57:4
66:13
good
5:6 6:8,9 14:14 18:19
19:16 69:3
grab
58:13
grabbing
65:16
Graduating
10:17
Gross
3:4 5:10
ground
5:16
grouped
44:11,14
guess
8:16 9:6 13:3 16:18
36:18 48:18 63:17
64:15 69:5
guy
29:18
G.E
13:4 14:8,11,17,18

**H**

H
4:6
Hall
36:11
hand
29:2
handed
32:9 43:12 60:6 66:18
handle
10:7 20:11 31:14
handled
31:15
handles
8:9
handling
56:3,4
happened
14:20
happy
16:7
hard
20:11
hardware
50:4
haven't
13:10 18:18 42:19
43:16
head
6:3
heat
16:17 17:3 57:19 61:5
61:7
heated
47:9
heating
16:16 27:21,22 34:7,7
66:5,6
held
2:2 13:3 14:7 20:18
help
37:5
helped
34:13
hereto
70:13

here's
48:15
he's
33:13,20 44:1,1,22
45:2,7,7,8 47:8 61:21
62:20 63:22 64:4
65:11,12
higher
11:22 61:6
highlight
28:22 29:2,4,13
highlighted
29:10,11
highlighting
29:8
Hobert
27:12
hold
9:8 32:3 56:14 59:14
64:12 65:16
Holly
2:5 6:13
hope
36:22
hoped
52:4 66:11
Hopkins
34:19 39:11 47:3
58:21 59:18
hospital
1:9 7:2 14:2,4 26:13
26:13,20 34:21 46:22
58:21
hot
16:18 39:22 40:12
41:2,3,7 50:8,10,17
50:21 51:1 56:8
hour
21:2,10 35:21
hours
10:20 11:6,7 21:21
Howard
1:8 7:2
human
8:5,7,7,20 10:7 18:7
18:10 19:3 52:17

hundreds
30:6 51:6,15 62:21,21
64:1,1
hypothetical
53:16 54:7
hypothetically
39:19

**I**

idea
40:20
identification
7:8 23:8 27:8 32:7
43:10 60:4 66:16
identified
7:1
identify
26:16
igniting
61:11
illuminated
61:9
illumination
61:1,2
immediately
54:20
implant
37:22 38:2,4
important
29:5,11
improper
46:17 66:3
improperly
46:21 56:7
inches
41:2,3
incident
58:22
include
21:10
incorrect
30:16 50:1,9
incorrectly
50:6
indirectly
16:19

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

| | | | |
|---|---|---|---|
| individuals | items | 27:22 | **L** |
| 52:21 | 23:15,16,18 | journal | |
| individual's | it's | 19:3 | label |
| 53:20 54:8 | 6:22 10:6 14:1 18:7 | journals | 65:5 |
| information | 19:4 22:7 36:11 44:4 | 19:2,10,22 | laboratory |
| 59:5 68:9 | 44:15 45:5 47:1,6 | jurisdiction | 52:4 |
| initially | 51:1 53:2,19,21 | 11:9 | landed |
| 34:5 | 54:12 55:13 58:1,9 | jurisdictions | 13:5 |
| inspect | 59:3,7 60:17,19 | 10:11,16 | lastly |
| 53:3,20 | 61:12 62:1,13 63:14 | | 6:6 |
| instance | 64:14,15 65:4 | **K** | lateral |
| 31:10 | I'd | | 38:11 |
| instruction | 5:22 7:5 9:8 20:20 | KAREN | law |
| 4:15 27:15 60:2,6,9,17 | 27:4 55:8 60:1 | 3:12 | 5:9 24:10 36:12 |
| 62:2 63:15,20 64:6,9 | I'll | Karlin | lawsuit |
| 65:2 | 5:8,21 9:6 18:12 24:7 | 3:12 9:14 18:16 19:13 | 25:13 |
| instrument | 37:16 45:12 49:15 | 26:10 34:18 35:17 | learn |
| 30:8 51:8 | 57:10 | 40:9 41:8 42:3 43:22 | 62:4 |
| instrument's | I'm | 44:13,21 45:5,10,19 | leave |
| 50:13 | 5:9 7:21 9:1 11:10 | 46:8 47:10 48:4 | 61:8 63:15 |
| intend | 21:21 22:9 23:2 25:6 | 51:22 52:10 53:5,22 | lectures |
| 29:22 31:16 | 26:10 28:1 29:14,15 | 54:10,13 61:20 62:14 | 8:2,5 |
| intended | 29:17,18,18 31:1 | 62:18 63:6,10 64:12 | left |
| 61:17,22 | 32:18 37:20 44:3 | 65:3,9 67:8 68:8,16 | 37:22 38:2,6 |
| intensity | 47:15 48:4,16 55:12 | 68:22 69:8,10 | Legg |
| 61:1,7 | 60:18 63:9 66:13 | Keep | 1:21 2:9 70:2 |
| interacts | 68:18 | 64:19 65:14 | length |
| 8:7 | I've | keeping | 40:20 47:7 |
| interested | 18:20,21 22:13 23:12 | 69:3 | letter |
| 70:14 | 42:14 43:16 47:16 | Kevin | 9:7 |
| internal | 58:8 59:6 | 3:3 5:7 | let's |
| 14:22 | | know | 13:17 15:15 32:4 |
| interrogatories | **J** | 5:7,15,15 6:3,7 15:22 | 53:16 |
| 27:20 | | 18:6 24:12,13 25:3 | level |
| introduce | Jersey | 30:21 32:3 33:16 | 34:7 66:5 |
| 5:9 | 7:18 | 34:18 36:5,10,12,17 | license |
| investigation | Jesse | 37:1,8,11,13,18,19 | 7:14,15 |
| 14:22 | 32:19 33:4,5,20 67:1,6 | 39:3 40:6 41:9 42:18 | licensed |
| involved | Joan | 44:17 47:1 50:5,16 | 12:2 |
| 8:3 11:4 26:5 27:16 | 36:11 | 50:21 51:4,22 56:17 | licenses |
| 30:17 31:1 34:4 54:1 | job | 60:15 62:4 64:5 | 12:5 |
| 54:2 66:5,20 67:2 | 1:19 69:3 | 65:13 | life |
| isn't | John | knowledge | 52:21 |
| 52:7 62:13 | 58:20 | 42:6,7,8 | light |
| issues | Johns | knows | 57:18,21,22 58:3,5,10 |
| 8:3 16:13 | 34:19 | 64:3 | 60:7,22 61:7,9 |
| | Joule | | lighted |

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

8:17 13:13 25:16,19
26:1 30:17 31:14,15
40:5,17 42:22 46:13
49:6 50:16 51:6
54:19 55:14,18 56:4
56:18 57:4,11 58:5
58:22 60:13 63:4
66:3 68:1
**lighting**
57:13,14,15
**Linda**
36:11
**liposuction**
38:10
**liquids**
64:20
**list**
9:21 18:7,10,11,13
24:6,8 25:6 37:4,16
49:21 55:17 56:15
**listed**
32:20
**listens**
9:2
**literally**
62:21
**literature**
19:8,18 27:17
**little**
16:15 36:19 41:17
44:10 59:4
**LLC**
3:11
**LLP**
3:4
**long**
13:7 35:20 66:7
**longer**
17:19 44:15,15
**look**
45:16,17 49:14 50:12
50:15 60:16
**looked**
20:12 42:13 50:11
61:16
**looking**

7:21 23:3 29:12,14,15
29:17,19 42:10 43:20
46:4,9 50:4,22 57:3
60:18
**looks**
44:9,11 49:20 58:17
59:7
**loose**
14:21
**Lozano**
23:20
**lying**
50:11
**L-O-Z-A-N-O**
23:21
**L.A**
23:22

## M

**M**
3:3
**machine**
13:2 14:7
**magazine**
19:6,7
**mail**
36:3
**malfunction**
55:19 62:22 63:1
**malfunctioned**
54:19
**malfunctions**
62:16
**manager**
25:2 36:8,10
**managers**
33:17
**manner**
31:14
**manual**
4:15 26:3,4 27:15 60:2
60:7,9,17 62:2 63:20
64:2,6
**manuals**
64:9
**manufacturer**

61:18,21,22
**mark**
23:5 43:7 60:1 66:14
**marked**
7:7 23:7,12 27:7 32:6
43:9 60:3 66:15
**markings**
44:6
**Mary**
1:5 5:11 7:1 28:11
37:11 38:21 41:19
43:13 49:5
**MaryJo**
1:21 2:9 70:2
**Maryland**
1:2,14 2:6,11 3:7,16
6:13 11:11 70:18
**material**
49:12 61:13
**materials**
9:3 26:7 27:10,20
**mean**
17:18 18:18 21:5 31:3
33:1
**Meaning**
56:6
**means**
52:1 65:14
**measures**
67:17
**mechanical**
6:18,20 16:4,10,17
19:5
**medical**
8:14 10:4 17:4,9,15,18
29:15 45:7,8 52:11
52:12 53:7 63:8,11
**medicine**
12:2
**meeting**
35:10,20
**member**
9:16
**memory**
55:12
**mention**

28:13
**mentioned**
10:12 15:10 33:4 67:1
**Merit**
2:10
**met**
5:8 35:11,13
**millimeters**
39:14,14,14
**mine**
17:18
**mini**
69:6
**minimum**
61:1
**model**
25:19,22 60:8
**month**
28:19,21 29:9 35:16
**monthly**
19:4,6,7
**Moore**
33:17 36:11
**morning**
5:6 11:6
**motion**
45:14
**multiple**
46:5 47:8
**M.D**
3:11 27:14

## N

**N**
3:1 4:1,1 5:1
**name**
5:7 6:11 24:12 25:10
36:13
**named**
25:12
**nature**
34:17 68:13
**Naval**
16:9 33:21
**Navy**
33:20

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 9

**near**
61:10 63:16 67:18
**necessarily**
63:10
**necessary**
61:1
**need**
45:13 64:6 69:5
**neither**
70:9
**never**
26:5 34:4,9,10 39:8
61:8 66:2,12
**new**
7:17 36:8
**nights**
16:6
**nine**
48:8,12,20 49:13
**nods**
6:3
**North**
3:5,14
**Northern**
1:3
**Notary**
2:10 70:1,18
**Note**
60:19
**notebook**
27:13 49:20
**noted**
65:21 68:2
**notice**
2:9 4:12 27:5 40:11
**noticed**
23:10 67:14
**number**
49:4,22 50:15 55:17
56:14 58:16 64:14
65:21 66:9

---
**O**

**O**
4:1 5:1
**object**
1:1

**44:3**
**objection**
9:14 18:16 19:13 40:9
41:8 42:3 43:22
44:13,21 45:19 46:8
47:10 51:22 52:10
53:5,6,22 54:10
61:20 62:14,18 63:6
65:3,9 68:8,16
**obtained**
36:13
**obvious**
50:1
**obviously**
34:16 57:7
**occasions**
30:7 46:6 51:6,15
**occur**
62:17
**occurred**
46:5 59:20 68:6
**offer**
36:6 39:21 54:6
**offering**
39:15 48:3 65:18
**officer**
70:2
**offices**
2:2
**oftentimes**
21:21
**Oh**
20:16
**okay**
5:15 6:10,22 7:19,21
8:19 9:6,21 10:6,10
11:14 13:12 15:6,10
16:20 20:4,17 21:10
22:1,11,14 24:6,22
25:6 26:22 27:4,4
28:3 31:2,21 32:15
33:4,18 35:1,10
36:18 37:4,19 39:2
40:20 41:14 42:18,21
43:7,17,20 45:9 46:1
46:4,20 47:5,17

**48:11,15 49:4,13**
50:14 51:3 54:17
56:13 57:6 58:4,13
58:15 60:16 65:7
66:13 67:7,14
**oldest**
11:11
**once**
11:10,12 15:3 17:11
35:14 36:18 54:18
55:13
**open**
50:1
**operated**
54:21
**operating**
9:11,11,19 10:2 12:9
12:14 13:11 16:20
30:18 31:7 47:15
55:14,16 57:3
**opinion**
13:15 14:1,9,15 15:9
17:6,11,15,16,18
19:19 26:6 31:17
41:6,11 45:2 47:6
48:20 49:8,11 50:3
51:9,12,18 52:11
53:7 54:2,6,17 55:1,4
55:17,20 56:1,13,16
56:20 57:1 58:9,15
59:13,14,17 61:15
62:7 63:8,12,19
66:22
**opinions**
20:2 29:22 35:4,4,8
45:8 47:21 48:8,17
48:18 49:1,21 65:17
67:12
**optimum**
61:2
**order**
63:7
**orders**
63:4
**originally**
15:7

**outcome**
70:14
**outline**
29:2
**outside**
44:4,22 52:10 68:16
**overheat**
34:8 56:5,18 57:5,8
58:2
**overheated**
39:1,5 40:7,13 41:16
41:18 42:1 47:5 49:6
57:15 68:1
**overheating**
17:13,20,22 30:7,11
30:12 39:17,21 40:18
40:21 46:17 51:7
54:20 58:6,11,22
59:20
**owner's**
26:3,4

---
**P**

**P**
3:1,1 5:1
**packet**
65:22
**page**
4:2,8 29:5 32:13 33:7
43:20 45:17 48:1
60:16,17 64:11,15
**pages**
1:20 29:6
**pair**
30:16 31:7
**pairing**
49:22
**parse**
35:3
**part**
16:16 18:5 25:18
39:16,20 43:17 48:20
60:10 61:14
**particular**
64:2
**particularly**

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

14:14
parties
37:8 70:10,13
parts
39:10,22 40:7
pass
11:1,13,17
passed
11:21
patient
12:13 13:5 61:10,11
  63:5,16 65:16
patients
64:20 65:15
Paul
27:14 37:17
Pause
49:17
pay
21:6
Peat
23:21
people
31:18
perceives
8:8
percent
20:7,7 47:3 59:1,20
perfect
53:17
perform
37:21
performed
45:7
performing
31:10 51:5
person
5:19 8:8 14:3
personally
25:13
pertinent
8:3 16:13
photographs
4:14 42:11,13,14
  43:12,14
photos

46:9
phrasing
48:21
physical
29:16
physician
6:14 44:1
physicians
63:12
Ph.D
1:13 2:1 4:2 5:2 6:17
  16:17
picked
6:4
picking
46:6 47:8
piece
8:12 19:21 51:18 54:9
  55:16 56:11 57:6,9
  57:13,17 60:7 62:12
  62:21 65:11
pieces
10:8 52:21 61:19
place
41:22
placed
68:1
plaintiff
1:6 3:2 5:4 14:16 20:5
  20:7,10,13,15 22:18
  22:19 24:3 28:11
plan
48:2 65:18
PLASTIC
3:10
please
6:10 30:4 61:5
point
10:19 20:1 26:14 55:6
  67:13
portal
21:17,17
portion
40:5,6,17 41:1 46:13
  47:5,9 67:4,5
position

33:10
possible
25:7,9 57:7
PowerPoint
8:20
PowerPoints
9:1,2
practice
12:2 18:5 25:16 31:20
precautions
41:22
predict
57:4
preparation
28:14
preparing
66:20
present
4:11 23:12
presentation
8:21
presentations
7:22 8:2,19
press
56:6
pretest
52:14
pretty
16:7 50:14
prevented
42:1
price
21:14,15
prior
31:10 35:10 43:14
  50:11
probably
8:22 15:3,14 24:14
  27:18 29:8 48:13
  57:14
problem
6:7 14:11 17:12 30:8
  50:13 51:7 55:15
procedure
30:22 31:6 38:22
  44:19 45:6 47:14

53:11 67:19
procedures
29:16
produce
8:21 57:21
produced
31:22 32:15 35:22
  36:20 58:10
produces
57:19
producing
33:22 34:12 38:13
  57:22
product
8:9,9,10,12
professional
6:19 9:17 10:11,16,22
  11:2 12:7,15 19:2,22
professor
11:20 16:1,8
program
10:18
proper
13:22 17:21 30:11
properly
31:13 51:20 52:8
  54:22 55:16
provide
26:14,17 34:21 37:6
provided
27:5
providing
45:2 51:18
Public
2:10 70:1,18
publications
7:22 8:1
purpose
6:7 14:19 65:1
Pursuant
2:9
put
30:15 50:6
putting
46:6 47:8 63:4
P.E

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

1:13 2:1 4:2 5:2 7:14
   11:5,21 33:21
**p.m**
69:13

**Q**

**question**
26:22 43:13 53:6
   54:12
**questioning**
45:4
**questions**
45:13 68:22
**quick**
36:19 49:15 56:15
**quickly**
5:16
**quite**
42:20
**quiz**
55:12

**R**

**R**
3:1 5:1
**Ram**
23:21
**rate**
21:20
**reach**
64:19 65:14
**read**
47:16 60:21 61:22
   62:2,3 64:8 67:20
   68:10
**reading**
21:22 32:18 69:12
**ready**
24:22 30:19
**real**
49:15 56:15
**realized**
17:12 54:18 55:14
**really**
30:21 42:19 65:13
**reason**

20:14 34:8
**recall**
13:2 67:5
**received**
43:18
**recognize**
7:10 33:8
**recognized**
19:15
**record**
5:21 6:4,11 20:17,18
   26:11 43:17 48:5
   49:16,19 70:8
**records**
21:11 32:16
**recovery**
29:16
**red**
51:1
**reduced**
70:7
**refer**
18:5
**reference**
39:13
**referencing**
29:6
**referring**
23:10
**refresh**
5:17
**regard**
9:14 29:20 53:1
**registered**
2:10 10:10,15 11:2,11
   11:12
**regular**
36:3
**regularly**
18:5 25:15 37:21
**related**
9:11 10:5 70:10
**relates**
17:3
**relative**
70:12

**Relevance**
53:22
**relevant**
51:21
**rely**
49:10 51:11 55:3,22
   56:22 59:16,17 65:8
**relying**
19:18 30:1 59:18
**render**
29:22
**rendering**
54:1
**renew**
7:17
**repeating**
48:22
**replaced**
17:20 30:11 39:12
   40:13 54:21 55:15
**report**
4:13 15:5 31:21,22
   32:4,10,15,17,19,19
   33:3 34:1,12,13,14
   34:15,16,19,20 38:14
   39:12 46:20 47:3,19
   48:6,9,12 51:3 54:18
   58:21 59:3,5,8 68:3
**Reported**
1:21
**reportedly**
49:5
**reporter**
2:10 5:20 69:2,8
**repositioning**
37:22
**representing**
5:10
**request**
26:20
**requested**
26:12,18
**require**
6:6
**required**
10:15

**reread**
55:8
**research**
9:10 24:21
**researched**
18:19
**responses**
6:2
**responsibility**
52:7 53:3,20 54:8
   63:20
**responsible**
56:10 58:19 59:9,21
   62:9,13
**responsibly**
17:19 30:10
**result**
61:13
**retain**
69:2
**retained**
20:5,6,9,15
**retaining**
14:19
**Retention**
20:11
**retractor**
8:17 13:13 17:12,20
   25:16,20 26:1 27:16
   27:16 29:21 30:6,17
   31:14,15 39:1 40:5
   40:11,12,13 42:1,22
   44:18 46:13 49:6
   51:6 54:19,21,21
   55:15,19 56:4 57:4
   57:11 58:22 60:13
   63:5 66:3 68:1
**retractor's**
50:16 56:18
**return**
6:1
**review**
5:16 19:1,7,9 20:21
   21:11 25:18 27:1,10
   27:21 28:6,20 29:1
   34:14 36:20 51:21

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

53:15 60:10 63:20
64:3
**reviewed**
24:9,19 25:8 27:12,15
27:17,19 28:18 31:4
32:1,16 43:14 57:9
58:8 59:4 60:10
61:14,18
**reviewing**
49:20
**re-review**
28:15
**Richard**
1:13 2:1 4:2,8 5:2,6
6:12,14 7:7,10 12:1
23:4,7 24:9 25:12,15
26:19 27:7,10 32:6,9
37:8 38:20 43:9
45:16 60:3 66:15,18
**right**
11:15 17:13 21:8 26:4
38:4,8 44:9 49:15
50:2 59:3,12 67:9
**Ringel**
3:3 4:3 5:5,7 7:9 9:15
18:22 19:17 20:17,19
23:5,9 26:21 27:9
32:8 35:2 40:15
41:10 42:4 43:7,11
44:8,16 45:2,9,12,15
45:22 46:11 47:12
48:10 49:16,18 52:6
52:16 53:9 54:5,12
54:16 60:1,5 62:6,15
63:2,9,18 64:13 65:6
65:10 66:13,17 67:9
67:10 68:11,19 69:1
**risk**
61:11 63:17
**RMR**
1:21
**Robert**
28:7 37:16
**Rockville**
3:16
**role**

33:10,18,22 34:12
67:11
**room**
9:11,11,19 10:2 12:10
12:14 13:11 16:21
30:18 31:7 47:15
50:21 55:14 57:3
**Ruff**
27:14,14 32:22 37:17
38:15,18
**rules**
5:16
**rush**
69:6
**Russell**
28:9 37:17
**Ryan**
23:19
**R-U-F-F**
27:14

─────── S ───────
**S**
3:1,12 4:1,6 5:1
**SAE**
19:8
**safe**
53:21
**safety**
9:11,19 10:2,4 16:21
19:6 41:22 53:17
54:8 65:2,4
**saw**
48:5
**saying**
53:19
**says**
49:22 51:3 54:18
56:16 59:8 60:21
63:14 64:15,18,19
65:14 66:9
**scalpels**
31:11
**scan**
25:3
**scene**

61:2
**schedule**
20:20
**school**
10:18
**score**
11:22
**search**
36:19
**second**
10:21 14:6 15:21 26:8
60:18
**see**
7:21 9:16,21 10:10
26:5 27:14 29:9,19
31:11 33:12 35:1
44:6 56:4,15,15
68:19 69:2
**seen**
42:14 43:16
**send**
37:6
**Senior**
6:20
**sense**
8:4 15:15 17:9,10
18:18 20:8 41:4
42:10
**sentences**
61:4
**separate**
43:21 45:18,20
**September**
32:10 34:20 70:20
**setting**
61:7
**settle**
22:10
**shakes**
6:3
**sharp**
31:12
**sheet**
36:9
**show**
7:5 27:4

**Sigal**
28:7 32:22 37:16
38:14,18
**signature**
32:13 33:7,11 69:12
**signed**
33:12,15
**similar**
27:17
**simply**
30:18
**sitting**
21:22
**situation**
53:13
**six**
15:19
**size**
27:21
**skim**
29:9
**skimmed**
28:22
**skin**
42:5,22 43:5
**slides**
8:21
**slip**
13:1,18 53:15
**slippery**
13:19,21 54:3,4
**small**
22:7
**Sobin**
3:4 5:10
**societies**
9:17,18
**Society**
19:4,5,5,6,7
**somebody**
27:18 33:12 62:3,3
**sorry**
28:1
**sort**
5:15 9:3 12:4 14:12,22
15:6 19:22 25:3,7,10

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

27:22 29:12
**Sound**
6:8
**source**
58:5 60:22 61:7
**speak**
5:22
**speaking**
5:19 50:7 52:20 55:10
**specific**
8:14,16 12:12 13:12
17:3 19:18,21 30:1
39:2,7,16 41:17
51:14 55:6 57:11
**specifically**
9:10 16:13 24:13,18
42:12 45:6 51:14
57:10
**speculating**
61:21
**spurred**
28:20
**standard**
17:7,16 63:8,11
**standpoint**
18:2
**stars**
29:6
**start**
13:17
**started**
5:8
**starting**
49:4
**state**
2:11 6:10 11:12 48:5
70:18
**stated**
46:20 53:14 56:16
58:16
**statement**
26:11 55:10
**statements**
55:6
**states**
1:1 11:13

**stenotypy**
70:6
**stop**
33:14
**stopped**
17:13
**store**
64:20
**Storz**
60:7
**Street**
3:14
**strictly**
18:1
**strike**
47:18
**study**
59:18
**stuff**
12:16 29:17 31:12
**subscribe**
19:1
**substandard**
14:12
**sudden**
53:18 56:7
**suffered**
58:19 59:10 62:9
**Suite**
3:6,15
**summarize**
48:1 66:1
**support**
55:11
**supporting**
31:5
**supports**
20:2
**suppose**
25:2 42:10
**sure**
5:18,21 6:2,5 49:9
52:8 53:21 62:1
**surgeon**
51:5
**surgeons**

52:13
**surgery**
3:11 31:10,20 40:1,14
49:6,7 50:12 51:5
52:15 53:12 54:20
56:19 58:20 59:10
62:10 67:15 68:6
**surgical**
17:1 27:19 61:10
63:16 68:5
**suspension**
12:4
**switched**
17:14
**sworn**
5:3 70:5
**symbol**
65:4
**symbols**
64:16
**system**
30:16 36:19
**S-T-O-R-Z**
60:7

---

**T**

**T**
4:1,1,6
**tab**
48:9,12 51:4
**take**
10:21 11:9,19 49:14
53:16
**taken**
5:12 12:5 15:11,13
70:3,6,11
**takes**
66:7
**talk**
26:7 47:3 52:13
**taught**
16:12,12,19,20
**teaches**
33:21
**teaching**
16:1,3,16 18:20

**technical**
29:14,17,18,21
**Technologies**
2:4 6:12,21 24:19
36:13
**Tecum**
4:12
**tell**
36:7 42:11 45:21 46:9
48:19 50:8 52:2
**temperature**
66:10
**temperatures**
66:8
**Ten**
13:8
**tend**
28:22 64:8
**term**
18:16 19:13
**terms**
21:19 39:10 41:2
53:12
**test**
10:22,22 11:8,17,21
31:9,11 34:3,5
**tested**
39:12
**testified**
5:3 22:1,15 30:22
47:17
**testify**
15:7 21:18 22:7
**testifying**
58:4
**testimony**
21:11,13 30:2,4,13
36:6 39:15,22 40:16
51:14 70:4,5,8
**testing**
54:2
**tests**
11:1
**text**
28:1
**textbooks**

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

Page 14

18:4,14 19:22 28:2,3

**texts**
18:4 27:21

**Thank**
68:21

**that's**
10:18,20 11:11 29:17
31:12,16 33:5,7,11
34:3,6 46:10 49:3
50:14,18,20,21 52:12
56:9,12 59:6,8 64:7
68:21

**therapy**
29:16

**there's**
19:21 23:15,16 29:19
40:4 44:9 48:2,17,19
53:18 56:13 57:2,21
58:18 59:8

**they're**
11:5 18:19 19:15
24:15 27:13 31:11
45:20,21

**thing**
17:13 30:14 52:13
65:16 66:14

**things**
27:22 29:1,5,12,14,15
29:17 37:5

**think**
7:14 11:21 15:4 19:4
23:2,2 26:11 30:14
31:4,18 32:21 37:19
44:22 45:3,10 47:20
47:22 48:20 54:14
58:15 61:12 63:22
64:2 66:22

**third**
54:13

**thought**
34:2,6 48:14

**three**
12:20 15:18 23:15,16
23:18 24:5 32:21
39:19 41:2 43:21
44:6 64:10 66:22,22

**time**
5:19 6:7 11:20,22 20:9
20:15 21:19,20 26:14
32:17,19 33:3 34:7
34:19 51:20 52:3,9
53:4 54:13 58:14
66:5,7,11 67:13,18

**times**
5:19 12:18 15:12,19
20:4,5 22:1,12 24:19
35:13 44:17 47:8
51:19 62:22 64:1,4

**tip**
58:5 61:6,8

**title**
6:19

**today**
5:8 28:15 32:21 35:18
43:15 68:7,14

**today's**
5:11 35:10

**told**
15:4 32:21 44:22 45:7

**top**
64:15

**total**
37:1

**towels**
47:13

**track**
13:4 14:13,21

**training**
10:20 11:15

**transcript**
4:7 7:8 23:8 27:8 28:6
32:7 43:10 60:4
66:16

**transfer**
16:17 17:3 38:6,8

**transient**
66:5,7,11

**travel**
21:19,20

**treat**
67:18

**trial**

21:13,18 22:2 23:21
24:1,8 40:16 65:19
69:6

**trials**
4:10 22:9,15 23:3,11

**true**
6:22 8:18 10:9 12:3
20:3 25:17 27:3
39:18 40:2 41:13
46:10,15 47:11 50:9
50:20 51:2 54:15
56:9,12 62:11 64:22
70:8

**try**
67:18

**twice**
54:11

**two**
12:20 15:17 16:6 22:8
22:10 24:1 29:1
32:21 35:7 41:3 61:4
64:10

**type**
54:2 57:6

**types**
57:9

**typewriting**
70:7

**typical**
15:17 22:5

**typically**
18:8,10 62:2 64:7

**U**

**understanding**
38:20 39:6,9 40:3
41:15,18,21 42:15,21
46:1,12 65:1

**unit**
64:20

**UNITED**
1:1

**University**
16:5

**upper**
44:7

**up-to-date**
7:13,17,20 10:13
23:13 24:7 64:2

**use**
9:2 18:8,11 25:15 31:6
52:21 53:4 59:16
62:4,5,12 63:6 64:3,5

**users**
61:18

**uses**
8:9 31:6

**V**

**various**
66:8

**verbal**
6:3,5

**versus**
7:2 20:5 23:21,22 24:3

**Vesnovsky**
27:13

**video**
61:3

**vision**
61:3

**visually**
50:7

**Vitae**
4:9

**vs**
1:7

**W**

**waived**
11:19 69:12

**walking**
57:3

**want**
18:11 47:21 48:15,22
69:8

**wants**
62:4

**warning**
63:15

**Washington**
3:14

CLYDE C. RICHARD, PH.D., P.E., 4/9/2014

**wasn't**
30:17 40:10 47:15
  51:20
**way**
14:12 35:3 36:17
  41:11 49:14 55:18
  56:14,17 57:2 58:18
  59:9 62:8
**Wednesday**
1:15
**weeks**
22:8
**went**
20:12 30:18
**we'll**
26:7 36:18 48:18
**we're**
5:10 23:3 31:21 48:21
**we've**
19:22
**whatsoever**
12:7
**what's**
22:5 63:9
**When's**
20:9
**who's**
35:17
**Williams**
28:9 37:17
**wire**
16:18 27:21
**witness**
4:16 66:19 69:11 70:4
  70:6,9
**witnesses**
30:20 37:15
**won**
16:5
**won't**
39:15 58:4
**word**
63:7
**wording**
48:14
**words**

50:19
**work**
10:21 18:21 21:2
  22:13 52:3,22
**working**
51:19,20 52:8
**worried**
65:15
**wouldn't**
31:9 50:5,5,7,8,12,21
  53:2 54:1 57:16 64:5
  65:12
**write**
15:5 29:4 34:13 67:4
**writing**
67:5
**written**
9:3 31:22 33:3
**wrote**
32:19 34:13,15,20
  59:5

---

**X**

**X**
1:4,11 4:6
**XENON**
60:8

---

**Y**

**yeah**
13:10 14:3 19:15 21:5
  52:12 53:11 62:1
  66:2
**year**
8:5 15:17,19 22:5,6,9
  22:10
**years**
10:21 11:1 13:8 15:16
  15:18 16:8,9 18:20
  18:21 20:8 22:2,9,11
  22:13,14
**you'd**
45:17
**you're**
9:16 11:12 21:8 24:15
  25:9 26:6,11 51:18

63:7,11 64:7
**you've**
8:2 12:18 15:10,12
  25:8 69:3

---

**S**

**$360**
21:10
**$365**
21:2

---

**0**

**00184**
1:7

---

**1**

**1**
1:20 4:9 7:7 49:4,22
**1-246811**
1:19
**1:13**
1:7
**100**
22:3,4,12 51:19 53:17
**101st**
51:20 52:3 53:18
**11**
3:14
**11/2010**
22:20
**11:20**
1:16
**12**
22:8
**12:31**
69:13
**15**
16:9 20:7
**150**
41:20

---

**2**

**2**
4:10 23:6,7,12 60:16
**2-1/2**
39:14
**200**

15:14
**2009**
4:11 23:11
**2013**
32:10 34:20 36:9
**20133120**
60:8
**2014**
1:15
**2017**
70:20
**20850**
3:16
**20877**
3:7
**21401**
2:6 6:13
**22nd**
36:9
**224-4235**
2:7
**23**
4:11
**24th**
32:10 34:20
**2444**
2:5 6:12
**25**
22:9
**27**
4:12
**294-2110**
3:17

---

**3**

**3**
4:12 27:7
**3/28/2014**
22:21
**30**
22:13 47:3 59:1,20
  70:20
**300**
3:6 60:8
**301**
3:8,17

| | |
|---|---|
| **32** <br> 4:13 <hr> **4** <br> **4** <br> 4:13 32:6 39:14 47:20 <br>   50:15 55:17 64:11 <br> **4.8-millimeter** <br> 59:1,21 <br> **400** <br> 3:15 <br> **410** <br> 2:7 <br> **43** <br> 4:14 <br> **481** <br> 3:5 <hr> **5** <br> **5** <br> 4:3,14 43:8,9 56:14 <br>   58:16 <hr> **6** <br> **6** <br> 4:15 60:3 <br> **6/18/12** <br> 20:13 <br> **6/29/2012** <br> 22:20 <br> **60** <br> 4:15 <br> **66** <br> 4:16 <br> **670-7030** <br> 3:8 <hr> **7** <br> **7** <br> 4:9,16 65:21 66:15 <br> **7/2010** <br> 22:19 <br> **70** <br> 1:20 <hr> **8** <br> **8** | 65:21 66:9 <br> **8/16/13** <br> 23:16 <br> **82** <br> 11:21 <br> **85** <br> 20:7 <hr> **9** <br> **9** <br> 1:15 <br> **9/24/13** <br> 4:13 <br> **90** <br> 11:22 |